UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
DIANNE DULONG,                  )
                                )
        Plaintiff,              )
                                )
        v.                      )          C.A. No. 04-12552-NG
                                )
JOHN E. POTTER, POSTMASTER      )
GENERAL, JOSEPH M. FERREIRA,    )
Individually, AARON TOBEY,      )
JR., Individually and as the    )
President of the APWU, Local    )
6005, and the AMERICAN POSTAL   )
WORKERS UNION AFL-CIO, CAPE     )
COD AREA LOCAL 6005,            )
                                )
        Defendants.             )
_____)
```

**THE DEFENDANTS' MEMORANDUM IN SUPPORT
OF THEIR MOTION FOR SUMMARY JUDGMENT**

Joseph M. Ferreira, Aaron Tobey, Jr., and the American Postal Workers Union AFL-CIO, Cape Cod Area Local 6005 (collectively the "defendants"), by their Attorney, Michael J. Sullivan, United States Attorney for the District of Massachusetts, hereby submit this Memorandum of Law in support of his Motion for Summary Judgment.  For the reasons set forth below, the undisputed material facts show that the defendants are entitled to judgment in their favor as a matter of law.

**I.    INTRODUCTION**

The plaintiff's allegations of discrimination based on age, sex and retaliation for EEOC filing in Count I and Retaliation for filing an EEOC complaint in Count III should be dismissed for

failure to establish a *prima facie* case.

Counts II, VI, and VII should be dismissed for failure to state a claim under 42 U.S.C. §§ 1981 or 1983.

Counts IV and V should be dismissed as the claims arise from express contracts with agencies of the United States and subject matter jurisdiction properly lies with the Court of Federal Claims under the Tucker Act.

Counts VIII and IX should be dismissed because the FTCA does not waive sovereign immunity for intentional interference with contract claims.

Counts X and XI, intentional infliction of emotional distress, should be dismissed as these are tort based claims and the plaintiff has failed to exhaust administrative remedies.

**II.  LOCAL RULE 56.1 STATEMENT OF FACTS**

The defendants herein incorporate their Local Rule 56.1 Statement of Materials Facts of Record as if stated herein.

**III. STANDARD ON MOTION FOR SUMMARY JUDGMENT**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  To prevail on summary judgment, the moving party need only demonstrate "that there is an absence of evidence to support

2

the non-moving party's case." <u>Celotex Corp. V. Catrett</u>, 477 U.S. 317, 325 (1986); <u>Clifford v. Barnhart</u>, 449 F.3d 276, 280 (1st Cir. 2006).  Once the moving party satisfies this requirement, the burden shifts to the non-moving party to establish the existence of at least one factual issue that is both genuine and material.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Melanson v. Browning-Ferris Industries, Inc.</u>, 281 F.3d 272, 276 (1st Cir. 2002).  To successfully oppose summary judgment, the non-moving party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 256; <u>Atlantic Ave. Corp. v. Allied Waste Industries, Inc.</u>, 482 F. Supp. 2d 60, 73 (D. Mass. 2007).

Summary judgment is appropriate even where motive or intent are at issue, "if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." <u>Vives v. Fajardo</u>, 472 F.3d 19, 21 (1st Cir. 2007), <u>quoting</u> <u>Medina-Munoz v. R.J. Reynolds Tobacco Co.</u>, 896 F.2d 5, 8 (1st Cir. 1990).  Because the plaintiff's claims do in fact rest <u>solely</u> upon "conclusory allegations, improbable inferences, and unsupported speculation," the defendant is entitled to summary judgment.

## IV.  <u>ARGUMENT – BURDEN SHIFTING UNDER TITLE VII</u>

Title VII claims are analyzed under the test set forth in

McDonnell Douglas Corp. V. Green, 411 U.S. 792 (1973), and two subsequent Supreme Court cases, Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981); and St. Mary's Honor Center v. Hicks, 113 S.Ct. 2742 (1993).  Where, as here, there is no direct evidence of discrimination, McDonnell Douglas's well-known burden-shifting analysis applies.  See, e.g., Mesnick, 950 F.2d at 823.

The employee bears the initial burden of raising an inference of discrimination by making a prima facie showing of four standardized elements suggestive of possible discrimination. McDonnell Douglas, 411 U.S. at 802-805.

To establish a prima facie case of age discrimination, the plaintiff "must adduce evidence that: (1)[she] was at least forty years of age; (2)[her] job performance met the employer's legitimate expectations; (3) the employer subjected [her] to an adverse employment action (e.g., an actual or constructive discharge); and (4) the employer had a continuing need for the services provided by the position from which the claimant was discharged." Gonzalez v. El Dia, Inc., 304 F.3d 63, 68 (1st Cir. 2002).

If the plaintiff employee can make such a prima facie showing, it is presumed that the employer engaged in impermissible discrimination and the burden of production shifts to the defendant.  St. Mary's Honor Center, supra, 113 S.Ct. at

2747; <u>Udo v. Tomes</u>, 54 F.3d 9, 12 (1st Cir. 1995); <u>LeBlanc</u>, 6 F.3d at 842.

However, if the employer articulates a legitimate, non-discriminatory reason for its decision, the presumption of discrimination vanishes, and the burden of production shifts back to the plaintiff.  The defendant employer must then articulate a legitimate non-discriminatory reason for the challenged conduct. <u>Texas Dept. of Community Affairs v. Burdine</u>, <u>supra</u>, 450 U.S. at 255-256; <u>Woods  v. Friction Materials, Inc.</u>, 30 F.3d 255, 260 (1st Cir. 1994).  At this stage, the employer's burden is merely one of production; in discrimination cases, the burden of persuasion remains with the plaintiff at all times.  <u>St. Mary's Honor Center</u>, 113 S.Ct. at 2742;  <u>Woods</u>, 30 F.3d at 260.

If the employer articulates a legitimate non-discriminatory reason for the non-promotion, the presumption established by the <u>prima facie</u> showing "drops out of the picture."  <u>St. Mary's Honor Center</u>, 113 S.Ct at 2749; <u>Udo</u>, 54 F.3d at 12.  At that stage, to avoid summary judgment, the plaintiff must

> introduce sufficient evidence to support two
> findings: (1) that the employer's articulated
> reason for [not promoting] the plaintiff is a
> pretext, and (2) that the true reason is
> discriminatory. ... While the plaintiff may
> rely on the same evidence to prove both
> pretext and discrimination, the evidence
> must be sufficient for a reasonable fact finder

to infer that the employer's decision
was motivated by discriminatory animus.

Udo, 54 F. 3d at 13 (citation omitted); Woods, 30 F.3d at 260.

**V.    The Plaintiff Cannot Establish a Prima Facie Case of Age
        Discrimination**

      **1.    The Plaintiff Cannot Show that The Defendants Had
        a Continuing Need for the Services Provided by Her
        Position.**

The plaintiff asserts that her supervisor, Joseph Ferreira

("Ferreira"), discriminated against her on the basis of age

because he "purposefully dried up her position [as clerk

stenographer] so that it could be reposted." (Exh. 1, Dulong

Depo. pg. 75, ln. 1-3). Further, "a younger person secured the

job," Lorraine Sawyer ("Sawyer"). Id. at 3-6. However, the

plaintiff admits that she does not know the age of Sawyer. Id.

at 8. Hence, there is no concrete evidence that the plaintiff

was even discriminated against on the basis of her age, even if

her allegation was true.[1]

Regardless, the evidence abundantly shows that there was no

longer a need for the clerk stenographer position that the

plaintiff held, as required to prove a prima facie case. The

reason for abolishing the plaintiff's job and reposting it under

the mail processing position was a lack of work in the clerk

---

[1]Lorraine Sawyer testified at her deposition that she was born on
October 12, 1957. In May 2003, the date of the plaintiff's EEO complaint,
Sawyer would have been 45 years old.

stenographer position and a lack of help in the mail processing operations department. (Exh. 2, Ferreira Affidavit dated October 28, 2003).  The clerk stenographer job description was too restrictive and did not allow that person to run mail processing equipment, which was needed due to the influx of mail.  (Exh. 3, Ferreira Depo. pg. 51, ln. 6-8).  The mail processing position description included typing, administrative work, as well as running automative equipment.  (Exh. 4, Mail Processing Clerk PS-05 position description).

Moreover, the job duties of a clerk steno were outdated in 2003 due to the prevailing use of the computer and electronic mail as a preferred method of communication.  (Exh. 3, Ferriera depo. at pg. 51, ln. 10-11).  Most documents were sent in electronic form as opposed to paper mail which made Ferreira's job, in responding via electronic mail, more efficient than dictating responses and memos to the plaintiff.  Id. at pg. 59, ln 20-24.  In 2003, at most the plaintiff would write three memos a month for Ferreira whereas in 1993 she was doing up to ten a day.  Id. at pg. 51, ln. 12-16.

The decision to abolish the clerk steno job was not simply Ferreira's but also part of the Union's Joint Job Committee Proposal ("Committee").  The recommendation of the Committee was to "abolish the stenographer's position" because "additional staffing is needed in automation." (Exh. 5, Joint Job Committee

7

Proposal).  The main objective of the Committee was to make the facility as efficient as possible because it had been slated to close.  (Exh. 3, Ferreira Depo., pg. 64, ln. 14-23).    Further, while the plaintiff claims that Ferreira purposefully removed typing from the mail processing position, job descriptions are created nationally and subject to the discretion of regional managers.  (Exh. 3, Ferriera Depo. pg. 87, ln. 17).  While it was at Ferreira's discretion to determine which jobs would remain, his decisions were based on operational and efficiency requirements, especially in light of the possible plant closure. Id. at pg. 67, ln. 22-23.

As there is more than sufficient evidence indicating the plaintiff's position was abolished for operational and efficiency reasons, not due to her age, the plaintiff cannot satisfy the elements of an age discrimination claim.

**2.    There is No Evidence that the Plaintiff was Treated Differently from Similarly Situated Employees.**

It is boilerplate, in disparate treatment cases, that the absence of any showing that the plaintiff was treated differently from similarly situated employees requires a finding for the defendants.  Thomas v. Digital Equip. Corp., 702 F. Supp 22, 25 (D. Mass 1988), aff'd, 880 F.2d 1486 (1st Cir. 1989); Heard v. Com. of Massachusetts, 2003 WL 21960726 (D. Mass. 2003).

As part of the re-organization of the Cape Cod Processing

and Distribution Facility ("Facility") in 2003, thirteen other
employee's positions were abolished and reposted, in addition to
the plaintiff's clerk stenographer job.  (Exh. 2).  These
individuals' jobs were changed dramatically, some were given
different tours and some were now scheduled to work on their days
off.  (Exh. 3, Ferreira Depo. pg. 78, ln. 3-5).  There were also
others who were given split days off and still others with
childcare issues who were now being scheduled to come in at 11
p.m.  Id. at pg. 80, ln. 5-6.  Memorandums were sent to all
affected employees apologizing for the inconvenience but
explaining the operational needs for doing so.  Id. at pg. 80,
ln. 15-17.  These individuals were not treated any differently
and given their prior positions back but, like the plaintiff,
they had to bid for new positions with new schedules.  Id. at pg.
78, ln 3-10.[2]  Of these fourteen individuals, six were female,
one was older than the plaintiff (who was 58 at the time), four
were within 5 years of the plaintiff's age, and an additional six
individuals were within 10 years of the plaintiff's age.  (Exh.
7, Comparative Analysis from EEO Investigative Report).
Accordingly, the plaintiff cannot show that she was treated any
differently than those similarly situated employees who suffered
the same inconveniences.

---

[2] As noted in ¶ 13 of the Defendants' 56.1 Statement of Undisputed
Facts, the plaintiff won the bid for the reposting of her position.

The defendants submit that the plaintiff has failed to produce any evidence to establish a claim of age discrimination. The plaintiff relies on "conclusory allegations, improbable inferences, and unsupported speculation", and thus judgment should enter for the defendants.  <u>Leblanc</u>, 6 F.3d at 842, <u>quoting</u> <u>Medina-Munoz v. R.J. Reynolds Tobacco Co.</u>, 896 F.2d 5, 8 (1st Cir. 1990).

**VI.** **<u>Even if the Plaintiff Could Establish a Prima Facie Case of Age Discrimination, the Defendants Have Articulated a Legitimate Non-Discriminatory Reason for Their Actions and the Plaintiff Cannot Show that it is Merely a Pretext.</u>**

The plaintiff also fails at the third stage of the <u>McDonnell Douglas</u> framework, which requires her to show that the legitimate non-discriminatory reason asserted by the defendants are merely a pretext for some discriminatory animus. <u>McDonnell Douglas Corp.</u>, 411 U.S. at 802.  To meet her burden, the plaintiff cannot "simply refute or cast doubt on [the] defendant's rationale." <u>Medina-Munoz</u>, 896 F.2d at 9; <u>Pakigezi</u>, 8310 F.Supp. at 908.

The plaintiff alleges that her termination is a result of age discrimination.  (Exh. 6, Pl. Compl. ¶ 44).  However, it was the operational and efficiency needs that prompted abolishing the plaintiff's postion as clerk stenographer.  (Exh. 3, Ferreira Depo., pg. 67, ln. 22-23).

As stated above, the evidence demonstrates that the clerk stenographer position was outdated due to the prevailing use of

the computer and electronic mail communication.  (Exh. 3,
Ferreira Depo. pg. 51, ln. 10-11).  Further, the position
description was too restrictive for the type of work that needed
to be performed to make the Facility efficient and operational.
<u>Id.</u> at pg. 51, ln. 6-8.  By abolishing the position and reposting
it as a mail processing clerk position, the Facility was able to
meet the administrative needs as well as the operational
requirements. (Exh. 5, Joint Job Committee Proposal; Exh. 3,
Ferreira Depo. pg. 64, ln. 14-23).  The sole basis for the
reposting was not due to the plaintiff's age but rather because
of efficiency purposes.  <u>Id.</u>  The plaintiff can point to no other
evidence, outside of her personal opinion, which indicates that
the position reposting was merely a pretext for age
discrimination.

     Because the defendants have met their burden of articulating
a legitimate non-discriminatory reason for their allegedly
adverse actions against the plaintiff, her claim for age
discrimination should be dismissed.

**VII. <u>The Gender Discrimination Claim Should Be Dismissed Because
     the Plaintiff Cannot Show She was Treated Differently From
     Other Similarly Situated Employees.</u>**
     As stated above, disparate treatment cases require a finding
for the defendants absent any showing that the plaintiff was
treated differently from a similarly situated employee. <u>Thomas v.
Digital Equip. Corp.</u>, 702 F. Supp 22, 25 (D. Mass 1988), <u>aff'd</u>,

880 F.2d 1486 (1st Cir. 1989); <u>Heard v. Com. of Massachusetts</u>, 2003 WL 21960726 (D. Mass. 2003).  A plaintiff claiming discriminatory discharge must show that he was terminated while other similarly situated employees not of his protected class were retained.  See <u>Marcano-Rivera v. Pueblo Intern., Inc.</u> 232 F.3d 245, 252 (1st Cir. 2000).

As part of the re-organization of the Cape Cod Processing and Distribution Facility ("Facility") in 2003, thirteen other employee's positions were abolished and reposted, in addition to the plaintiff's job (Exh. 2).  Of these fourteen individuals, six (including the plaintiff) were female.  (Exh. 7).  In addition, one of these females, like the plaintiff, was employed in the manual sector.  <u>Id.</u>  The other four females were employed in mechanical positions.  <u>Id.</u>  Accordingly, the plaintiff cannot show that she was treated any differently than those similarly situated employees who suffered the same job termination. As such, her gender discrimination claim should be dismissed.

## VIII. <u>THE PLAINTIFF'S RETALIATION CLAIM SHOULD BE DISMISSED FOR FAILURE TO ESTABLISH A PRIMA FACIE CASE</u>

Under Title VII, the <u>McDonnell Douglas</u> burden-shifting scheme governs a court's assessment of whether an employer may be found liable for adverse actions taken against an employee allegedly in retaliation for that employee's engaging in protected activity.  <u>Ruffino v. State Street Bank and Trust Co.</u>,

908 F. Supp. 1019, 1044 (D. Mass. 1995); <u>McDonnell Douglas Corp.</u>
<u>v. Green</u>, 411 U.S. 792, 802-804 (1993).  Under the three-stage
analysis established in <u>McDonnell Douglas Corp.</u>, the plaintiff
must demonstrate, by a preponderance of the evidence, that a
rational fact finder could conclude that the adverse action was
taken for retaliatory reasons.  <u>McDonnell Douglas Corp.</u>, 411 U.S.
at 802-804; <u>Hazel v. U.S. Postmaster General</u>, 7 F.3d 1, 3 (1st
Cir. 1993).

First, the plaintiff must make out a prima facie case of
retaliation demonstrating that: (1) he engaged in a protected
activity, known to the employer; (2) he suffered an adverse
employment action; and (3) there was a causal connection between
the protected activity and the adverse employment action.
<u>McDonough v. City of Quincy</u>, 452 F.3d, 8, 18 (1st Cir. 2006)
(citing <u>Ramirez Rodriguez v. Boehringer Ingelheim</u>
<u>Pharmaceuticals, Inc.</u>, 425 F.3d 67, 84 (1st Cir. 2005)).

If the plaintiff has succeeded in satisfying these three
elements, the burden shifts to the defendants to articulate a
legitimate, non-discriminatory reason for the adverse employment
action.  <u>Id</u>.  If and when the defendant satisfies his burden, the
burden will fall back to the plaintiff.  <u>Id</u>.  The plaintiff must
show that the reasons asserted by the defendant are merely a
pretext for its true discriminatory motives. <u>Id</u>.

1.  **The Plaintiff Cannot Show She Engaged in a Protected Activity**

Summary judgment is appropriate where the plaintiff did not engage in "protected activity" as required to prove a Title VII retaliation claim.  42 U.S.C. § 2000e-3(a), <u>Douglas v. DynMcDermott Petroleum</u>, 144 F.3d 364 (5th Cir.1998) <u>cert.</u> <u>denied</u>.

"Protected activity" occurs when a complainant opposes any practice made unlawful by Title VII or makes a charge, testified, assisted or participated in any investigation or other Title VII procedure.  <u>Id.</u>  Filing a grievance with a union that does not raise Title VII issues, such as discrimination based on race, color, religion, sex or national origin, is not a protected activity under § 2000e-3.  <u>Jones v. United Parcel Service, Inc.</u>, 411 F.Supp.2d 1236, 1258-59 (D. Kan. 2006).[3]

---

[3] Compare similar cases where union grievances failing to allege discrimination are not protected activities. <u>Ramey v. Potomac Elec. Power Co.</u> 468 F.Supp.2d 51, 59 (D.D.C.2006) (holding union grievance not a protected activity where it strictly challenged the authority of PEPCO to subject the plaintiff to a breathalyser test and did not allege any discrimination); <u>Hounton v. Gallup Indep. Co.</u>, 113 F.App'x 329, 334 (10th Cir.2004) (filing of police report not protected activity when report does not refer to discriminatory activity); <u>Anderson v. Acad. Sch. Dist.</u> 20, 122 F.App'x 912, 916 (10th Cir.2004) (grievance did not allege mistreatment based on race); <u>Moore v. United Parcel Serv., Inc.</u>, 150 F.App'x 315 (5th Cir.2005) (grievance which alleged violation of agreement with union but not race discrimination not protected activity); <u>Tiedeman v. Neb. Dep't of Corrs.</u>, 144 F.App'x 565 (8th Cir.2005) (grievance about pay rate based on union contract, not sex discrimination, not protected activity); <u>Lewis v. Conn. Dep't of Corr.</u>, 355 F.Supp.2d 607, 617 (D. Conn.2005) ("[T]he union grievance [plaintiff] filed ... did not explicitly allege racial discrimination and thus could not be considered protected activity under Title VII."); <u>Clemente v. N.Y. State Div. of Parole</u>, No. 01 Civ. 3945(TPG), 2004 WL 1900330, 13 (S.D.N.Y. Aug.24, 2004) (holding that union grievances that do not allege discrimination are not protected activity under Title VII); <u>Vital v. Interfaith Med. Ctr.</u>, No. 96CV363FBSMG, 2001 WL 901140, 6 (E.D.N.Y. July 31, 2001) (holding that a union grievance that does not concern discrimination is not protected activity).
But contrast cases where union grievance that contains discriminatory allegations considered protected activity. <u>Pardi v. Kaiser Foundation Hospitals</u> 389 F.3d 840, 850 (9th Cir. 2004) (holding union grievance

14

Here, the plaintiff alleges that her position was wrongfully abolished by the defendants in retaliation for filing union grievances, complaining about working conditions, and the filing of charges with the Equal Employment Opportunity Commission. (Exh. 6, Pl. Compl. ¶ 57).  The plaintiff's position as clerk stenographer was abolished by the defendants on May 3, 2003. (Exh. 7).  The plaintiff's complaints prior to this date include several union grievances whereby she alleges the following: in January 2003, the plaintiff's co-worker, Patricia Monroe ("Monroe") received preferential treatment by being able to use the time clock in her office, play computer games, backdating forms, and by blocking access to the plaintiff's files; in September 2002, the plaintiff alleges that a member of the management was opening and distributing mail before the plaintiff's arrival, taking work away from her. (Exh. 6, Pl. Compl. ¶ 37(d)) and ¶ 37(c).[4]  While union grievances can be considered protected activity, if they do not allege discriminatory conduct protected under Title VII, they are insufficient to satisfy the first element of retaliation.  <u>Jones</u>,

---

concerning disability accommodation to be protected activity under retaliation claim); <u>O'Sullivan v. City of Chicago</u> 2006 WL 3332788, 2 (N.D.Ill. 2006) (filing a union grievance charging racial discrimination is protected activity). <u>Lang v. Illinois Dept. of Children and Family Services</u>, 361 F.3d 416, 419 (7th Cir.2004)(union grievance about racially discriminatory practice qualified as protected activity under Title VII).

[4] The plaintiff also filed four other union grievances which are discussed in the below causation paragraph.  These grievances are irrelevant as they occur outside of the causation period.

411 F. Supp. 2d at 1258-59. Here, the plaintiff's grievances are completely void of any discriminatory conduct on the part of the defendants but rather concern only on trivial workplace matters and idiosyncracies. As such, the plaintiff's claim of retaliation should be dismissed for failure to establish the first element of protected activity.

    **2.**   **<u>There is No Causal Connection Based on the Lengthy Time Period Between Contacting the EEOC and the Alleged Adverse Actions as well as the Plaintiff's Failure to Properly Specify Her Allegations</u>**

    **(i)**   **The Plaintiff's Allegations of Retaliation Occur Outside of the Required Temporal Period.**

Under the third requirement, the plaintiff must demonstrate a causal connection between the protected activity and the adverse employment action. <u>McDonnell Douglas Corp.</u>, 411 U.S. at 802-804; <u>Hazel</u>, 7 F.3d at 3. An inference of retaliation may arise where "a showing of adverse action ... soon after the employee engages in protected activity specifically protected by section 704(a) of Title VII ... is indirect proof of a causal connection between the adverse action... and the activity because it is strongly suggestive of retaliation." <u>Ruffino</u>, 908 F. Supp. at 1044; <u>Oliver v. Digital Equipment Corp.</u>, 846 F.2d 103, 110 (1st Cir. 1988).

The temporal period between the protected activity and the adverse employment action must not be lengthy, and if it is, no

inference of causation is created.  <u>Woods v. Bentsen</u>, 889 F.
Supp. 179, 187 (E.D. Pa. 1995); <u>Parrott v. Cheney</u>, 748 F. Supp.
312, 318 (D. Md. 1989), <u>aff'd</u>, 914 F.2d 248 (4th Cir. 1990).
Three and four month periods have been held insufficient to
establish a causal connection based on temporal proximity.
Calero-Cerezo v. U.S. Dept. of Justice 355 F.3d 6, 25 -26 (1st
Cir. 2004) citing <u>Richmond v. ONEOK, Inc.</u>, 120 F.3d 205, 209
(10th Cir. 1997) and <u>Hughes v. Derwinski</u>, 967 F.2d 1168, 1174-75
(7th Cir. 1992).[5]   While the plaintiff makes numerous
allegations of discriminatory conduct by the defendants, they are
either too far removed or undated as to when the alleged event
occurred.   The plaintiff filed two prior EEO complaints in
November of 2001 and September of 2000.  (Exh. 6).  While these
complaints are undoubtedly "protected activity," they both occur
more than two years prior to the plaintiff's alleged termination
and as such no causation can be inferred.

   In addition to the two grievances in September 2002 and

---

[5] <u>King v. Town of Hanover</u>, 116 F.3d 965, 968 (1st Cir. 1997) (time
period of five months insufficient to establish causal connection); <u>Hughes v.
Derwinski</u>, 967 F.2d 1168, 1174 (7th Cir. 1992)(disciplinary letter issued four
months after discrimination charge filed not causally linked to employer
action);  <u>Lees v. Case-Hoyt Corp</u>., 779 F. Supp. 717, 727 (W.D.N.Y.
1991)(suspension four months after filing of discrimination complaint not
causally linked to adverse employment action).  <u>Juarez v. Ameritech Mobile
Communications, Inc.</u>, 746 F. Supp. 798 (N.D. Ill. 1990)(almost six months does
not support an inference), <u>aff'd</u>, 957 F.2d 317 (7th Cir. 1992);  <u>Cooper v.
City of North Olmsted</u>, 795 F.2d 1265, 1272 (6th Cir. 1986)(discharge four
months after filing of discrimination charge not causally linked to adverse
employer action);  <u>Jones v. Flagship International</u>, 793 F.2d 714 (5th Cir.
1986)(no finding of causal connection even though plaintiff terminated 10
weeks after filing EEO charge).

January 2003 discussed above (which are insufficient to establish "protected activity"), the plaintiff also filed four other union grievances, in November 2001, December 2001, June 2003, and July 2003. (Exh. 6). Notwithstanding the fact that these grievances fail to allege discrimination, they also fail to occur within the required time period. The grievances in 2001 occur more than two years prior to her termination and those filed in 2003 occur *after* she was terminated. Id. Accordingly, the plaintiff's union grievances cannot demonstrate the required causation.

Paragraph 17 of complaint states, "[b]eginning in October and November of 2001, Ferreira forced the plaintiff to work in a hostile work area." (Exh. 6). In paragraph 34, the plaintiff alleges that "[o]n November 28, 2001, Tobey was aware that Ferreira badgered the plaintiff enough to reduce her to tears and forcing her to leave the building." Id. Again, notwithstanding whether these allegations concern discriminatory conduct to be considered "protected activity", they both occur more than two years prior to the plaintiff's termination and as such are insufficient to establish causation.

### (ii) The Plaintiff Has Failed to Allege Her Claims with Specificity

In her complaint, the plaintiff also alleges a number of instances of discriminatory conduct by the defendants yet fails to allege when these instances occurred. Even if these allegations are true, they are insufficient to show causation.

18

See Hoeppner v. Crotched Mountain Rehabilitation Center, Inc., 31 F.3d 9, 14 (1st Cir. 1994) (to prevail with respect to the causal prong, the plaintiff "must point to specific facts detailed in affidavits and depositions--that is, names, *dates*, incidents, and supporting testimony--giving rise to an inference of discriminatory animus"). It is not sufficient to proffer accusations which "remain largely conclusory and lacking in the concrete documentation necessary to prove the causal link between her protected activity and her retaliatory treatment." Id. 31 F.3d at 15 (quoting Ramos, 936 F.2d at 49).

The plaintiff asserts as follows:

¶12: From the outset of Ferreira's supervision of the plaintiff, he treated he in a prejudicial and disdainful manner, unlike the way he treated all other postal employees in his supervision.

¶13: Ferreira's treatment of the Plaintiff was unlike the way he treated all other postal employees under his supervision.

¶15: Ferreira did not communicate with the plaintiff regarding work issues necessary to do her job.

¶19: Ferreira made disparaging remarks about the plaintiff's work.

¶20: Ferreira during a request for accommodations meeting said to the plaintiff "You don't want to work at 4:00 AM". [sic] In addition, Ferreira met with the Plaintiff's steward privately and the plaintiff had no knowledge of said meeting until she was called in.

¶22: Ferreira did not the Plaintiff the same consideration for annual leave and change of schedules that he did for others.

¶23: Ferreira acted in an intimidating fashion towards the plaintiff on a constant basis in an effort to establish an uncomfortable and stressful atmosphere at her place of employment.

¶24: Ferreira begrudgingly gave meager acknowledgments of
job well done to the plaintiff.  At the same time,
Ferreira approved generous monetary awards and glowing
letters of recognition to other employees for minor
accomplishments like showing up for work.

¶26: Ferreira told the plaintiff her work was not as
important as Ms. Monroe's.

¶27: Ferreira harassed the Plaintiff about breaks and lunch
times and went so far as to wait for the Plaintiff at
her desk and/or calling the Plaintiff on the phone at
exactly the moment she was due to return, a treatment
to which no other similarly situated employee was
subjected.

¶28: Ferreira insisted the plaintiff receive computer
training from Providence Personnel (on two different
occasions) and then interrupted said training.

¶31: Aaron Tobey, Jr. ("Tobey"), President of the APWU,
Local 6005 was aware of the situation that existed in
the administrative area and allowed the hostile
environment created by Ferreira to continue.

¶32: Tobey's treatment was unlike the treatment that he
showed to all other members of the bargaining unit.

¶33: Tobey was aware that Ferreira attempted to force the
plaintiff to perform a function that the plaintiff did
not feel safe performing (monitoring duties - post
9/11).

¶35: In addition, Tobey and Ferreira were aware that the
plaintiff suffered from the following physical
problems: osteoporosis, chronic fatigue syndrome,
arthritis, fibromyalgia, stress and anxiety.

(Exh.6).

As these allegations entirely fail to state specific dates
and times of occurrence, causation cannot be inferred and the
plaintiff's claim of retaliation must be dismissed.  <u>Hoeppner</u>, 31
F.3d at 14.

IX.  **COUNTS II, VI, AND VII SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM UNDER 42 U.S.C,. §§ 1981 or 1983**

The plaintiff's claims under 42 U.S.C. § 1983 must fail for the reason that the statute applies only to actions taken "under color of state law."  <u>Soldevila v. Secretary of Agriculture</u>, 512 F.2d 427 (1st Cir. 1975).  Each of the defendants in this case is a employee of the United States Postal Service, and any alleged civil rights violations could only have occurred in connection with the defendants' actions pursuant to federal law.  Absent specific allegations that any of the defendants were acting under color of state law, the § 1983 claim cannot succeed.  <u>Mooney v. Clerk of Courts, District of New Hampshire</u>, 831 F. Supp. 7, 9-10 (D. N.H. 1993) (dismissing § 1983 claim against federal clerks and judges); <u>see</u> Chatman v. Hernandez, 805 F.2d 453, 455 (1st Cir. 1986) (stating that § 1983 only applies to persons acting under color of state law and not to persons acting pursuant to federal law); and see the analysis in <u>District of Columbia v. Carter</u>, 409 U.S. 418, 423 (1973).

Although Plaintiff brings this action under 42 U.S.C. § 1983, the statute is utterly inapplicable.  The statute provides:

> [E]very person who, under color of any
> statute, ordinance, regulation, custom or
> usage, of any State or Territory, subjects or
> causes to be sub jected, any citizen of the
> United States ... to the deprivation of any
> rights, privileges, or immunities secured by
> the Constitution and laws, shall be liable to
> the party injured in any action at law, suit

in equity, or other proper proceedings for
redress.

In terms, section 1983 provides for redress of constitutional
violations only if the person responsible for deprivation of U.S.
constitutional rights was acting under State law.  <u>Lugar v.
Edmonson Oil Co., Inc.</u>, 457 U.S. 926, 928 (1982); <u>Wyatt v. Cole</u>,
504 U.S. 158, 161 (1992)("The purpose of 1983 is to deter state
actors from using their badge of authority to deprive individuals
of their federally guaranteed rights and to provide relief to
victims if such deterrence fails."); <u>Wheeldin v. Wheeler</u>, 373
U.S. 647, 650 (1963)(Since federal officials do not act under
color of state law, they do not fall within the purview of
section 1983; <u>Chatman v. Henandez</u>, 805 F.2d 453, 455 (1st Cir.
1986)(jurisdiction over federal defendants cannot be predicated
upon section 1983 because it does not apply to persons acting
pursuant to federal law).  Insofar as the Complaint in this case
is filed against individuals employed by the <u>federal</u> government,
section 1983 cannot confer jurisdiction over the plaintiff's
claims and Counts II, VI, and VII must be dismissed.  <u>Wyatt v.
Cole</u>, 504 U.S. at 161; <u>Redondo-Borges v. U.S. Dept. of Housing
and Urban Development</u>, 421 F.3d 1, 6 (1st Cir. 2005).

**X.**   **<u>COUNTS IV AND V SHOULD BE DISMISSED BECAUSE THE COURT LACKS
SUBJECT MATTER JURISDICTION PURSUANT TO THE TUCKER ACT</u>**

It is well-settled that district courts do not have subject
matter jurisdiction over contract claims like those alleged in

22

the counts IV and V (intentional, improper interference with contractual relations) of the plaintiff's complaint. <u>V.S. Ltd. Pshp. v. HUD</u>, 235 F.3d 1109 (8th Cir. 2000) (determining that the district court lacked subject matter jurisdiction over a contract action brought against a federal agency, since the Tucker Act vested exclusive subject matter jurisdiction over all such suits in excess of $10,000 in the Court of Federal Claims).

Here, the plaintiff has failed to state a basis for subject matter jurisdiction in its Complaint.  The only basis that may exist over Plaintiff's claims in Count IV (Breach of Employment Contract) and V (Breach of Implied Covenant of Good Faith and Fair Dealing) is the Tucker Act, 28 U.S.C. §§ 1396, 1491.[6]  The Tucker Act constitutes a grant of subject matter jurisdiction and a conditional waiver of sovereign immunity with regard to monetary claims "founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any *express or implied contract with the United States*, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1) (emphasis supplied).

---

[6] The Tucker Act consists of 28 United States Code Section 1491, which sets out the jurisdiction of the Court of Federal Claims, and 28 United States Code Section 1346, which provides concurrent jurisdiction to the district courts for non-contract  claims not exceeding $10,000.  28 U.S.C. § 1346(a)(2) is referred to as the "Little Tucker Act."  <u>See</u> 16 <u>Moore's Federal Practice</u> § 105.25 (Matthew Bender 3d ed.). However, as is evident from the Complaint, Plaintiff's claims clearly do not fall under this category.

In the present case, the plaintiff's claims in Count IV and V arise from an express federal contract between the United States Postal Service and the American Postal Workers Union, AFL-CIO 2000-2003. Regardless of how these claims are couched, they sounds in contract.

Given Counts IV and V arise from express contracts with agencies of the United States, subject matter jurisdiction properly lies with the Court of Federal Claims under the Tucker Act. Thus, this Court does not have jurisdiction over Plaintiff's claims, and these counts must be dismissed pursuant to Fed. R. Civ. P. 12(b)(1).

**XI.  COUNTS VIII and IX SHOULD BE DISMISSED BECAUSE THE FEDERAL TORT CLAIMS ACT DOES NOT WAIVE SOVEREIGN IMMUNITY FOR CONTRACT CLAIMS**

Intentional interference with a contractual relationship falls within the exclusionary umbrella of interference with contract rights. See e.g., Ongaro, 988 F.2d at 121 (plaintiff's "claim against the government was for tortious interference with a business relationship, which is explicitly excepted from the FTCA under section 2680(h)"); Cooper v. American Automobile Ins. Co., 978 F.2d 602, 613 (10th Cir. 1992) (the claim for loss of future business opportunities was barred by section 2680(h)); Chen v. U.S., 854 F.2d 622, 628 (2nd Cir. 1988); Art Metal-U.S.A., Inc. V. U.S., 753 F.2d 1151, 1154-1155 (D.C. Cir. 1985)

24

(it would be illogical to hold except interference with contract
relations from liability, but not except interference with
economic relationships with third parties); <u>Small v. U.S.</u>, 33
F.2d 702, 704 (3rd Cir. 1964) (the exemption for interference
with existing contractual relationships extends to unlawful
interference with prospective contractual relationships as well).
Therefore, counts XIII and IX of the plaintiff's complaint should
be dismissed because the FTCA does not waive sovereign immunity
for that type of claim.

**XII. COUNT X AND XI SHOULD BE DISMISSED FOR FAILURE TO PRESENT TORT CLAIMS TO THE POSTMASTER GENERAL**

In order to successfully bring a tort claim against the
United States, the plaintiff must bring the claim under the
Federal Tort Claims Act ("FCTA").  28 U.S.C. § 2671 et seq.
However, even before filing an action with the courts, the
plaintiff must have fulfilled the administrative prerequisites.
Section 2675(a) of the title 28, United States Code, the FTCA,
requires that the plaintiff present her claim to the appropriate
federal agency, and that, subsequently, the agency denied her
claim in writing. 28 U.S.C. § 2675(a).  Furthermore, the
regulations requiring notice under the FTCA provides that the
plaintiff must submit standard Form 95 or provide other written
notification of the incident in addition to the claim for
damages. 28 C.F.R. § 14.2(a).  "The purpose behind the

25

administrative claim requirement is to give the government an initial opportunity to carefully investigate the specifics of each individual claim against it and settle those claims which are meritorious." <u>Cogburn v. U.S.</u>, 717 F.Supp. 958, 963 (D. Mass. 1989). Failure to afford the agency proper notice deprives the U.S. District Courts of jurisdiction over tort claims against the United States. <u>Eveland v. Director of Central Intelligence Agency</u>, 843 F.2d 46, 50 (1st Cir. 1988).

Since the plaintiff failed to file an administrative claim with the Postal Service, the Court should dismiss the plaintiff's claims for intentional infliction of emotional distress.

CONCLUSION

WHEREFORE, based on the arguments and authorities cited herein, the defendants' Motion for Summary Judgment should be allowed.

JOHN POTTER,
POSTMASTER GENERAL, ET. AL.
By their attorneys,
MICHAEL J. SULLIVAN
United States Attorney


By: <u>/s/ Rayford A. Farquhar</u>
RAYFORD A. FARQUHAR
Assistant U.S. Attorney
John J. Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02109

DATED: July 31, 2007                    (617) 748-3100

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on July 31, 2007.

<u>/s/ Rayford A. Farquhar</u>

Rayford A. Farquhar

Assistant U.S. Attorney

## THE POSTMASTER GENERAL'S
## EXHIBIT LIST

Exh. 1    Plaintiff's Dianne Dulong Deposition dated March 27, 2007

Exh. 2    Affidavit of Joseph M. Ferreira dated October 28, 2003

Exh. 3    Deposition of Joseph M. Ferreira dated March 23, 2007

Exh. 4    Mail Processing Clerk PS-05 position description

Exh. 5    Joint Job Committee Proposal as of 4-11-03, Union's Observations

Exh. 6    Plaintiff's Amended Verified Complaint dated July 15, 2005

Exh. 7    Comparative Analysis from EEO Investigative Report

Exh. 8    EEO complaint of Discrimination in the Postal Service filed by Dianne E. Dulong, dated May 12, 2003

EXHIBIT 1

31

1   please?  With regard to your job.

2        A    In 2003, my job was abolished, done away with, re-

3   posted as a very different job with different hours,

4   different duties, stenography and typing were removed as

5   requirements.

6        Q    Okay.  It was re-posted.  And what was it re-

7   posted as?

8        A    It was re-posted as a working time of 4 a.m. to 12

9   noon.

10        Q    What was the name of the position?

11        A    That's a good question.  Mail processor, I believe

12   is the new title.

13        Q    Did you bid for the position?

14        A    Yes, I did.

15        Q    Did you get the position?

16        A    I did not.

17        Q    Okay, and what happened at that point, after you

18   did not get that position?

19        A    I was awarded a different position, I had bid -  I

20   had gotten a different position that I was awarded.

21        Q    Okay, and what was the name of that position?

22        A    I want to say they were all called mail

23   processors.  I think they had given them all the same title,

24   I'm not really sure.  But that was more of an expeditor,

25   manual-type position, which the other jobs were more machine

1 | operators.

2     Q    What were going to be the duties and
3 | responsibilities of the position that you were awarded?

4     A    It was going to be expediting on the dock,
5 | checking the trucks in and out, more paper work and computer
6 | type thing - I'm not sure, I really - I'm not sure what
7 | the other things were, but it was a more manual type as
8 | opposed to processing machinery.

9     Q    And did you take this position?

10     A    I was not allowed to take that position.

11     Q    And how come?

12     A    Because the hours - because of my physical
13 | limitations, that my doctor had provided, I had asked for
14 | accommodations to be able to come in later than 4 a.m., and
15 | I went through a reasonable accommodation committee, and I
16 | was denied that opportunity to come in at that time.  That
17 | was only - that request was for three days a week, the
18 | other two days the start time was at seven, and I felt I
19 | could manage that but my doctor felt I could - but the
20 | other three days was four, so we were asking to change that
21 | by three hours on those three days.

22     Q    Okay, so for three days it started at 7 a.m.

23     A    Two days it started at seven, and three days it
24 | started at four.

25     Q    At 4 a.m.  Okay.  And you were seeking to have

74

1  was all going on.  So it would be fall of 2000.  I don't
2  have an exact date in front of me, but   -

3      Q     All right.  Then under 38B in November of '01,
4  this was with regards to another EEO complaint where you
5  left the building, despite submitting a leave slip to Mr.
6  Smolinsky.

7      A     Correct.

8      Q     And what was the outcome of this EEO complaint?
9      A     The outcome was that the AWOL charge that Mr.
10 Ferreira charged me with out of retaliation, that was
11 changed to sick leave on the slip.  And that's how that was
12 resolved.

13     Q     And this was resolved at the EEO level?
14     A     Yes.

15     Q     Okay.  Lastly, under 38C, that EEO complaint which
16 is the basis of this lawsuit, is the, as you have described
17 it here, the job loss.  And it was filed in -  the complaint
18 was filed on May 8th of '03, sounds correct?

19     A     Sounds correct.

20     Q     Okay.  Now, I want to finish up by asking you a
21 couple of questions with regard to Mr. Ferreira.

22          You allege that you have been discriminated
23 against based on your age.  Could you tell me why you
24 believe you have been discriminated against based on your
25 age?

1        A    Yes, because Mr. Ferreira purposely dried up my
2    position so that it could be reposted and a younger person
3    secured that job.
4        Q    And who was the younger person that secured the
5    job?
6        A    That was Lorraine Sawyer.
7        Q    Okay, and do you know how old Lorraine Sawyer is?
8        A    Today I don't.  I know that she's younger than I,
9    I can state that.
10       Q    Did Mr. Ferreira ever make any comments about your
11   age?
12       A    Not that I recall, specifically.
13       Q    Now, you also mention that -  I should ask you,
14   strike that.
15            What about Mr. Tobey?  Do you believe that he
16   discriminated against you in any way because of your age?
17       A    Because of age, I'd have to say no.
18       Q    All right, you say that Ferreira wanted a younger
19   person to get the job.  But aren't the jobs actually
20   assigned through the postal service by seniority?
21       A    Correct.
22       Q    Why was it your assumption that someone who was
23   younger than yourself would be able to get the job?
24       A    Because even though they posted that job with no
25   requirements, by looking at the seniority list above my name

1  there was very few people who knew how to type, to my
2  knowledge.  And typing was needed for that position, so they
3  would want someone in there who could type -- and I'm just
4  assuming -  there were younger people that could type ahead
5  of me.
6      Q    Were there some people that were older on the list
7  that were ahead of you?
8      A    Yes.
9      Q    Were these women or men that were on the list?
10     A    I'd say both.
11     Q    So you're stating that to your knowledge, there
12 were no individuals on that list that were older than
13 yourself that knew how to type?
14     A    No, I didn't say that.  I  -
15     Q    That's my question to you.
16          Do you know whether or not  -
17     A    Could you repeat the question please?
18     Q    Sure, do you know whether or not there were any
19 individuals on that list that were older than yourself that
20 knew how to type?
21     A    No.
22     Q    You're not sure?
23     A    I'm not sure.
24     Q    Okay.  You also  -
25     A    I can't quite recall who was on the list above me

77

1   now, four years later.

2       Q    At the time that the list was posted, do you have

3   a memory as to that time period?

4       A    No.

5       Q    Okay.  You also allege that you were discriminated

6   against by Mr. Ferreira because of -  you have your sex, but

7   obviously your gender.  Correct?

8       A    Correct.

9       Q    I'm assuming there were no allegations of sexual

10  harassment, correct?

11      A    Correct.

12      Q    Can you tell me why, please, you believe that Mr.

13  Ferreira discriminated against you because of your gender?

14      A    Because while both employed in the front office,

15  the male employee and myself, the male employee was allowed

16  extended change of schedules -  extended period of time for

17  change of schedules, say for two months at a time.  And when

18  I requested the same consideration for a change of schedule

19  for extended time, I was denied.  I was only allowed to put

20  my schedule in for a week at a time, whereas the male

21  employee could do it for a two month period.

22          Also, when it came to vacation time and annual

23  leave, if my slip had already been approved to leave early,

24  and the male employee decided to leave early that day, he

25  was allowed.  Technically, one of us should be there, but he

1    was allowed.  If the situation was reversed, and he had his

2    slip in and I put in for that same day, I was not allowed to

3    leave.

4          Q    Who was the male employee that you are talking

5    about?

6          A    That was James Chapman.

7          Q    What time period are you talking about?

8          A    '94-'99.

9          Q    When did Mr. Chapman stop working in the office?

10         A    2001?

11         Q    Do you know where he went?

12         A    He went to the floor.  He took a job on the floor.

13         Q    Do you know what that job was?

14         A    No, there was a couple of different titles.

15    Possibly mail processing, or NP operator maybe.  I'm not

16    sure what that title is.

17         Q    And the time period between when all this change

18    of schedule and leave slips was taking place was between '94

19    and '99?

20         A    Approximately.

21         Q    Did anyone take his place in the front office when

22    he left in approximately '01?

23         A    Yes, that was Ann Bernacchio.

24         Q    Okay.  What about Ms. Monroe, was she in the

25    office during this time Mr. Chapman was in the office?

EXHIBIT 2

U.S. Postal Service

**EEO Investigative Affidavit** *(Witness)*

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| | **1** | 2 | 1B-029-0039-03 |

| 1. Affiant's Name *(First, Middle, Last)* | | | 2. Employing Postal Facility | |
|---|---|---|---|---|
| Ferreira, Joseph M. | | | Providence P & DC | |

| 3. Position Title | 4. Grade Level | 5. Postal Address and ZIP + 4 | 6. Unit Assigned |
|---|---|---|---|
| Manager Maintenance | EAS-24 | 24 Corliss Street<br>Providence, RI 02904-9731 | Maintenance |

**Privacy Act Notice**

Privacy Act Notice. The collection of this information is authorized by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e-16; the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 633a; the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794a; and Executive Order 11478, as amended. This information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. As a routine use, this information may be disclosed to an appropriate government agency, domestic or foreign, for law enforcement purposes; where pertinent, in a legal proceeding to which the USPS is a party or has an interest; to a government agency in order to obtain information relevant to a USPS decision concerning employment, security clearances, contracts, licenses, grants, permits or other benefits; to a government agency upon its request when relevant to its decision concerning employment, security clearances, security or suitability investigations.

contracts, licenses, grants or other benefits; to a congressional office at your request; to an expert, consultant, or other person under contract with the USPS to fulfill an agency function; to the Federal Records Center for storage; to the Office of Management and Budget for review of private relief legislation; to an independent certified public accountant during an official audit of USPS finances; to an investigator, administrative judge or complaints examiner appointed by the Equal Employment Opportunity Commission for investigation of a formal EEO complaint under 29 CFR 1614; to the Merit Systems Protection Board or Office of Special Counsel for proceedings or investigations involving personnel practices and other matters within their jurisdiction; and to a labor organization as required by the National Labor Relations Act. Under the Privacy Act provision, the information requested is voluntary for the complainant, and for Postal Service employees and other witnesses.

**USPS Standards of Conduct**

Postal Service regulations require all postal employees to cooperate in any postal investigation.
Failure to supply the requested information could result in disciplinary action. (ELM 666)

7. Statement *(Continue on Form 2589 if additional space is required)*

1.) In that I am entitled to representation, I do choose Anthony Rice-attorney for

the NEA, USPS as my representation. Anthony T. Rice office is located at the

Windsor Law Office, 8 Griffin Road North, Windsor, CT 06006-0170.

2.) I am a 43 year old male.

3.) No, my present position is Manager Maintenance, at the Providence P & DC. I have b

in this position since May 19, 2003. Prior to May 19, 2003, I was the Plant

Manager at the Cape Cod P & D facility located in Wareham, MA.

4.) The complainant was the clerk steno on or about May 3, 2003 and performed

adminstrative duties for me and other office personnel.

5.) Issue #1

A.) The reason the complainant position was reposted on May 3, 2003, was a

lack of work in the clerk steno position and a lack of help in the

processing operations as well as a substantial increase of mail and work

in the processing operations.

B.) The EL-912 National Contract between the APWU and USPS were the guiding

I declare under penalty of perjury that the foregoing is true and correct.

| Affiant's Signature | Date Signed |
|---|---|
| | 10-28 |

PS Form 2568-B, March 2001

**UNITED STATES**
**POSTAL SERVICE.**

**EEO Investigative Affidavit** *(Continuation Sheet)*

| Page No. | No. Pages | Case No. |
|----------|-----------|----------|
| 2 | 2 | 1B-029-0039-03 |

procedures in the clerk-steno as well as fourteen (14) other jobs being

reposted on or about May3, 2003.

C.) No, not in any way.

D.) The complainant was treated equally and fairly, as was the other fourteen (14)

affected employees whose jobs were reposted on or about May. 3, 2003.

Note - see attached

E.) All affected employees were treated in the same manner and in accordance to the

EE-912 National Contract.

F.) No other clerk-steno position were reposted in that the complainant was the

only employee within the facility with the title clerk-steno in their title.

G.) No, the complainants sex and prior EEO activity played no role in any way in

the reposting of the clerk-steno position.

Issue #2 and Issue #3

I cannot comment on the complainants allegations after May19, 2003, in that I was

assigned to the Providence P & DC.  I had no involvement in any requests by the

complainant, denial for accommodations or job actions.

6.)

A.) Yes, I became aware of the complainants EEO complaint, when I received a call

from an EEO investigator during September 2000.

B.) The complainant claimed that she was not afforded an opportunity to train for

flat sorter operations.  The charge was dismissed on or about September 11, 2003.

C.) I was her supervisor.

D.) 1.) The complainants prior EEO activity had no cause or relationship in any way

or manner and was not a factor in the decision to repost the clerk-steno bid.

2.) & 3.) I cannot comment on the complainants allegations after May 19, 2003

in that I was assigned to the Providence P & DC.

AFFIDAVIT
PAGE __2__ OF __23__

I declare under penalty of perjury that the foregoing is true and correct.

PAGE 54

| Affiant's Signature | Date Signed |
|---------------------|-------------|
| | 10-28-03 |

PS Form 2569, March 2001

D0045

EXHIBIT 3

Page 51

1    I was going to say --

2           MR. FARQUHAR: Did you finish your answer?

3           WITNESS: No.

4           MR. FARQUHAR:  See, what I'm saying is I want

5    to hear what he's saying.

6    A    Part of the problem was that the job description of the

7    clerk stenographer, and this was discussed with the

8    union, did not generally allow that person to run mail

9    processing equipment, it was very restrictive, and the

10   job duties of a clerk stenographer were outdated in the

11   year 2003.  There was -- without exaggeration, Dianne

12   was taking shorthand or memos for me maybe the most,

13   and I'd be pushing it because maybe I was lazy, one,

14   two, maybe three a month at most, where in 1993, she

15   was probably doing five, six, seven, eight a day, ten a

16   day.

17        The mail processing job allowed -- and there was

18   also a change in the contract where the mail processing

19   position all became level fives which was the same

20   level that Dianne was.  They used to be level fours.

21   Q    So I want to direct your attention to approximately

22   September of 2001, post September 11, 2001.  Did you

23   assign Dianne Dulong to any monitoring duties, to gate

24   monitoring duties?

Page 64

1          it was specifically Dianne's job, and reposted with

2          automation to provide flexibility.  That was one of the

3          recommendations from the job committee.  I had numerous

4          recommendations from the job committee that the

5          president of the ABW, Aaron Tobey, and I went over

6          along with some other managers that were in my

7          department, specifically more Joe Cleary than anyone

8          else.

9    Q   Was the job committee's --

10              MR. GALLITANO:  Strike that.

11    Q   Was one of the objectives of the job committee to try

12          to restructure jobs to have as little impact on the

13          employees as possible?

14    A   That was -- the main objective from my perspective of

15          the job committee was to give a proposal that would

16          work best for the Postal Service, yes, and cause the

17          least impact and movement and everything else.  But the

18          main guiding light is to make the facility as efficient

19          as possible because we had been cited as being a site

20          to be closed.  The national -- headquarters had come

21          out with a list of facilities that they were looking at

22          closing and one of the sites on it was the Cape Cod P&D

23          facility.

24    Q   Which hasn't been closed, though, has it?

Page 67

1                    WITNESS:   Can I do this?

2                    MR. FARQUHAR:   Is this is in reference --

3                         (Short break was taken.)

4    BY MR. GALLITANO:

5    Q    Regardless of what the recommendations were, were you

6         involved in the ultimate decision-making process as to

7         what shape these positions were going to take, what

8         their start times were going to be, what they were

9         going to be doing, what their job description was?

10   A    Ultimately as the plant manager, I had the full

11        authority to and final decision on these positions,

12        okay, but that was agreed to do it in conjunction with

13        the union and working with them.  But, yeah, ultimately

14        I was the plant manager and it was ultimately my final

15        decision with input from all the supervisors, from the

16        job committee and a lot of input from the president of

17        the union.

18   Q    But still as the plant manager, it was at your

19        discretion what the schedules or the different

20        positions were going to be and what positions were

21        going to be retained and what were going to be gone?

22   A    Yeah, and I would use that word loosely, my discretion.

23        It was all for operational and efficiency purposes, not

24        just hey, I'd like to do this to have this.  It was

Page 68

1           done for business reasons.

2      Q    I understand that.  What I'm trying to establish is

3           that regardless of the motive, it was still your

4           decision whether it was for plant efficiency or

5           whatever.  The buck stopped with you is what I'm

6           getting at?

7      A    Correct.  I mean the union could have aggrieved, filed

8           grievances if they did not agree with it, but there

9           were no grievances filed on those positions with the

10          exception of maybe Dianne's or a couple here and there.

11     Q    But Dianne had filed a lot of grievances?

12     A    No, not a real lot in comparison to some people.  She

13          had actually very few compared to most people.  I mean

14          I had some people that filed four or five grievances a

15          week.

16     Q    And in addition to grievances, you agreed, though, she

17          also filed EEO complaints?

18     A    Well, she did.  I'm not agreeing, I mean, she did.  She

19          had that right just like any other employee.

20     Q    I understand.  It seems like from 1993 to 2000 you and

21          Dianne were on fairly good terms you said; is that

22          correct?

23     A    I was on good terms with her generally speaking the

24          whole time I worked there as far as I'm concerned.

1     decisions made.  That was not brought to my attention

2     that she could not meet those job duties until after

3     the fact, okay.  Numerous peoples' jobs were changed

4     dramatically, entire tours, some peoples' non-sched.

5     days off.  This job was posted with the same days off,

6     Saturday, Sunday, it was still considered Tour 2,

7     considered a day job, it was not changed on a different

8     tour, there were other jobs that were changed from one

9     tour to another.  And other people being accommodated,

10    I'm not aware of other people under this job thing.  I

11    mean we accommodated people -- we had a guy in there

12    years ago who had -- what's the sugar -- diabetes who

13    we made accommodations for that the union fought

14    against and filed grievances and different things

15    that the reasonable accommodations committee under the

16    American Disabilities Act chimed in and accommodations

17    were made to those people.

18         Short-term accommodations were normally done for

19    people who broke a hand and they couldn't run a machine

20    or hurt their back temporarily either on the job or off

21    the job accommodations were done.  But permanent

22    accommodations are all required to go through the

23    reasonable accommodation committee and they give their

24    final recommendation and position on what it is.  In

Page 80

1     able to do it or anyone else being able to do it.  4:00

2     a.m. -- we have people that come in on the midnight

3     shift.  The postal jobs are 24 hours a day, seven days

4     a week.  We have people that at that time were coming

5     in at eleven o'clock at night that had childcare

6     issues, had health issues, had split days off, all

7     kinds of different things, so there was no deep thought

8     process at all with her or anyone else.  Memos went out

9     to everyone that said I apologize for any inconvenience

10    this may cause you, but here it is what we're doing,

11    we're running a business and here's the operational

12    needs and here's the jobs.  And it had nothing to do

13    with any previous grievance or EEO activity, I'll tell

14    you that.  I'll swear to God himself on that.

15  Q  So you weren't irritated by any of those prior

16     complaints filed by her?

17  A  No, none whatsoever.  I had more EEOs and grievances

18     filed against me from other people.  That did not

19     bother me at all.  And especially the one --

20          MR. FARQUHAR:  There's no question.

21  Q  There's no question.  Let me direct your attention to a

22     grievance -- just a recap here and then maybe we'll be

23     done -- a grievance on monitoring duties we went over

24     this.  You were aware of the complaint that she was

1    A    Yes.   The union -- every single position in the Postal

2         Service has a job description.   My job as a manager has

3         a job description.   A mail processing clerk has a job

4         description, a clerk steno has one, a flat sorter has

5         one.   And in 2002 they combined a number of job

6         positions with this general mail processing clerk

7         position that could do pretty much anything. And when

8         Dianne Dulong's job was reposted, it was posted under

9         the mail processing job which allowed them to do

10        typing, administrative work, plus also run automative

11        equipment.   But under the old clerk steno position,

12        there's nothing in there that says anything about

13        processing mail on machines or anything else, and at

14        one point the union did bring that up as an issue.

15   Q    Who was responsible for actually creating those job

16        descriptions?

17   A    That's done nationally.

18   Q    So you have nothing to do with that?

19   A    Nothing whatsoever.

20                  MR. FARQUHAR: I have no further questions.

21                  MR. GALLITANO: No questions. We're done.

22        Thank you very much for coming in.

23                  (Whereupon, the deposition in the above-

24                  entitled matter was concluded at 2:00 p.m.)

EXHIBIT 4



STD POSITION DESCRIPTION                                    U. S. Postal Service

## MAIL PROCESSING CLERK,   PS-05

### FUNCTIONAL PURPOSE

Performs a variety of clerk duties required to process mail using automated mail processing equipment or manual methods of sortation and distribution.

### DUTIES AND RESPONSIBILITIES

1. Makes one or more sortations of outgoing and/or incoming mail using the appropriate sort program or manual distribution scheme.

2. On a rotation basis, performs all of the following duties: loads mail onto automated equipment, culling out non- processable items; enters sort plan and starts equipment; monitors flow of mail to ensure continuous feed; sweeps separated mail from bins/ stackers; and stops equipment when distribution run or operation is completed.  Runs machine reports, clears jams and contacts maintenance for assistance when required.

3. Prepares work area, ensuring all necessary support equipment and materials including labels, trays, and other containers, are in place.

4. Removes sorted mail from bins or separations and places into appropriate trays or containers for further processing or dispatch based on knowledge of operating plans and dispatch schedules, or at the instruction of supervisors or expediters; may riffle or verify mail to ensure sortation accuracy as needed.

5. In addition, may perform any of the following duties: provide service at public window for non-financial transactions; maintain records of mails; examine balances in advance deposit accounts; and record and bill mail requiring special service.

6. Uses established safe work methods, procedures and safety precautions.

7. Performs other job related tasks in support of primary duties.

### SUPERVISION

Supervisor, Distribution Operations; Supervisor, Customer Services, or other designated supervisor

### SELECTION METHOD

### BARGAINING UNIT

CLERK

---

(End of Document)

---

Document Date: 04-25-02          SPD Number: SP-2046          Occupation Code: 2315-0063

Page:    1

OPS 41

D0031

EXHIBIT 5

Joint Job Committees' Proposal (as of 4-11-03)
Union's Observations

**Job Committees proposes the following:**

Tour 1 Flat Sorters:
- Change all starting times to 2200. Why? You reduce the risk of Plan Failure, on any given day, by gaining 2 additional hours of machine time before dispatch.

Tour 1 Automation:
- Increase full-time compliment by one. Why? Reduce overtime.
- Be creative in managing existing staff. Why? From 0300 to 0600, coordinating staffing with mail volume seems to be a daily challenge for the supervisors.

Tour 1 Manual:
- Decrease Nantucket scheme staffing compliment from 3 to 2. Why? Additional staffing is needed in Automation, Tour 1.

Tour 2 Lips:
- No changes. Why? Operators are available for overtime from 0400 to 0600 if needed.

Tour 2 Automation:
- Change all (6) mail processors starting times from 0700 to 0600. Why? DPS mail, 1st and 2nd pass, for 0830 dispatch.

Tour 2 Manual:
- Change Bulk Mail/Express starting time from 1100 to 1150. Why? Additional help in Express from 1950 to 2000.
- Abolish stenographer's position. Why? Additional staffing is needed in Automation.

Tour 3 Flat Sorters:
- Change Flat Sorter/Lips starting times from 1550 to 1750. Why? 2 to 4 additional clerks from 2400 to 0200, reduce casual hours during that time.
- Repost one Flat Sorter/Lips, Sunday 1200, Monday to Thursday 1750. Why? Two full-time flat sorter/lips operators working on Sunday.
- Create one Flat Sorter/Lips (same as above).

Tour 3 Automation:
- Create 2 additional mail processor positions.

Tour 3 Manual:
- Change starting time from 1550 to 1700 (Expediter/Registry bid)
- Abolish manual position with incoming/outgoing principle assignment area.

#5 p. 30-32

**PAGE** 12

EXHIBIT 13
PAGE 1 OF 1

3

D0001



Supervisors' Proposal (as of 4-11-03)
Union's Observations

**The Supervisors are proposing the following:**

Tour 1 Flat Sorter: (Full-time staffing)
- On Sundays, increase staffing compliment from 0 to 1. Why? To reduce risk of Plan Failure on Monday mornings.
- On Mondays, increase staffing compliment from 4 to 5. Why? To reduce risk of Plan Failure.
- On Thursdays, decrease staffing compliment from 6 to 5. Why? One clerk is needed on Sunday.
- On Fridays, decrease staffing compliment from 6 to 5. Why? An additional clerk is needed on Monday.
- Monday to Saturday, 0650 to 0850, a minimum six hours of work, per day, is available for tour 1 flat sorters (3 clerks x 2 hours = 6 hours)
- On Sunday, 0650 to 0850, a minimum of two hours of work is available for tour 1 flat sorter.

Tour 1 Automation:
- Create three additional mail processor bids. Why? Increase staffing compliment by 120 hours (40 hours x 3 clerks = 120 hours) to avoid overtime pay and minimize risk of Plan Failure.

Tour 1 Manual:
- Decrease Nantucket scheme staffing compliment from 3 to 2. Why? Additional staffing is needed in Automation, Tour 1.
- Change starting time of the 2 Nantucket scheme bids from 2150 to 2200. Why? Gain additional .50 of mail sorting before dispatch.

Tour 2 Lips:
- Change starting time of all (4) clerks from 0600 to 0700? Why? To allow a mailhandler to set up the machine.

Tour 2 Automation:
- Abolish 2 mail processor positions. Why? Additional mail processors are needed on Tour 1 from 0200 to 1050.

Tour 2 Manual:
- Change Bulk Mail/Express starting time from 1100 to 1150. Why? Additional help in Express from 1950 to 2000.
- Abolish stenographer's position. Why? Additional mail processor is needed on Tour 2 for flexibility.

EXHIBIT __14__
PAGE__1__OF_2_

PAGE __25__

D0002          1



Tour 3 Flat Sorters
- Create 1 Flat Sorter/Lips position, 1550 to 2400, Mon/Tue.  Why? An additional operator Wednesday to Sunday.

Tour 3 Automation
- Change two mail processors starting times from 1850 to 1750. Why? Heavy SCF mail volumes arriving at 1700.
- Create an additional mail processor's position.

Tour 3 Manual
- Change two manual clerks starting times from 1600 to 1700.  Why? Two additional clerks from 2400 to 0150.
- Abolish  manual position with incoming/outgoing principle assignment area.

EXHIBIT ___14___
PAGE__2_ OF _2_

PAGE_____

EXHIBIT 6

RECEIVED
U.S. ATTORNEY

UNITED STATES DISTRICT COURT 10 PM 4: 31
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DIANNE DULONG | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) C.A. No. 1:04-cv-12552 |
| | ) |
| JOHN E. POTTER, POSTMASTER GENERAL, | ) |
| JOSEPH M. FERREIRA, Individually, AARON | ) |
| TOBEY, JR., Individually and as President of the | ) |
| APWU, Local 6005, and the AMERICAN POSTAL | ) |
| WORKERS UNION AFL-CIO, CAPE COD AREA | ) |
| LOCAL 6005, | ) |
| Defendants. | ) |

## AMENDED VERIFIED COMPLAINT
## (REQUEST FOR JURY TRIAL)

### Introduction

This is an action for damages and equitable relief by the Plaintiff, Dianne

DuLong, against the Defendants, John E. Potter, Postmaster General, Joseph M. Ferreira

and Aaron Tobey, Jr. for harassment and discrimination in employment based on age,

gender and retaliation in violation of the Plaintiff's 14th Amendment Rights and claims

set forth in her EEOC filing dated May 12, 2003 and transferred to the Federal Court on

December 6, 2004, pursuant to 29 C.F.R. 1601.28(d), (1), (2), (e), (4), breach of contract

and implied covenant of good faith dealings, wrongful termination and intent.

### Parties

1.    The Plaintiff, Dianne DuLong (hereinafter "DuLong"), is an individual who

resides at 9 Wareham Road, Plymouth, Plymouth County, MA 02360.

1

2.     The Defendant, John E. Potter, Postmaster General, with its regional office located at the Northeast Area Office, 6 Griffin Rd. N, Windsor, CT 06006-7000. The Defendant, John E. Potter, at all times relevant to the Complaint herein was the Postmaster General, and employed by the United States Post Office at 475 L'Enfant Plaza, Washington, DC 20002.

3.     The Defendant, Joseph M. Ferreira, (hereinafter "Ferreira), is an individual who resides at 688 Copicut Rd., North Dartmouth, MA 02747. Ferreira is being sued individually and in his capacity as Plant Manager.

4.     The Defendant, Aaron Tobey, Jr. (hereinafter "Tobey), is an individual who resides at 46 Old Powderhouse Rd., Lakeville, MA 02347. Tobey is being sued individually and in his capacity as President of the APWU, Local 6005.

5.     The Defendant, American Postal Workers Union, AFL-CIO, Cape Cod Area Local 6005, (hereinafter APWU, Local 6005), 25 Tobey Road, Wareham, MA 02571 and a mailing address of P. O. Box 7781, W. Wareham, MA 02576. At all times relevant to the Amended Verified Complaint the United States Postal Service had an Agreement with the American Postal Workers Union, AFL-CIO.

## JURISDICTION

6.     On May 12, 2003, DuLong timely filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), naming the United States Post Office and John E. Potter, Postmaster General as Respondents.

7.     On September 7, 2004, pursuant to 29 C.F.R. 1601.28(d), (1), (2), (e), (4), DuLong removed her Charge from the EEOC in order to file a civil action.

## FACTS

8.      The Plaintiff first became employed with the Post Office on April 25, 1987, at the

Buzzards Bay Post Office, Meetinghouse Lane, Buzzards Bay, MA from 4/25/87 to

10/92. Thereafter it became the Cape Cod Processing & Distribution. In October of 2000

the facility moved to 25 Tobey Road, Wareham MA 02571.

9.      Plaintiff is a member of Local 6005 of the Postal Workers Union and her

employment is governed in part by collective bargaining contract then and now is in

existence.

10.     The Plaintiff became the Clerk/Steno in October of 1989. At that time Plaintiff's

supervisor was Cyril P. Dumas who now works in Providence.

11.     In February 1993, Joseph Ferreira became the Plant Manager and Direct Report

Supervisor to whom the Plaintiff reported.

12.     From the outset, Ferreira treated the Plaintiff in a prejudicial and disdainful

manner; especially after she filed her first complaint with the EEOC on September 11,

2000.

13.     Ferreira's treatment of the Plaintiff was unlike the way he treated all other postal

employees under his supervision.

14.     The Plaintiff was awarded a position that required training. In the presence of a

supervisor, Ferreira denied the Plaintiff the training, which was a contractual guarantee.

15.     Ferreira did not communicate with the Plaintiff regarding work issues necessary

for her to do her job.

16.     Ferreira badgered the Plaintiff about security duties with respect to the gate

monitor (post 9/11). In addition, Ferreira also threatened to give the Plaintiff more work.

3

17. On November 28, 2001, Ferreira charged the Plaintiff as being absent without leave when she was not.

18. Beginning October and November 2001, Ferreira forced the Plaintiff to work in a hostile work area.

19. Ferreira made disparaging remarks about the Plaintiff's work.

20. Ferreira during a request for accommodations meeting said to the Plaintiff "You don't want to work at 4:00 AM". In addition, Ferreira met with the Plaintiff's steward privately and the Plaintiff had no knowledge of said meeting until she was called in.

21. Ferreira gave privileges to Ms. Patricia E. Monroe, Distribution Clerk (formerly Timekeeper) and denied same to the Plaintiff. Ms. Monroe always had preferential treatment, which became more pronounced after the Plaintiff filed her grievance in January, 2003.

22. Ferreira did not give the Plaintiff the same consideration for annual leave and change of schedules that he did for others.

23. Ferreira acted in an intimidating fashion towards the Plaintiff on a constant basis in an effort to establish an uncomfortable and stressful atmosphere at her place of employment.

24. Ferreira deliberately reduced the Plaintiff's workload with the intent of removing her from the position as a response to the Plaintiff's efforts to seek fair and equitable treatment. This was accomplished by distributing her work to others and doing some of it himself.

25. Ferreira begrudgingly gave meager acknowledgment of jobs well done by the Plaintiff. At the same time, Ferreira approved generous monetary awards and glowing

4

letters of recognition to people for minor accomplishments like showing up for work. Mostly male employees received these awards.

26.     Ferreira told the Plaintiff her work was not as important as Ms. Monroe's.

27.     Ferreira harassed the Plaintiff about breaks and lunchtimes and went so far as to wait for the Plaintiff at her desk and/or calling the Plaintiff on the phone at exactly the moment she was due to return, a treatment to which no other similarly situated employee was subjected.

28.     Ferreira insisted the Plaintiff receive computer training from Providence Personnel (on two different occasions) and then interrupted said training.

29.     Ferreira removed the Plaintiff from her job based on the pretext of a need for more help on the workroom floor, despite the fact that the available resources were not being utilized.

30.     Ferreira deliberately posted the new administration position without qualifications to ensure the Plaintiff would not regain the position. Typing skills were necessary for her position, but Ferreira deleted such requirements to avoid having to give the position to the Plaintiff.

31.     Aaron Tobey, Jr., President of the APWU, Local 6005 (hereinafter "Tobey") was aware of the situation that existed in the administrative area and allowed the hostile environment created by Ferreira to continue.

32.     Tobey's treatment of the Plaintiff was unlike the treatment that he showed to all other members of the bargaining unit.

33.     Tobey was aware that Ferreira attempted to force the Plaintiff to perform a function that the Plaintiff did not feel safe performing (monitoring duties-post 9/11).

5

34.    On November 28, 2001, Tobey was aware that Ferreira badgered the Plaintiff

enough to reduce her to tears and forcing her to leave the building.

35.    In addition, Tobey and Ferreira were aware that the Plaintiff suffered from the

following physical problems: osteoporosis, chronic fatigue syndrome, arthritis,

fibromyalgia, stress and anxiety.

36.    As a result of Ferreira's influence, the Reasonable Accommodation Committee

(RAC) treated the Plaintiff differently by refusing her requests for reasonable

accommodations.  Other employees had been accommodated by RAC and/or Ferreira.

37.    As a result of Ferreira's behavior toward the Plaintiff, the Plaintiff has filed the

following Grievances with her Union:

  a. Grievance:  01-136-Monitor Duties – Date of Step 1:  11/27/01.  The
    Complainant was forced to act as the security guard for the building (post
    9/11). The monitor was removed, Ferreira angry over the matter and
    badgered the Plaintiff.

  b. Grievance:  01-156-AWOL Charge – Date of Step 1:  12/01/01.  Ferreira's
    badgering of the Plaintiff caused her to leave the building and the Plaintiff
    was charged AWOL.

  c. Grievance:  02-44-Management doing Plaintiff's work – Date of Step 1:
    9/25/02.  A member of management was opening and distributing mail
    before the Plaintiff's arrival, taking work away from her.

  d. Grievance:  03-02-Disparate Treatment – Date of Step 1: 01/14/03.  P.
    Monroe made her own schedule.  The Plaintiff was not allowed to do the
    same.  Ferreira went so far as to backdate Monroe's forms to make them
    appear as if they were submitted on time.  Monroe was allowed games on
    her computer for entertainment, the Plaintiff was not.  Monroe was
    allowed to use the time clock in her office; the Plaintiff was required to go
    to the floor.  Monroe appeared to have two time cards.  Monroe was
    allowed to block access to the Plaintiff's files, located behind her office.
    Ferreira tried to force the Plaintiff to enter this area despite her telling him
    she did not feel safe.  Documented that Monroe has a volatile temper.

  e. Grievance:  03-19 – Management doing Plaintiff's work-Date of Step 1:
    06/05/03.  Ferreira began doing typing previously done by Plaintiff;
    Ferreira had others do typing previously done by Plaintiff; Ferreira began
    transporting work to the Plaintiff's desk rather than allowing Plaintiff to
    retrieve it from his desk as previously done; Ferreira was made aware that
    a member of management was emptying the daily mail pouch before the

Plaintiff arrived for work. This was her job. Ferreira contacted Providence regarding casual hiring. This was previously done by Plaintiff as part of her job. Ferreira telephoned casuals himself with reporting time information, which previously had been done by the Plaintiff as part of her job.

f.    Grievance: 03-23-Denied Reasonable Accommodations-Date of Step 1: 07/24/03. Ferreira and Sawyer met before the Plaintiff was called into Ferreira's office to discuss Plaintiff's accommodation request. Ferreira rushed the Plaintiff through the process, completing the form in a sloppy, haphazard, dismissive manner. Ferreira told the Plaintiff, "She did not want to work at 4:00 a.m." Ferreira questioned the Plaintiff's bid choices. Ferreira's input influenced the RAC committee's decision to deny the Plaintiff accommodation.

38.    As a result of the Defendant's behavior toward the Plaintiff, the Plaintiff has filed

the following Complaints with the EEOC:

a.    EEO Complaint: 1B0290001-01- training denied - filed 9/11/00. The Plaintiff was awarded a position that required training. In the presence of a supervisor, Ferreira denied the Plaintiff the training, which was a contractual guarantee.

b.    EEO Complaint: 1B0290004-02 – charged AWOL – filed 11/28/01. Ferreira harassed the Plaintiff over the gate monitoring duties to the point where she left the building in tears. Despite the fact that the Plaintiff submitted a leave slip to Matthew Smolinsky, a 204B (acting supervisor with authority of a real supervisor), Ferreira chose to charge the Plaintiff AWOL instead of another form of approved leave.

c.    EEO Complaint: 1B0290039-03 - Job Loss – filed 5/8/03. Ferreira dried up the Plaintiff's work with the intent of abolishing her position. At no time was there any discussion about reduction in workload. Ferreira, with the help of Tobey removed the Plaintiff from the administration area. Tobey did nothing to correct the hostile environment created by Ferreira.

## CAUSES OF ACTION

### COUNT I – Discrimination based on age and sex and retaliation for EEOC filing- transfer of EEOC Filing to Federal District Court

39.    The Plaintiff, DuLong, realleges and incorporates by reference herein the

allegations set forth in paragraphs 1 through 38.

7

40. On May 12, 2003, DuLong filed a discrimination claim against the United States Postal Service with the New York District Office of the Equal Employment Opportunity Commission ("EEOC"). (A copy is enclosed herewith and marked Exhibit A).

41. On September 7, 2004 DuLong requested a Notice of Right to Sue pursuant to 29 C.F.R. § 1601.28 (d), (1), (2), (e), (4) against the United States Postal Service under Title VII of the Civil Rights Act of 1964 ("Title VII"). (A copy is enclosed herewith and marked Exhibit B).

42. On September 7, 2004, Kevin J. Berry, Administrative Judge entered a Dismissal Order allowing DuLong to file private suit in the Federal District Court. (A copy is enclosed herewith and marked Exhibit C).

43. Said Verified Complaint was filed within 90 days of the Dismissal Order.

44. At all times relevant hereto, while DuLong was an employee of the United States Postal Service, DuLong was subjected to age and sex discrimination by her direct supervisor Joseph Ferreira.

45. As a result of this discrimination inflicted upon DuLong, DuLong suffered emotional damages for which the United States Postal Service is liable under Title VII.

## COUNT II – Civil Rights Violations-Against the Defendant John E. Potter, Postmaster General

46. The Plaintiff, DuLong, realleges and incorporates by reference herein the allegations set forth in paragraphs 1 through 45.

47. The reasons given by the Defendants for termination of the Plaintiff were malicious, false and fabricated; and were conspired and contrived by Defendants and

8

were intended and did defame, ridicule, harass and wrongly and unjustly accuse the Plaintiff of incompetence and seriously damaged her reputation.

48.     The Plaintiff has been subjected, because of the above recited acts, to the deprivation by the Defendants under color or law, and of the customs and usages of the Commonwealth of Massachusetts, or rights, privileges and immunities secured to her by the Constitution and Laws of the United States and particularly, her right to enjoy those privileges essential to the orderly pursuit of happiness by free men, specifically her right to equal protection of the laws guaranteed by the Fourteenth Amendment to said Constitution.

49.     The Plaintiff alleges that in doing the acts and things complained of above, the Defendant was engaged in a scheme and conspiracy designed and intended to deny and deprive the Plaintiff of rights guaranteed to her under the Constitution and Laws of the United States and of the Commonwealth of Massachusetts and particularly those hereinabove enumerated.

50.     The Plaintiff alleges that the Defendant knew or should have known that Plaintiff's employment termination was based on the malicious and intentional acts of the Defendants to do her harm and injure her professionally. Further, the illegal action by the Defendant was their participation in the conspiracy to deny Plaintiff a harmonious work environment and to deny Plaintiff her employment with the United States Postal Service.

51.     The reduction in work force as the reason for abolishing Plaintiff's position of employment was a pretext to wrongfully terminate her, as part of a purposeful discrimination against her with intent to maliciously harm her.

9

52.     The Plaintiff alleges that as the direct consequence and result of the acts of the

Defendant, the Plaintiff suffered much anxiety and mental distress, much discomfort and

embarrassment, her reputation was impaired, her earning capacity, she suffered a loss of

income, a loss of health insurance benefits, future income, and retirement benefits in

excess of $350,000.00.

     **Wherefore**, the Plaintiff demands a judgment for damages both compensatory

and punitive against the Defendant John E. Potter, Postmaster General, in an amount this

Court deems just and appropriate with interest, and cost of this action including

attorney's fees.

### COUNT III-Retaliation for filing complaints with the EEOC

53.     The Plaintiff, DuLong, realleges and incorporates by reference herein the

allegations set forth in paragraphs 1 through 52.

54.     While being employed, the Plaintiff filed numerous complaints in the form of

grievances under the collective bargaining agreement.

55.     While employed, the Plaintiff complained on numerous occasions about working

conditions including but not limited to those referred to herein.

56.     While employed, the Plaintiff filed charges with the Equal Employment

Opportunity Commission.

57.     Defendants have by the conduct cited herein unlawfully retaliated against the

Plaintiff because of each instance where she engaged in protected activity by filing each

grievance, complaining about working conditions, and the filing of charges with the

Equal Employment Opportunity Commission.

58.     In each instance Defendants' have engaged in conduct that violates public policy

and in the stances where Defendants have practiced reprisals against Plaintiff for filing

charges with the Equal Employment Opportunity Commission they have done so in

violation of 42 U.S.C.2000e-(16).

        Wherefore, the Plaintiff alleges that the Defendants have by this conduct caused

the Plaintiff to suffer anxiety, mental distress, much discomfort, embarrassment and

ridicule and as a direct consequence her reputation has been damager, her earning

capacity severely diminished; she suffered a loss of income, a loss of health benefits,

future income and retirement benefits in excess of $350,000.00.

## COUNT IV-Breach of Employment Contract-
### Against the Defendant John E. Potter, Postmaster General

59.     The Plaintiff, DuLong, realleges and incorporates by reference herein the

allegations set forth in paragraphs 1 through 58.

60.     The Defendant John E. Potter, Postmaster General relied upon false and

mistaken information in making its decision to terminate the employment of the

Plaintiff herein.

61.     Despite that the Defendant knew there was no legal basis to any of the claims

made by the Defendants Ferreira and Tobey against the Plaintiff, Defendant, John E.

Potter, terminated the Plaintiff's position despite a long service to the company and

good job performance all in direct violation of the Plaintiff's contract.

62.     At the time of her termination, the Plaintiff had a written contract with the

Defendant, Postmaster, entitled "Agreement between the United States Postal Service

and American Postal Workers Union, AFL-CIO 2000-2003" of which the Plaintiff

11

was a member at the time in good standing, and aforesaid contract was in full force and effect at the time of her termination.

63.     The Defendant breached said contract by the elimination of Plaintiff's position and constructive wrongful termination on June 9, 2003.

64.     Further, that the Defendant violated Article 2, Section One of said contract prohibiting discrimination against an employee based upon sex or age. (A copy of Article 2, Section One is attached hereto and marked D).

65.     As a result of the actions of the Defendant set forth above, the defendant breached its employment contract by wrongfully terminating DuLong causing her to sustain damages, i.e. loss of job, compensation and benefits to which she was otherwise entitled.

**Wherefore,** Plaintiff demands judgment against the Defendant John E. Potter, Postmaster General, in an amount this Court deems just and appropriate with interest, cost of this action including attorneys' fees.

## COUNT V - Wrongful Termination and Breach of the Implied Covenant of Good Faith and Fair Dealing-Against The Defendant John E. Potter, Postmaster General

66.     The Plaintiff, DuLong, realleges and incorporates by reference herein the allegations set forth in paragraphs 1 through 65.

67.     DuLong and the Defendant, John E. Potter, Postmaster General, had a written employment contract governing the employment of DuLong; and in all employment contracts there is an implied covenant of good faith and fair dealing, which is inherent in all employment relationships. As a result of the conduct and action set forth above, the Defendant John E. Potter, Postmaster General, breached the implied covenant of

12

good faith and fair dealing. As a result of that breach, DuLong sustained significant damages including but not limited to loss of job, loss of income, benefits, emotional, and/or mental anguish.

68.     The reduction in work force as the reason for abolishing Plaintiff's position of employment was a pretext to wrongfully terminate her, as part of a purposeful discrimination against her with intent to maliciously harm her.

**Wherefore**, Plaintiff, demands judgment against the Defendant John E. Potter, Postmaster General, in an amount this Court deems just and appropriate with interest, cost of this action including attorneys' fees.

## COUNT VI – Civil Rights Violations-Against the Defendant Joseph M. Ferreira

69.     The Plaintiff, DuLong, realleges and incorporates by reference herein the allegations set forth in paragraphs 1 through 68.

70.     The reasons given by the Defendants for termination of the Plaintiff were malicious, false and fabricated; and were conspired and contrived by Defendants and were intended and did defame, ridicule, harass and wrongly and unjustly accuse the Plaintiff of incompetence and seriously damaged her reputation.

71.     The Plaintiff has been subjected, because of the above recited acts, to the deprivation, by the Defendant under color or law, the customs and usages of the Commonwealth of Massachusetts, or rights, privileges and immunities secured to her by the Constitution and Laws of the United States and particularly, her right to enjoy those privileges essential to the orderly pursuit of happiness by free men, specifically her right to equal protection of the laws guaranteed by the Fourteenth Amendment to said Constitution.

72.     The Plaintiff alleges that in doing the acts and things complained of above, the Defendant was engaged in a scheme and conspiracy designed and intended to deny and deprive the Plaintiff of rights guaranteed to her under the Constitution and Laws of the United States and of the Commonwealth of Massachusetts and particularly those hereinabove enumerated.

73.     The Plaintiff alleges that the Defendant knew or should have known that Plaintiff's employment termination was based on the malicious and intentional acts of the Defendants to do her harm and injure her professionally. Further, the illegal action by the Defendant was their participation in the conspiracy to deny Plaintiff a harmonious work environment and to deny Plaintiff her employment with the United States Postal Service.

74.     The reduction in work force as the reason for abolishing Plaintiff's position of employment was a pretext to wrongfully terminate her, as part of a purposeful discrimination against her with intent to maliciously harm her.

75.     The Plaintiff alleges that as the direct consequence and result of the acts of the Defendant, the Plaintiff suffered much anxiety and mental distress, much discomfort and embarrassment, her reputation was impaired, her earning capacity, she suffered a loss of income, a loss of health insurance benefits, future income, and retirement benefits in excess of $350,000.00.

        **Wherefore**, the Plaintiff demands a judgment for damages both compensatory and punitive against the Defendant Joseph M. Ferreira, in an amount this Court deems just and appropriate with interest, and cost of this action including attorney's fees.

## COUNT VII – Civil Rights Violations-Against the Defendant
## Aaron Tobey, Jr.

76. The Plaintiff, DuLong, realleges and incorporates by reference herein the allegations set forth in paragraphs 1 through 75.

77. The reasons given by the Defendants for termination of the Plaintiff were malicious, false and fabricated; and were conspired and contrived by Defendant and were intended and did defame, ridicule, harass and wrongly and unjustly accuse the Plaintiff of incompetence and seriously damaged her reputation.

78. The Plaintiff has been subjected, because of the above recited acts, to the deprivation by the Defendants under color or law, and of the customs and usages of the Commonwealth of Massachusetts, or rights, privileges and immunities secured to her by the Constitution and Laws of the United States and particularly, her right to enjoy those privileges essential to the orderly pursuit of happiness by free men, specifically her right to equal protection of the laws guaranteed by the Fourteenth Amendment to said Constitution.

79. The Plaintiff alleges that in doing the acts and things complained of above, the Defendant was engaged in a scheme and conspiracy designed and intended to deny and deprive the Plaintiff of rights guaranteed to her under the Constitution and Laws of the United States and of the Commonwealth of Massachusetts and particularly those hereinabove enumerated.

80. The Plaintiff alleges that the Defendant Tobey knew or should have known that Plaintiff's employment termination was based on the malicious and intentional acts of the Defendants to do her harm and injure her professionally. Further, the illegal action by the

15

Defendant was his participation in the conspiracy to deny Plaintiff a harmonious work environment and to deny Plaintiff her employment with the United States Postal Service.

81.    The reduction in work force as the reason for abolishing Plaintiff's position of employment was a pretext to wrongfully terminate her, as part of a purposeful discrimination against her with intent to maliciously harm her.

82.    The Plaintiff alleges that as the direct consequence and result of the acts of the Defendant Tobey, the Plaintiff suffered much anxiety and mental distress, much discomfort and embarrassment, her reputation was impaired, her earning capacity, she suffered a loss of income, a loss of health insurance benefits, future income, and retirement benefits in excess of $350,000.00.

**Wherefore**, the Plaintiff demands a judgment for damages both compensatory and punitive against the Defendant Aaron Tobey, Jr., in an amount this Court deems just and appropriate with interest, and cost of this action including attorney's fees.

## COUNT VIII - Intentional, Improper Interference with Contractual Relationship-Against the Defendant Joseph M. Ferreira

83.    The Plaintiff, DuLong, realleges and incorporates by reference herein the allegations set forth in paragraphs 1 through 82.

84.    At all relevant times herein, DuLong had specific written and/or implied terms of employment with John E. Potter, Postmaster General. The Defendant Ferreira knowingly and/or wrongfully attempted to and did interfere with DuLong's employment contract. The Defendant Ferreira's interference with DuLong's contractual relationship with John E. Potter, Postmaster General, was wrongful and intentional and done through improper motives and means so as to cause DuLong to

16

sustain harm and damages as a result of his actions. As a result of said actions,

DuLong has sustained significant damages.

**Wherefore**, Plaintiff demands judgment against the Defendant Joseph M.

Ferreira in an amount this Court deems just and appropriate with interest, cost of this

action including attorneys' fees.

## COUNT IX  - Intentional, Improper Interference with Contractual Relationship-Against the Defendant Aaron Tobey, Jr.

85.    The Plaintiff, DuLong, realleges and incorporates by reference herein the

allegations set forth in paragraphs 1 through 84.

86.    At all relevant times herein, DuLong had specific written and/or implied terms

of employment with John E. Potter, Postmaster General.  The Defendant Tobey

knowingly and/or wrongfully attempted to and did interfere with DuLong's

employment contract.  The Defendant Tobey's interference with DuLong's

contractual relationship with John E. Potter, Postmaster General, was wrongful and

intentional and done through improper motives and means so as to cause DuLong to

sustain harm and damages as a result of his actions. As a result of said actions,

DuLong has sustained significant damages.

**Wherefore**, Plaintiff demands judgment against the Defendant Aaron Tobey

Jr., in an amount this Court deems just and appropriate with interest, cost of this action

including attorneys' fees.

17

## COUNT X - Intentional, Infliction of Emotional Distress- Against the Defendant Joseph M. Ferreira

87.    The Plaintiff, DuLong, realleges and incorporates by reference herein the allegations set forth in paragraphs 1 through 86.

88.    The Defendant Ferreira through his conduct, which was extreme and outrageous, as set forth above has intentionally caused DuLong to suffer emotional distress as demonstrated by physical manifestations. As a result of Ferreira's intentional infliction of emotional distress, DuLong has sustained permanent and serious personal injuries including but not limited to pain and suffering and emotional damage.

**Wherefore**, Plaintiff demands judgment against the Defendant Joseph M. Ferreira, in an amount this Court deems just and appropriate with interest, cost of this action including attorneys' fees.

## COUNT XI. - Intentional, Infliction of Emotional Distress- Against the Defendant Aaron Tobey, Jr.

89.    The Plaintiff, DuLong, realleges and incorporates by reference herein the allegations set forth in paragraphs 1 through 88.

90.    The Defendant Tobey through his conduct, which was extreme and outrageous, as set forth above has intentionally caused DuLong to suffer emotional distress as demonstrated by physical manifestations. As a result of Tobey's intentional infliction of emotional distress, DuLong has sustained permanent and serious personal injuries including but not limited to pain and suffering and emotional damage.

18

**Wherefore,** Plaintiff demands judgment against the Defendant Aaron Tobey, Jr.,

in an amount this Court deems just and appropriate with interest, cost of this action

including attorneys' fees.


## THE PLAINTIFF REQUESTS A JURY TRIAL.


THE PLAINTIFF,
Dianne DuLong
By her attorneys


/s/ Joseph R. Gallitano
Joseph R. Gallitano
BBO # 183700
34 Main Street Ext., Suite 202
Plymouth, MA 02360
(508) 746-1500


/s/ Richard D. Armstrong, Jr.
Richard D. Armstrong, Jr., Esq.
BBO # 021580
1400 Hancock Street
3rd Floor
Quincy, MA 02169
(617) 471-4400

Dated: July 15, 2005

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

DIANNE DULONG               )
          Plaintiff,        )
                           )
vs.                         ) C.A. No. 1:04-CV-12552
                           )
JOHN E. POTTER, POSTMASTER GENERAL  )
          Defendant.       )

## **VERIFICATION OF AMENDED COMPLAINT**

I, Dianne DuLong, being first duly sworn, state that I am the Plaintiff in the

above-entitled action, that I have read the foregoing Verified Complaint and know the

contents thereof, and that the same is true to my own knowledge and belief.

/s/ Dianne DuLong
Dianne DuLong

Dated: July 15, 2005

20

# EXHIBIT A

**UNITED STATES**
**POSTAL SERVICE®**

## EEO Complaint of Discrimination in the Postal Service
*(See Instructions and Privacy Act Statement on Reverse)*

| 1. Name DIANNE E. DULONG | | 2. SSN 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 | 3. Case No. 1B-029-0039-03 |
|---|---|---|---|

| 4a. Mailing Address – Street or PO Box 9 Wareham Road | 4b. City State & Zip +4 Plymouth MA 02360-3234 | |
|---|---|---|

| 5. Email Address* none | 6. Home Phone (508) 224-6980 | 7. Work Phone (508) 291-8705 |
|---|---|---|

| 8. Position Title *(USPS Employees Only)* Clk/Steno (until 5/3/03) | 9. Grade Level *(USPS Employees Only)* 5 | 10. Do you have Veteran's Preference Eligibility? ☐ Yes  ☒ No |
|---|---|---|

| 11. Installation Where You Believe the Discrimination Occurred *(Identify Installation, City, State, and Zip+4)* CCP&D 25 Tobey Road Wareham MA 02571-9701 | 12. Name and Title of Person(s) Who Took the Action(s) You Allege Was Discriminatory Joseph M. Ferreira Plant Manager |
|---|---|

MAY 13 2003
EEO OFFICE USPS
PROVIDENCE RI 02904

| 13a. Name of Your Designated Representative NA at present time | 13b. Title |
|---|---|

| 13c. Mailing Address *(Street or P.O .Box)* | 13d. City, State and Zip +4 |
|---|---|

| 13e. Email Address* . | 13f. Home Phone ( ) | 13g. Work Phone ( ) |
|---|---|---|

**14. Type of Discrimination You Are Alleging**

☐ Race *(Specify)*:
☐ Color *(Specify)*:
☐ Religion *(Specify)*:
☐ National Origin *(Specify)*:

☒ Sex *(Specify)*: female
☒ Age (40+) *(Specify)*: 07-25-44
☒ Retaliation *(Specify)*: 1B0290001-01
☐ Disability *(Specify)*: 1B0290004-02

**15. Date on which alleged act(s) of Discrimination Took Place**
04-29-03

*grievance #03-02, also has bearing on this clai

16. Explain the specific action(s) or situation(s) that resulted in you alleging that you believe you were discriminated against (treated differently than other employees or applicants) because of your race, color, religion, sex, age (40+), national origin, or disability. *Note that if your allegation is like or related to a previous complaint, that complaint may be amended. 29 C.F.R § 1614.106(d)*

I allege discrimination based on gender, age and retaliation in that on April 29, 2003, I was notified that my job would be reposted and effective May 3, 2003 I was deemed to be an unencumbered employee. The points I would like to make in support of this claim are:

1. Disparate treatment in that I have been held to a different standard of performance than other clerk(s) in the front office.

2. I have been subjected to harrassment at the hands of the plant manager and the union president.

3. I believe that my job abolishment is due to previous grievance and EEO activity that was necessary.

4. I believe the plant manager has deliberately "dried up" my duties to justify his actions.

5. The plant manager has pursued this action will full knowledge of my age, health and physical limitations. (exceptions were made for the other clerk in the administrative area). In doing so, he is aware it will be impossible for me to do the type of work and to maintain the hours as posted. Also, I believe my position was deliberately posted without qualifications to ensure I would not/could not be a successful bidder.

17. What Remedy Are You Seeking to Resolve this Complaint?

To retain my Clerk/Stenographer position - same hours, NS days and duties

| 18. Did You Discuss Your Complaint with a *Dispute Resolution Specialist* or a *REDRESS™* mediator? ☒ Yes  5/8/2003                            ☐ No | |
|---|---|
| *(Date You Received the Notice of Final Interview)* | |
| 19a. Signature of Dispute Resolution Specialist | 19b. Date 5/8/2003 |
| 20. Signature of Complainant or Complainant's Attorney | 21. Date of this Complaint 5/12/03 |

*Providing this information will authorize the U.S. Postal Service to send you important documents electronically.

PAGE 201

PS Form **2565**, March 2001 *(page 1 of 2)*

## Privacy Act Notice

'rivacy Act Notice. The collection of this information is authorized by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e-16; the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 633a; the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794a; and Executive Order 11478, as amended. This information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. As a routine use, this information may be disclosed to an appropriate government agency, domestic or foreign, for law enforcement purposes; where pertinent, in a legal proceeding to which the USPS is a party or has an interest; to a government agency in order to obtain information relevant to a USPS decision concerning employment, security clearances, contracts, licenses, grants, permits or other benefits; to a government agency upon its request when relevant to its decision concerning employment, security clearances, security or suitability investigations,

contracts, licenses, grants or other benefits; to a congressional office at your request, to an expert, consultant or other person under contract with the USPS to fulfill an agency function; to the Federal Records Center for storage; to the Office of Management and Budget for review of private relief legislation; to an independent certified public accountant during an official audit of USPS finances; to an investigator, administrative judge or complaints examiner appointed by the Equal Employment Opportunity Commission for investigation of a formal EEO complaint under 29 CFR 1614; to the Merit Systems Protection Board or Office of Special Counsel for proceedings or investigations involving personnel practices and other matters within their jurisdiction; and to a labor organization as required by the National Labor Relations Act. Under the Privacy Act provision, the information requested is voluntary for the complainant, and for the Postal Service employees and other witnesses.

## Instructions

A. Use this form to file a formal complaint if you are an employee or applicant for employment who believes that you have been discriminated against by the Postal Service because of your race, color, religion, sex, age (40+), national origin or disability. You must have presented the matter to an EEO dispute resolution specialist within 45 calendar days of the date the incident occurred, or, if a personnel action was involved, within 45 calendar days of the effective date of the personnel action.

B. Unless you have agreed to extend the 30-day period for an additional 60 calendar days, you will receive a notice of right to file a formal complaint within 30 calendar days from the date of your first contact with the EEO Office. You must file your formal complaint within 15 calendar days of the date on which you receive your notice of right to file. If you do not receive a notice of right to file 'thin the appropriate time period, you may file a formal complaint a any ime thereafter, up to 15 calendar days after receiving the notice.

C. you ave agreed to participate in alternative dispute resolution OR he informal process must be completed within 90 calendar ys your first contact with the EEO office. You have the right to nal complaint at any time thereafter, up to 15 calendar days u have received your notice of right to file.

D. itice of right to file contains the address where your formal ant must be mailed or delivered. The formal complaint will be d timely if it is received or postmarked before the expiration 15-day filing period, or, in the absence of a legible postmark, received by mail within 5 days of the expiration of the filing p t.

E. me limits for filing a formal complaint may be extended if you that you were prevented by circumstances beyond your c. from timely submitting the complaint, or if you present other re is considered sufficient by the Postal Service.

F. If need help preparing this form, you may obtain assistance fro a representative of your choice. You may also seek guidance frc the dispute resolution specialist who issued you the notice of rig to file.

G. Y formal complaint must be in writing and must be signed and da d by you or your attorney. You are entitled to a representative of our choice at all stages of the EEO complaint process; however, or an attorney can sign official EEO documents on your behalf.

H. If our written complaint is accepted, it will be assigned to an EEO complaints investigator who will provide you with an opportunity to present all the facts that you believe resulted in the alleged discrimination. The EEO complaints investigator will conduct a thorough review of the circumstances under which the alleged discrimination occurred.

I. While your complaint is under investigation, you may amend it to add claims that are like or related. Contact the EEO office for the address where your written amendment request must be mailed or delivered.

J. You and your representative will each be provided a copy of the completed investigative file. You have the right to request a hearing within 30 calendar days of the date you receive the investigative file by mailing or delivering your request to the appropriate Equal Employment Opportunity Commission (EEOC) District Office with a copy to the case Manager, EEO Compliance & Appeals. If you are

represented by an attorney, the 30-day period will begin on the date your attorney receives a copy of the case file. Instead of requesting a hearing, you may request an agency decision without a hearing and the head of the agency or his/her designee will issue you a decision letter with appeal rights.

K. If you request a hearing, the EEOC will appoint an administrative judge (AJ) to conduct the hearing. The AJ will notify you and the Postal Service of the right to seek discovery prior to the hearing to develop evidence reasonably on matters relevant to the issues raised in the complaint(s) to be heard. Attendance at the hearing will be limited to persons the administrative judge determines have direct knowledge relating to the complaint. Hearings are part of the investigative process and are closed to the public.

L. Following the hearing, the AJ will send you copy of the hearing record, including the transcript and his/her decision. The head of the agency, or his/her designee, will review the entire record, including the transcript, and will determine whether or not to implement the AJ's decision. You will receive the agency's notification of final action within 40 days of the date the agency receives the AJ's decision. If the agency's final action will not fully implement the AJ's decision, the agency must appeal to the EEOC. A copy of the Postal Service's appeal will be attached to your notification of final action.

M. If you are not satisfied with the decision of the AJ, or the agency's final action on the decision, you have the right to appeal within 30 calendar days after receiving notification of the agency's final action. Your appeal must be mailed to the EEOC at the following address:

EEOC
OFFICE OF FEDERAL OPERATIONS
PO BOX 19848
WASHINGTON DC 20036-9848

N. In lieu of filing an appeal of the agency's final action to the EEOC's Office of Federal Operations (OFO), you may file a civil action in an appropriate U.S. District Court within 90 calendar days of your receipt of the agency's final action.

O. You may also file a civil action in an appropriate U.S. district court after 180 days have passed from the date you filed the complaint, if the final agency action has not been issued and an appeal has not been filed; within 90 days of receipt of the OFO's decision on your appeal; or after 180 days have passed from the date you filed your appeal with the OFO, if there has been no decision issued on that appeal.

P. Special statutory provisions in Public 93-259 relate to age discrimination. The Public Law sets forth the right to by-pass the administrative complaint processing procedure and file a civil action. For additional information, contact the EEO office.

Q. Under the Equal Pay Act, you have the right to file a civil action without exhausting the administrative procedures.

R. You must keep the EEO complaint processing office aware of your current mailing address at all times. Failure to notify the EEO complaint processing office and the EEOC of an address change could result in the dismissal of your complaint.

PAGE 202

# EXHIBIT B

# ATTORNEY JOSEPH R. GALLITANO
## & ASSOCIATES

34 MAIN STREET EXT., SUITE 202, PLYMOUTH, MASSACHUSETTS 02360
(508) 746-1500          FAX (508) 747-1150

September 7, 2004

**Via Fax and Regular Mail**

Kevin J. Berry, Administrative Judge
US EEOC
New York District Office
33 Whitehall Street, 5th Floor
New York, NY 10004

RE:    Claimant: Dianne E. DuLong
       EEOC No. 160-2004-00218X
       Agency No. 1B-029-0039-03

Dear Judge Berry:

Pursuant to 29 C.F.R. § 1601  8(a)(1), (2) and (3)(d), the Claimant requests the
Commission to issue a notice of Right to Sue in the Federal District Court and dismiss the
within action before the EEOC.

Please forward to this office a Notice of Right to Sue pursuant to 29 C.F.R. § 1601.8(e).
Upon receipt of said notice the Claimant Dianne DuLong will file a complaint in the U.S.
District Court of Massachusetts within 90 days of receipt of aforesaid order authorizing
the Claimant to proceed in Federal District Court.

Thank you for your attention to this matter.

Very truly yours,

Joseph R. Gallitano

JRG/pjm

cc:    Attorney Karen Cote
       Dianne DuLong

# EXHIBIT C

**UNITED STATES OF AMERICA**
**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**NEW YORK DISTRICT OFFICE**

Dianne E. DuLong,

          Complainant,

              v.

John E. Potter, Postmaster General
United States Postal Service,

              Agency.

EEOC Hearing No. 160-2004-00218X
Agency File No. 1B-029-0039-03

## DISMISSAL ORDER

On September 7, 2004 the Complainant requested dismissal of the above referenced complaint before the EEOC due to her desire to file a private suit in Federal District Court. Based upon the Complainant's request and the fact that more than 180 days has passed since the filing of the administrative complaint, this complaint is hereby DISMISSED.

It is so Ordered.

For the Commission:

Kevin J. Berry
Administrative Judge

Date: 9/7/07

# EXHIBIT D

Article 2.3

## ARTICLE 2
## NON-DISCRIMINATION AND CIVIL RIGHTS

### Section 1. Statement of Principle

The Employer and the Union agree that there shall be no discrimination by the Employer or the Union against employees because of race, color, creed, religion, national origin, sex, age, or marital status.

In addition, consistent with the other provisions of this Agreement, there shall be no unlawful discrimination against handicapped employees, as prohibited by the Rehabilitation Act.

(see Memo, page 277)

### Section 2. Committees

There are established at the national and APWU regional/USPS Area levels Joint Committees on Human Rights. The committees will be composed of responsible representatives of the Union and responsible management officials. The committees may develop affirmative action proposals on all matters affecting minority groups. The committees will also be advised of the plan for site selection for facilities planned for national postal mail networks and major metropolitan areas, and review availability of adequate housing and public transportation. The committees shall meet as required at mutually agreeable times.

### Section 3. Grievances

Grievances arising under this Article may be filed at Step 2 of the grievance procedure within fourteen (14) days of when the employee or the Union has first learned or may reasonably have been expected to have learned of the alleged discrimination, unless filed directly at the national level, in

5

Dianne DuLong
9 Wareham Rd
Plymouth MA 02360-3234

# AGREEMENT

between

United States Postal Service

and

American Postal Workers Union
AFL-CIO

2000-2003

# Complaints and Other Initiating Documents

1:04-cv-12552-NG Dulong v. Potter

### United States District Court

### District of Massachusetts

Notice of Electronic Filing

The following transaction was received from Gallitano, Joseph entered on 7/15/2005 at 10:35 AM EDT
and filed on 7/15/2005

**Case Name:**        Dulong v. Potter
**Case Number:**      1:04-cv-12552
**Filer:**            Dianne Dulong
**Document Number:** 14

**Docket Text:**
AMENDED COMPLAINT *VERIFIED* against Joseph M. Ferreira, Aaron Tobey, Jr, American Postal
Work Union, filed by Dianne Dulong. (Attachments: # (1))(Gallitano, Joseph)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**yes
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1029851931 [Date=7/15/2005] [FileNumber=1051994-0
] [4a4ace43dabc1fd3e6215e7103cfe533081b99696edb74e841d883cae907a412b98
3a1917640690156690e4528bab50472b22f5364cc61d578de157907289253]]
**Document description:**
**Original filename:**yes
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1029851931 [Date=7/15/2005] [FileNumber=1051994-1
] [75e01f090a09ae754e44a3779e172058c443c7d21d9ec5678bf7627bb4a0f158ec6
eac777f8da110e04c0d2de61167323d3e965a1462c316a92b2e9a5308a2c5]]

### 1:04-cv-12552 Notice will be electronically mailed to:

Jeffrey Mark Cohen    jeffrey.cohen@usdoj.gov

Joseph R. Gallitano    jrgassoc@adelphia.net

### 1:04-cv-12552 Notice will not be electronically mailed to:

EXHIBIT 7

EEO Investgative Report
Dulong, Dianne E.
1B-029-0039-03

## COMPARATIVE ANALYSIS

Complainant claims discrimination based on her sex (female), age (59, DOB 7-25-44), and in retaliation for prior EEO activity, when (1) her current position was reposted for bid, and she became an unencumbered employee May 3, 2003; (2) on July 7, 2003, her request for reasonable accommodation was denied; and (3) effective July 12, 2003, she was again deemed an unencumbered employee.

Effective Saturday, May 3, 2003, the following employees were deemed unencumbered employees when their positions were reposted for bid due to either a change in the fixed non-scheduled days or reporting and ending times.

| NAME | DOB | SEX | POSITION | RECEIVED NOTICE OF POSITION REPOSTING | DEEMED AND UNENCUMBERED EMPLOYEE |
|------|-----|-----|----------|---------------------------------------|----------------------------------|
| Boucher | 05-08-46 | Male | Mech | Yes | Yes |
| Chapman | 05-28-53 | Male | Mech | Yes | Yes |
| DeCosta | 11-15-50 | Male | Manual | Yes | Yes |
| Doyle | 08-23-54 | Female | Mech | Yes | Yes |
| Dulong | 07-25-44 | Female | Manual | Yes | Yes |
| Goodwin-Smith | 02-15-61 | Female | Manual | Yes | Yes |
| Henderson | 10-24-44 | Female | Mech | Yes | Yes |
| LaFlamme | 08-31-71 | Female | Mech | Yes | Yes |
| Lapier | 03-19-51 | Female | Mech | Yes | Yes |
| Miller | 11-18-57 | Male | Mech | Yes | Yes |
| Rudow | 07-30-51 | Male | Mech | Yes | Yes |
| Tibbetts | 12-17-43 | Male | Manual | Yes | Yes |
| Urbon | 03-14-53 | Male | Mech | Yes | Yes |
| Wetherbee | 02-10-48 | Male | Mech | Yes | Yes |

Investigator's Notes:

The Comparison employees were provided by Joseph Ferreira, Manager Maintenance. (Affidavit B)

The DOB information was obtained from Employee Form 50s and Joseph Ferreira, Manager Maintenance. (Affidavit B)

The Notice of Position Reposting information was obtained from Joseph Ferreira. (Affidavit B)

PAGE 

EXHIBIT 8

**UNITED STATES POSTAL SERVICE®**

## EEO Complaint of Discrimination in the Postal Service

*(See Instructions and Privacy Act Statement on Reverse)*

| 1. Name<br>**DIANNE E. DULONG** | 2. SSN<br>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 | 3. Case No.<br>1B-029-0039-03 |
|---|---|---|
| 4a. Mailing Address – Street or PO Box<br>9 Wareham Road | 4b. City State & Zip +4<br>Plymouth MA 02360-3234 | |
| 5. Email Address•<br>none | 6. Home Phone<br>(508) 224-6980 | 7. Work Phone<br>(508) 291-8705 |

| 8. Position Title (USPS Employees Only)<br>Clk/Steno (until 5/3/03) | 9. Grade Level (USPS Employees Only)<br>5 | 10. Do you have Veteran's Preference Eligibility?<br>☐ Yes  ☒ No |
|---|---|---|

| 11. Installation Where You Believe the Discrimination Occurred<br>(Identify Installation, City, State, and Zip+4)<br>CCP&D<br>25 Tobey Road<br>Wareham MA 02571-9701 | 12. Name and Title of Person(s) Who Took the Action(s) You Allege was Discriminatory<br>Joseph M. Ferreira<br>Plant Manager | RECEIVED<br>MAY 1 3 2003<br>EEO OFFICE USPS<br>PROVIDENCE RI 02904 |
|---|---|---|

| 13a. Name of Your Designated Representative<br>NA at present time | 13b. Title | |
|---|---|---|
| 13c. Mailing Address (Street or P.O .Box) | 13d. City, State and Zip +4 | |
| 13e. Email Address* | 13f. Home Phone<br>( ) | 13g. Work Phone<br>( ) |

**14. Type of Discrimination You Are Alleging**

☐ Race (Specify):
☐ Color (Specify):
☐ Religion (Specify):
☐ National Origin (Specify):

☒ Sex (Specify):  female
☒ Age (40+) (Specify): 07-25-44
☒ Retaliation (Specify): 1B0290001-01
☒ Disability (Specify): 1B0290004-02

**15.** Date on which alleged act(s) of Discrimination Took Place
04-29-03

*grievance #03-02 also has bearing on this clai

16. Explain the specific action(s) or situation(s) that resulted in you alleging that you believe you were discriminated against (treated differently than other employees or applicants) because of your race, color, religion, sex, age (40+), national origin, or disability. *Note that if your allegation is like or related to a previous complaint, that complaint may be amended. 29 C.F.R § 1614.106(d)*

I allege discrimination based on gender, age and retaliation in that on April 29, 2003, I was notified that my job would be reposted and effective May 3, 2003 I was deemed to be an unencumbered employee. The points I would like to make in support of this claim are:

1. Disparate treatment in that I have been held to a different standard of performance than other clerk(s) in the front office.
2. I have been subjected to harrassment at the hands of the plant manager and the union president.
3. I believe that my job abolishment is due to previous grievance and EEO activity that was necessary.
4. I believe the plant manager has deliberately "dried up" my duties to justify his actions.
5. The plant manager has pursued this action will full knowledge of my age, health and physical limitations. (exceptions were made for the other clerk in the administrative area). In doing so, he is aware it will be impossible for me to do the type of work and to maintain the hours as posted. Also, I believe my position was deliberately posted without qualifications to ensure I would not/could not be a successful bidder.

17. What Remedy Are You Seeking to Resolve this Complaint?

To retain my Clerk/Stenographer position - same hours, NS days and duties

| 18. Did You Discuss Your Complaint with a *Dispute Resolution Specialist* or a *REDRESS™* mediator?<br>☒ Yes  5/8/2003   ☐ No<br>(Date You Received the Notice of Final Interview) | |
|---|---|
| 19a. Signature of Dispute Resolution Specialist | 19b. Date<br>5/8/2003 |
| 20. Signature of Complainant or Complainant's Attorney | 21. Date of this Complaint<br>5/12/03 |

•Providing this information will authorize the U.S. Postal Service to send you important documents electronically.

PS Form 2565, March 2001 *(page 1 of 2)*

PAGE 201

## Privacy Act Notice

Privacy Act Notice. The collection of this information is authorized by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e-16; the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 633a; the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794a; and Executive Order 11478, as amended. This information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. As a routine use, this information may be disclosed to an appropriate government agency, domestic or foreign, for law enforcement purposes; where pertinent, in a legal proceeding to which the USPS is a party or has an interest; to a government agency in order to obtain information relevant to a USPS decision concerning employment, security clearances, contracts, licenses, grants, permits or other benefits; to a government agency upon its request when relevant to its decision concerning employment, security clearances, security or suitability investigations,

contracts, licenses, grants or other benefits; to a congressional office at your request, to an expert, consultant or other person under contract with the USPS to fulfill an agency function; to the Federal Records Center for storage; to the Office of Management and Budget for review of private relief legislation; to an independent certified public accountant during an official audit of USPS finances; to an investigator, administrative judge or complaints examiner appointed by the Equal Employment Opportunity Commission for investigation of a formal EEO complaint under 29 CFR 1614; to the Merit Systems Protection Board or Office of Special Counsel for proceedings or investigations involving personnel practices and other matters within their jurisdiction; and to a labor organization as required by the National Labor Relations Act. Under the Privacy Act provision, the information requested is voluntary for the complainant, and for Postal Service employees and other witnesses.

## Instructions

A. Use this form to file a formal complaint if you are an employee or applicant for employment who believes that you have been discriminated against by the Postal Service because of your race, color, religion, sex, age (40+), national origin or disability. You must have presented the matter to an EEO dispute resolution specialist within 45 calendar days of the date the incident occurred, or, if a personnel action was involved, within 45 calendar days of the effective date of the personnel action.

B. Unless you have agreed to extend the 30-day period for an additional 60 calendar days, you will receive a notice of right to file a formal complaint within 30 calendar days from the date of your first contact with the EEO Office. You must file your formal complaint within 15 calendar days of the date on which you receive your notice of right to file. If you do not receive a notice of right to file within the appropriate time period, you may file a formal complaint at any time thereafter, up to 15 calendar days after receiving the notice.

C. If you have agreed to participate in alternative dispute resolution (ADR), the informal process must be completed within 90 calendar days of your first contact with the EEO office. You have the right to file a formal complaint at any time thereafter, up to 15 calendar days after you have received your notice of right to file.

D. Your notice of right to file contains the address where your formal complaint must be mailed or delivered. The formal complaint will be deemed timely if it is received or postmarked before the expiration of the 15-day filing period, or, in the absence of a legible postmark, if it is received by mail within 5 days of the expiration of the filing period.

E. The time limits for filing a formal complaint may be extended if you show that you were prevented by circumstances beyond your control from timely submitting the complaint, or if you present other reasons considered sufficient by the Postal Service.

   If you need help preparing this form, you may obtain assistance from a representative of your choice. You may also seek guidance from the dispute resolution specialist who issued you the notice of right to file.

G. Your formal complaint must be in writing and must be signed and dated by you or your attorney. You are entitled to a representative of your choice at all stages of the EEO complaint process; however, only an attorney can sign official EEO documents on your behalf.

H. If your written complaint is accepted, it will be assigned to an EEO complaints investigator who will provide you with an opportunity to present all the facts that you believe resulted in the alleged discrimination. The EEO complaints investigator will conduct a thorough review of the circumstances under which the alleged discrimination occurred.

I. While your complaint is under investigation, you may amend it to add claims that are like or related. Contact the EEO office for the address where your written amendment request must be mailed or delivered.

J. You and your representative will each be provided a copy of the completed investigative file. You have the right to request a hearing within 30 calendar days of the date you receive the investigative file by mailing or delivering your request to the appropriate Equal Employment Opportunity Commission (EEOC) District Office with a copy to the area Manager, EEO Compliance & Appeals. If you are

represented by an attorney, the 30-day period will begin on the date your attorney receives a copy of the case file. Instead of requesting a hearing, you may request an agency decision without a hearing and the head of the agency or his/her designee will issue you a decision letter with appeal rights.

K. If you request a hearing, the EEOC will appoint an administrative judge (AJ) to conduct the hearing. The AJ will notify you and the Postal Service of the right to seek discovery prior to the hearing to develop evidence reasonably on matters relevant to the issues raised in the complaint(s) to be heard. Attendance at the hearing will be limited to persons the administrative judge determines have direct knowledge relating to the complaint. Hearings are part of the investigative process and are closed to the public.

L. Following the hearing, the AJ will send you copy of the hearing record, including the transcript and his/her decision. The head of the agency, or his/her designee, will review the entire record, including the transcript, and will determine whether or not to implement the AJ's decision. You will receive the agency's notification of final action within 40 days of the date the agency receives the AJ's decision. If the agency's final action will not fully implement the AJ's decision, the agency must appeal to the EEOC. A copy of the Postal Service's appeal will be attached to your notification of final action.

M. If you are not satisfied with the decision of the AJ, or the agency's final action on the decision, you have the right to appeal within 30 calendar days after receiving notification of the agency's final action. Your appeal must be mailed to the EEOC at the following address:

   EEOC
   OFFICE OF FEDERAL OPERATIONS
   PO BOX 19848
   WASHINGTON DC 20036-9848

N. In lieu of filing an appeal of the agency's final action to the EEOC's Office of Federal Operations (OFO), you may file a civil action in an appropriate U.S. District Court within 90 calendar days of your receipt of the agency's final action.

O. You may also file a civil action in an appropriate U.S. district court: after 180 days have passed from the date you filed the complaint, if the final agency action has not been issued and an appeal has not been filed; within 90 days of receipt of the OFO's decision on your appeal; or after 180 days have passed from the date you filed your appeal with the OFO, if there has been no decision issued on that appeal.

P. Special statutory provisions in Public 93-259 relate to age discrimination. The Public Law sets forth the right to by-pass the administrative complaint processing procedure and file a civil action. For additional information, contact the EEO office.

Q. Under the Equal Pay Act, you have the right to file a civil action without exhausting the administrative procedures.

R. You must keep the EEO complaint processing office aware of your current mailing address at all times. Failure to notify the EEO complaint processing office and the EEOC of an address change could result in the dismissal of your complaint.

PS Form 2565, March 2001 (Page 2 of 2)

PAGE 202

D0072

D. DuLong
9 Wareham Road
Plymouth, MA 02360-3234



RECEIVED

MAY 13 2003

EEO OFFICE USPS
PROVIDENCE RI 02904

025048541i 0009

Mr. Richard Shayer
EEO Dispute Resolution Spec.
24 Corliss Street
Providence RI 02904-9411



PAGE 203