UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DIANNE DULONG | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) C.A. No. 1:04-cv-12552 |
| | ) |
| JOHN E. POTTER, POSTMASTER GENERAL, | ) |
| Defendant. | ) |

**MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

The Plaintiff, Dianne DuLong, brought the above-entitled action against John E. Potter, Postmaster General of the United States Post Office (hereinafter the USPS) in order to transfer her EEOC Complaint filed on May 12, 2003, alleging gender and age discrimination and retaliation for filing EEOC Complaints against the USPS and Plant Manager, Joseph Ferreira, et al.

Pursuant to 29 C.F.R. 1601.28(d), (1), (2), (e), (4), the EEOC Complaint was removed to file a civil complaint in the Federal District Court. The Plaintiff's Amended Verified Complaint is annexed hereto and made a part hereof as Exhibit A.

After extensive discovery and an attempt to mediate the within claims made by the Plaintiff, the matter is now before the Court for Summary Judgment on Motion of the Defendant.

After review of evidence obtained by discovery, the Plaintiff is prepared to narrow the issues to the matters set forth in her EEOC filing # 1B0290039-03, dated May 8, 2003. The Plaintiff voluntarily agrees to the dismissal of Counts IV through XI on the basis that some of the

causes of action are inclusive in Counts I through III and that others are barred by Federal immunity or regulations requiring action in a different forum.

The Plaintiff desires to proceed, with Counts I, II and III, which set forth her primary claims, and believes discovery has produced sufficient evidence in support of disputed facts to warrant Counts I, II & III, to be presented to a jury for findings of fact.

## CASE SUMMARY

Simply stated, the Plaintiff, Dianne DuLong (hereinafter "DuLong"), was unjustifiably and wrongfully terminated by the Defendant after a four year pattern of extended and deliberate discrimination and retaliation from 1999 through 2003. She was a member of a protected class by age and gender, upon which her discrimination claims are based. She was engaged in a protective activity of filing EEOC Complaints for which she was subjected to long term retaliation. The EEOC claims followed her filing grievances against Joseph Ferreira (hereinafter "Ferreira") her Plant Manager and Supervisor.

Her unequal treatment violated her 14th Amendment Constitutional Rights as well as the aforesaid discrimination, which was part of the retaliation against her. The Plaintiff was subjected routinely to a malicious and devious scheme of intentional discrimination based upon her age and her gender. The Plaintiff, if allowed to proceed to trial, will show that this treatment was a result of her opposing the Plant Manager, Ferreira, and filing grievances and EEOC Complaints against Ferreira, who was not only the Plaintiff's Plant Manager, but her direct supervisor. As such, he had to directly deal with any of her grievances while anyone else in the Plant not directly under his supervision had their grievances handled by their immediate superior.

The Plaintiff alleges and testimony of other employees support the claims that Ferreira resented having to deal with her grievances and implemented a disparative treatment of her including ultimately arranging her job to go to a younger woman, allowing substantially

more freedom in the work place to the male co-worker in her office than to her, and creating a

hostile environment around her by overtly allowing disruptive behavior of other workers,

isolating her, badgering her to take on responsibilities clearly not part of her job, filing false

charges against her, taking her work from her and performing it himself to justify ultimately

abolishing her position and forcing her to seek disability retirement as her only option to assure

her financial survival at a great loss of income.  (Sawyer Deposition, page 30, lines 1-22, page

31, lines 4-22, page 24, lines 6-19, pages 32-33, lines 1-24, page 38, lines 13-24, page 39, lines

1-17, page 25, lines 6-9, page 26, lines 12-23, Exhibit B; Sawyer Affidavit, page 2, Exhibit C.

     All of the above was done not because Ferreira disliked the Plaintiff or for personal

reasons.  Quite the contrary, Ferreira expressed a friendly attitude toward the Plaintiff and

considered her a good employee.  (Ferreira Deposition, pages 33, lines 1-24, Exhibit D).

However, once challenged by her through her grievances and EEOC complaints, all of which

were specifically directed at him, he embarked upon a program of "don't get mad, get even"

attitude within the management of the Plant Operations.  Said attitude manifested itself in the

form of unequal treatment of the Plaintiff by Ferreira intentionally discriminating against her on

the basis of age and gender, knowing full well DuLong would recognize it as such.  All of his

actions were based upon retaliation for her defying him and making him look bad on the record

by her prevailing in her grievances and EEOC complaints against him.  He intentionally devised

a clever program of retaliation on the basis that he could provide a substantial pretext to cover

his abusive and retaliatory behavior without consequence of liability and ultimately remove her

from the postal service.

## STANDARD OF REVIEW

Summary Judgment can only be rendered if the Defendants carry their burden of showing that there is no genuine issue as to any material fact and that they are entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The Court must view the entire record in the light most favorable to DuLong and indulge all reasonable inferences to his favor. Padilla-Garcia v. Rodriguiez, 212 F.3d 69, 74 (1st Cir. 2000).

The Defendants have the burden of showing that "there is an absence of evidence" to support DuLong's case. FDIC v. Municipality of Ponce, 904 F2d 740, 742 (1st Cir. 1990). If, and only if, the Defendants do so, then the burden shifts to DuLong to establish a genuine factual dispute. Id. In deciding whether a factual dispute is genuine, the Court must determine whether "the evidence is such that a reasonable jury *could* return a verdict for the non-moving part." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (emphasis added).

In addition, in employment discrimination cases, the Court must be mindful that the "often elusive" intent to discriminate is usually shown only through indirect proof and inferences from apparently benign conduct. Reed v. Lepage Bakeries, 244 F.3d 254, 259 n.3 (1st Cir. 2001).

Judged under this standard, the Defendants have not met their burden on DuLong's claims, Counts I through III of her Complaint.

## FACTS

1.    The Plaintiff incorporates by reference and annexed hereto her Rule 56.1 Statement of Disputed Facts filed herewith.

2.    The Plaintiff incorporates by reference and annexed hereto and made a part hereof the Plaintiff's Amended Complaint, marked Exhibit A and in particular the facts set forth in each and every count, including Counts IV through XI, although voluntarily dismissing the request for

relief under said counts, Plaintiff incorporates the facts set forth in each Count as relating back to Counts I – III.

3.      The Plaintiff incorporates by reference the Affidavit of the Plaintiff, Dianne DuLong, marked as Exhibit M and made a part hereof.

4.      The Plaintiff was wrongfully terminated on June 9, 2003, as the culmination of a three year course of harassment and retaliation by Ferreira, the Wareham Postal Facility Plant Manager.  (Affidavit of DuLong, pages 2-4, Exhibit M; Pine Affidavit, page 2, paragraphs 8 – 12, Exhibit K).

5.      The Plaintiff filed grievances as set forth in paragraph 32 of her Affidavit and EEOC complaint as set forth in Paragraph 33 of her Affidavit all of them against Ferreira.

6.      Ferreira intentionally with purpose to intentionally discriminate against the Plaintiff based upon gender, instituted a pattern of behavior from 2000-2003 of treating the Plaintiff in a disparative and discriminatory fashion as opposed to her male co-worker in the same office area, James Chapman. (See Affidavit of DuLong, paragraphs 18 & 23, Exhibit M and Sawyer Deposition, page 30, lines 1-22, page 31, lines 4-22 and page 24, lines 6-19, Exhibit B).

7.      As set forth in Plaintiff's Complaint and her Affidavit, Ferreira systematically reduced Plaintiff's work load, and under the pretext of plant reorganization abolished her position, but gave her former duties as part of a new job position to a younger woman.  (See Ferreira Deposition, page 67, lines 5-24, Exhibit D; DuLong Deposition, page 66, lines 3-9).

8.      Ferreira engineered the restructuring of the job abolishment to insure a younger woman who had union seniority would prevent Plaintiff from keeping the job she had.  (See Chapman Deposition, paragraph 11, Exhibit F and DuLong Affidavit, paragraph 26, Exhibit M).

9.      Even though joint management union jobs committee recommended Plaintiff's position remain virtually the same, Ferreira on his own authority abolished the position as retaliation for Plaintiff filing EEOC Complaints.  (See Sawyers Deposition, page 31, lines 4-22, Exhibit B).

10.     Because of her union activity Ferreira treated the Plaintiff differently from all other employees similarly situated.  (See, Chapman Affidavit, paragraphs 1-14, Exhibit F; Sawyer Deposition, page 38, lines 13-24, page 39, lines 1-17, Exhibit B, DuLong Affidavit, paragraphs 5-50, Exhibit M).

11.     The retaliation was intertwined with intentional discrimination and abusive treatment by Ferreira, who was prone to such conduct and had demonstrated such behavior in the past.   (See, Chapman Affidavit, paragraphs 1-14, Exhibit F; Sawyer Deposition, page 24, lines 6-19, Exhibit B, DuLong Affidavit, paragraphs 5-50, Exhibit M).

12.     As set forth in her Complaint, the Plaintiff tried all the administrative avenues available to her to protect herself and her job, having exhausted all administrative remedies.  She transferred her claim to the Federal Court as was her right.  (See DuLong Affidavit, paragraphs 33-36, Exhibit M).  The Plaintiff if allowed to proceed to trial will show that the treatment she received was as a result of her opposing the Plant Manager and filing grievances and EEOC complaints against Ferreira, who was not only the Plant Manager, but her supervisor.  As such he had to directly deal with any of her grievances while anyone else in the Plant, not directly under his supervision, had their grievances handled by their supervisor.  (See DuLong Deposition, page 68, lines 1-7, page 28, lines 19-20, Exhibit E).

13.     The Plaintiff alleges and testimony of other employees support the claim that Ferreira resented having to deal with her grievances and implemented a disparative treatment of her including intentionally arranging her job to go to a younger woman, allowing substantially more freedom in the work place to her male co-worker in her office, than to her, and creating a hostile

environment around her by overtly discriminating and retaliating against her.  (See DuLong

Deposition, page 68, lines 1-7, page 28, lines 19-20, page 75, lines 18-24, page 76, lines 1-5,

Exhibit E).


## ARGUMENT

The Plaintiff having voluntarily dismissed Counts IV-XI, believes she is entitled to a trial

on Counts I, II and III and a jury should determine her case of the matter of gender

discrimination, violation of her 14th Amendment Rights and violation of 41 USC 2000e-(16),

Title VI of the Civil Rights Act with the age discrimination claim to be determined by the

presiding judge.

1.      The Plaintiff was a member of a protected class as a woman, (gender) and at the time the

causes of action arose she was age 58.  She was engaged in protected activity by filing the EEOC

complaints against Ferreira.

2.      The Postal Service through Ferreira took adverse employment actions against her by

filing false charges of AWOL against her, making her take on security duties clearly not part of

her job description, reducing her work while creating an abusive hostile environment around her.

3.      Retaliating against her by the aforesaid actions for her filing EEOC complaints as well as

grievances against Ferreira, culminating in ultimately abolishing her position and only providing

a position for her, which defendant knew because of her preexisting health condition she could

not perform.

4.      In the process Ferreira treated male co-worker completely different than the constant

monitoring he subjected the Plaintiff and allowed abusive atmosphere to exist around her from

other co-workers who he allowed to come and go at will.

5.      Ferreira discriminated against her based on age for spite knowing full well Plaintiff would recognize that Ferreira's replacement of her with a younger woman was intentional discrimination because he was sure he could do it without consequences to him.

The Defendant argues that everything was done for operational purposes. The Defendant gives various explanations, which Plaintiff contends is pure pretext to cover up Ferreira retaliation, discrimination and disparative treatment of her.

The Plaintiff has set forth extensive disputed facts as set forth in her Rule 56.1 Statement of Disputed Facts and references them here in their entirety. Said disputed facts are supported by deposition testimony as well as affidavits, all supporting Plaintiff's contentions set forth above in paragraphs 1-5.

It is fairly obvious by all accounts that Ferreira could have accommodated the Plaintiff by slightly modifying her position, but in direct contradiction to a job committee's recommendation, a committee set up by the Defendant, Ferreira abolished her job.

The reasoning Ferreira suggests and the motives, the Plaintiff contends, are a pretext for retaliation against her, and should be a determination to be made by a jury.

In Candy Bell v. John Potter in his official capacity as Postmaster General of the United States of America, United States Postal Service, 234 F. Supp.2d 91, 2002 U.S. Dist. LEXIS 24161. (See case attached hereto and marked Case No. 1).

As to judgment as a matter of law, the employer argued that the employee's evidence was insufficient on many grounds such that the verdict could not stand. The court, however, concluded that there was sufficient evidence. The jury could have concluded that a fitness-for-duty examination (FFD) was an adverse action. The employee testified that when the FFD was ordered she felt punished for complaining. None of the employers' cases stood for the proposition that, as a general matter, sending an employee for a FFD could not serves as the basis for a retaliation claim. The court found that the jury could have reasonably concluded that the employee filed her Equal Employment Opportunity (EEO) complaint in good faith; it was not for the court to second guess the jury's credibility assessment, but only determine if there was sufficient evidence for such a conclusion. Further, where the adverse action occurred only

days after the employer learned of the employee's protected activity, it appeared that a causal connection could reasonably be inferred.  Finally, it was permissible for the jury to infer discrimination from the falsity of the employer's explanation.

Further in <u>Bell v. Potter</u>.

In the analogous context of summary judgment under Rule 56, we have stated that the court must review the record 'taken as a whole.'  And the standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'  It therefore follows that, in entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record.

In doing so, however, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.  'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'  Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.  That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'

In addition, the Court stated:

Again, it is not for the Court to second guess the jury's credibility assessment, but only to determine if there was sufficient evidence for a reasonable jury to come to that conclusion.  See generally <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 255, 91L.Ed. 2d 202, 106 S. Ct. 2505 (1986).  The plaintiff presented evidence that her EEO complaint was ultimately triggered by the events of March 15, but that it was also a response to what she reasonably believed was a long history of racial and sexual harassment at the Post Office.  Based on Bell's testimony as to what she had endured in the nature of racial and sexual harassment over the years and the inadequate response of management, the jury could have reasonably concluded that Bell believed in good faith that the March 15th incident was more of the same.

Like <u>Bell</u>, DuLong endured a long term course of harassment and discriminatory treatment.  When her job was abolished, she was further retaliated against by giving her a position she could not perform of which the Defendant was fully aware when the mail processor position was offered to her with a 4:00 a.m. starting time.  DuLong Affidavit, paragraphs 50-52, Exhibit M).

When all the testimony of disinterested witnesses is taken into consideration, the Plaintiff has presented a prima facia case.

As for Count II, 14th Amendment Violations, the Federal government does not have immunity.  True, the Federal Code, which is protective of the 14th Amendment Rights applies to only state actions.  But Plaintiff pleads solely on the bases of equal protection claims of the 14th Amendment to which Federal agencies are not immune from civil actions.

In <u>Hampton, Chairman, U.S. Civil Commission, et al v. Mow Sun Wong, et al</u>, 426 U.S. 88; 96 S. Ct. 1895; 48 L. Ed. 2d 495; 1976 U.S. Lexis 153, (case attached hereto as Case No. 2), the court ruled on actions; based upon due process and equal protection under the 5th and 14th Amendment to the U.S. Constitution by legal aliens in the United States applying for civil service positions was a valid cause of action against a Federal Agency and rule deprived of a liberty without due process.

> In sum, assuming without deciding that the national interests identified by the petitioners would adequately support an explicit determination by Congress or the President to exclude all noncitizens from the federal service, we conclude that those interests cannot provide an acceptable rationalization for such a determination by the Civil Service Commission.  The impact of the rule on the millions of lawfully admitted resident aliens is precisely the same as the aggregate impact of comparable state rules which were invalidated by our decision in *Sugarman*.  By broadly denying this class substantial opportunities for employment, the Civil Service Commission rule deprives its members of an aspect of liberty.  Since these residents were admitted as a result of decisions made by the Congress and the President, implemented by the Immigration and Naturalization Service acting under the Attorney General of the United States, n49 due process requires that the decision to impose that deprivation of an important liberty be made either at a comparable level of government or, if it is to be permitted to be made by the Civil Services Commission, that it be justified by reasons which are properly the concern of that agency.  We hold that § 338.101(a) of the Civil Service Commission Regulations has deprived these respondents of liberty without due process o law and is therefore invalid.

The Plaintiff submits that Defendants argument for dismissal of Count II fails because Defendant's rely upon the standards or actions brought under 42 U.S.C. 1981 or 1983, which

based upon actions taken under color of state law.  But the Plaintiff did not plead violations of said sections of the United States Code.

Instead, Plaintiff specifically cited violation of her constitutional rights under the 14th Amendment to the United States Constitution, guaranteeing her to equal protection under the law.

The Court has ruled that Bill of Rights applies to the Federal government as well as to state action especially in matters involving due process and equal protection.

See, Hampton, Chairman U.S. Civil Service, et al v. Mow Sun Wong, et al.  The Plaintiff was clearly exposed to unequal treatment as set forth herein.

The Plaintiff has provided specifics throughout her Amended Complaint.  The paragraphs Defendants cite lacking specificity in Plaintiff's Amended Complaint are set in a time sequence by previous allegations and subsequent allegations set forth in the Complaint.  Specifically, the conduct is tied to the dates of grievances and EEOC Complaints specifically identified in the Amended Complaint.  Further, when read in its entirety, and not taken out of context, the Complaint clearly demonstrates an on-going course of conduct by the Defendants over the years 2000 to June 9, 2003.  The aforesaid long term course of conduct demonstrates a causal connection to the Plaintiff's wrongful and retaliatory loss of employment.

The Plaintiff is entitled to utilize circumstantial evidence of discrimination for a fact finder to make a determination as well as direct evidence.  The Plaintiff has provided both direct and substantial circumstantial evidence that addresses employment actions taken against her for the purpose of retaliating against her by Ferreira for exercising her right to file grievances and EEOC complaints in attempting to defend herself from his discriminatory and retaliatory conduct since he was the pertinent decision maker for the Defendant, concerning her employment and work environment.

**CONCLUSION**

For all the above stated reasons, the Defendant's Motion for Summary judgment should be denied in all respects and the Plaintiff's three remaining counts of her complaint be set down for final pretrial conference and a jury trial.

Respectfully submitted,
DianeDuLong
By her Attorneys


/s/ Joseph R. Gallitano
Joseph R. Gallitano, Esq.
BBO # 183700
34 Main Street Ext. Suite 202
Plymouth, MA  02360
(508) 746-1500

/s/ Richard D. Armstrong, Jr.
Richard D. Armstrong, Jr., Esq.
BBO # 021580
1400 Hancock Street
3rd Floor
Quincy, MA  02169
(617) 471-4400

Dated:    October 11, 2007

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DIANNE DULONG | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) C.A. No. 1:04-cv-12552 |
| | ) |
| JOHN E. POTTER, POSTMASTER GENERAL, | ) |
| JOSEPH M. FERREIRA, Individually, AARON | ) |
| TOBEY, JR., Individually and as President of the | ) |
| APWU, Local 6005, and the AMERICAN POSTAL) | |
| WORKERS UNION (APWU) Local 6005 | ) |
| Defendants. | ) |

## AMENDED VERIFIED COMPLAINT
## (REQUEST FOR JURY TRIAL)

### Introduction

This is an action for damages and equitable relief by the Plaintiff, Dianne

DuLong, against the Defendant, John E. Potter, Postmaster General, for harassment and

discrimination in employment based on age, gender and retaliation in violation of the

Plaintiff's 14th Amendment Rights and claims set forth in her EEOC filing dated May 12,

2003 and transferred to the Federal Court on December 6, 2004, pursuant to 29 C.F.R.

1601.28(d), (1), (2), (e), (4), breach of contract and implied covenant of good faith

dealings, wrongful termination and intent.

### Parties

1.     The Plaintiff, Dianne DuLong (hereinafter "DuLong"), is an individual who

resides at 9 Wareham Road, Plymouth, Plymouth County, MA 02360.

2.      The Defendant, John E. Potter, Postmaster General, with its regional office located at the Northeast Area Office, 6 Griffin Rd. N, Windsor CT  06006-7000.  The Defendant, John E. Potter, at all times relevant to the Complaint herein was the Postmaster General, and employed by the United States Post Office at 475 L'Enfant Plaza, Washington, DC 20002.

3.      The Defendant, Joseph M. Ferreira, (hereinafter "Ferreira), is an individual who resides at 688 Copicut Rd., North Dartmouth, MA  02747.  Ferreira is being sued individually and in his capacity as Plant Manager.

4.      The Defendant, Aaron Tobey, Jr. (hereinafter "Tobey), is an individual who resides at 46 Old Powderhouse Rd., Lakeville, MA  02347.  Tobey is being sued individually and in his capacity as President of the APWU, Local 6005.

5.      The Defendant, American Postal Workers Union Local 6005, (hereinafter APWU, Local 6005), is a Union duly organized...

### Jurisdiction

6.      On May 12, 2003, DuLong timely filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), naming the United States Post Office and John E. Potter, Postmaster General as Respondents.

7.      On September 7, 2004, pursuant to 29 C.F.R. 1601.28(d), (1), (2), (e), (4), DuLong removed her Charge from the EEOC in order to file a civil action.

### FACTS

8.      The Plaintiff first became employed with the Post Office on April 25, 1987 at the Buzzards Bay Post Office, Meetinghouse Lane, Buzzards Bay MA from 4/25/87 to

10/92. Thereafter it became the Cape Cod Processing & Distribution. In October of 2000 the facility moved to 25 Tobey Road, Wareham MA 02571.

9.      Plaintiff is a member of Local of the Postal Workers Union and her employment is governed in part by collective bargaining contract then and now is in existence.

10.     The Plaintiff became the Clerk/Steno in October of 1989. At that time Plaintiff's supervisor was Cyril P. Dumas who now works in Providence.

11.     In February 1993, Joseph Ferreira became the Plant Manager and Direct Report Supervisor to whom the Plaintiff reported.

12.     From the outset, Ferreira treated the Plaintiff in a prejudicial and disdainful manner; especially after she filed her first complaint with the EEOC on September 11, 2000.

13.     Ferreira's treatment of the Plaintiff was unlike the way he treated all other postal employees under his supervision.

14.      The Plaintiff was awarded a position that required training. In the presence of a supervisor, Ferreira denied the Plaintiff the training, which was a contractual guarantee.

15.     Ferreira did not communicate with the Plaintiff regarding work issues necessary for her to do her job.

16.     Ferreira badgered the Plaintiff about security duties with respect to the gate monitor (post 9/11). In addition, Ferreira also threatened to give the Plaintiff more work.

17.     On November 28, 2001, Ferreira charged the Plaintiff as being absent without leave when she was not.

18.     Beginning October and November 2001, Ferreira forced the Plaintiff to work in a hostile work area.

19.    Ferreira made disparaging remarks about the Plaintiff's work.

20.    Ferreira during a request for accommodations meeting said to the Plaintiff "You don't want to work at 4:00 AM". In addition, Ferreira met with the Plaintiff's steward privately and the Plaintiff had no knowledge of said meeting until she was called in.

21.    Ferreira gave privileges to Ms. Patricia E. Monroe, Distribution Clerk (formerly Timekeeper) and denied same to the Plaintiff. Ms. Monroe always had preferential treatment, which became more pronounced after the Plaintiff filed her grievance in January, 2003.

22.    Ferreira did not give the Plaintiff the same consideration for annual leave and change of schedules that he did for others.

23.    Ferreira acted in an intimidating fashion towards the Plaintiff on a constant basis in an effort to establish an uncomfortable and stressful atmosphere at her place of employment.

24.    Ferreira deliberately reduced the Plaintiff's workload with the intent of removing her from the position as a response to the Plaintiff's efforts to seek fair and equitable treatment. This was accomplished by distributing her work to others and doing some of it himself.

25.    Ferreira begrudgingly gave meager acknowledgment of jobs well done by the Plaintiff. At the same time, Ferreira approved generous monetary awards and glowing letters of recognition to people for minor accomplishments like showing up for work. Mostly male employees received these awards.

26.    Ferreira told the Plaintiff her work was not as important as Ms. Monroe's.

27.     Ferreira harassed the Plaintiff about breaks and lunchtimes and went so far as to wait for the Plaintiff at her desk and/or calling the Plaintiff on the phone at exactly the moment she was due to return, a treatment to which no other similarly situated employee was subjected.

28.     Ferreira insisted the Plaintiff receive computer training from Providence Personnel (on two different occasions) and then interrupted said training.

29.     Ferreira removed the Plaintiff from her job based on the pretext of a need for more help on the workroom floor, despite the fact that the available resources were not being utilized.

30.     Ferreira deliberately posted the new administration position without qualifications to ensure the Plaintiff would not regain the position. Typing skills were necessary for her position, but Ferreira deleted such requirements to avoid having to give the position to the Plaintiff.

31.     Aaron Tobey, Jr., President of the APWU, Local 6005 (hereinafter "Tobey") was aware of the situation that existed in the administrative area and allowed the hostile environment created by Ferreira to continue.

32.     Tobey's treatment of the Plaintiff was unlike the treatment that he showed to all other members of the bargaining unit.

33.     Tobey was aware that Ferreira attempted to force the Plaintiff to perform a function that the Plaintiff did not feel safe performing (monitoring duties-post 9/11).

34.     On November 28, 2001, Tobey was aware that Ferreira badgered the Plaintiff enough to reduce her to tears and forcing her to leave the building.

35.    In addition, Tobey and Ferreira were aware that the Plaintiff suffered from the

following physical problems:  osteoporosis, chronic fatigue syndrome, arthritis,

fibromyalgia, stress and anxiety.

36.    As a result of Ferreira's influence, the Reasonable Accommodation Committee

(RAC) treated the Plaintiff differently by refusing her requests for reasonable

accommodations.  Other employees had been accommodated by RAC and/or Ferreira.

37.    As a result of Ferreira's behavior toward the Plaintiff, the Plaintiff has filed the

following Grievances with her Union:

      a.     Grievance:  01-136-Monitor Duties – Date of Step 1:  11/27/01.  The
Complainant was forced to act as the security guard for the building (post
9/11).  The monitor was removed, Ferreira angry over the matter and
badgered the Plaintiff.

      b.     Grievance:  01-156-AWOL Charge – Date of Step 1:  12/01/01.  Ferreira's
badgering of the Plaintiff caused her to leave the building and the Plaintiff
was charged AWOL.

      c.     Grievance:  02-44-Management doing Plaintiff's work – Date of Step 1:
9/25/02.  A member of management was opening and distributing mail
before the Plaintiff's arrival, taking work away from her.

      d.     Grievance:  03-02-Disparate Treatment – Date of Step 1: 01/14/03.  P.
Monroe made her own schedule.  The Plaintiff was not allowed to do the
same.  Ferreira went so far as to backdate Monroe's forms to make them
appear as if they were submitted on time.  Monroe was allowed games on
her computer for entertainment, the Plaintiff was not.  Monroe was
allowed to use the time clock in her office; the Plaintiff was required to go
to the floor.  Monroe appeared to have two time cards.  Monroe was
allowed to block access to the Plaintiff's files, located behind her office.
Ferreira tried to force the Plaintiff to enter this area despite her telling him
she did not feel safe.  Documented that Monroe has a volatile temper.

      e.     Grievance:  03-19 – Management doing Plaintiff's work-Date of Step 1:
06/05/03.  Ferreira began doing typing previously done by Plaintiff;
Ferreira had others do typing previously done by Plaintiff; Ferreira began
transporting work to the Plaintiff's desk rather than allowing Plaintiff to
retrieve it from his desk as previously done; Ferreira was made aware that
a member of management was emptying the daily mail pouch before the
Plaintiff arrived for work.  This was her job.  Ferreira contacted
Providence regarding casual hiring.  This was previously done by Plaintiff
as part of her job.  Ferreira telephoned casuals himself with reporting time

information, which previously had been done by the Plaintiff as part of her job.

f.    Grievance: 03-23-Denied Reasonable Accommodations-Date of Step 1: 07/24/03. Ferreira and Sawyer met before the Plaintiff was called into Ferreira's office to discuss Plaintiff's accommodation request. Ferreira rushed the Plaintiff through the process, completing the form in a sloppy, haphazard, dismissive manner. Ferreira told the Plaintiff, "She did not want to work at 4:00 a.m." Ferreira questioned the Plaintiff's bid choices. Ferreira's input influenced the RAC committee's decision to deny the Plaintiff accommodation.

38.    As a result of the Defendant's behavior toward the Plaintiff, the Plaintiff has filed

the following Complaints with the EEOC:

a.    EEO Complaint: 1B0290001-01- training denied - filed 9/11/00. The Plaintiff was awarded a position that required training. In the presence of a supervisor, Ferreira denied the Plaintiff the training, which was a contractual guarantee.

b.    EEO Complaint: 1B0290004-02 – charged AWOL – filed 11/28/01. Ferreira harassed the Plaintiff over the gate monitoring duties to the point where she left the building in tears. Despite the fact that the Plaintiff submitted a leave slip to Matthew Smolinsky, a 204B (acting supervisor with authority of a real supervisor), Ferreira chose to charge the Plaintiff AWOL instead of another form of approved leave.

c.    EEO Complaint: 1B0290039-03 - Job Loss – filed 5/8/03. Ferreira dried up the Plaintiff's work with the intent of abolishing her position. At no time was there any discussion about reduction in workload. Ferreira, with the help of Tobey removed the Plaintiff from the administration area. Tobey did nothing to correct the hostile environment created by Ferreira.

## CAUSES OF ACTION

### COUNT I – Discrimination based on age and sex and retaliation for EEOC filing- transfer of EEOC Filing to Federal District Court

39.    The Plaintiff, DuLong, realleges and incorporates by reference herein the

allegations set forth in paragraphs 1 through 38.

40.    On May 12, 2003, DuLong filed a discrimination claim against the United States Postal Service with the New York District Office of the Equal Employment Opportunity Commission ("EEOC").  (A copy is enclosed herewith and marked Exhibit A).

41.    On September 7, 2004 DuLong requested a Notice of Right to Sue pursuant to 29. C.F.R. § 1601.28 (d), (1), (2), (e), (4) against the United States Postal Service under Title VII of the Civil Rights Act of 1964 ("Title VII").  (A copy is enclosed herewith and marked Exhibit B).

42.    On September 7, 2004, Kevin J. Berry, Administrative Judge entered a Dismissal Order allowing DuLong to file private suit in the Federal District Court.   (A copy is enclosed herewith and marked Exhibit C).

43.    Said Verified Complaint was filed within 90 days of the Dismissal Order.

44.    At all times relevant hereto, while DuLong was an employee of the United States Postal Service, DuLong was subjected to age and sex discrimination by her direct supervisor Joseph Ferreira.

45.    As a result of this discrimination inflicted upon DuLong, DuLong suffered emotional damages for which the United States Postal Service is liable under Title VII.

### COUNT II – Civil Rights Violations-Against the Defendant John E. Potter, Postmaster General

46.    The Plaintiff, DuLong, realleges and incorporates by reference herein the allegations set forth in paragraphs 1 through 45.

47.    The reasons given by the Defendants for termination of the Plaintiff were malicious, false and fabricated; and were conspired and contrived by Defendants and

were intended and did defame, ridicule, harass and wrongly and unjustly accuse the
Plaintiff of incompetence and seriously damaged her reputation.

48.    The Plaintiff has been subjected, because of the above recited acts, to the
deprivation by the Defendants under color or law, and of the customs and usages of the
Commonwealth of Massachusetts, or rights, privileges and immunities secured to her by
the Constitution and Laws of the United States and particularly, her right to enjoy those
privileges essential to the orderly pursuit of happiness by free men, specifically her right
to equal protection of the laws guaranteed by the Fourteenth Amendment to said
Constitution.

49.    The Plaintiff alleges that in doing the acts and things complained of above, the
Defendant was engaged in a scheme and conspiracy designed and intended to deny and
deprive the Plaintiff of rights guaranteed to her under the Constitution and Laws of the
United States and of the Commonwealth of Massachusetts and particularly those
hereinabove enumerated.

50.    The Plaintiff alleges that the Defendant knew or should have known that
Plaintiff's employment termination was based on the malicious and intentional acts of the
Defendants to do her harm and injure her professionally.  Further, the illegal action by the
Defendant was their participation in the conspiracy to deny Plaintiff a harmonious work
environment and to deny Plaintiff her employment with the United States Postal Service.

51.    The reduction in work force as the reason for abolishing Plaintiff's position of
employment was a pretext to wrongfully terminate her, as part of a purposeful
discrimination against her with intent to maliciously harm her.

9

52.    The Plaintiff alleges that as the direct consequence and result of the acts of the Defendant, the Plaintiff suffered much anxiety and mental distress, much discomfort and embarrassment, her reputation was impaired, her earning capacity, she suffered a loss of income, a loss of health insurance benefits, future income, and retirement benefits in excess of $350,000.00.

**Wherefore**, the Plaintiff demands a judgment for damages both compensatory and punitive against the Defendant John E. Potter, Postmaster General, in an amount this Court deems just and appropriate with interest, and cost of this action including attorney's fees.

## **COUNT III-Retaliation for filing complaints with the EEOC**

53.    The Plaintiff, DuLong, realleges and incorporates by reference herein the allegations set forth in paragraphs 1 through 52.

54.    While being employed, the Plaintiff filed numerous complaints in the form of grievances under the collective bargaining agreement.

55.    While employed, the Plaintiff complained on numerous occasions about working conditions including but not limited to those referred to herein.

56.    While employed, the Plaintiff filed charges with the Equal Employment Opportunity Commission.

57.    Defendants have by the conduct cited herein unlawfully retaliated against the Plaintiff because of each instance where she engaged in protected activity by filing each grievance, complaining about working conditions, and the filing of charges with the Equal Employment Opportunity Commission.

58.     In each instance Defendants' have engaged in conduct that violates public policy and in the instances where Defendants have practiced reprisals against Plaintiff for filing charges with the Equal Employment Opportunity Commission they have done so in violation of 42 U.S.C.2000e-(16).

Wherefore, the Plaintiff alleges that the Defendants have by this conduct caused the Plaintiff to suffer anxiety, mental distress, much discomfort, embarrassment and ridicule and as a direct consequence her reputation has been damaged, her earning capacity severely diminished; she suffered a loss of income, a loss of health benefits, future income and retirement benefits in excess of $350,000.00.

### COUNT IV-Breach of Employment Contract-
### Against the Defendant John E. Potter, Postmaster General

59.     The Plaintiff, DuLong, realleges and incorporates by reference herein the allegations set forth in paragraphs 1 through 58.

60.     The Defendant John E. Potter, Postmaster General relied upon false and mistaken information in making its decision to terminate the employment of the Plaintiff herein.

61.     Despite that the Defendant knew there was no legal basis to any of the claims made by the Defendants Ferreira and Tobey against the Plaintiff, Defendant, John E. Potter, terminated the Plaintiff's position despite a long service to the company and good job performance all in direct violation of the Plaintiff's contract.

62.     At the time of her termination, the Plaintiff had a written contract with the Defendant, Postmaster, entitled "Agreement between the United States Postal Service and American Postal Workers Union, AFL-CIO 2000-2003" of which the Plaintiff

was a member at the time in good standing, and aforesaid contract was in full force and effect at the time of her termination.

63.    The Defendant breached said contract by the elimination of Plaintiff's position and constructive wrongful termination on June 9, 2003.

64.    Further, that the Defendant violated Article 2, Section One of said contract prohibiting discrimination against an employee based upon sex or age. (A copy of Article 2, Section One is attached hereto and marked D).

65.    As a result of the actions of the Defendant set forth above, the defendant breached its employment contract by wrongfully terminating DuLong causing her to sustain damages, i.e. loss of job, compensation and benefits to which she was otherwise entitled.

        **Wherefore**, Plaintiff demands judgment against the Defendant John E. Potter, Postmaster General, in an amount this Court deems just and appropriate with interest, cost of this action including attorneys' fees.

### COUNT V - Wrongful Termination and Breach of the Implied Covenant of Good Faith and Fair Dealing-Against The Defendant John E. Potter, Postmaster General

66.    The Plaintiff, DuLong, realleges and incorporates by reference herein the allegations set forth in paragraphs 1 through 65.

67.    DuLong and the Defendant, John E. Potter, Postmaster General, had a written employment contract governing the employment of DuLong; and in all employment contracts there is an implied covenant of good faith and fair dealing, which is inherent in all employment relationships. As a result of the conduct and action set forth above, the Defendant John E. Potter, Postmaster General, breached the implied covenant of

good faith and fair dealing. As a result of that breach, DuLong sustained significant damages including but not limited to loss of job, loss of income, benefits, emotional, and/or mental anguish.

68.    The reduction in work force as the reason for abolishing Plaintiff's position of employment was a pretext to wrongfully terminate her, as part of a purposeful discrimination against her with intent to maliciously harm her.

**Wherefore**, Plaintiff, demands judgment against the Defendant John E. Potter, Postmaster General, in an amount this Court deems just and appropriate with interest, cost of this action including attorneys' fees.

### COUNT VI – Civil Rights Violations-Against the Defendant Joseph M. Ferreira

69.    The Plaintiff, DuLong, realleges and incorporates by reference herein the allegations set forth in paragraphs 1 through 68.

70.    The reasons given by the Defendants for termination of the Plaintiff were malicious, false and fabricated; and were conspired and contrived by Defendants and were intended and did defame, ridicule, harass and wrongly and unjustly accuse the Plaintiff of incompetence and seriously damaged her reputation.

71.    The Plaintiff has been subjected, because of the above recited acts, to the deprivation, by the Defendant under color or law, the customs and usages of the Commonwealth of Massachusetts, or rights, privileges and immunities secured to her by the Constitution and Laws of the United States and particularly, her right to enjoy those privileges essential to the orderly pursuit of happiness by free men, specifically her right to equal protection of the laws guaranteed by the Fourteenth Amendment to said Constitution.

72.    The Plaintiff alleges that in doing the acts and things complained of above, the Defendant was engaged in a scheme and conspiracy designed and intended to deny and deprive the Plaintiff of rights guaranteed to her under the Constitution and Laws of the United States and of the Commonwealth of Massachusetts and particularly those hereinabove enumerated.

73.    The Plaintiff alleges that the Defendant knew or should have known that Plaintiff's employment termination was based on the malicious and intentional acts of the Defendants to do her harm and injure her professionally.  Further, the illegal action by the Defendant was their participation in the conspiracy to deny Plaintiff a harmonious work environment and to deny Plaintiff her employment with the United States Postal Service.

74.    The reduction in work force as the reason for abolishing Plaintiff's position of employment was a pretext to wrongfully terminate her, as part of a purposeful discrimination against her with intent to maliciously harm her.

75.    The Plaintiff alleges that as the direct consequence and result of the acts of the Defendant, the Plaintiff suffered much anxiety and mental distress, much discomfort and embarrassment, her reputation was impaired, her earning capacity, she suffered a loss of income, a loss of health insurance benefits, future income, and retirement benefits in excess of $350,000.00.

**Wherefore**, the Plaintiff demands a judgment for damages both compensatory and punitive against the Defendant Joseph M. Ferreira, in an amount this Court deems just and appropriate with interest, and cost of this action including attorney's fees.

## COUNT VII – Civil Rights Violations-Against the Defendant
## Aaron Tobey, Jr.

76.    The Plaintiff, DuLong, realleges and incorporates by reference herein the

allegations set forth in paragraphs 1 through 75.

77.    The reasons given by the Defendants for termination of the Plaintiff were

malicious, false and fabricated; and were conspired and contrived by Defendant and were

intended and did defame, ridicule, harass and wrongly and unjustly accuse the Plaintiff of

incompetence and seriously damaged her reputation.

78.    The Plaintiff has been subjected, because of the above recited acts, to the

deprivation by the Defendants under color or law, and of the customs and usages of the

Commonwealth of Massachusetts, or rights, privileges and immunities secured to her by

the Constitution and Laws of the United States and particularly, her right to enjoy those

privileges essential to the orderly pursuit of happiness by free men, specifically her right

to equal protection of the laws guaranteed by the Fourteenth Amendment to said

Constitution.

79.    The Plaintiff alleges that in doing the acts and things complained of above, the

Defendant was engaged in a scheme and conspiracy designed and intended to deny and

deprive the Plaintiff of rights guaranteed to her under the Constitution and Laws of the

United States and of the Commonwealth of Massachusetts and particularly those

hereinabove enumerated.

80.    The Plaintiff alleges that the Defendant Tobey knew or should have known that

Plaintiff's employment termination was based on the malicious and intentional acts of the

Defendants to do her harm and injure her professionally.  Further, the illegal action by the

15

Defendant was his participation in the conspiracy to deny Plaintiff a harmonious work environment and to deny Plaintiff her employment with the United States Postal Service.

81.     The reduction in work force as the reason for abolishing Plaintiff's position of employment was a pretext to wrongfully terminate her, as part of a purposeful discrimination against her with intent to maliciously harm her.

82.     The Plaintiff alleges that as the direct consequence and result of the acts of the Defendant Tobey, the Plaintiff suffered much anxiety and mental distress, much discomfort and embarrassment, her reputation was impaired, her earning capacity, she suffered a loss of income, a loss of health insurance benefits, future income, and retirement benefits in excess of $350,000.00.

**Wherefore**, the Plaintiff demands a judgment for damages both compensatory and punitive against the Defendant Aaron Tobey, Jr., in an amount this Court deems just and appropriate with interest, and cost of this action including attorney's fees.

## COUNT VIII - Intentional, Improper Interference with Contractual Relationship-Against the Defendant Joseph M. Ferreira

83.     The Plaintiff, DuLong, realleges and incorporates by reference herein the allegations set forth in paragraphs 1 through 82.

84.     At all relevant times herein, DuLong had specific written and/or implied terms of employment with John E. Potter, Postmaster General. The Defendant Ferreira knowingly and/or wrongfully attempted to and did interfere with DuLong's employment contract. The Defendant Ferreira's interference with DuLong's contractual relationship with John E. Potter, Postmaster General, was wrongful and intentional and done through improper motives and means so as to cause DuLong to

# EXHIBIT A CONTINUED

sustain harm and damages as a result of his actions. As a result of said actions,

DuLong has sustained significant damages.

   **Wherefore**, Plaintiff demands judgment against the Defendant Joseph M.

Ferreira in an amount this Court deems just and appropriate with interest, cost of this

action including attorneys' fees.

## COUNT IX - Intentional, Improper Interference with Contractual Relationship- Against the Defendant Aaron Tobey, Jr.

85.    The Plaintiff, DuLong, realleges and incorporates by reference herein the

allegations set forth in paragraphs 1 through 84.

86.    At all relevant times herein, DuLong had specific written and/or implied terms

of employment with John E. Potter, Postmaster General.  The Defendant Tobey

knowingly and/or wrongfully attempted to and did interfere with DuLong's

employment contract.  The Defendant Tobey's interference with DuLong's

contractual relationship with John E. Potter, Postmaster General, was wrongful and

intentional and done through improper motives and means so as to cause DuLong to

sustain harm and damages as a result of his actions. As a result of said actions,

DuLong has sustained significant damages.

   **Wherefore**, Plaintiff demands judgment against the Defendant Aaron Tobey

Jr., in an amount this Court deems just and appropriate with interest, cost of this action

including attorneys' fees.

## COUNT X - Intentional, Infliction of Emotional Distress-
### Against the Defendant Joseph M. Ferreira

87.    The Plaintiff, DuLong, realleges and incorporates by reference herein the allegations set forth in paragraphs 1 through 86.

88.    The Defendant Ferreira through his conduct, which was extreme and outrageous, as set forth above has intentionally caused DuLong to suffer emotional distress as demonstrated by physical manifestations. As a result of Ferreira's intentional infliction of emotional distress, DuLong has sustained permanent and serious personal injuries including but not limited to pain and suffering and emotional damage.

**Wherefore**, Plaintiff demands judgment against the Defendant Joseph M. Ferreira, in an amount this Court deems just and appropriate with interest, cost of this action including attorneys' fees.

## COUNT XI. - Intentional, Infliction of Emotional Distress-
### Against the Defendant Aaron Tobey, Jr.

89.    The Plaintiff, DuLong, realleges and incorporates by reference herein the allegations set forth in paragraphs 1 through 88.

90.    The Defendant Tobey through his conduct, which was extreme and outrageous, as set forth above has intentionally caused DuLong to suffer emotional distress as demonstrated by physical manifestations. As a result of Tobey's intentional infliction of emotional distress, DuLong has sustained permanent and serious personal injuries including but not limited to pain and suffering and emotional damage.

**Wherefore**, Plaintiff demands judgment against the Defendant Aaron Tobey, Jr., in an amount this Court deems just and appropriate with interest, cost of this action including attorneys' fees.

## THE PLAINTIFF REQUESTS A JURY TRIAL.

THE PLAINTIFF,
Dianne DuLong
By her attorneys

/s/ Joseph R. Gallitano
Joseph R. Gallitano
BBO # 183700
34 Main Street Ext., Suite 202
Plymouth, MA  02360
(508) 746-1500

/s/ Richard D. Armstrong, Jr.
Richard D. Armstrong, Jr., Esq.
BBO # 021580
1400 Hancock Street
3rd Floor
Quincy, MA  02169
(617) 471-4400

Dated:  July 15, 2005

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DIANNE DULONG | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) C.A. No. 1:04-CV-12552 |
| | ) |
| JOHN E. POTTER, POSTMASTER GENERAL | ) |
| Defendant. | ) |

## <u>VERIFICATION OF AMENDED COMPLAINT</u>

I, Dianne DuLong, being first duly sworn, state that I am the Plaintiff in the above-entitled action, that I have read the foregoing Verified Complaint and know the contents thereof, and that the same is true to my own knowledge and belief.


/s/ Dianne DuLong
Dianne DuLong

Dated:  July 15, 2005

# EXHIBIT A

**UNITED STATES POSTAL SERVICE®**

# EEO Complaint of Discrimination in the Postal Service
*(See Instructions and Privacy Act Statement on Reverse)*

| 1. Name | 2. SSN | 3. Case No. |
|---|---|---|
| DIANNE E. DULONG | 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 | 1B-029-0039-03 |

| 4a. Mailing Address – Street or PO Box | 4b. City State & Zip +4 |
|---|---|
| 9 Wareham Road | Plymouth MA 02360-3234 |

| 5. Email Address* | 6. Home Phone | 7. Work Phone |
|---|---|---|
| none | (508) 224-6980 | (508) 291-8705 |

| 8. Position Title *(USPS Employees Only)* | 9. Grade Level *(USPS Employees Only)* | 10. Do you have Veteran's Preference Eligibility? |
|---|---|---|
| Clk/Steno (until 5/3/03) | 5 | ☐ Yes   ☒ No |

| 11. Installation Where You Believe the Discrimination Occurred *(Identify Installation, City, State, and Zip+4)* | 12. Name and Title of Person(s) Who Took the Action(s) You Allege Was Discriminatory |
|---|---|
| CCP&D<br>25 Tobey Road<br>Wareham MA 02571-9701 | Joseph M. Ferreira<br>Plant Manager<br><br>RECEIVED<br>MAY 13 2003<br>EEO OFFICE USPS<br>PROVIDENCE RI 02904 |

| 13a. Name of Your Designated Representative | 13b. Title |
|---|---|
| NA at present time | |

| 13c. Mailing Address *(Street or P.O .Box)* | 13d. City, State and Zip +4 |
|---|---|

| 13e. Email Address* | 13f. Home Phone ( ) | 13g. Work Phone ( ) |
|---|---|---|

| 14. Type of Discrimination You Are Alleging | | 15. Date on which alleged act(s) of Discrimination Took Place |
|---|---|---|
| ☐ Race *(Specify):*  ☒ Sex *(Specify):* female | | 04-29-03 |
| ☐ Color *(Specify):*  ☒ Age (40+) *(Specify):* 07-25-44 | | |
| ☐ Religion *(Specify):*  ☒ Retaliation *(Specify):* 1B0290001-01 | | *grievance #03-02 also |
| ☐ National Origin *(Specify):*  ☐ Disability *(Specify):* 1B0290004-02 | | has bearing on this clai |

16. Explain the specific action(s) or situation(s) that resulted in you alleging that you believe you were discriminated against (treated differently than other employees or applicants) because of your race, color, religion, sex, age (40+), national origin, or disability. *Note that if your allegation is like or related to a previous complaint, that complaint may be amended. 29 C.F.R § 1614.106(d)*

I allege discrimination based on gender, age and retaliation in that on April 29, 2003, I was notified that my job would be reposted and effective May 3, 2003 I was deemed to be an unencumbered employee. The points I would like to make in support of this claim are:

1. Disparate treatment in that I have been held to a different standard of performance than other clerk(s) in the front office.
2. I have been subjected to harrassment at the hands of the plant manager and the union president.
3. I believe that my job abolishment is due to previous grievance and EEO activity that was necessary.
4. I believe the plant manager has deliberately "dried up" my duties to justify his actions.
5. The plant manager has pursued this action will full knowledge of my age, health and physical limitations. (exceptions were made for the other clerk in the administrative area). In doing so, he is aware it will be impossible for me to do the type of work and to maintain the hours as posted. Also, I believe my position was deliberately posted without qualifications to ensure I would not/could not be a successful bidder.

17. What Remedy Are You Seeking to Resolve this Complaint?

To retain my Clerk/Stenographer position - same hours, NS days and duties

| 18. Did You Discuss Your Complaint with a *Dispute Resolution Specialist* or a *REDRESS™* mediator? | |
|---|---|
| ☒ Yes  5/8/2003 | ☐ No |
| *(Date You Received the Notice of Final Interview)* | |

| 19a. Signature of Dispute Resolution Specialist | 19b. Date 5/8/2003 |
|---|---|
| 20. Signature of Complainant or Complainant's Attorney | 21. Date of this Complaint 5/12/03 |

*Providing this information will authorize the U.S. Postal Service to send you important documents electronically.

PAGE 201

PS Form **2565**, March 2001 *(page 1 of 2)*

PAGE 202

## Instructions

A. Use this form to file a formal complaint if you are an employee or applicant for employment who believes that you have been discriminated against by the Postal Service because of your race, color, religion, sex, age (40+), national origin or disability. You must have presented the matter to an EEO dispute resolution specialist within 45 calendar days of the date the incident occurred, or, if a personnel action was involved, within 45 calendar days of the effective date of the personnel action.

B. Unless you have agreed to extend the 30-day period for an additional 60 calendar days, you will receive a notice of right to file a formal complaint within 30 calendar days from the date of your first contact with the EEO Office. You must file your formal complaint within 15 calendar days of the date on which you receive your notice of right to file. If you do not receive a notice of right to file within the appropriate time period, you may file a formal complaint at any time thereafter, up to 15 calendar days after receiving the notice.

C. If you have agreed to participate in alternative dispute resolution (ADR), the informal process must be completed within 90 calendar days of your first contact with the EEO Office. You have the right to file a formal complaint at any time thereafter, up to 15 calendar days after you have received your notice of right to file.

D. Your notice of right to file contains the address where your formal complaint must be mailed or delivered. The formal complaint will be deemed timely if it is received or postmarked before the expiration of the 15-day filing period, or, in the absence of a legible postmark, if it is received by the EEO office 5 days of the expiration of the filing period.

E. The time limits for filing a formal complaint may be extended if you show that you were prevented by circumstances beyond your control from timely submitting it, or if you present other reasons considered sufficient by the Postal Service.

F. If you need help preparing this form, you may obtain assistance from a representative of your choice. You may also seek guidance from the dispute resolution specialist who issued you the notice of right to file.

G. Your formal complaint must be in writing and must be signed and dated by you or your attorney. You are entitled to a representative of your choice at all stages of the EEO complaint process; however, only an attorney can sign official EEO documents on your behalf.

H. If your written complaint is accepted, it will be assigned to an EEO complaints investigator who will provide you with an opportunity to present all the facts that you believe resulted in the alleged discrimination. The EEO complaints investigator will conduct a thorough review of the circumstances under which the alleged discrimination occurred.

I. While your complaint is under investigation, you may amend it to add claims that are like or related. Contact the EEO office for the address where your written amendment request must be mailed or delivered.

J. You and your representative will each be provided a copy of the completed investigative file. You have the right to request a hearing before an administrative file within 30 calendar days of the date you receive the investigative file by mailing or delivering your request for a hearing to the appropriate Equal Employment Opportunity Commission (EEOC) District Office with a copy to the area Manager, EEO Compliance & Appeals. If you are

K. If you request a hearing, the EEOC will appoint an administrative judge (AJ) to conduct the hearing. The AJ will notify you and the Postal Service of the right to seek discovery prior to the hearing to develop evidence reasonably on matters relevant to the issues raised in the complaint(s) to be heard. Attendance at the hearing will be limited to persons the administrative judge determines have direct knowledge relating to the complaint. Hearings are part of the investigative process and are closed to the public.

L. Following the hearing, the AJ will send you copy of the hearing record, including the transcript and his/her decision. The head of the agency, or his/her designee, will review the entire record, including the transcript, and will determine whether or not to implement the A/J's decision. You will receive the agency's notification of final action within 40 days of the date the agency receives the A/J's decision. If the agency's final action will not fully implement the A/J's decision, the agency must appeal to the EEOC. A copy of the Postal Service's appeal will be attached to your notification of final action.

M. If you are not satisfied with the decision of the A/J, or the agency's final action on the decision, you have the right to appeal within 30 calendar days after receiving notification of the agency's final action. Your appeal must be mailed to the EEOC at the following address:

EEOC
OFFICE OF FEDERAL OPERATIONS
PO BOX 19848
WASHINGTON DC 20036-9848

N. In lieu of filing an appeal to the agency's final action to the EEOC's Office of Federal Operations (OFO), you may file a civil action in an appropriate U.S. District Court within 90 calendar days of your receipt of the agency's final action.

O. You may also file a civil action, in an appropriate U.S. district court, after 180 calendar days passed from the date you filed the complaint, if the final agency action has not been issued and an appeal has not been filed, within 90 days of receipt of the OFO's decision on your appeal; or after 180 days have passed from the date you filed your appeal with the OFO, if there has been no decision issued on that appeal.

P. Special statutory provisions in Public 93-259 relate to age discrimination. The Public Law sets forth the right to by-pass the administrative complaint processing procedure and file a civil action. For additional information, contact the EEO office.

Q. Under the Equal Pay Act, you have the right to file a civil action without exhausting the administrative procedures.

R. You must keep the EEO complaint processing office aware of your current mailing address at all times. Failure to notify the EEO complaint processing office and the EEOC of an address change could result in the dismissal of your complaint.

## Privacy Act Notice

**Privacy Act Notice.** The collection of this information is authorized by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e-16; the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 633a; the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794a; and Executive Order 11478, as amended. This information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. As a routine use, this information may be disclosed to an appropriate government agency, domestic or foreign, for law enforcement purposes; where pertinent, in a legal proceeding to which the USPS is a party or has an interest; to a government agency in order to obtain information relevant to a USPS decision concerning employment; security clearances, contracts, licenses, grants, permits or other benefits; to a government agency upon its request when relevant to its decision concerning employment, security clearances, security or suitability investigations, contracts, licenses, grants or other benefits; to a congressional office at your request; to an expert, consultant or other person under contract with the USPS to fulfill an agency function; to the Federal Records Center for storage; to the Office of Management and Budget for review of private relief legislation; to an independent certified public accountant during an audit of USPS finances; to an investigator, administrative judge or complaints examiner appointed by the Equal Employment Opportunity Commission for investigation of a formal EEO complaint under 29 CFR 1614; to the Merit Systems Protection Board or Office of Special Counsel for proceedings or investigations involving personnel practices and other matters within their jurisdiction; and to a labor organization as required by the National Labor Relations Act. Under the Privacy Act provision, the information requested is voluntary for the complainant, and for Postal Service employees and other witnesses.

# EXHIBIT B

# ATTORNEY JOSEPH R. GALLITANO
## & ASSOCIATES

34 MAIN STREET EXT., SUITE 202, PLYMOUTH, MASSACHUSETTS 02360
(508) 746-1500        FAX (508) 747-1150

September 7, 2004

**Via Fax and Regular Mail**

Kevin J. Berry, Administrative Judge
US EEOC
New York District Office
33 Whitehall Street, 5th Floor
New York, NY 10004

RE:    Claimant:  Dianne E. DuLong
       EEOC No. 160-2004-00218X
       Agency No. 1B-029-0039-03

Dear Judge Berry:

Pursuant to 29 C.F.R. § 1601 8(a)(1), (2) and (3)(d), the Claimant requests the Commission to issue a notice of Right to Sue in the Federal District Court and dismiss the within action before the EEOC.

Please forward to this office a Notice of Right to Sue pursuant to 29 C.F.R. § 1601.8(e). Upon receipt of said notice the Claimant Dianne DuLong will file a complaint in the U.S. District Court of Massachusetts within 90 days of receipt of aforesaid order authorizing the Claimant to proceed in Federal District Court.

Thank you for your attention to this matter.

Very truly yours,

Joseph R. Gallitano

JRG/pjm

cc:    Attorney Karen Cote
       Dianne DuLong

# EXHIBIT C

**UNITED STATES OF AMERICA**
**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**NEW YORK DISTRICT OFFICE**

Dianne E. DuLong,
     Complainant,


     v.

John E. Potter, Postmaster General
United States Postal Service,
     Agency.

EEOC Hearing No.  160-2004-00218X
Agency File No. 1B-029-0039-03

## DISMISSAL ORDER

On September 7, 2004 the Complainant requested dismissal of the above referenced complaint before the EEOC due to her desire to file a private suit in Federal District Court.  Based upon the Complainant's request and the fact that more than 180 days has passed since the' filing of the administrative complaint, this complaint is hereby DISMISSED.

It is so Ordered.

For the Commission:


Kevin J. Berry
Administrative Judge

      Date: 9/7/07

# EXHIBIT D

Article 2.3

## ARTICLE 2
## NON-DISCRIMINATION AND CIVIL RIGHTS

### Section 1.  Statement of Principle

The Employer and the Union agree that there shall be no discrimination by the Employer or the Union against employees because of race, color, creed, religion, national origin, sex, age, or marital status.

In addition, consistent with the other provisions of this Agreement, there shall be no unlawful discrimination against handicapped employees, as prohibited by the Rehabilitation Act.                              (see Memo, page 277)

### Section 2.  Committees

There are established at the national and APWU regional/USPS Area levels Joint Committees on Human Rights. The committees will be composed of responsible representatives of the Union and responsible management officials. The committees may develop affirmative action proposals on all matters affecting minority groups. The committees will also be advised of the plan for site selection for facilities planned for national postal mail networks and major metropolitan areas, and review availability of adequate housing and public transportation. The committees shall meet as required at mutually agreeable times.

### Section 3.  Grievances

Grievances arising under this Article may be filed at Step 2 of the grievance procedure within fourteen (14) days of when the employee or the Union has first learned or may reasonably have been expected to have learned of the alleged discrimination, unless filed directly at the national level, in

5

Damo DuLong
9 Wareham Rd.
Plymouth, MA 02360-3234

# AGREEMENT

between

United States Postal Service

and

American Postal Workers Union

AFL-CIO

## 2000–2003

Handbook EL-912

# EXHIBIT B

Pages: 1-49

Exhibits: 3

UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS

C.A. No.: 1:04-cv-12552

DIANNE DULONG,

    Plaintiff,

v

JOHN E. POTTER, POSTMASTER GENERAL,
JOSEPH M. FERREIRA, Individually, AARON
TOBEY, JR., Individually and as President
of the APWU, Lock 6005, and the AMERICAN POSTAL
WORKERS UNION AFL-CIO, CAPE COD AREA
LOCAL 6005,

    Defendants.

       DEPOSITION OF LORRAINE SAWYER, a witness called
for examination by counsel for the Plaintiff, taken pursuant
to the applicable provisions of the Massachusetts Rules of
Civil Procedure before KIM McCARTHY, a Court Reporter,
Notary Public in and for the Commonwealth of Massachusetts,
at ATTORNEY JOSEPH R. GALLITANO & ASSOCIATES, 34 Main Street
Extension, Suite 202, Plymouth, Massachusetts on Tuesday,
March 27, 2007, commencing at 2:02 p.m.

**LINDA M. CORCORAN**
**CERTIFIED COURT REPORTER**
**P.O. Box 4**
**Kingston, Massachusetts 02364**
**(781) 585-8172**

Page 11

1    Q    Did Dianne Dulong ask you to prepare this statement?

2    A    Yes.

3    Q    Did you prepare this statement on your own?

4    A    Yes.

5    Q    Did Dianne Dulong tell you what to say in this

6         statement at any time?

7    A    No.

8    Q    So this was provided voluntarily by you?

9    A    Yes.

10   Q    At her request?

11   A    Yes.

12   Q    I want to show you Exhibit 2.  This has the legal

13        heading of this case on it plus it says affidavit of

14        Lorraine L. Sawyer.  Do you recognize this document?

15   A    Yes.

16   Q    And after providing Dianne Dulong with your Exhibit 1,

17        the statement prepared by you, did she return to you at

18        some later date with your statement redrafted in an

19        affidavit form?

20   A    Yes.

21   Q    Is this that affidavit or a true copy of it?

22   A    It looks like it.

23   Q    Is that your signature on page 5?

24   A    Yes.

Page 24

1            Dulong?

2    A      Can you rephrase that?

3    Q      Sure.  Did you ever observe how Mr. Ferreira behaved

4           towards Pat Munroe?

5    A      Yes.

6    Q      And you said you observed his behavior towards Dianne

7           Dulong?

8    A      Yes.

9    Q      In his behavior towards Pat Munroe, did he appear to be

10          more friendly, cordial, talkative with Pat Munroe than

11          he was with Dianne Dulong?

12   A      Yes.

13   Q      Did he tend to isolate Dianne Dulong in that he

14          wouldn't talk to her unless absolutely necessary and if

15          he did so, it could be in a sarcastic fashion?

16   A      I am not sure.

17   Q      Did you ever hear him talk to Dianne Dulong in a

18          sarcastic manner?

19   A      Yes.

20   Q      Did he ever talk to Dianne Dulong in what you might say

21          was fresh?  By that I don't mean profanity, but just in

22          a sort of an antagonistic, mean sort of a demeanor.

23   A      I'm not sure.

24   Q      Did Mr. Ferreira ever give you the impression that he

Page 25

1      did not appreciate the grievances filed against him

2      naming him and the EEO complaints against him naming

3      him filed by Dianne Dulong?

4   A  Verbally no. I did represent Dianne as her steward and

5      did meet with him and Dianne on numerous occasions and

6      he didn't appreciate -- Mr. Ferreira didn't appreciate

7      grievances being filed in general.

8   Q  What about Dianne Dulong's grievances being filed?

9   A  No, he didn't like Dianne filing grievances.

10  Q  Did you get the impression that -- did he do or say

11     anything that you were able to observe or hear that

12     gave you the impression that he considered Dianne a

13     nuisance or a troublemaker for filing the grievances?

14  A  I'm trying to think of what I would -- how I --

15            MR. FARQUHAR: Take your time.

16  Q  What you remember. What you can recollect.

17            MR. FARQUHAR: Listen to his question

18     carefully. He's asking you whether or not you have any

19     experience in which specifically Mr. Ferreira gave you

20     the impression that because of the grievances or the

21     EEO complaints that she filed that he was annoyed with

22     her because of that.

23  A  He never verbally said that he was annoyed because of

24     that. As of the EEO complaints, I don't know anything

Page 28

1          job, that the person who was on the floor really didn't

2          work that much on the floor; is that correct?

3   A   The person worked on the floor, just not much on the

4          automation, on the machines.

5   Q   Wasn't the problem was about her working on the

6          machines, they wanted somebody on the machines?

7   A   Yes.

8   Q   So, in fact, they didn't really need anybody on the

9          machines?

10   A   At the time, I believe I was the only four o'clock

11          report that went to the machine, ran an automation

12          machine at the beginning of the shift.

13   Q   So at that point if Mr. Ferreira wanted to, he could

14          have made an accommodation at that time?

15          MR. FARQUHAR: Objection.  You can answer the

16          question.

17   A   In my personal opinion, he could have.

18   Q   Item Number 37 you talk about "An employee was

19          transferred from Boston last year, October 2004, was

20          given accommodation by changing his hours of duty to

21          Tour 1 to Tour 3 and allowing him to work manual mail.

22          He was not sent for either a fitness for duty or to a

23          reasonable accommodations hearing.  This was done

24          locally by management;" is that correct?

Page 30

1    not Dianne Dulong provide medical documentation for

2    what her situation was?

3    A    Yes.

4    Q    And all these other people supplied medical notes and

5    documentation were afforded accommodation, correct?

6    A    Yes.

7    Q    But in spite of the fact that Dianne Dulong provided

8    medical documentation, she still was refused an

9    opportunity to have any kind of accommodation?

10   A    Yes.

11   Q    In fact, wasn't she even refused the opportunity to try

12   and do the job for a period of time?

13   A    At the reasonable accommodations hearing the acting

14   plant manager at the time, Joe Cleary, had said that he

15   would give Dianne an opportunity to try to do the job,

16   but that never happened.

17   Q    On Paragraph 33 of page 4 you state that "Mr. Cleary

18   said he had no work within her restrictions.  To my

19   knowledge, Mr. Cleary did not check and see what work

20   was available.  There was work in the front office

21   Dianne could have done."  Is that true?

22   A    Yes.

23   Q    So do you know or did anybody say that --

24        MR. GALLITANO: Strike that.

Page 31

1    Q    Did Mr. Cleary say that he had discussed this action on

2         his part with anyone else?

3    A    No.

4    Q    Do you know even if Mr. Ferreira was on a detail, was

5         he still in touch with the plant, was he still

6         responsible for the plant as the plant manager?

7    A    Mr. Cleary was running the plant and I'm not sure about

8         who was ultimately responsible for the plant when the

9         plant manager is on a detail.

10   Q    Do you know if Mr. Ferreira was still in communication

11        with Mr. Cleary at the time when he was on a detail in

12        Providence?

13   A    I think he was.

14   Q    Is it true that, to the best of your knowledge, if

15        someone's acting as the plant manager, the actual plant

16        manager is still the ultimate responsible managing

17        person for that plant; is that not correct?

18             MR. FARQUHAR: Do you understand the question?

19             MR. GALLITANO: Let me rephrase it.

20   A    Yeah, I think I do, but I would think that the plant

21        manager would be still ultimately responsible, but as

22        far as that, I really don't know how that works.

23   Q    Fair enough.

24             In Paragraph 17 you talk about "Dianne provided

Page 32

1          Mr. Ferreira with medical documentation that she would

2          not be able to report at 0400, four o'clock in the

3          morning, and she requested the seven o'clock in the

4          morning report time."  Do you recall that?

5     A    Yes.

6     Q    In Paragraph 18 you indicate that "Dianne was willing

7          to train on the equipment and attempt to perform the

8          duties of that particular job that she had bid on and

9          was tentatively awarded."  Do you recall that?

10    A    Yes.

11    Q    Did she get a chance to train on that equipment and get

12         a try at performing the duties for a period of time?

13    A    No.

14    Q    Do you know why she wasn't afforded that opportunity?

15    A    The last day that Dianne was at work was the day that

16         she was supposed to start training with me, and I did

17         show her a video, which is the first step in training

18         because I'm also the training tech. at the plant.

19    Q    You wear a lot of hats there, I guess?

20    A    Too many.  So I showed Dianne the video and then it was

21         my time -- my end of tour, which was 15:30 and I was

22         getting ready to go home.  That's when Joe Cleary told

23         Dianne to go also.

24    Q    Would you look at Paragraph 19, you state that "Mr.

Page 33

1              Ferreira decided to send Dianne to a reasonable

2              accommodations committee hearing." So it was Mr.

3              Ferreira's decision not to let her train, but to send

4              her to a RAC hearing?

5    A    Mr. Ferreira sent her to the RAC hearing prior to her

6              beginning to train.

7    Q    What was the result of that hearing?

8    A    The reasonable accommodations committee denied Dianne

9              accommodations.

10   Q    So she had to try the position at the start time that

11             was designated?

12   A    Mr. Cleary had said that he would let her stay at her

13             current start time while she was training to see if she

14             could perform the duties.

15   Q    Who represented her from the union at that RAC hearing?

16   A    I did.

17   Q    Were you going to be allowed to represent her

18             originally?

19   A    No.

20   Q    What was the story behind you getting ultimately to

21             represent her?

22   A    Dianne had received the letter from Mr. Ferreira that

23             she was to go to a reasonable accommodations hearing,

24             and I don't remember if it was Dianne that talked to

Page 38

```
 1              question only because the grievances follow -- actually
 2              take place over a period of time. They take place from
 3              November of 2001 all the way up to June of '03.  So are
 4              you asking her if she noticed a difference after
 5              November of 2001 than prior to November of 2001?  On
 6              page 6 of the --
 7                   MR. GALLITANO: I got it.
 8         Q    You heard about the monitor duties which was in
 9              November of 2001.  Did you ever notice Mr. Ferreira
10              badgering her about that, asking her repeatedly why she
11              wouldn't do the monitoring?
12         A    No.
13         Q    Did you ever notice him around that time or shortly
14              after that time intensifying what one might call hard
15              feelings against her?
16         A    The only time that I would see Dianne pretty much and
17              Mr. Ferreira together would be if I had to go to talk
18              to Dianne or if I was representing her, which is kind
19              of a different type of situation.
20         Q    Different context?
21         A    Different context.
22         Q    During that context, did you get the feeling that Mr.
23              Ferreira was upset with Dianne?
24         A    Yeah, he would get upset.
```

Page 39

1    Q    Did you feel that he resented the charges being made
2         against him?
3              MR. FARQUHAR: Can we have a time frame,
4         please.
5    Q    The instances I'm talking about the times -- any of the
6         times that you were together with the two of them
7         regarding the negotiations or talks regarding
8         grievances filed against Mr. Ferreira.  And that would
9         have been anywhere from November 27th of '01 up to the
10        time that she left.
11   A    I believe I filed my first grievance for Dianne in
12        January of '03.
13   Q    Did you detect a certain bitterness from Mr. Ferreira
14        towards Mr. Dulong?
15   A    In regards to grievances.
16   Q    Is that a yes?
17   A    Yes.
18             MR. GALLITANO: Let's stop for a minute.
19                  (Short break was taken.)
20             MR. GALLITANO: I don't have any other
21        questions for you today unless, of course, there's some
22        questions from counsel.
23             MR. FARQUHAR: Yes, a few questions for you.
24                           *



UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DIANNE DULONG <br>      Plaintiff, <br><br> vs. <br><br> JOHN E. POTTER, POSTMASTER GENERAL, <br> JOSEPH M. FERREIRA, Individually, AARON <br> TOBEY, JR., Individually and as President of the <br> APWU, Local 6005, and the AMERICAN POSTAL <br> WORKERS UNION (APWU) Local 6005 <br>         Defendant. | ) <br> ) <br> ) <br> ) C.A. No. 1:04-cv-12552 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

EXHIBIT 2

L. Sawyer
3/27/07 Km

PENGAD 800-631-6989

## AFFIDAVIT OF LORRAINE L. SAWYER

I, Lorraine L. Sawyer, hereby state as follows:

1. I am the Steward for the Cape Cod Area Local 6005, APWU.

2. Dianne Dulong was employed at the Cape Cod P & D Facility for 16 years.

3. For most of that time she held the Clerk-Stenographer position.  The position required typing and shorthand skills.

4. A new facility was built in Wareham and at that time all the jobs were restructured to meet the needs of the new facility.

5. Dianne's job was taken away from her and re-posted for bidding.  Dianne bid and was awarded a Flat Sorter Position that required keyboard training.

6. On the day she was to start training she informed Joe Ferreira, former plant manager that she would be training with me for an hour, in case he was looking for her.

7. Mr. Ferreira then told Dianne that she could not go to training because she was going to get her old job back eventually.

1

8.    According to our Collective Bargaining Agreement a senior bidder on a position that requires skills training is to begin training within 10 days of being awarded a bid. After causing Dianne much duress, Mr. Ferreira allowed Diane to complete training.

9.    Dianne did eventually get her position as clerk-stenographer back because no one else in the facility was able to qualify on the required skills.

10.    In 2003, a decision was made by Mr. Ferreira to again restructure jobs in the facility.

11.    Aaron Tobey, former APWU Local President, formed a Job Committee. The Union Committee was to come up with a counter proposal to management.

12.    To my knowledge that Committee was to come up with a way to restructure jobs to the needs of the service with as little impact to employees as possible.

13.    The Committee discussed changing the position that Dianne held by one (1) hour, brining her in one hour later to help out on Tour 3, if necessary. The position would not have to be reposted and Dianne would have stayed in the position she was in.

14.    At no time was it discussed that the position would be changed to a 04:00 a.m. start, with Automation as a Principle Duty assignment and taking the typing and stenography off.

15.    After the Committee was disbanded by Mr. Tobey, he and Mr. Ferreira met to discuss the change to be made.

16.    Members of the Committee were not happy when the posting for the new positions went up and they were much different than the proposal agreed upon by the Committee.

2

17. Dianne then bid and was awarded Bid MN-22, 0400-1230, 0700-1530 on weekends. Dianne provided Mr. Ferreira medical documentation that she would not be able to report at 0400 and requested that she be given a 0700 report time. Dianne was also unable to perform some of the required duties.

18. Dianne was willing to train on and attempt to perform the duties.

19. Mr. Ferreira then decided to send Dianne to a Reasonable Accommodations Committee Hearing. She was handed a letter stating the date and time of the hearing.

20. Dianne had less than a week to prepare for the hearing.

21. Management was also aware that I, the steward, was going to be on annual leave at the time of the meeting.

22. Dianne spoke with Aaron Tobey, and he informed her that she was on her own; she was not entitled to union representation.

23. Tobey then approached me, as the steward, and told me that I was not to represent Dianne at the hearing.

24. I informed Tobey that Dianne was entitled to union representation.

25. Tobey placed a call to our National Business Agent Tom O'Brien, who informed him that Dianne was entitled to representation at a RAC hearing.

26. I postponed leaving for vacation until after the meeting.

27. We were given very little time to prepare.

28. When we arrived for the meeting there were seven (7) members present from management. I feel that this was unfair since Dianne was not informed of this.

3

29.    The Committee members kept alluding that Dianne did not want to work. Dianne was and is willing and able to work and perform any duties within her medical limitations.

30.    Mr. Cleary, who represented local management at the meeting (Mr. Ferreira was on a detail in Providence), agreed to let Dianne stay on her current hours (0830-1700) pending the findings of the RAC.

31.    Dianne was allowed to train on her duties of the bid to see what she was able to do.

32.    On Monday, I was to start to train Dianne. My end of tour was 1530. At that time Mr. Cleary informed Dianne that she was to punch off the clock and go home.

33.    Mr. Cleary said he had no work within her restrictions. To my knowledge, Mr. Cleary did not check and see what work was available. There was work in the front office that Dianne could have done.

34.    The RAC denied Dianne reasonable accommodations and suggested she file for disability retirement.

35.    The RAC did not even make an attempt to accommodate her. Not once did the Committee offer her positions that were available in other offices. They have in the past accommodated employees.

36.    Although management stated emphatically that Automation was an iatrical part of Position MN022, the employee who was given the position, after the service refused to accommodate Dianne, only worked a minimal amount of hours on a machine (less than 8 hours in a 3 month period, less after that).

4

37.    An employee, who transferred from Boston last year (October 2004), was given accommodations by changing his hours of duty from Tour 1 to Tour 3 and allowing him to work only manual mail.  He was not sent for either Fitness for Duty or to a Reasonable Accommodations Hearing.  This was done locally by management.

38.    However, they would not do the same thing for Dianne, who was a dedicated employee for 16 years.

39.    Other employees were accommodated either with Doctor's notes or courtesy light duty.  Michelle LaFlamme was allowed to work Tour 2 for a period of time after returning home after maternity leave.  Matt Smolinsky was detailed to a higher level position upon returning from a heart attack.  Aaron Tobey was given courtesy light duty for a hip problem.  I was given light duty upon my return to work after shoulder surgery. A Tour 1 casual employee was given light duty throwing manual mail.  And there are many more instances that I could site, including 2 employees on Rehab assignments. Joan Kingston was accommodated by hours of duty and days off.  She only sorts manual mail.  The difference between Joan and Dianne was Joan was hurt on the job.

40.    There should be no difference.  All employees should be treated equally, but unfortunately they are not.


Signed and sworn to under the pains and penalties of perjury this _30_ day of August, 2005.


_Lorraine L. Sawyer_
Lorraine L. Sawyer, Steward
Cape Cod Area Local 6005, APWU

# EXHIBIT D

Pages: 1-90

Exhibits: 1

UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS

C.A. No.: 1:04-cv-12552

---

DIANNE DULONG,

    Plaintiff,

v

JOHN E. POTTER, POSTMASTER GENERAL,

JOSEPH M. FERREIRA, Individually, AARON

TOBEY, JR., Individually and as President

of the APWU, Lock 6005, and the AMERICAN POSTAL

WORKERS UNION AFL-CIO, CAPE COD AREA

LOCAL 6005,

    Defendants.

---

       DEPOSITION OF JOSEPH FERREIRA, a witness called

for examination by counsel for the Plaintiff, taken pursuant

to the applicable provisions of the Massachusetts Rules of

Civil Procedure before KIM McCARTHY, a Court Reporter,

Notary Public in and for the Commonwealth of Massachusetts,

at ATTORNEY JOSEPH R. GALLITANO & ASSOCIATES, 34 Main Street

Extension, Suite 202, Plymouth, Massachusetts on Friday,

March 23, 2007, commencing at 10:07 a.m.

**LINDA M. CORCORAN**
**CERTIFIED COURT REPORTER**
**P.O. Box 4**
**Kingston, Massachusetts 02364**
**(781) 585-8172**

1    Q   From 1993 to the year 2000, did Dianne Dulong serve as

2         the clerk steno?

3    A   Yeah.

4    Q   Did she report directly to you during that time?

5    A   I was her direct manager, yes.

6    Q   How would you describe your relationship with her

7         during that period?

8    A   I thought it was good.

9    Q   So when you say you thought it was good, would you

10       consider yourself friendly?

11    A   To a certain extent.

12    Q   Did you consider her a good employee?

13    A   I thought she was good, yes.

14    Q   Did she perform her work well?

15    A   Most times.

16    Q   Did you ever do any evaluation reports on her

17       performance?

18    A   No, and they weren't required.

19    Q   Did you ever give her any commendations for her

20       performance?

21    A   A couple as I recall.

22    Q   Did you ever give anything that might be considered a

23       demerit for her performance?

24    A   What do you mean?

Page 67

1              WITNESS:  Can I do this?

2              MR. FARQUHAR:  Is this is in reference --

3              (Short break was taken.)

4    BY MR. GALLITANO:

5    Q    Regardless of what the recommendations were, were you

6         involved in the ultimate decision-making process as to

7         what shape these positions were going to take, what

8         their start times were going to be, what they were

9         going to be doing, what their job description was?

10   A    Ultimately as the plant manager, I had the full

11        authority to and final decision on these positions,

12        okay, but that was agreed to do it in conjunction with

13        the union and working with them.  But, yeah, ultimately

14        I was the plant manager and it was ultimately my final

15        decision with input from all the supervisors, from the

16        job committee and a lot of input from the president of

17        the union.

18   Q    But still as the plant manager, it was at your

19        discretion what the schedules or the different

20        positions were going to be and what positions were

21        going to be retained and what were going to be gone?

22   A    Yeah, and I would use that word loosely, my discretion.

23        It was all for operational and efficiency purposes, not

24        just hey, I'd like to do this to have this.  It was

Page 84

| | | |
|---|---|---|
| 1 | | work? |
| 2 | A | No.  But Dianne Dulong came to me numerous times and |
| 3 | | said that on a number of occasions and said, "I don't |
| 4 | | think this is my work, I think Pat Munroe should do |
| 5 | | this or Jimmy Chapman should do this, I think this is |
| 6 | | the general clerk's job. It's not my work," and that |
| 7 | | type of stuff. I do recall that. |
| 8 | Q | So did you consider her complaining about a lot of |
| 9 | | different other people at that time instead of doing |
| 10 | | her work? |
| 11 | A | Not any more than she had or Jimmy had or Pat Munroe |
| 12 | | had or Ann Bernachio had or other employees, no. She |
| 13 | | didn't stick out as being a complainer.  She was a |
| 14 | | postal employee and almost all of them have some |
| 15 | | complaint at some point. |
| 16 | Q | Let's revisit the background information.  I'm going to |
| 17 | | ask you again do you have a criminal record? |
| 18 | A | Yes. |
| 19 | Q | Could you tell me what convictions you've had? |
| 20 | A | I had a conviction of possession of a controlled |
| 21 | | substance, a DWI, and that's it. |
| 22 | Q | What year was the possession of controlled substance? |
| 23 | A | I believe it was '79. |
| 24 | Q | What was the substance? |

Page 85

| | | |
|---|---|---|
| 1 | A | Cocaine.  In fact, it was cocaine -- as I recall, it |
| 2 | | was cocaine, marijuana and fireworks. |
| 3 | Q | What was the disposition on that charge besides the |
| 4 | | conviction; were you given a sentence or probation? |
| 5 | A | Probation, pleaded nolo to that charge. |
| 6 | Q | Probation for how long? |
| 7 | A | I don't recall. |
| 8 | Q | Was there any suspended sentence? |
| 9 | A | I don't recall. |
| 10 | Q | The DWI was what year? |
| 11 | A | That happened either later that same year or the year |
| 12 | | after.  DWI and a misdemeanor, possession of a |
| 13 | | controlled substance. |
| 14 | Q | And the controlled substance again was...? |
| 15 | A | Cocaine. |
| 16 | Q | And that was 1979 also you said? |
| 17 | A | Or 1980.  I can't recall. |
| 18 | Q | How old were you then? |
| 19 | A | Twenty years old.  I was born in 1960, so in '79 I was |
| 20 | | 19 years old. |
| 21 | Q | Any other charges with no convictions? |
| 22 | A | Yes. |
| 23 | Q | What were those? |
| 24 | A | I was charged with rape.  I was acquitted and that |

# EXHIBIT E

1

1 - 89

IN THE UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS


DIANNE ELAINE DULONG,                )
                                     )
          Plaintiff,                 ) CIVIL DOCKET NO.
                                     ) 1:04-cv-12552-NG
     v.                              )
                                     )
U.S. Postmaster General,             )
John E. Potter, and                  )
JOSEPH M. FERREIRA, Individually,)
AARON TOBEY, JR., Individually    )
and as President of the             )
American Postal Work Union,         )
Local 6005 and the American         )
Postal Workers Union AFL-CIO,       )
Cape Cod Area, Local 6005,          )
                                     )
          Defendants.                )
                                     )


          THE ORAL DEPOSITION OF DIANNE E. DULONG, held

pursuant to Notice, and the Federal Rules of Civil

Procedure, before Gigi Marino, a Court Reporter and Notary

Public, within and for the Commonwealth of Massachusetts, at

the law offices of Joseph Gallitano, 34 Main Street

Extension, Suite 202, Plymouth, Massachusetts, on Tuesday,

March 27, 2007, commencing at 10:00 o'clock a.m.



1    individuals you have told us about, Ms. Bernacchio, Beverly

2    Gabbett, Aaron Tobey - would any of them from your

3    knowledge, and this could come from perhaps one of them

4    saying something to you about the situation, or making a

5    comment to you.  Is there anyone that you know that could

6    also state that for some reason, allegedly Ms. Monroe was

7    being given this type of treatment?

8         A    Other than from my telling them?

9         Q    Yes.

10        A    From them seeing it themselves?  I would say they

11   would see if for themselves by coming in and out of the

12   front office from observation.

13        Q    Okay, and the individuals that you just mentioned

14   you would still be comfortable with putting them on that

15   list of people who would have seen this?

16        A    Yes.

17        Q    Okay.  Did you have any other problems or any

18   issues with Ms. Monroe?

19        A    There was numerous issues, 'cause it was a hostile

20   environment because she was allowed to do what she wanted

21   when she wanted, how she wanted, and I was not allowed those

22   same things.  It was preferential treatment, it was -  it

23   caused a hostile environment in the front office because all

24   of this was allowed, and although it was brought to the

25   plant manager's attention, he did nothing about it.

1  knowledge.  She might have had some paperwork in there too,

2  old paperwork.

3      Q    Okay.  Under section 37E, you filed a grievance

4  with regard to Mr. Ferreira doing typing previously done by

5  yourself, and others doing typing.  Can you tell me what

6  type of typing he was doing?

7      A    He was general typing letters that I would

8  normally do, like notes to supervisors and internal

9  correspondence.

10     Q    Now, help me to understand this.

11          At one point, you only had way back when, one

12  computer in the entire office.

13     A    I believe we started out with one.  It was quite a

14  ways back, but I think we only had the one.

15     Q    When he started to do his own typing, and it looks

16  like this is in  -

17     A    '02.

18     Q    -- '02-'03, it says 060503, so perhaps it even

19  happened in late '02 or '03, did he have a computer in

20  office?

21     A    Yes, he did.

22     Q    Did he receive emails on that computer?

23     A    I assume so.

24     Q    And he was doing the typing that you are alleging

25  was your job on that computer?

68

1    A    Well, as he became more hostile and retaliatory

2    towards me, he began speaking to me much less, interacting

3    with me much less, avoiding me as much as he could, and

4    rather than me going to his office to get the work as I had

5    always done for the previous nine years, he was bringing

6    things out to me, would lay them on my counter.  Or he would

7    dictate a letter to me standing at my counter.

8    Q    Okay.  You have also here that you made him aware

9    that a member of management was emptying the daily mail

10   pouch before you arrived.

11   A    Right.  We just spoke about that.

12   Q    Yeah, was that the same incident?  Okay.  Is that

13   a repeat of the previous grievance?  Why is that there?

14   A    I don't know.  There was the one grievance about

15   the mail pouch, and probably the other grievance about him,

16   more so him doing work that I used to do.  Meaning Mr.

17   Ferreira.  That must be a repeat, the mail pouch.

18   Q    Okay.

19   A    Maybe there are two sheets.

20   Q    No, I'm just looking.

21        Okay.  Lastly, you have that Ferreira telephoned

22   casuals himself with reporting time information which

23   previously had been done by you as part of your job.

24   A    Correct.

25   Q    Okay.  Tell me a little bit about that please.

74

1   was all going on.  So it would be fall of 2000.  I don't

2   have an exact date in front of me, but   -

3       Q    All right.  Then under 38B in November of '01,

4   this was with regards to another EEO complaint where you

5   left the building, despite submitting a leave slip to Mr.

6   Smolinsky.

7       A    Correct.

8       Q    And what was the outcome of this EEO complaint?

9       A    The outcome was that the AWOL charge that Mr.

10  Ferreira charged me with out of retaliation, that was

11  changed to sick leave on the slip.  And that's how that was

12  resolved.

13      Q    And this was resolved at the EEO level?

14      A    Yes.

15      Q    Okay.  Lastly, under 38C, that EEO complaint which

16  is the basis of this lawsuit, is the, as you have described

17  it here, the job loss.  And it was filed in -  the complaint

18  was filed on May 8th of '03, sounds correct?

19      A    Sounds correct.

20      Q    Okay.  Now, I want to finish up by asking you a

21  couple of questions with regard to Mr. Ferreira.

22          You allege that you have been discriminated

23  against based on your age.  Could you tell me why you

24  believe you have been discriminated against based on your

25  age?

APEX Reporting
(617) 426-3077

75

1    A    Yes, because Mr. Ferreira purposely dried up my

2  position so that it could be reposted and a younger person

3  secured that job.

4    Q    And who was the younger person that secured the

5  job?

6    A    That was Lorraine Sawyer.

7    Q    Okay, and do you know how old Lorraine Sawyer is?

8    A    Today I don't.  I know that she's younger than I,

9  I can state that.

10    Q    Did Mr. Ferreira ever make any comments about your

11  age?

12    A    Not that I recall, specifically.

13    Q    Now, you also mention that -  I should ask you,

14  strike that.

15        What about Mr. Tobey?  Do you believe that he

16  discriminated against you in any way because of your age?

17    A    Because of age, I'd have to say no.

18    Q    All right, you say that Ferreira wanted a younger

19  person to get the job.  But aren't the jobs actually

20  assigned through the postal service by seniority?

21    A    Correct.

22    Q    Why was it your assumption that someone who was

23  younger than yourself would be able to get the job?

24    A    Because even though they posted that job with no

25  requirements, by looking at the seniority list above my name

1   there was very few people who knew how to type, to my

2   knowledge.    And typing was needed for that position, so they

3   would want someone in there who could type -- and I'm just

4   assuming -  there were younger people that could type ahead

5   of me.

6        Q    Were there some people that were older on the list

7   that were ahead of you?

8        A    Yes.

9        Q    Were these women or men that were on the list?

10       A    I'd say both.

11       Q    So you're stating that to your knowledge, there

12  were no individuals on that list that were older than

13  yourself that knew how to type?

14       A    No, I didn't say that.  I  -

15       Q    That's my question to you.

16            Do you know whether or not  -

17       A    Could you repeat the question please?

18       Q    Sure, do you know whether or not there were any

19  individuals on that list that were older than yourself that

20  knew how to type?

21       A    No.

22       Q    You're not sure?

23       A    I'm not sure.

24       Q    Okay.  You also  -

25       A    I can't quite recall who was on the list above me

# EXHIBIT F



UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DIANNE DULONG ) | |
|           Plaintiff, ) | |
| ) | |
| vs. ) | C.A. No. 1:04-cv-12552 |
| ) | |
| JOHN E. POTTER, POSTMASTER GENERAL, ) | |
| JOSEPH M. FERREIRA, Individually, AARON ) | |
| TOBEY, JR., Individually and as President of the ) | |
| APWU, Local 6005, and the AMERICAN POSTAL) | |
| WORKERS UNION (APWU) Local 6005 ) | |
|           Defendant. ) | |

### <u>AFFIDAVIT OF JAMES H. CHAPMAN, JR.</u>

I, James H. Chapman, Jr., hereby state as follows:

1.    At the time that Dianne Dulong was employed by the Postal Service, my position was that of General Clerk.

2.    Dianne Dulong was employed at the Cape Cod P & D Facility for 16 years.

3.    For most of that time she held the Clerk-Stenographer position.  The position required typing and shorthand skills.

4.    Joseph M. Ferreira (hereinafter "Ferreira") was the Plant Manager.  I witnessed Ferreira's rude and obnoxious treatment toward the Plaintiff, Dianne DuLong.

5.    Ferreira treated Dianne DuLong differently then he treated Ms. Monroe, another employee.

6.    I witnessed Ferreira threaten Dianne DuLong with removing stenography as part of her job description, in an effort to get her removed from her job.

7.    I believe that Ferreira went out of his way to discriminate and harass Dianne DuLong on an ongoing basis, even though he knew that she had medical issues.

8.    I witnessed the panic attacks and chest pains Dianne DuLong suffered during these incidents.

9.    I witnessed a report of a false incident, in which Dianne DuLong was charged as absent without leave from her job.

10.    The Job Committee never changed Dianne DuLong's job description except by one hour, which would have kept her in the position.  In addition her duties were never changed and the Job Committee substantiated her position.

11.    After the Job Committee was through, Ferreira and Aaron Tobey, Jr., (hereinafter "Tobey"), who was the President of the APWU, switched all the jobs to the opposite of what the Job Committee recommended, without informing the Job Committee.

12.    I provided a letter for the Job Committee against the aforesaid Ferreira and Tobey opposing their actions and a letter to the employees stating that the job changes did not reflect the Committee's action.

13.    I believe Ferreira and Tobey went after Dianne DuLong stronger after the aforesaid, because she did not want to monitor the new system of security, which was a maintenance job.

14.    If I ran a business, I would be quite lucky to have an employee of Dianne DuLong's dedication.  In the years I worked with her she showed a genuine concern for the work task and always put her job before her health.

Signed and sworn to under the pains and penalties of perjury this 2-7 day of September, 2005.

James H. Chapman, Jr.

# EXHIBIT G

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

C.A. NO. 1:04-cv-12552

```
-------------------------------------)
DIANNE DuLONG,                       )
        Plaintiff                    )
VS.                                  )
                                     )
JOHN E. POTTER, POSTMASTER GENERAL,  )
JOSEPH M. FERREIRA, Individually,    )
AARON TOBEY, JR., Individually and   )
as President of the APWU, Local 6005,)
and the AMERICAN POSTAL WORKERS UNION)
AFL-CIO, CAPE COD AREA LOCAL 6005,   )
        Defendants                   )
-------------------------------------)
```

DEPOSITION OF JAMES H. CHAPMAN, JR., a witness

called for examination by counsel for the Plaintiff,

taken pursuant to the applicable provisions of the

Massachusetts Rules of Civil Procedure, before LINDA M.

CORCORAN, a Court Reporter-Notary Public in and for the

Commonwealth of Massachusetts, at the Law Offices of

Joseph R. Gallitano & Associates, 34 Main Street

Extension, Suite 202, Plymouth, Massachusetts, on Monday,

August 6, 2007, commencing at 11:32 a.m.

**LINDA M. CORCORAN**
**CERTIFIED COURT REPORTER**
**P. O. Box 4**
**Kingston, Massachusetts  02364**
**(781) 585-8172**

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Page 28

1    area, and she was off to the right with a counter instead

2    of an office.

3        Q.    So would you say that you worked with her from

4    2000 -- the year 2000 to 2003?

5        A.    Yeah, or maybe even longer than that.  It could

6    have been previous to 2000.

7        Q.    Like 1998?

8        A.    It could have been, yeah.  I'd have to see my

9    Form 50s appointing me as the general clerk.

10       Q.    I want to show you Exhibit 1, and if you'd hand

11   a copy to your counsel.  And that's for him.  This is for

12   you marked Exhibit 1.

13             (Hands to witness.)

14       Q.    This is entitled "Affidavit of James H.

15   Chapman, Jr."  Do you recognize this document?

16       A.    No.

17       Q.    I direct you to the last page.  Is that your

18   signature?

19       A.    Yeah, that's my signature.

20       Q.    Let me show you something else.

21             MR. GALLITANO:  Would you mark this as Exhibit

22   2.

23                              (Whereupon, a letter was

24                              marked as Exhibit No. 2 for

FORM CSR- LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1                              the plaintiff.)

2          (Pause.)

3    BY MR. GALLITANO

4          Q.   And after you've reviewed the document, do you

5    recall it now?

6          A.   No, I don't.  I never remember going to court.

7          Q.   Well, let me refresh your recollection.  You

8    wouldn't have gone to court to do that.

9               Was that document presented to you by Ms.

10   DuLong to sign after you gave her a letter which

11   basically said the exact same thing?

12         A.   That's possible.  I don't know.

13         Q.   Let me refresh your recollection.  If you could

14   just put that down for a minute, and I'll give you

15   Exhibit 2.

16         A.   Okay.

17         Q.   And hand a copy to your counsel.

18              (Hands to witness.)

19         A.   Sure.

20         Q.   Showing you a letter from you to Ms. DuLong,

21   and if you would read that and compare it to the

22   affidavit.

23         A.   Sure.

24              (Pause.)

1        A.    Uh-huh, I remember that.

2        Q.    Okay, you remember this.  The letter you

3    remember is a letter that's addressed to Dianne DuLong of

4    9 Wareham Road, Plymouth, Mass.?  It starts off "Dear

5    Dianne"?

6        A.    Uh-huh.

7        Q.    And it's signed by you as Jim Chapman, correct?

8        A.    Correct.

9        Q.    And would you agree that the statements set

10   forth in the affidavit entitled "Affidavit of James H.

11   Chapman, Jr." reflect many of the same statements made in

12   your letter to Dianne?

13       A.    Sure, they do.

14       Q.    And that, in fact, the affidavit was derived

15   from that letter and then presented to you for execution?

16       A.    I'm sure it was.  It's my signature.  I mean,

17   it's -- I don't remember it, but I remember this letter

18   more than I remember this (indicates).  But also I've had

19   a couple different breakdowns with my PTSD, and my memory

20   sometimes is not as clear as it should be.

21       Q.    Let's just address that problem for a minute.

22   Your posttraumatic stress disorder, is that in any way

23   inhibiting your answering the questions here today?

24       A.    If it did, I would say so.

FORM CSR-LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1          MR. GALLITANO:  Mark that Exhibit 3.

2                              (Whereupon, a letter dated

3                              December 28, 2001, was

4                              marked as Exhibit No. 3 for

5                              the plaintiff.)

6     BY MR. GALLITANO

7          Q.    This is an exhibit for you, and if you would

8     hand a copy to your counsel.

9               (Hands to witness.)

10              MR. FARQUHAR:  Thanks, Joe.

11         Q.    This is a letter to Joe Ferreira -- Joseph

12    Ferreira, plant manager, dated 12/28/01, and the subject

13    is EEO 1B-029-0004-02, Dianne DuLong.  That's a letter

14    signed by you on the second page, and it has some

15    attachments with it.  And if you'd take a moment to look

16    through that.  Maybe this will refresh your recollection.

17              (Pause.)

18         A.    Okay, your question was?

19         Q.    Are you familiar with this letter?

20         A.    Yeah, I must have been in some form of union

21    capacity to write a letter like that.

22         Q.    And are you familiar with the complaint, the

23    settlement agreement attached to it?

24         A.    I don't know about the settlement and

Page 40

1    everything like that.

2         Q.    But you recognize that?

3         A.    I would have written -- I would have written

4    this letter for Dianne from a union perspective to back

5    her up in any EEO that she had put in.

6         Q.    In going through the letter, from what you've

7    expressed in the letter, was it your opinion that Mr.

8    Ferreira was basically going after Ms. DuLong for filing

9    an EEO complaint?

10        A.    For this EEO complaint?

11        Q.    For this and other EEO complaints.

12        A.    Well, I don't remember unless you show me

13   another EEO complaint.  I don't believe I was part of

14   this process in the EEO.  This letter would have been in

15   support for an EEO that she put in.  I guess what I'm

16   wondering is, something that's been settled here on

17   paper, why it's being brought up.  I don't understand

18   that.  This is a settlement that was made.

19             MR. FARQUHAR:  Don't worry about it.  Just

20        listen to his question.

21             THE WITNESS:  Oh, okay.

22        Q.    I'm not interested in the settlement.  I'm

23   interested in the opinion you expressed in your letter.

24        A.    Right.

1          Q.    Right, but ultimately it's still the plant

2    manager's decision?

3          A.    Oh, absolutely.  Oh, absolutely.

4          MR. GALLITANO:  I'd like to mark this Exhibit

5          -- this would be 4.

6                               (Whereupon, a letter dated

7                               December 7, 2000, was

8                               marked as Exhibit No. 4 for

9                               the plaintiff.)

10   BY MR. GALLITANO

11         Q.    And if you would pass a copy.

12               (Hands to witness.)

13         MR. FARQUHAR:  Thanks, Joe.

14         MR. GALLITANO:  While you're reviewing, just

15         for the record, all the exhibits should be collected

16         at the end of the deposition and kept with the

17         transcript, and if you want a separate copy of

18         exhibits to take, the copies that I've provided

19         today, you can take those with you.

20         MR. FARQUHAR:  Thanks, Joe.

21         Q.    Let me know, Mr. Chapman, when you've had a

22   chance to review that.

23         A.    Okay.

24               (Pause.)

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Page 64

1      A.    Okay.

2      Q.    Is the letter I've given you accurate in every

3   respect that you recall?

4      A.    As far as I recall.  I don't -- there are some

5   things I just don't remember.  I remember incidences.  I

6   remember some of the behavior patterns.  The specific

7   incident on this, I don't remember.

8      Q.    In this letter is it fair to say that you're

9   concerned about a course of harassment that Ms. DuLong

10  was being subjected to by Mr. Ferreira?

11     A.    It seems to me it's from the timekeeper, not

12  Mr. Ferreira.

13     Q.    Did Mr. Ferreira do anything to resolve this

14  issue?

15     A.    I know that he supposedly took her in his

16  office a couple times and said things.  What, I wasn't

17  privy to.

18     Q.    When you say "her," who do you mean?

19     A.    The timekeeper.

20     Q.    And the timekeeper's name is?

21     A.    Pat Monroe.

22     Q.    Was this a situation which you made reference

23  to earlier of Mr. Ferreira's behavior of playing people

24  off against each other?

1          A.    My understanding, it was a big promotion.   I

2     don't know the actual grade involved.

3                MR. GALLITANO:   Off the record.

4                (Discussion off the record.)

5                (Short recess was taken.)

6                MR. GALLITANO:   Back on the record.

7     BY MR. GALLITANO

8          Q.    Mr. Chapman, did you ever have an incident with

9     Mr. Ferreira personally in which you believed he was

10    violent toward you?

11               MR. FARQUHAR:   Physically violent?

12               MR. GALLITANO:   Physically violent or

13          threatened to be physically violent.

14         A.    No physically, that I recollect.   I remember

15    walking out of his office one day making a statement that

16    was a threat, "I'm not putting up with it," but I don't

17    recollect the actual incident.

18         Q.    I show you exhibit --

19               MR. GALLITANO:   It's going to be Exhibit 6.

20                                (Whereupon, a letter dated

21                                December 7, 1999, was

22                                marked as Exhibit No. 6 for

23                                the plaintiff.)

24    BY MR. GALLITANO

1          Q.    Here's a copy for your counsel.

2                (Hands to witness.)

3          Q.    This is a letter dated 1999 to John

4    Yanuskiewicz --

5          A.    Nobody's ever pronounced that right.  They're

6    always calling him Johnny Y.

7          Q.    Okay, well, Johnny Y, an APWU steward.

8                -- from you.  Do you recognize this?  And would

9    you take a minute to read it, please.

10         A.    Sure.

11               (Pause.)

12         A.    Okay.

13         Q.    Do you recall now an incident that occurred

14   between you and Mr. Ferreira as a result of reviewing

15   this letter?

16         A.    The same.  As I said, yeah, I remember walking

17   out of his office.  Now that I've seen Mr. Jenkins, I

18   remember Mr. Jenkins got involved with it after the fact.

19               There were many times that Joe Ferreira and I

20   would have issues, whether from a union perspective or

21   from a personal perspective as an employee.  Joe -- I

22   can't recollect what was said back then.  I do remember

23   walking out of the office.  I do remember saying I was

24   going to postal inspectors.  Mr. Jenkins was the local

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

# EXHIBIT H



EXHIBIT 3
CHAPMAN
8-6-07
LINDA M. CORCORAN
CERTIFIED COURT REPORTER

Joseph Ferreira
Plant Manager

12/28/01

Subject: EEO - 1B-029-0004-02 - Dianne Dulong

Mr. Ferreira,

This correspondence has been prepared in regards to the closure of the above case and a summary of statements made by you during the EEO, which necessitates rebuttal.

Ms. Dulong made this case very simple for you to settle. In actuality you gave nothing except what she was entitled to. The exception is that you cannot give her back the physical and mental stress that was caused by this most insidious and forceful incident. For the record, no matter who your so-called experts in workmen's compensation think, Ms. Dulong would have been entitled to fill out a CA-1 for what she considered a traumatic experience as a result of your actions in your office. I am also familiar with the laws regarding these matters. The determination as to what is approved or disapproved is workmen's compensation. However, what is not their determination is how you did not fulfill your obligation under the ELM to inform Ms. Dulong of her rights and instead charged her AWOL, which was also in violation of the same federal mandate.

I would like to remind you of a few things that will be monitored very closely in the future so as not to disrupt Ms. Dulong's exceptional performance and sick leave record. You made a mockery of her and created a hostile working environment when you charged her AWOL when this employee has been absent a total of (3) times in (2) years. Your actions also placed her on restricted sick leave in violation of the ELM, which is a federal mandate. It has not gone unnoticed that other employees in your office which you are responsible for have been allowed to take EAL and other leave for absences far exceeding Ms. Dulong's without the need for documentation as required which clearly shows desperate treatment and favoritism. The union has a record that the grievance on the monitor was solved prior to Ms. Dulong providing you medical documentation, which clearly shows that either you or the EEO counselor was in error when it was quoted as you taking the monitor out because of the medical documentation.

I would like to remind you of a few areas that are of concern that I hope are not going to be used in the future towards further action as reprisal against Ms. Dulong. In the past, while I was present, you made the statement that if you wanted to abolish Ms. Dulong's job because you didn't like her; you would eliminate the dictation. You also made the comment that the General Clerks job was the only job not authorized in the front office. It appears now, that you have made it clear that the secretary/stenographer's job is not authorized. Let me point out that it was the General Clerks job not authorized. In addition, you have a clerk in the timekeepers office unauthorized whom should be in a residual position on tour 1 and have a supervisor doing clerk work that is here from what I have been told on workmen's compensation. It would be strongly looked at, that if you are thinking of taking anybody's job, you must get rid of all of the above before the (1) authorized position in the secretary/stenographer.

The CC-Mail that your refer to as cutting dictation may be true to some degree. However, let me point out that we had CC-Mail in the old building and for quite sometime. Why now are you bringing out that this is a new discovery making such a difference in workload?

It is very insulting that you used Ms. Dulong's strong dedication to duty against her. It is true that Ms. Dulong has for some years **as a favor to management**, interviewed casuals for hire. However, **I find it very manipulating during an EEO investigation that you used this as a means to undermine the work quantity that Ms. Dulong has.** Simply put, she was put on higher level management when she conducted these interviews to free you and any other supervisor up that would be required to hire. This is

Page 2. Dulong.

not part of her job nor has it ever been.

Finally, please keep in mind that I have been subject to your manipulation and deceiving tactics for the past 7 plus years working in the front office. You were the main reason, which is well documented in many files as to the reason I bid out of the front office giving up a day job. I will not now or in the future sit idle and see you harass Ms. Dulong as you have done to me and many others in this facility. If I have to solicit the troops together for statements or call on a Congressional Inquiry into your antics, it will be done and all will be exposed. Common sense would tell you to treat this employee with the dignity and respect she deserves. Some say including me that you are the hardest on people who suffer from illnesses and disabilities. There are laws to protect us from this type of activity and I fully intend to become familiar with them all to include any contacts necessary should the need arise to defend employees from a hostile and abusive work environment. In the case of having a steward present. Ms. Dulong has been made very aware of her rights so not to be mislead in the future.

Jim Chapman


**UNITED STATES**
**POSTAL SERVICE**

**EEO Settlement Agreement**

Case No. **1B-029-0004-02**

I, _Dianne E. Dulong_, do hereby voluntarily withdraw my request for EEO counseling or formal complaint, as applicable, based on the stipulation(s) that:

1. Both parties agree to treat eachother with dignity and Respect.
2. Management agrees that Dianne Dulong ~~will~~ will be allowed to request a union Steward in accordance with the National Agreement.
3. Both parties agree that all employees are entitled to work in a hostile-~~free~~ work environment.
4. Management agrees that the sick leave Dianne Dulong used on 11-28-01 and 11-29-01 will be approved as FMLA sick leave and copies of the 3971's will be given to Dianne Dulong.
5. Management agrees to expunge, from the timekeeper's Records, the 3971 submitted by Dianne Dulong on 11-28-01 that listed her absence as AWOL.
6. Management agrees to follow all Rules and Regulations as outlined in the National Agreement and all Postal Manuals.

I fully understand that by agreeing to this resolution, I waive my rights to any further appeal of my complaint through the EEO process. I further state that this agreement did not result from harassment, threats, coercion or intimidation.

I am fully aware that any settlement agreement knowingly and voluntarily agreed to by the parties, reached at any stage of the complaint process is binding on both parties. Should I believe the Postal Service has failed to adhere to the stipulations contained in this agreement for any reason not attributable to my acts or conduct, I must notify the EEO Complaint's Processing Office located in my district, in writing, within 30 calendar days of the alleged noncompliance. (Employees at Postal Service Headquarters and Headquarters Field Units and employees of the Inspection Service should notify the EEO Appeals Review Specialist at Postal Service Headquarters.) I may include in my statement of noncompliance a request that the terms of the settlement agreement be specifically implemented or, alternatively, that my complaint be reinstated for further processing from the point processing ceased. The Postal Service will respond to my request in accordance with 29 C.F.R. § 1614.504.

**Privacy Act Notice**

**Privacy Act Notice.** The collection of this information is authorized by The Equal Employment Opportunity Act of 1972, 42 U.S.C. 2000e-16; The Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C.633a; The Rehabilitation Act of 1973, as amended, 29 U.S.C. 794a; and Executive Order 11478, as amended. This information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. As a routine use, this information may be disclosed to an appropriate government agency, domestic or foreign, for law enforcement purposes; where pertinent, in a legal proceeding to which the USPS is a party or has an interest; to a government agency in order to obtain information relevant to a USPS decision concerning employment, security clearances, contracts, licenses, grants, permits or other benefits; to a government agency upon its request when relevant to its decision concerning employment, security clearances, security or suitability investigations, contracts, licenses, grants or other benefits; to a congressional office at your request; to an expert, consultant, or other person under contract with the USPS to fulfill an agency function; to the Federal Records Center for storage; to the Office of Management and Budget for review of private relief legislation; to an independent certified public accountant during an official audit of USPS finances; to an investigator, administrative judge or complaints examiner appointed by the Equal Employment Opportunity Commission for investigation of a formal EEO complaint under 29 CFR 1614; to the Merit Systems Protection Board or Office of Special Counsel for proceedings or investigations involving personnel practices and other matters within their jurisdiction; and to a labor organization as required by the National Labor Relations Act. Under the Privacy Act provision, the information requested is voluntary for the complainant, and for Postal Service employees and other witnesses.

| Signature of Complainant | Date |
|---|---|
| _D. Dianne E. Dulong_ | _12-27-01_ |

Management agrees to the aforementioned stipulation solely in an effort to resolve the complainant's allegation(s), and this agreement should not be construed as an admission of discrimination or wrongdoing on the part of any official of the U.S. Postal Service.

| Signature of Management Representative | Date |
|---|---|
| _(signature)_ | _12-27-01_ |

| Printed Name of Management Representative | Title of Management Representative |
|---|---|
| _Joseph Ferreira_ | _Plant Mgr._ |

PS Form 2564-B, November 1999

# UNITED STATES POSTAL SERVICE™

## Request for or Notification of Absence

| Employee's Name (Last, First, M.I.) | | | Social Security No. | | Date Submitted | | No. of Hours Requested | | | | PP | Year | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DuLong, Dianne | | | 014 24 4127 | | 12/3/01 | | 5 | | | | Day | Init. | Hours | |

| Installation (For PM leave, show City, State, and ZIP Code) | | N/S Day | Pay Loc. # | D/A Code | From Date | Hour | | | Sat 01 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CAPE COD P&D FAC, MA 02571-9701 | | S S | 50 | | 11/24/01 | 1050 | | | | | |

| Time of Call or Request | Scheduled Reporting Time | Employee Can Be Reached At (If needed) | Thru Date | Hour | | Sun 02 |
|---|---|---|---|---|---|---|
| | | ☐ No Call | 11/24/01 | 17 00 | | |

**Type of Absence**
- ☐ Annual
- ☐ Carrier 701 Rule
- ☐ LWOP (See Reverse)
- ☒ Sick (See Reverse)
- ☐ Late          ☐ COP
- ☐ Other:

**Documentation (For Official Use Only)**
- ☐ For COP Leave (CA1 on File)
- ☐ For Advanced Sick Leave (1221 on File)
- ☐ For Military Leave (Orders Reviewed)
- ☐ For Court Leave (Summons Reviewed)
- ☐ For Higher Level (1723 on File)
- ☐ Scheme Training Testing, Qualifying (Memo on File)

| Revised Schedule for (Date) | | Approved in Advance |
|---|---|---|
| | | ☐ Yes   ☐ No |
| Begin Work | | |
| Lunch-Out | | |
| Lunch-In | | |
| End Work | | |
| Total Hours | | |

**Remarks (Do Not Enter Medical Information)**

To replace previous slip denied under FMLA

| Mon 03 | | |
| Tue 04 | | |
| Wed 05 | | |
| Thur 06 | | |
| Fri 07 | | |
| Sat 08 | | |
| Sun 09 | | |

I understand that the annual leave authorized in excess of amount available to me during the leave year will be changed to LWOP.

| Employee's Signature and Date | Signature of Person Recording Absence and Date | Signature of Supervisor and Date Notified | Mon 10 |
|---|---|---|---|
| Dianne DuLong | | | Tue 11 |

**Official Action on Application (Return copy of signed request to employee)**
- ☒ Approved, FMLA   ☐ Pending Documentation Noted on Reverse.
- ☐ Disapproved (Give Reason)

| Wed 12 |
| Thur 13 |
| Fri 14 |

**Warning:** The furnishing of false information on this form may result in a fine of not more than $10,000 or imprisonment of not more than 5 years, or both. (18 U.S.C. 1001)

☐ Continued on Reverse

PS Form 3971, June 1995

**UNITED STATES POSTAL SERVICE®**

# Request for or Notification of Absence

| Employee's Name *(Last, first, M.I)* | | | | Social Security No. | | Date Submitted | | No. of Hours Requested | | | PP | Year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dubois D | | | | 4137 | | 11-28-01 | | 8 | | | Day | Init. | Hours |

| Installation *(For PM leave, show city, state, and ZIP code)* | | N/S Day | Pay Loc. # | D/A Code | From Date | Hour | Sat 01 |
|---|---|---|---|---|---|---|---|
| Cape Cod P+D | | | | | 11-28-01 | 10 | Sun 02 |

| Time of Call or Request | Scheduled Reporting Time | Employee Can Be Reached At *(If needed)* | Thru Date | Hour | |
|---|---|---|---|---|---|
| 1400 | | ☐ No Call | | | Mon 03 |

| Type of Absence | Documentation *(For official use only)* | | Revised Schedule for *(Date)* | Approved in Advance | | |
|---|---|---|---|---|---|---|
| ☐ Annual | ☐ For COP Leave *(CA1 on file)* | | | ☐ Yes  ☐ No | | Tue 04 |
| ☐ Carrier 701 Rule | ☐ For Advanced Sick Leave *(1221 on file)* | | | | | |
| ☐ LWOP *(See reverse)* | ☐ For Military Leave *(Orders reviewed)* | | Begin Work | | | Wed 05 |
| ☒ Sick *(See reverse)* | ☐ For Court Leave *(Summons reviewed)* | | | | | |
| ☐ Late  ☐ COP | ☐ For Higher Level *(1723 on file)* | | Lunch-Out | | | Thur 06 |
| ☐ Other: _____ | ☐ Scheme Training Testing, Qualifying *(Memo on file)* | | Lunch-In | | | Fri 07 |

| Remarks *(Do not enter medical information)* | | End Work | | Sat 08 |
|---|---|---|---|---|
| Change from 144 Sk to 8 FMLA | | Total Hours | | Sun 09 |
| FMLA | | | | |

I understand that the annual leave authorized in excess of amount available to me during the leave year will be changed to LWOP.

| Employee's Signature and Date | Signature of Person Reporting Absence and Date | Signature of Supervisor and Date Notified | Mon 10 |
|---|---|---|---|
| *[signature]* | *Matthew [signature] 11-28-01* | | Tue 11 |

## Official Action on Application *(Return copy of signed request to employee)*

| | | | Wed 12 |
|---|---|---|---|
| ☐ Approved, not FMLA* | ☒ Approved, FMLA *(See Publication 71)* | ☐ Pending Documentation Noted on Reverse. | Thur 13 | V | 8 |
| ☐ Disapproved *(Give reason)*: | | | Fri 14 |

\* If employee requests FMLA, but FMLA is not approved because employee does not meet eligibility requirements (1250 hrs. worked during 12 mos. prior to start of leave and 1-year employment), specify when eligibility is projected: _____     ☐ Continued on Reverse

PS Form **3971**, December 1999

Warning: The furnishing of false information on this form may result in a fine of not more than $10,000 or imprisonment of not more than 5 years, or both. (18 U.S.C. 1001)

**UNITED STATES**
**POSTAL SERVICE**™

**Request for or Notification of Absen**

| Employee's Name (Last, First, M.I.) | | Social Security No. | Date Submitted | No. of Hours Requested | | PP | Year |
|---|---|---|---|---|---|---|---|
| Delong, Dann- E | | 014 34 4137 | 12/14/01 | 1 hr | | Day | Init. | H |

| Installation (For PM leave, show City, State, and ZIP Code) CAPE COD P&D FAC, MA 02571-9701 | | N/S Day S/S | Pay Loc. # 500 | D/A Code | From Date 12/12/01 | Hour 16³⁰ | | Sat 01 | |

| Time of Call or Request | Scheduled Reporting Time | Employee Can Be Reached At (If needed) ☐ No Call | | Thru Date 12/12/01 | Hour 17⁵⁰ | | Sun 02 | |

| Type of Absence | Documentation (For Official Use Only) | Revised Schedule for (Date) | Approved in Advance | | Mon 03 | |
|---|---|---|---|---|---|---|
| ☐ Annual | ☐ For COP Leave (CA1 on File) | | ☐ Yes  ☐ No | | Tue 04 | |
| ☐ Carrier 701 Rule | ☐ For Advanced Sick Leave (1221 on File) | | | | Wed 05 | |
| ☐ LWOP (See Reverse) | ☐ For Military Leave (Orders Reviewed) | Begin Work | | | Thur 06 | |
| ☑ Sick (See Reverse) | ☐ For Court Leave (Summons Reviewed) | | | | Fri 07 | |
| ☐ Late  ☐ COP | ☐ For Higher Level (1723 on File) | Lunch-Out | | | Sat 08 | |
| ☐ Other: _____ | ☐ Scheme Training Testing, Qualifying (Memo on File) | Lunch-In | | | Sun 09 | |

Remarks (Do Not Enter Medical Information)

| | End Work | | Mon 10 |
| | Total Hours | | Tue 11 |

I understand that the annual leave authorized in excess of amount available to me during the leave year will be changed to LWOP.

| Employee's Signature and Date | Signature of Person Recording Absence and Date | Signature of Supervisor and Date Notified | Wed 12 |

**Official Action on Application (Return copy of signed request to employee)**

| ☐ Approved, not FMLA | ☐ Approved, FMLA | ☐ Pending Documentation Noted on Reverse | Thur 13 |
| ☐ Disapproved (Give Reason) | | | Fri 14 |

Warning: The furnishing of false information on this form may result in a fine of not more than $10,000 or imprisonment of not more than 5 years, or both. (18 U.S.C. 1001)    ☐ Continued on Reverse

PS Form **3971**, June 1995

U.S. Postal Service

## Information for Pre-Complaint Counseling

| Certified Mail No. | Date Mail  *or*  Hand Delivered On |
| | 11-28-01 |
| By *(Initials)* EM | Case No. |

On _____ Nov. 28, 2001 _____, you requested an appointment with a Dispute Resolution Specialist.
*Month, Day, Year*

**Important: Please Read.** You should complete this form and return it to the EEO office *within 10 calendar days of receipt.* This the only notification that you will receive regarding the necessity for you to complete this form.

### A. Requester Information

Name *(Last, First, MI)*  Dulong, Dianne E.
Social Security No.  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
Home Telephone No.  (508) 224-6980

Your Mailing Address  9 Wareham Road  Plymouth, MA 02360-3234

Name of Postal Facility Where You Work  Cape Cod P+DC  Wareham, MA
Office Telephone No.  (508) 291-8700

Address of Postal Facility  25 Tobey Road  Wareham, MA 02571

Employment Status *(Check One)*  ☐ Applicant  ☐ Casual  ☐ TE  ☒ Career
Position Title  Clerk/Stenographer
Grade Level  PS-05

Pay Location  500
Tour  2
Duty Hours  0800-1700
Off Days *(If Tour I, Show Nights Off)*  Sat/Sun
Time in Current Position  15 Years ___ Months

Your Supervisor's Name  Joseph Ferreira
Supervisor's Title  Manager, Cape Cod P+DC
Supervisor's Telephone No.  508-291-8700

☐ Providing this information will authorize the U.S. Postal Service to send you important documents electronically.

### B. Discrimination Factors

Prohibited discrimination includes actions taken based on your *Race, Color, Religion, Sex, Age (40+), National Origin, Physical and/or Mental Disability, or in Retaliation (actions based on your participation in prior EEO activity).* These categories are referred to on this form as factors.

What Factor(s) of Discrimination Are You Alleging? *(Please be specific, i.e., Race - African American, Sex - Female.)*

```
sex - female
age - over 40
```

**For Retaliation Allegations Only:** If you are alleging retaliation discrimination, provide the date(s) and specifics of the EEO activity which you feel caused you to be retaliated against.

1. On _____ 10-05-00 _____, I engaged in EEO activity.  Case No.: ___ 1B 029-0001-01 _____.
   *Month, Day, Year*

2. On _____, I engaged in EEO activity.  Case No.: _____.
   *Month, Day, Year*

### C. Description of Incident/Activity

Please use the space below to briefly describe the incident or action that prompted you to seek EEO counseling at this time.

On _____ November 28, 2001 __,
                      *Month, Day*          *Year*

please see attached

_____

_____

_____

_____

_____

On November 28, 2001, with my FMLA documentation in front of him, Joseph Ferreira, Plant Manager of CCP&D, chose to question me, **AGAIN**, about my feelings concerning the security monitor he had installed in my office on November 3, 2001. My feelings were expressed to Mr. Ferreira by me on more than one occasion and a union representative had also spoken with him on this matter on more than one occasion. Mr. Ferreira was now badgering me. He then informed me that if he removed the monitor he would have to increase my workload. Because of previous discussions about workload, Mr. Ferreira knew, by making this statement, he would be adding insult to injury and really upset me. He sarcastically dismissed me. I went to my union representative but before we could get behind closed doors I broke down in tears due to my extremely agitated state. It was humiliating to be seen in such a vulnerable state. I attempted to return to my work station a short while later but simply could not stay in the building due to stress. I personally handed a 3971 to the acting supervisor, marked admin. leave, and left the building. I was upset for the remainder of the day. On Friday, November 30, 2001, my 3971 was returned to me marked AWOL. This was a purely vindictive act. I have never even been **LATE** in 14 ½ years, let alone AWOL. In addition to loss of pay, this was an extreme blow to my character and my record. I resubmitted a 3971 listing SL FMLA. It was denied as FMLA - more vindictiveness.

The above events are not innocuous. They follow a long line of Mr. Ferreira's history of derogatory and hurtful remarks, discrimination in regards to leave and change of schedules, overburdening of work, denying help, negating me and my performance, threatening my job, questioning my honesty and a pure lack of dignity and respect. Despite all of the above, it was not until October of 2000 that I finally was forced to file EEO charges against Mr. Ferreira who blatantly, willfully and maliciously denied me training that was contractually due me on award of a mechanization position. AND, I might add, Providence defended him. (I **did** receive the training, however, there were no repercussions for Mr. Ferreira's actions and no consideration for the stress caused me.) When the Postal Service says it has a Zero Tolerance Policy, I assume that it applies to **ALL** facilities, including Cape Cod P & D Facility.

## D. Comparisons

Explain why, based on the factors you cited in Section B, you believe that you were treated differently than other employees or applicants in similar situations.

1. _____
   *(Name of Employee)*      *Factor(s) that describe the employee, i.e., sex (male), National Origin (Hispanic)*

   was treated differently than I when: _____

   _____

   _____

2. _____
   *(Name of Employee)*      *Factor(s) that describe the employee, i.e., sex (male), National Origin (Hispanic)*

   was treated differently than I when: _____

   _____

   _____

3. _____
   *(Name of Employee)*      *Factor(s) that describe the employee, i.e., sex (male), National Origin (Hispanic)*

   was treated differently than I when: _____

   _____

   _____

## E. Official(s) Responsible for Action(s)

List the name(s) of the official(s) who took the action which prompted you to seek counseling at this time.

| 1a. Name | b. Title |
| --- | --- |
| Joseph M. Ferreira | Plant Manager |
| c. Office | d. Grade Level |
| Cape Cod P & D Facility | 21 |
| 2a. Name | b. Title |
| | |
| c. Office | d. Grade Level |
| | |

*Retaliation Allegations Only:* Was/were the official(s) listed in Section E above aware of your prior EEO activity?

☒ Yes    ☐ No     If yes, explain how the official(s) became aware:

Anne Bivens-Williams met with Mr. Ferreira after her meeting with me.

I do not know if he had prior knowledge before he was advised she was coming.

## F. Resolution

What are you seeking as a resolution to your pre-complaint?

Administrative Leave and/or Sick Leave FMLA
All AWOL notations on any and all paperwork removed permanently
The ceasing of all harrassing and badgering comments/questions
The right the come to work in a stress-free environment - ZERO TOLERANCE
An investigation if necessary
Corrected paystub for PP 25 01 with NO notation under "Leave Without Pay"

## G. Grievance/MSPB Appeal

On the incident that prompted you to seek EEO counseling, have you:

| | | | | | |
| --- | --- | --- | --- | --- | --- |
| 1. Filed a grievance on the issue? | ☐ No | ☒ Yes | If yes, | 12-04-01 *(Date)* | 1 *(Current Step)* |
| 2. Filed an MSPB appeal on this issue? | ☐ No | ☐ Yes | If yes, | NA *(Date Appeal Filed)* | |

## H. Anonymity

You have the right to remain anonymous during the pre-complaint process.

Do you desire anonymity?    ☒ No    ☐ Yes    If mediation is chosen, anonymity is not an option.

## I. Representation

You have the right to retain representation of your choice. *(Check One)*

☐ I waive the right to representation at this time.    ☐ I authorize the person listed below to represent me.

It is my intent to have a representative

| Name of Representative | Representative's Title |
|---|---|
| Organization | Telephone No. ( ) | Email Address * |

Mailing Address *(Street or P.O. Box, City, State and ZIP + 4)*

* Providing this information will authorize the U.S. Postal Service to send your representative important documents electronically.

## J. Documentation

Please attach any documentation you wish to submit to support your allegation(s) Include a copy of any written action(s) that caused you to seek counseling at this time.

Note: If you are alleging mental and/or physical disability, it is important for you to submit medical documentation of your disability during the pre-complaint process.

## K. Privacy Act Statement

**Privacy Act Notice.** The collection of this information is authorized by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e-16; the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 633a; the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794a; and Executive Order 11478, as amended. This information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. As a routine use, this information may be disclosed to an appropriate government agency, domestic or foreign, for law enforcement purposes; where pertinent, in a legal proceeding to which the USPS is a party or has an interest; to a government agency in order to obtain information relevant to a USPS decision concerning employment, security clearances, contracts, licenses, grants, permits or other benefits; to a government agency upon its request when relevant to its decision concerning employment, security clearances, security or suitability investigations, contracts, licenses, grants or other benefits; to a congressional office at your request; to an expert, consultant, or other person under contract with the USPS to fulfill an agency function; to the Federal Records Center for storage; to the Office of Management and Budget for review of private relief legislation; to an independent certified public accountant during an official audit of USPS finances; to an investigator, administrative judge or complaints examiner appointed by the Equal Employment Opportunity Commission for investigation of a formal EEO complaint under 29 CFR 1614; to the Merit Systems Protection Board or Office of Special Counsel for proceedings or investigations involving personnel practices and other matters within their jurisdiction; and to a labor organization as required by the National Labor Relations Act. Under the Privacy Act provision, the information requested is voluntary for the complainant, and for Postal Service employees and other witnesses.

## L. Authorization

I am aware that the claim(s) contained herein shall by-pass the pre-complaint process *if* like or related to a formal complaint that I have already filed, or *if* the claim(s) constitutes a spin-off complaint. (A spin-off complaint contests the manner in which a previously filed complaint is being processed.) In completing this PS Form 2564-A, *Information for Pre-Complaint Counseling,* I recognize that the Manager, Dispute Resolution, will review the claim(s) contained herein and determine how they shall be processed. I will be notified, in writing, if the Manager determines that my claim(s) shall be processed as amendments or appendages to a formal complaint that I have already filed.

Dianne DuLong

Please Print Your Name Here

Dianne DuLong

| Your Signature | Date Signed |
|---|---|
| *Dianne DuLong* | 12-05-01 |

**Please Return This Form to:**

> **US POSTAL SERVICE**
> **EEO COMPLAINTS PROCESSING**
> **24 CORLISS ST   RM 372**
> **PROVIDENCE RI  02904-9411**
> 401-276-5032

# EXHIBIT H CONTINUED

**UNITED STATES**
**POSTAL SERVICE™**

# Request for or Notification of Absence

| Employee's Name (Last, First, M.I.) | Social Security No. | Date Submitted | No. of Hours Requested | | PP | Year | |
|---|---|---|---|---|---|---|---|
| Dubon, Dianne F | 014 31 4137 | 11/28/01 | 5 | | Day | Init. | Hours |

| Installation (For PM leave, show City, State, and ZIP Code) | N/S Day | Pay Loc. # | D/A Code | From Date | Hour | | Sat 01 | | |
|---|---|---|---|---|---|---|---|---|---|
| CAPE COD P&D FAC, MA 02571-9701 | 3/5 | 6° | | 11/28/01 | 1050 | | | | |

| Time of Call or Request | Scheduled Reporting Time | Employee Can Be Reached At (If needed) | | Thru Date | Hour | Sun 02 | | |
|---|---|---|---|---|---|---|---|---|
| | | | □ No Call | 11/28/01 | 17° | | | |

| Type of Absence | Documentation (For Official Use Only) | Revised Schedule for (Date) | Approved in Advance | Mon 03 |
|---|---|---|---|---|
| □ Annual | □ For COP Leave (CA1 on File) | | | Tue 04 |
| □ Carrier 701 Rule | □ For Advanced Sick Leave (1221 on File) | | □ Yes  □ No | Wed 05 |
| □ LWOP (See Reverse) | □ For Military Leave (Orders Reviewed) | Begin Work | | |
| □ Sick (See Reverse) | □ For Court Leave (Summons Reviewed) | | | Thur 06 |
| □ Late  □ COP | □ For Higher Level (1723 on File) | Lunch-Out | | Fri 07 |
| ☑ Other: ADMIN | □ Scheme Training Testing, Qualifying (Memo on File) | Lunch-In | | Sat 08 |

| Remarks (Do Not Enter Medical Information) | | End Work | | Sun 09 |
|---|---|---|---|---|
| Stress caused by Plant Mgr. | | Total Hours | | Mon 10 |

I understand that the annual leave authorized in excess of amount available to me during the leave year will be changed to LWOP.

| Employee's Signature and Date | Signature of Person Recording Absence and Date | Signature of Supervisor and Date Notified | Tue 11 |
|---|---|---|---|
| Dianne Dubon 11/28/01 | | | Wed 12 |

## Official Action on Application (Return copy of signed request to employee)

| □ Approved, not FMLA | □ Approved, FMLA | □ Pending Documentation Noted on Reverse. | Thur 13 |
|---|---|---|---|
| ☑ Disapproved (Give Reason) | | | Fri 14 |

Warning: The furnishing of false information on this form may result in a fine of not more than $10,000 or imprisonment of not more than 5 years, or both. (18 U.S.C. 1001)     □ Continued on Reverse

PS Form **3971**, June 1995

**UNITED STATES POSTAL SERVICE**

# Request for or Notification of Absence

| Employee's Name (Last, First, M.I.) | | Social Security No. | Date Submitted | No. of Hours Requested | | PP | Year |
|---|---|---|---|---|---|---|---|
| Dulong Diane E | | 014 34 4159 | 12/13/01 | 8 | | | |

| Installation (For PM leave, show City, State, and ZIP Code) | N/S Day | Pay Loc. # | D/A Code | From Date | Hour | Day | Sat 01 | Init. | Hou |
|---|---|---|---|---|---|---|---|---|---|
| CAPE COD P&D FAC, MA 02571-9701 | S C | 80 | | 11/14 | 1050 | | | | |

| Time of Call or Request | Scheduled Reporting Time | Employee Can Be Reached At (If needed) | | Thru Date | Hour | Sun 02 |
|---|---|---|---|---|---|---|
| | | | ☐ No Call | 11/17 | 11 00 | |

| Type of Absence | Documentation (For Official Use Only) | Revised Schedule for (Date) | Approved in Advance | | Mon 03 |
|---|---|---|---|---|---|
| ☐ Annual | ☐ For COP Leave (CA1 on File) | | ☐ Yes ☐ No | | Tue 04 |
| ☐ Carrier 701 Rule | ☐ For Advanced Sick Leave (1221 on File) | | | | |
| ☐ LWOP (See Reverse) | ☐ For Military Leave (Orders Reviewed) | Begin Work | | | Wed 05 |
| ☒ Sick (See Reverse) | ☒ For Court Leave (Summons Reviewed) | | | | Thur 06 |
| ☐ Late ☐ COP | ☐ For Higher Level (1723 on File) | Lunch-Out | | | Fri 07 |
| ☐ Other: | ☐ Scheme Training Testing, Qualifying (Memo on File) | Lunch-In | | | Sat 08 |

| Remarks (Do Not Enter Medical Information) | End Work | Sun 09 |
|---|---|---|
| To replace previous dip denied under | Total Hours | Mon 10 |

I understand that the annual leave authorized in excess of amount available to me during the leave year will be changed to LWOP.

| Employee's Signature and Date | Signature of Person Recording Absence and Date | Signature of Supervisor and Date Notified | Tue 11 |
|---|---|---|---|
| | | | Wed 12 |

**Official Action on Application** *(Return copy of signed request to employee)*

| ☒ Approved, not FMLA | ☐ Approved, FMLA | ☐ Pending Documentation Noted on Reverse. | Thur 13 |
|---|---|---|---|
| ☐ Disapproved (Give Reason) | | | Fri 14 |

Warning: The furnishing of false information on this form may result in a fine of not more than $10,000 or imprisonment of not more than 5 years, or both. (18 U.S.C. 1001)     ☐ Continued on Reverse

PS Form **3971**, June 1995

| 500 | 24-1045 | D E DULONG | | | | | 4137 | 25 01 | 09702991 |
|-----|---------|------------|---|---|---|---|------|-------|----------|
| PAYLOC | FINANCE NO. | EMPLOYEE NAME | | | | SOCIAL SECURITY NO. | PAY PERIOD | | SERIAL NUMBER |

| DETAIL EARNINGS | | | | | | GROSS TO NET | | | LEAVE STATUS | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| WK | RSC/LEV | RATE | CODE | TYP | HOURS | PAY | | THIS PERIOD | YEAR-TO-DATE | ANNUAL LEAVE | |
| 2 | P 05 | 40472 | 110 | W | 2145 | 41737 | GROSS PAY | 146127 | 3883398 | FROM PREV YR | 7578 |
| 1 | P 05 | 40472 | 110 | W | 3031 | 58976 | FED TAXS1 | 16822 | 485945 | EARNED THIS YR | 13800 |
| | | | | L | 2334 | 45414 | ST TAX MASO | 6232 | 159048 | | BAL 21378 |
| | | | | | | | RETIRE 8 | 1169 | 32298 | USED YR | 15086 |
| | | | | | | | MEDICARE | 2092 | 55642 | THIS PP | 170 |
| | | | | | | | UN W | 1573 | 39325 | BALANCE | 8492 |
| | | | | | | | IN6J5 | 2266 | 80923 | SICK LEAVE | |
| | | | | | | | TSP11 | 16074 | 403700 | FROM PREV YR | 38560 |
| | | | | | | | HP104 | 1863 | 46011 | EARNED THIS YR | 9200 |
| | | | | | | | SOSEC | 8944 | 2379118 | USED YR | 7926 |
| | | | | | | | | | | THIS PP | 1364 |
| | | | | | | | | | | BALANCE | 39834 |
| | | | | | | | | | | LEAVE WITHOUT PAY | |
| | | | | | | | | | | THIS PP | 490 |
| | | | | | | | | | | CUMULATIVE | 490 |
| | | | | | | | | | | BOND DATA | |
| | | | | | | | | | | UNAPPL BAL | |
| ADJ FOR 24-01 PROCESSED | | | | | | | | | | NO. ISSUED | |
| | | | | | | NET PAY | 890.92 | | | USPS RETIREMENT | 3705.67 |



FACE OF THIS DOCUMENT PRINTED IN RED, BLUE & GRAY INKS.

**UNITED STATES POSTAL SERVICE**

PAYROLL CHECK

EAGAN MN 55121-9640

DATE 12-07-2001

E 08948030    CHECK NO. H 09702991

$*****890 DOLLARS 92 CENTS

VOID AFTER ONE YEAR

$*****890.92

PAY TO THE ORDER OF    DIANNE E DULONG

CITIBANK DELAWARE
New Castle, Delaware

VICE PRESIDENT, TREASURER

⑈09702991⑈ ⑆031100209⑆ 38546594⑈

| Case No. | 1B-029-0004-02 |
| --- | --- |
| Date of Contact | |

U.S. Postal Service
## Agreement to Extend 30-Day EEO Counseling Process

I, _____Dianne E. Dulong_____, in accordance with 29 C.F.R. §1614.105(e), hereby agree to postpone the final interview and to extend the informal counseling process for a period up to 60 additional days. In signing this agreement, I understand that I retain my right to file a formal complaint if the matter(s) which I raised during counseling is not resolved within 90 calendar days from the date of my first contact with the EEO Office, and at any time thereafter up to 15 calendar days after my receiving my notice of right to file a discrimination complaint.

**Privacy Act Notice**

The collection of this information is authorized by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e-16; the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 633a; the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794a; and Executive Order 11478, as amended. This information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. As a routine use, this information may be disclosed to an appropriate government agency, domestic or foreign, for law enforcement purposes; where pertinent, in a legal proceeding to which the USPS is a party or has an interest; to a government agency in order to obtain information relevant to a USPS decision concerning employment, security clearances, contracts, licenses, grants, permits or other benefits; to a government agency upon its request when relevant to its decision concerning employment, security clearances, security or suitability investigations, contracts, licenses, grants or other benefits; to a congressional office at your request, to an expert, consultant or other person under contract with the USPS to fulfill an agency function; to the Federal Records Center for storage; to the Office of Management and Budget for review of private relief legislation; to an independent certified public accountant during an official audit of USPS finances; to an investigator, administrative judge or complaints examiner appointed by the Equal Employment Opportunity Commission for investigation of a formal EEO complaint under 29 CFR 1614; to the Merit Systems Protection Board or Office of Special Counsel for proceedings or investigations involving personnel practices and other matters within their jurisdiction; and to a labor organization as required by the National Labor Relations Act. Under the Privacy Act provision, the information requested is voluntary for the complainant, and for Postal Service employees and other witnesses.

| Signature of Counselee | Date |
| --- | --- |
| | 12-13-01 |

PS Form **2567-A**, March 2001



 **UNITED STATES POSTAL SERVICE** ®

## Certification of Receipt — Publication 133

**Privacy Act Notice**

**Privacy Act Notice.** The collection of this information is authorized the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e-16; the Age Disrimination in Employment Act of 1967, as amended, 29 U.S.C. § 633a; the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794a; and Executive Order 11478, as amended. This information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. As a routine use, this information may be disclosed to an appropriate government agency, domestic or foreign, for law enforcement purposes; where pertinent, in a legal proceeding to which the USPS is a party or has an interest; to a government agency in order to obtain information relevant to a USPS decision concerning employment, security clearances, contracts, licenses, grants, permits or other benefits; to a government agency upon its request when relevant to its decision concerning employment, security clearances, security or suitability investigations, contracts, licenses, grants or other benefits; to a congressional office at your request; to an expert, consultant or other person under contract with the USPS to fulfill an agency function; to the Federal Records Center for storage; to the Office of Management and Budget for review of private relief legislation; to an independent certified public accountant during an official audit of USPS finances; to an investigator, administrative judge or complaints examiner appointed by the Equal Employment Opportunity Commission for investigation of a formal EEO complaint under 29 CFR 1614; to the Merit Systems Protection Board or Office of Special Counsel for proceedings or investigations involving personnel practices and other matters within their jurisdiction; and to a labor organization as required by the National Labor Relations Act. Under the Privacy Act provision, the information requested is voluntary for the complainant, and for Postal Service employees and other witnesses.

## Certification of Receipt — Publication 133

I hereby certify that on this date I received a copy of Publication 133, *What You Need to Know About EEO*, to keep for my personal records.

| Signature of Recipient | Date |
|---|---|
| | 11-28-01 |

**Note:** Recipient, when you receive this form by mail, please sign and return it to the EEO Office at the same time you return your completed PS Form 2564-A, *Information for Pre-Complaint Counseling*.

## Certification of Service — Publication 133

I hereby certify that on this date, Publication 133, *What You Need to Know About EEO*,

was mailed to _____ Dianne  E.  Dulong _____

via Certified Mail No. _____

*or* delivered by hand to _____

| Signature of Server | Date |
|---|---|
| Rita O'Marnell | 11-28-01 |

PS Form **2563-A**, March 2001

U.S. Postal Service

# Agreement to Extend 30-Day EEO Counseling Process

| Case No. | |
|---|---|
| Date of Contact | 11-28-01 |

I, _____, in accordance with 29 C.F.R. §1614.105(e), hereby agree to postpone the final interview and to extend the informal counseling process for a period up to 60 additional days. In signing this agreement, I understand that I retain my right to file a formal complaint if the matter(s) which I raised during counseling is not resolved within 90 calendar days from the date of my first contact with the EEO Office, and at any time thereafter up to 15 calendar days after my receiving my notice of right to file a discrimination complaint.

The collection of this information is authorized by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e-16; the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 633a; the Rehabilitation Act of 1973 as amended, 29 U.S.C. § 794a; and Executive Order 11478, as amended. This information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. As a routine use, this information may be disclosed to an appropriate government agency, domestic or foreign, for law enforcement purposes; where pertinent, in a legal proceeding to which the USPS is a party or has an interest; to a government agency in order to obtain information relevant to a USPS decision concerning employment, security clearances, contracts, licenses, grants, permits or other benefits; to a government agency upon its request when relevant to its decision concerning employment, security clearances, security or suitability investigations, contracts, licenses, grants or other benefits; to a congressional office at your request; to an expert, consultant, or other person under contract with the USPS to fulfill an agency function; to the Federal Records Center for storage; to the Office of Management and Budget for review of private relief legislation; to an independent certified public accountant during an official audit of USPS finances; to an investigator, administrative judge or complaints examiner appointed by the Equal Employment Opportunity Commission for investigation of a formal EEO complaint under 29 CFR 1614; to the Merit Systems Protection Board or Office of Special Counsel for proceedings or investigations involving personnel practices and other matters within their jurisdiction; and to a labor organization as required by the National Labor Relations Act. Under the Privacy Act provision, the information requested is voluntary for the complainant, and for Postal Service employees and other witnesses.

| Signature of Counselee | Date |
|---|---|
| | |

PS Form **2567-A**, March 2001

U.S. Postal Service

# Agreement to Participate in REDRESS™, an Alternate Dispute Resolution Process

| Case No. | |
|---|---|
| Date of Contact | 11-28-01 |

I, _____ have been advised that, in accordance with 29 C.F.R. §1614.105(f), I have the option of participating in mediation instead of the counseling process. The EEO complaints processing office has given me information about the mediation procedure, and I voluntarily agree to participate in REDRESS™ mediation during the pre-complaint processing period. I am aware that REDRESS™ mediation sessions are confidential, and that resolutions reached during the procedure are handled in the same manner as are resolutions reached during the counseling process. In signing this agreement, I acknowledge that the pre-complaint processing period will be 90 calendar days. If the matter that I brought to the dispute resolution specialist's attention has not been resolved before the 90th day, I have the right to file a formal complaint at any time thereafter up to 15 calendar days after receiving ny notice of right to file a discrimination complaint.

**Privacy Act Notice.** The collection of this information is authorized by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e-16; the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 633a; the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794a; and Executive Order 11478, as amended. This information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. As a routine use, this information may be disclosed to an appropriate government agency, domestic or foreign, for law enforcement purposes; where pertinent, in a legal proceeding to which the USPS is a party or has an interest; to a government agency in order to obtain information relevant to a USPS decision concerning employment, security clearances, contracts, licenses, grants, permits or other benefits; to a government agency upon its request when relevant to its decision concerning employment, security clearances, security or suitability investigations,

contracts, licenses, grants, or other benefits; to a congressional office at your requestto an expert, consultant, or other person under contract with the USPS to fulfil an agency function; to the Federal Records Center for storage; to the Office of Management and Budget for review of private relief legislation; to an independent certified public accountant during an official audit of USPS finances; to an investigator, administrative judge or complaints examiner appointed by the Equal Employment Opportunity Commission for investigation of a formal EEO complaint under 29 CFR 1614; to the Merit Systems Protection Board or Office of Special Counsel for proceedings or investigations involving personnel practices and other matters within their jurisdiction; and to a labor organization as required by the National Labor Relations Act. Under the Privacy Act provision, the information requested is voluntary for the complainant, and for Postal Service employees and other witnesses.

| Signature of Counselee | Date |
|---|---|

PS Form **2567-B**, March 2001


**UNITED STATES**
**POSTAL SERVICE**

### EEO Settlement Agreement

Case No. **1B-029-0004-02**

I, **Dianne E. Dulong**, do hereby voluntarily withdraw my request for EEO counseling or formal complaint, as applicable, based on the stipulation(s) that:

1. Both parties agree to treat eachother with dignity and Respect.

2. Management agrees that Dianne Dulong ~~could~~ will be allowed to Request a union Steward in accordance with the National Agreement.

3. Both parties agree that all employees are entitled to work in a hostile-~~free~~ work environment.

4. Management agrees that the sick leave Dianne Dulong used on 11-28-01 and 11-29-01 will be approved as FMLA sick leave and copies of the 3971's will be given to Dianne Dulong.

5. Management agrees to expunge, from the timekeeper's Records, the 3971 submitted by Dianne Dulong on 11-28-01 that listed her absence as AWOL.

6. Management agrees to follow all Rules and Regulations as outlined in the National Agreement and all Postal Manuals.

I fully understand that by agreeing to this resolution, I waive my rights to any further appeal of my complaint through the EEO process. I further state that this agreement did not result from harassment, threats, coercion or intimidation.

I am fully aware that any settlement agreement knowingly and voluntarily agreed to by the parties, reached at any stage of the complaint process is binding on both parties. Should I believe the Postal Service has failed to adhere to the stipulations contained in this agreement for any reason not attributable to my acts or conduct, I must notify the EEO Complaint's Processing Office located in my district, in writing, within 30 calendar days of the alleged noncompliance. (Employees at Postal Service Headquarters and Headquarters Field Units and employees of the Inspection Service should notify the EEO Appeals Review Specialist at Postal Service Headquarters.) I may include in my statement of noncompliance a request that the terms of the settlement agreement be specifically implemented or, alternatively, that my complaint be reinstated for further processing from the point processing ceased. The Postal Service will respond to my request in accordance with 29 C.F.R. § 1614.504.

**Privacy Act Notice**

**Privacy Act Notice.** The collection of this information is authorized by The Equal Employment Opportunity Act of 1972, 42 U.S.C. 2000e-16; The Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C.633a; The Rehabilitation Act of 1973, as amended, 29 U.S.C. 794a; and Executive Order 11478, as amended. This information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. As a routine use, this information may be disclosed to an appropriate government agency, domestic or foreign, for law enforcement purposes; where pertinent, in a legal proceeding to which the USPS is a party or has an interest; to a government agency in order to obtain information relevant to a USPS decision concerning employment, security clearances, contracts, licenses, grants, permits or other benefits; to a government agency upon its request when relevant to its decision concerning employment, security clearances, security or suitability investigations, contracts, licenses, grants or other benefits; to a congressional office at your request; to an expert, consultant, or other person under contract with the USPS to fulfill an agency function; to the Federal Records Center for storage; to the Office of Management and Budget for review of private relief legislation; to an independent certified public accountant during an official audit of USPS finances; to an investigator, administrative judge or complaints examiner appointed by the Equal Employment Opportunity Commission for Investigation of a formal EEO complaint under 29 CFR 1614; to the Merit Systems Protection Board or Office of Special Counsel for proceedings or investigations involving personnel practices and other matters within their jurisdiction; and to a labor organization as required by the National Labor Relations Act. Under the Privacy Act provision, the information requested is voluntary for the complainant, and for Postal Service employees and other witnesses.

| Signature of Complainant | Date |
|---|---|
| *Dianne E. Dulong* | 12-27-01 |

Management agrees to the aforementioned stipulation solely in an effort to resolve the complainant's allegation(s), and this agreement should not be construed as an admission of discrimination or wrongdoing on the part of any official of the U.S. Postal Service.

| Signature of Management Representative | Date |
|---|---|
| *[signature]* | 12-27-01 |

| Printed Name of Management Representative | Title of Management Representative |
|---|---|
| *Joseph Ferreira* | *Plant Mgr.* |

PS Form 2564-B, November 1999

UNITED STATES POSTAL SERVICE™

# Request for or Notification of Absence

| Employee's Name (Last, First, M.I.) | Social Security No. | Date Submitted | No. of Hours Requested | Scheduled / Unscheduled | PP | Year |
|---|---|---|---|---|---|---|
| Dulong Dianne E | 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 | 12/3/01 | 5 | | | |

| Installation (For PM leave, show City, State, and ZIP Code) | N/S Day | Pay Loc. # | D/A Code | From Date / Hour |
|---|---|---|---|---|
| CAPE COD P&D FAC, MA 02571-9701 | S/S | 860 | | 11/28/01 / 1030 |

| Time of Call or Request | Scheduled Reporting Time | Employee Can Be Reached At (If needed) | Thru Date / Hour |
|---|---|---|---|
| | | ☐ No Call | 11/28/01 / 11:00 |

**Type of Absence**
- ☐ Annual
- ☐ Carrier 701 Rule
- ☐ LWOP (See Reverse)
- ☒ Sick (See Reverse)
- ☐ Late ☐ COP
- ☐ Other: ____

FMLA

**Documentation (For Official Use Only)**
- ☐ For COP Leave (CA1 on File)
- ☐ For Advanced Sick Leave (1221 on File)
- ☐ For Military Leave (Orders Reviewed)
- ☐ For Court Leave (Summons Reviewed)
- ☐ For Higher Level (1723 on File)
- ☐ Scheme Training Testing, Qualifying (Memo on File)

Revised Schedule for (Date):

Approved in Advance ☐ Yes ☐ No

| Day | Hours |
|---|---|
| Begin Work | |
| Lunch-Out | |
| Lunch-In | |
| End Work | |
| Total Hours | |

Remarks (Do Not Enter Medical Information)

To replace previous slip denied under [illegible]

| Day | Init. | Hours |
|---|---|---|
| Sat 01 | | |
| Sun 02 | | |
| Mon 03 | | |
| Tue 04 | | |
| Wed 05 | | |
| Thur 06 | | |
| Fri 07 | | |
| Sat 08 | | |
| Sun 09 | | |
| Mon 10 | | |
| Tue 11 | | |
| Wed 12 | | |
| Thur 13 | | |
| Fri 14 | | |

I understand that the annual leave authorized in excess of amount available to me during the leave year will be changed to LWOP.

| Employee's Signature and Date | Signature of Person Recording Absence and Date | Signature of Supervisor and Date Notified |
|---|---|---|
| [signature] 12/3/01 | | |

**Official Action on Application (Return copy of signed request to employee)**
- ☐ ~~Approved, not FMLA~~
- ☒ Approved, FMLA
- ☐ Disapproved (Give Reason)
- ☐ Pending Documentation Noted on Reverse.

Signature of Supervisor and Date: [signature] 11/05/01

**Warning:** The furnishing of false information on this form may result in a fine of not more than $10,000 or imprisonment of not more than 5 years, or both. (18 U.S.C. 1001)

☐ Continued on Reverse

PS Form 3971, June 1995

**UNITED STATES POSTAL SERVICE™**

# Request for or Notification of Absence

| Employee's Name (Last, First, M.I.) | Social Security No. | Date Submitted | Pay Loc. # | D/A Code | No. of Hours Requested | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|

Installation (For PM leave, show City, State, and ZIP Code)
CAPE COD P&D FAC, MA 02571-9701

**Time of Call or Request**

**Type of Absence**
- ☐ Annual
- ☐ Sick (See Reverse)
- ☐ LWOP (See Reverse)
- ☐ COP
- ☐ Late
- ☐ Other:

**Remarks (Do Not Enter Medical Information)**

**Documentation (For Official Use Only)**
- Scheduled Reporting Time
- ☐ For COP Leave (CA1 on File)
- ☐ For Advanced Sick Leave (1221 on File)
- ☐ For Military Leave (Orders Reviewed)
- ☐ For Court Leave (Summons Reviewed)
- ☐ For Higher Level (1723 on File)
- ☐ Scheme Training Testing, Qualifying (Mgmt of File)

Employee Can Be Reached At (If needed)
☐ No Call

Revised Schedule for (Date)

Approved in Advance
☐ Yes   ☐ No

| | Begin Work | Lunch-Out | Lunch-In | End Work | Total Hours |
|---|---|---|---|---|---|

I understand that the annual leave authorized in excess of amount available to me during the leave year cannot be changed to LWOP.

Employee's Signature and Date

**Official Action on Application (Return copy of signed request to employee)**
- ☐ Approved, not FMLA
- ☐ Disapproved (Give Reason)
- ☐ Approved, FMLA
- ☐ Pending Documentation
- ☐ Noted on Reverse

Signature of Person Recording Absence and Date

Signature of Supervisor and Date Verified

**Warning:** The furnishing of false information on this form may result in a fine or imprisonment or not more than $10,000 or imprisonment or not more than 5 years, or both. (18 U.S.C. 1001)

PS Form **3971**, June 1995

| Day | PP | Year | Init. | Hours |
|---|---|---|---|---|
| Sat 01 | | | | |
| Sun 02 | | | | |
| Mon 03 | | | | |
| Tue 04 | | | | |
| Wed 05 | | | | |
| Thur 06 | | | | |
| Fri 07 | | | | |
| Sat 08 | | | | |
| Sun 09 | | | | |
| Mon 10 | | | | |
| Tue 11 | | | | |
| Wed 12 | | | | |
| Thur 13 | | | | |
| Fri 14 | | | | |

☐ Continued on Reverse

# EXHIBIT I



December 7, 1999

John Yanuskiewicz
APWU Steward

John,

As you have probably heard, on Friday, December 3, 1999, when you weren't hear there was a major episode surrounding the plant manager and myself.

The attached statement was provided to the inspection service.

Fortunately, Mr. McAdams was here and he handled the case in your absence very well. I hope your feeling better.

In the final meeting that we had with the plant manager and inspector Jenkins, Mr. Ferreira apologized to me; told me I was a valuable employee; admitted that I never goof off and always give him a 100%; and am a valuable asset to the Postal Service. He assured me that he had no intentions of harming me or coming after me physically, emotionally or regarding my job and/or discipline. He said he had a problem with the APWU not me and he would not retaliate against me. He also said that you said that the grievance I put in on overtime was not going anywhere because it had no merit.

In lieu of the above, Mr. Ferreira also admitted that he occasionally at times slams doors and looses his temper. He informed me that he would try to be more sensitive to my disability. I agreed to let him know when I feel his actions are bothering me so he can stop.

Subsequent to the above, I wish to withdraw the grievance regarding the overtime issue. Secondly, I feel that the other grievance I have on Safety/Harassment has been settled because of Mr. Ferreiras's apology and all the information indicated above. I wish that you could get an extension on the grievance for about 2 or 3 weeks. If there is no further action on the part of Mr. Ferreira, I wish to drop it at that time. I just want to make sure that Mr. Ferreira means what he says.

I still have the EEO action to followup on if I need it.

I thank you for all your help. In a way, if you remember when we talked, I told you that this would come to a head when you were not here. Management in this facility seems to follow this pattern.

Please keep all information on file even though dropped in case we need a paper trail in the future.

As I indicated to Mr. Jenkins, I am taking a big step in faith that this issue is over.

If you need additional information regarding the meeting, I will be glad to provide it. Mr. McAdams also has information if you need it and was a witness to the meetings with Mr. Ferreira and Mr. Jenkins.

Thanks again for all you help.

Jim Chapman

# EXHIBIT J

EXHIBIT 4
CHAPMAN
8-6-07
LINDA M. CORCORAN
CERTIFIED COURT REPORTER

JOSEPH FERREIRA
PLANT MANAGER

12/7/00

MR. FERREIRA,

SEVERAL ISSUES HAVE BEEN REPORTED TO ME THAT REQUIRE YOUR IMMEDIATE
ATTENTION.

IN GOOD FAITH ONCE AGAIN I CAME TO YOU AND WE SET IN YOUR ROOM TO RESOLVE
DIFFERENCES WE HAD REGARDING THE TIMEKEEPERS OFFICE. YOU ASSURED ME THAT
YOU TOOK APPROPRIATE ACTION AND THE SITUATION WOULD NOT ESCULATE.

HOWEVER, I AM AWARE OF MS. DULONG'S PROBLEM WITH YET ANOTHER INCIDENT
RESOLVING THE PAYMENT TO HERSELF AFTER A ORDER WAS GIVEN BY YOU TO PAY FOR
A LUNCH PERIOD. THIS WAS IGNORED.

THE TIMECLOCK CONTINUES TO BE A PLACE WHERE THE PERSON INVOLVED KEEPS
SHOOTING OFF HER MOUTH ABOUT MS. DULONG AND MYSELF BEING COHORTS AND
ALMOST TO THE POINT OF INCENUATING THAT WE ARE HAVING RELATIONS.

MS. DULONG IS BEING SUBJECTED TO DERATORY COMMENTS SUPPOSEDLY SLAMMING
2240'S ON HER DESK WHILE CLAIMING 'THESE ARE FOR YOUR BUDDY." OTHER AREAS
ARE BEING SLAMMED, I.E., DOORS, THE COPIER, AND MAJOR SLAMMING NOISES BEHIND
CLOSED DOORS IN THAT OFFICE.

I HAVE FURTHER INFORMATION BUT I CHOOSE AT THIS TIME TO INFORM YOU THAT
WHATEVER YOU DID, DID NOT WORK AND I FEAR THAT MS. DULONG IS NOW THE
SUBJECT OF "0" TOLERANCE WHICH WAS JUST REINFORCED THIS DATE BY THE UPPER
CHAIN OF COMMAND.

THIS IS TO INFORM YOU THAT I INTEND GOING UP THE CHAIN AND COMMAND TO
INCLUDE CALLING POSTAL INSPECTORS AND ANYBODY I CAN TO STOP THE HARASSING
ACTION THAT YOU TOLD ME WOULD STOP. I AM NOT CONCERNED FOR MYSELF BECAUSE
I WILL BE SHORTLY LEAVING THE AREA. HOWEVER, I AM CONCERNED FOR MS. DULONG
AND HER BEING UNWARRANTED AND UNNECESSARY HARASMENT WHICH YOU
CONTINUE TO ALLOW WITHOUT ACTION. I AM GOING TO MAKE IT CRYSTAL CLEAR THAT
I AM BECAUSE THIS IS A CONTINUING VIOLATION THAT IS UNRESOLVED JUST (1) WEEK
AFTER YOU SAID IT WAS RESOLVED, RESURFACED, CONTACTING EEO ALSO.

JIM CHAPMAN

# EXHIBIT K

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DIANNE DULONG<br>　　　　　　　Plaintiff,<br><br>vs.<br><br>JOHN E. POTTER, POSTMASTER GENERAL,<br>JOSEPH M. FERREIRA, Individually, AARON<br>TOBEY, JR., Individually and as President of the<br>APWU, Local 6005, and the AMERICAN POSTAL<br>WORKERS UNION (APWU) Local 6005<br>　　　　　　　　　Defendant. | )<br>)<br>)<br>)  C.A. No. 1:04-cv-12552<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### AFFIDAVIT OF RICHARD PINE

I, Richard Pine, hereby state as follows:

1.　　I am a retired Supervisor from the Cape Cod P & D Post Office.

2.　　I have worked with Dianne DuLong and as the secretary I found her to be a very professional, knowledgeable and dedicated employee.

3.　　Since my retirement I learned that Ms. DuLong has lost her position as secretary.

4.　　I have spoken with Ms. DuLong about the loss of her position and I do not understand why the Postal Service could not accommodate her.  The Cape Cod P & D is a 24 hours, 7 day a week Mail Processing Plant.

5.　　I know that other employees have been given considerations and allowed schedule changes and have even been allowed to transfer to other facilities.

6.　　One employee who comes to mind had a less then good attendance record and was allowed to transfer to another Post Office as a Clerk Craft Employee.  In the past

1

your attendance record was used as a benchmark for promotions or transfers.  Because this employee was on the Plant Manager's good list, she was not only allowed to transfer, but was also allowed to change crafts.

7.    Mr. Joseph Ferreira, Plant Manager could be a very vindictive Manager if he had a falling out with an employee.

8.    Tour 2 machine operators were allowed to change their schedules on weekends and Mr. Ferreira allowed this.

9.    I believe that if Ms. DuLong was on Mr. Ferreira's good list, accommodations would have been made for her.

10.    The Postal Service hires casual employees as supplemental workers to cover heavy work load periods.  A casual employee could have been used to cover the time period in question.

11.    An employee with as many years of service as Ms. DuLong should have been given consideration of her request for medical reasons as well as the number of years Ms. DuLong had worked for the Postal Service.

12.    I believe Ms. DuLong could have been given a temporary schedule change until a bid was available with hours that would not be detrimental to her health.

Signed and sworn to under the pains and penalties of perjury this _15_ day of _April_, 2006.

_Richard Pine_

Richard Pine

# EXHIBIT L

COMMONWEALTH OF MASSACHUSETTS

PLYMOUTH, SS.                    UNITED STATES DISTRICT COURT
                                FOR THE DISTRICT OF MASSACHUSETTS
                                C.A. No. 1:04-CV-12552

------------------------------)
DIANNE DULONG,                )
                Plaintiff     )
                              )
vs.                           )
                              )
JOHN E. POTTER, POSTMASTER    )
GENERAL, JOSEPH M. FERREIRA,  )
Individually, AARON TOBEY, JR.,)
Individually and as President )
of the APWU, Local 6005, and  )
the AMERICAN POSTAL WORKERS   )
UNION ALF-CIO, CAPE COD AREA  )
LOCAL 6005                    )
                Defendants    )
------------------------------)

        DEPOSITION OF AARON TOBEY, JR., a witness called for
examination by counsel for the Plaintiff, taken pursuant to the
applicable provisions of the Massachusetts Rules of Civil
Procedure, before Alanna K. Sheils, a Professional Court
Reporter and Notary Public in and for the Commonwealth of
Massachusetts, at the law office of Attorney Joseph R. Gallitano
& Associates, 34 Main Street Ext., Suite 202, Plymouth,
Massachusetts, on Thursday, March 1, 2007, commencing at
10:15 a.m.

35

1  Q.  Post 9/11, in other words?

2  A.  I think that's correct.

3  Q.  Was this the reason for the heightened security then?

4  A.  No, I don't think so.

5  Q.  It was just something they were going to do?

6  A.  Yes.

7  Q.  So they were having security guards or security check

8      points or something like that with TV cameras and monitors?

9  A.  Not security guards, but -- all it was is that we had a

10     gate, and to gain access to the parking lot, they had an

11     intercom and that person would use the intercom, and the

12     person inside the office had a camera who could actually

13     see the person to give them access to the parking lot.

14 Q.  So there was a TV monitor and a TV camera?  The camera

15     shooting the person through the gate --

16 A.  Yes.

17 Q.  -- and the monitor receiving the reception for the gate

18     camera; is that correct?

19 A.  I believe so.

20 Q.  They were asking her to be there at her desk, have a

21     monitor that she could check in people or check them out,

22     and open and close the gate.  Was that the task?

23 A.  Yes.

24 Q.  That wasn't part of her job description?

LINDA M. CORCORAN
(781) 585-8172

1  A.   No.

2  Q.   So did you file a grievance on her behalf?

3  A.   Yes, I did.

4  Q.   What happened with that grievance?

5  A.   It was resolved at step one.

6  Q.   What was the resolution?

7  A.   Cease and desist.

8  Q.   Was Mr. Ferreira involved in that grievance?

9  A.   Yes, he was.

10 Q.   What was the discourse in handling that particular
11      grievance?  How would you describe his attitude?

12 A.   He had it in -- he had placed it in, I believe, two other
13      offices, one of which I believe was the timekeeper, and he
14      didn't have a problem with that, putting it in Dianne's
15      office.  I believe that it was not only part of her job
16      description, but it could have been maybe a higher level
17      position that was able to do it, which meant that if
18      they're going to do that, they would have to pay them
19      out- of-schedule pay or something like that.  I forget.
20      Whatever it was, the grievance was pretty solid.  So it was
21      just a matter of getting it resolved at an early stage so
22      he said, "Fine."

23 Q.   Did he express any displeasure with Mrs. DuLong as a result
24      of the grievance being filed?

1      sick leave, administrative leave?

2  Q.  The way the entire process was handled by Mr. Ferreira.

3      Let me break it down.

4      Did Mr. Ferreira normally charge members who left with

5      AWOL?

6  A.  I don't recall.  I want to say his direct supervision was

7      the front office, which is maybe like three or four clerks.

8      That's the first time I've heard of him charging anyone

9      with AWOL on something like that.  It was kind of -- she

10     did fill out a 3971, and it was approved by the acting

11     supervisor Smolinsky.

12  Q.  So up until that point, she had followed procedure then?

13  A.  Correct.  Well, the technical argument there was that when

14     you fill out a 3971, you give it to your immediate

15     supervisor.  Her immediate supervisor was Joe Ferreira.

16     She gave it to the supervisor who was on the working floor.

17     Now for whatever reason that occurred, I don't know.  I

18     would like to assume that Joe Ferreira wasn't in the front

19     office and she wanted to leave.  So she knew she had to

20     give it to a supervisor so she gave it to Smolinsky.

21     That's what I'd like to assume, and I don't see why she

22     would do it any other way.  Now, when he -- that's

23     basically what I know.

24  Q.  Had you had an opportunity -- besides this particular

49

1      had to be reposted because they changed the job description

2      by deleting stenography?

3   A.   No.  It was reposted because of time.  That was the main

4      reason why it was reposted.  Dianne, I believe, started at

5      7 or 8 o'clock in the morning.  I forget which it was.

6      Management changed it to starting time at 4'o clock.  In

7      our local contract, it says that if a job is going to be

8      changed by -- if the change is going to exceed by two

9      hours, then it has to be reposted.

10  Q.   When they reposted it, why didn't the job go to her, since

11     she had been doing the job for -- well, how many years do

12     you know that she was doing the job?  15 years?

13  A.   All of that, yeah.  I would say so.

14  Q.   So she had been doing this job for 15 years and so now it's

15     being reposted, and who got the job?

16  A.   Lorraine Sawyer.

17  Q.   Did Lorraine Sawyer have seniority to her?

18  A.   Yes.

19  Q.   By how many years?

20  A.   I don't know -- a couple maybe.

21  Q.   Is Lorraine Sawyer an older woman or a younger woman?

22  A.   I would say younger.

23  Q.   Lorraine Sawyer has that job now?

24  A.   Yes.

# EXHIBIT M

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DIANNE DULONG | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) C.A. No. 1:04-cv-12552-   NG |
| | ) |
| JOHN E. POTTER, POSTMASTER GENERAL | ) |
| Defendant. | ) |

## AFFIDAVIT OF DIANNE DULONG

I, Dianne DuLong, the Plaintiff herein, hereby state the following as my Affidavit in support of my opposition to the Defendant's Motion for Summary Judgment. I am over the age of 18 and competent to testify. I have read my Affidavit and know the contents thereof, and that the same is true to my own knowledge and belief:

1.      The Plaintiff, Dianne DuLong (hereinafter "DuLong"), is an individual who resides at 9 Wareham Road, Plymouth, Plymouth County, MA 02360.

2.      The Defendant, John E. Potter, Postmaster General, with its regional office located at the Northeast Area Office, 6 Griffin Rd. N, Windsor, CT  06006-7000.  The Defendant, John E. Potter, employed by the United States Post Office at 475 L'Enfant Plaza, Washington, DC 20002.

3.      The Defendant, Joseph M. Ferreira, (hereinafter "Ferreira), is an individual who resides at 688 Copicut Rd., North Dartmouth, MA  02747.

4.      The Plaintiff first became employed with the Post Office on April 25, 1987, at the Buzzards Bay Post Office, Meetinghouse Lane, Buzzards Bay, MA from 4/25/87 to

1

10/92. Thereafter it became the Cape Cod Processing & Distribution. In October of 2000 the facility moved to 25 Tobey Road, Wareham MA 02571.

5.      Plaintiff was a member of Local 6005 of the Postal Workers Union and her employment was governed in part by a collective bargaining contract.

6.      The Plaintiff became the Clerk/Steno in October of 1989. At that time Plaintiff's supervisor was Cyril P. Dumas who now works in Providence.

7.      In February 1993, Joseph Ferreira became the Plant Manager and Direct Report Supervisor to whom the Plaintiff reported.

8.      From the outset, Ferreira treated the Plaintiff in a prejudicial and disdainful manner; especially after she filed her first complaint with the EEOC on September 11, 2000.

9.      Ferreira's treatment of the Plaintiff was unlike the way he treated all other postal employees under his supervision.

10.      The Plaintiff was awarded a position that required training. In the presence of a supervisor, Ferreira denied the Plaintiff the training, which was a contractual guarantee.

11.      Ferreira did not communicate with the Plaintiff regarding work issues necessary for her to do her job.

12.      Ferreira badgered the Plaintiff about security duties with respect to the gate monitor (post 9/11). In addition, Ferreira also threatened to give the Plaintiff more work.

13.      On November 28, 2001, Ferreira charged the Plaintiff as being absent without leave when she was not.

14.      Beginning October/November 2001, Ferreira forced the Plaintiff to work in a hostile work area.

2

15.     Ferreira made disparaging remarks about the Plaintiff's work.

16.     Ferreira during a request for accommodations meeting said to the Plaintiff "You don't want to work at 4:00 AM". In addition, Ferreira met with the Plaintiff's steward privately and the Plaintiff had no knowledge of said meeting until she was called in.

17.     Ferreira gave privileges to Ms. Patricia E. Monroe, Distribution Clerk (formerly Timekeeper) and denied same to the Plaintiff. Ms. Monroe always had preferential treatment, which became more pronounced after the Plaintiff filed her grievance in January, 2003.

18.     Ferreira did not give the Plaintiff the same consideration for annual leave and change of schedules that he did for others, especially the same as he did for her male co-worker, Chapman.

19.     Ferreira acted in an intimidating fashion towards the Plaintiff on a constant basis in an effort to establish an uncomfortable and stressful atmosphere at her place of employment.

20.     Ferreira deliberately reduced the Plaintiff's workload with the intent of removing her from her position as a response to the Plaintiff's efforts to seek fair and equitable treatment. This was accomplished by distributing her work to others and doing some of it himself.

21.     Ferreira begrudgingly gave meager acknowledgment of jobs well done by the Plaintiff. At the same time, Ferreira approved generous monetary awards and glowing letters of recognition to people for minor accomplishments like showing up for work. Mostly male employees received these awards.

22.     Ferreira told the Plaintiff her work was not as important as Ms. Monroe's.

23.     Ferreira harassed the Plaintiff about breaks and lunchtimes and went so far as to wait for the Plaintiff at her desk and/or calling the Plaintiff on the phone at exactly the moment she was due to return, a treatment to which no other similarly situated employee was subjected.

24.     Ferreira insisted the Plaintiff receive computer training from Providence Personnel (on two different occasions) and then interrupted said training.

25.     Ferreira removed the Plaintiff from her job based on the pretext of a need for more help on the workroom floor, despite the fact that the available resources were not being utilized.

26.     Ferreira deliberately posted the new administration position without qualifications to ensure the Plaintiff would not regain the position. Typing skills were necessary for her position, but Ferreira deleted such requirements to avoid having to give the position to the Plaintiff.

27.     Aaron Tobey, Jr., President of the APWU, Local 6005 (hereinafter "Tobey") was aware of the situation that existed in the administrative area and allowed the hostile environment created by Ferreira to continue.

28.     Tobey was aware that Ferreira attempted to force the Plaintiff to perform a function that the Plaintiff did not feel safe performing (monitoring duties-post 9/11).

29.     On November 28, 2001, Tobey was aware that Ferreira badgered the Plaintiff enough to reduce her to tears and forcing her to leave the building.

30.     In addition, Ferreira was aware that the Plaintiff suffered from the following physical problems:  osteoporosis, chronic fatigue syndrome, arthritis, fibromyalgia, stress and anxiety.

4

31.    As a result of Ferreira's influence, the Reasonable Accommodation Committee

(RAC) treated the Plaintiff differently by refusing her requests for reasonable

accommodations.  Other employees had been accommodated by RAC and/or Ferreira.

32.    As a result of Ferreira's behavior toward the Plaintiff, the Plaintiff has filed the

following Grievances with her Union:

   a.    Grievance:  01-136-Monitor Duties – Date of Step 1:  11/27/01.  The
         Complainant was forced to act as the security guard for the building (post
         9/11).  The monitor was removed, Ferreira angry over the matter and
         badgered the Plaintiff.
   b.    Grievance:  01-156-AWOL Charge – Date of Step 1:  12/01/01.  Ferreira's
         badgering of the Plaintiff caused her to leave the building and the Plaintiff
         was charged AWOL.
   c.    Grievance:  02-44-Management doing Plaintiff's work – Date of Step 1:
         9/25/02.  A member of management was opening and distributing mail
         before the Plaintiff's arrival, taking work away from her.
   d.    Grievance:  03-02-Disparate Treatment – Date of Step 1: 01/14/03.  P.
         Monroe made her own schedule.  The Plaintiff was not allowed to do the
         same.  Ferreira went so far as to backdate Monroe's forms to make them
         appear as if they were submitted on time.  Monroe was allowed games on
         her computer for entertainment, the Plaintiff was not.  Monroe was
         allowed to use the time clock in her office; the Plaintiff was required to go
         to the floor.  Monroe appeared to have two time cards.  Monroe was
         allowed to block access to the Plaintiff's files, located behind her office.
         Ferreira tried to force the Plaintiff to enter this area despite her telling him
         she did not feel safe.  Documented that Monroe has a volatile temper.
   e.    Grievance:  03-19 – Management doing Plaintiff's work-Date of Step 1:
         06/05/03.  Ferreira began doing typing previously done by Plaintiff;
         Ferreira had others do typing previously done by Plaintiff; Ferreira began
         transporting work to the Plaintiff's desk rather than allowing Plaintiff to
         retrieve it from his desk as previously done; Ferreira was made aware that
         a member of management was emptying the daily mail pouch before the
         Plaintiff arrived for work.  This was her job.  Ferreira contacted
         Providence regarding casual hiring.  This was previously done by Plaintiff
         as part of her job.  Ferreira telephoned casuals himself with reporting time
         information, which previously had been done by the Plaintiff as part of her
         job.
   f.    Grievance:  03-23-Denied Reasonable Accommodations-Date of Step 1:
         07/24/03.  Ferreira and Sawyer met before the Plaintiff was called into
         Ferreira's office to discuss Plaintiff's accommodation request.  Ferreira
         rushed the Plaintiff through the process, completing the form in a sloppy,
         haphazard, dismissive manner.  Ferreira told the Plaintiff, "She did not

want to work at 4:00 a.m." Ferreira questioned the Plaintiff's bid choices.
Ferreira's input influenced the RAC committee's decision to deny the
Plaintiff accommodation.

33.    As a result of the Defendant's behavior toward the Plaintiff, the Plaintiff has filed

the following Complaints with the EEOC:

a.    EEO Complaint: 1B0290001-01- training denied - filed 9/11/00. The
Plaintiff was awarded a position that required training. In the presence of
a supervisor, Ferreira denied the Plaintiff the training, which was a
contractual guarantee.

b.    EEO Complaint: 1B0290004-02 – charged AWOL – filed 11/28/01.
Ferreira harassed the Plaintiff over the gate monitoring duties to the point
where she left the building in tears. Despite the fact that the Plaintiff
submitted a leave slip to Matthew Smolinsky, a 204B (acting supervisor
with authority of a real supervisor), Ferreira chose to charge the Plaintiff
AWOL instead of another form of approved leave.

c.    EEO Complaint:  1B0290039-03 - Job Loss – filed 5/8/03. Ferreira dried
up the Plaintiff's work with the intent of abolishing her position. At no
time was there any discussion about reduction in workload. Ferreira, with
the help of Tobey removed the Plaintiff from the administration area.
Tobey did nothing to correct the hostile environment created by Ferreira.

34.    On May 12, 2003, DuLong filed a discrimination claim against the United States

Postal Service with the New York District Office of the Equal Employment Opportunity

Commission ("EEOC").

35.    On September 7, 2004 DuLong requested a Notice of Right to Sue pursuant to 29

C.F.R. § 1601.28 (d), (1), (2), (e), (4) against the United States Postal Service under Title

VII of the Civil Rights Act of 1964 ("Title VII").

36    On September 7, 2004, Kevin J. Berry, Administrative Judge entered a Dismissal

Order allowing DuLong to file private suit in the Federal District Court.

37.    At all times relevant hereto, while DuLong was an employee of the United States

Postal Service, DuLong was subjected to age and sex discrimination by her direct

supervisor Joseph Ferreira.

38.     As a result of this discrimination and retaliation inflicted upon DuLong, DuLong suffered emotional damages for which the United States Postal Service is liable under Title VII.

39.     The reasons given by the Defendants for termination of the Plaintiff were malicious, false and fabricated; and were conspired and contrived by Defendant through Ferreira and was intended and did defame, ridicule, harass and wrongly and unjustly accuse the Plaintiff of incompetence and seriously damaged her reputation as retaliation against her for her protected activity of filing EEOC Complaints against Ferreira.

40.     The Plaintiff alleges that the Defendant knew or should have known that Plaintiff's employment termination was based on the malicious and intentional acts of Ferreira to do her harm and injure her professionally.  Further, the illegal action by the Defendant was their participation in the conspiracy to deny Plaintiff a harmonious work environment and to deny Plaintiff her employment with the United States Postal Service.

41.     The reduction in work force as the reason for abolishing Plaintiff's position of employment was a pretext to wrongfully terminate her, as part of a purposeful discrimination against her with intent to maliciously harm her and retaliate against her for filing EEOC complaints.

42.     The Plaintiff alleges that as the direct consequence and result of the acts of the Defendant, the Plaintiff suffered much anxiety and mental distress, much discomfort and embarrassment, her reputation was impaired, her earning capacity, she suffered a loss of income, a loss of health insurance benefits, future income, and retirement benefits in excess of $350,000.00.

43.     Defendants has by its conduct, cited herein unlawfully retaliated against the
Plaintiff because in each instance she was engaged in a protected activity by filing each
grievance, complaining about working conditions, and the filing of charges with the
Equal Employment Opportunity Commission.

44.     In each instance the Defendant has engaged in conduct that violates public policy
and in the instances where Defendant has practiced retaliation against Plaintiff for filing
charges with the Equal Employment Opportunity Commission, Defendant has done so in
violation of 42 U.S.C.2000e-(16).

45.     The Defendant John E. Potter, Postmaster General, relied upon false and
mistaken information in making the decision to terminate the employment of the
Plaintiff herein as furnished by Ferreira, all part of his scheme to retaliate against
DuLong.

46.     Despite that the Defendant knew there was no legal basis to any of the claims
made by the Defendants Ferreira and Tobey against the Plaintiff, Defendant, John E.
Potter, terminated the Plaintiff's position despite a long service to the company and
good job performance all as further retaliation against DuLong.

47.     At the time of her termination, the Plaintiff had a written contract with the
Defendant, Postmaster, entitled "Agreement between the United States Postal Service
and American Postal Workers Union, AFL-CIO 2000-2003" of which the Plaintiff
was a member at the time in good standing, and aforesaid contract was in full force
and effect at the time of her termination.

48.     The Defendant breached said contract by the elimination of Plaintiff's position
and constructive wrongful termination on June 9, 2003.

49.    The Defendant through the conduct of Ferreira, which was extreme and outrageous, as set forth above has intentionally caused DuLong to suffer emotional distress as demonstrated by physical manifestations. As a result of Ferreira's intentional infliction of emotional distress, DuLong has sustained permanent and serious personal injuries including, but not limited to pain and suffering and emotional damage.

50.    DuLong asked for a reasonable accommodation for a 7:00 a.m. start time as a mail processor in 2003 when her clerk/stenographer position was abolished.  The bid posted a start time of 7:00 a.m. on two of the days, but 4:00 a.m. on the other three days. DuLong requested a 7:00 a.m. start time on all 5 days.

51.    Due to her medical condition she could not do a 4:00 a.m. start time and Ferreira was well aware of her medical problem.

52.    Ferreira would do nothing to give her the start of 7:00 a.m. each day, although the person filling that very same position today has a 7:00 a.m. start time each day.

53.    The discrimination based on age and gender against DuLong was part of long term course of retaliation by Ferreira from 2000 to her date of termination, June 9, 2003.

54.    Ferreira representing, the Defendant, treated DuLong in an unequal fashion from the treatment he tendered towards others similarly situated in the postal facility Ferreira managed.

55.    Aforesaid unequal treatment was part of Ferreira's ongoing retaliation against DuLong to drive her out of the Postal Service.

9

Signed and sworn to under the pains and penalties of perjury this 3rd day of October, 2007.

Dianne DuLong

# CASE # 1

Source: My Sources > Massachusetts > Find Cases > MA Federal & State Cases, Combined ⓘ
Terms: in an action by plaintiff , a whistle-blower, alleging retaliation by his employer, summary judgment not
appropriate since issue is for a jury to dete... (Edit Search | Suggest Terms for My Search | Feedback on
Your Search)

✦Select for FOCUS™ or Delivery

☐

*234 F. Supp. 2d 91, \*; 2002 U.S. Dist. LEXIS 24161, \*\**

CANDY BELL, Plaintiff, v. JOHN E. POTTER, in his official capacity ·as Postmaster General of
the United States of America, United States Postal Service, Defendant.

CIVIL ACTION NO. 00-10054-RBC n1

n1 With the parties' consent this case was referred and reassigned to the undersigned for all
purposes including trial and the entry of judgment pursuant to 28 U.S.C. § 636(c).

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

234 F. Supp. 2d 91; 2002 U.S. Dist. LEXIS 24161

December 12, 2002, Decided

**DISPOSITION:** **[\*\*1]** Defendant's Motion For Judgment As Matter Of Law Or In
Alternative For New Trial was denied.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Defendant former **employer** moved for judgment as a matter
of law, or alternatively a new trial, after a **jury** returned a verdict in favor of plaintiff
former employee in the employee's Title VII of the Civil Rights Act of 1964 **retaliation**
action.

**OVERVIEW:** As to judgment as a matter of law, the **employer** argued that the
employee's evidence was insufficient on many grounds such that the verdict could not
stand. The court, however, concluded that there was sufficient evidence. The **jury** could
have concluded that a fitness-for-duty examination (FFD) was an adverse action. The
employee testified that when the FFD was ordered she felt punished for complaining. None
of the **employer's** cases stood for the proposition that, as a general matter, sending an
employee for an FFD could not serve as the basis for a **retaliation** claim. The court found
that the **jury** could have reasonably concluded that the employee filed her Equal
Employment Opportunity (EEO) complaint in good faith; it was not for the court to second
guess the **jury's** credibility assessment, but only determine if there was sufficient
evidence for such a conclusion. Further, where the adverse action occurred only days after
the **employer** learned of the employee's protected activity, it appeared that a causal
connection could reasonably be inferred. Finally, it was permissible for the **jury** to infer
discrimination from the falsity of the **employer's** explanation.

**OUTCOME:** The **employer's** motion was denied.

**CORE TERMS:** retaliation, prima facie case, personnel, adverse action, protected activity,
matter of law, new trial, reasonable jury, causal connection, credibility, favorable, summary
judgment, sexual harassment, causation, harassment, pretextual, sufficient evidence, jury
believed, trier of fact, moving party, psychological, absenteeism, credible, ordering, pretext,
shifted, suffice, supervisor, suspension, entitled to judgment

## LexisNexis(R) Headnotes Hide Headnotes

Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burden Shifting
Labor & Employment Law > Discrimination > Retaliation > General Overview

*HN1* A **retaliation** claim is analyzed according to the familiar three-stage "burden-shifting" paradigm set forth in the McDonnell Douglas decision.  More Like This Headnote

Evidence > Procedural Considerations > Preliminary Questions > Admissibility of Evidence > General Overview
Labor & Employment Law > Collective Bargaining & Labor Relations > Unfair Labor Practices > Interference With Protected Activities

Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview

*HN2* In accordance with the McDonnell Douglas analytical framework, it is incumbent upon the plaintiff first to make out a prima facie case of **retaliation** under Title VII of the Civil Rights Act of 1964. Courts have routinely noted that the prima facie burden is quite easy to meet. To establish a prima facie case, the plaintiff simply has to show that: (1) her **employer** was aware that she engaged in activity protected under Title VII (such as filing an Equal Employment Opportunity complaint); (2) some adverse employment action followed; and (3) there was a causal connection between the protected activity and the adverse action, motivated in part by **retaliation.**  More Like This Headnote | *Shepardize: Restrict By Headnote*

Evidence > Inferences & Presumptions > General Overview
Labor & Employment Law > Discrimination > Retaliation > Burdens of Proof
Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview

*HN3* Proof of a Title VII of the Civil Rights Act of 1964 prima facie case gives rise to a legally mandatory rebuttable presumption of **retaliation.** Once a prima facie case, and, hence, a presumption of discriminatory **retaliation** is established, then the burden shifts to the **employer** to articulate a legitimate reason for the adverse employment action. If the **employer** produces evidence of a non-retaliatory reason for its actions and the fact finder believes it, then the presumption of **retaliation** disappears. At that point, the plaintiff must prove by a preponderance of the evidence that the **employer's** stated reason for the adverse action was mere **pretext** and that it was actually taken in **retaliation.** However, after the **employer** has interposed a non-retaliatory reason for its actions, the fact finder may still rely on evidence that was offered during the plaintiff's case-in-chief: A satisfactory explanation by the defendant destroys the legally mandatory inference of discrimination arising from the plaintiff's initial evidence. Nonetheless, this evidence and inferences properly drawn therefrom may be considered by the trier of fact on the **issue** of whether the defendant's explanation is pretextual. Indeed, there may be some cases where the plaintiff's initial evidence, combined with effective cross-examination of the defendant, will suffice to discredit the defendant's explanation.  More Like This Headnote

Civil Procedure > Trials > Judgment as Matter of Law > General Overview

*HN4* Under Fed. R. Civ. P. 50, a court should render judgment as a matter of law when a party has been fully heard on an **issue** and there is no legally sufficient evidentiary basis for a reasonable **jury** to find for that party on that **issue.**  More Like This Headnote

Civil Procedure > Summary Judgment > Appellate Review > General Overview
Civil Procedure > Trials > Judgment as Matter of Law > General Overview
Evidence > Procedural Considerations > Weight & Sufficiency

*HN5* In the context of **summary judgment** under Fed. R. Civ. P. 56, the court must

review the record taken as a whole. And the standard for granting **summary judgment** mirrors the standard for judgment as a matter of law, such that the inquiry under each is the same. It therefore follows that, in entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record. In doing so, however, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are **jury** functions, not those of a judge. Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the **jury** is not required to believe. That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.  More Like This Headnote

Civil Procedure > Trials > Jury Trials > Jury Instructions > Objections to Instructions 🖼️
Labor & Employment Law > Discrimination > Retaliation > General Overview 🖼️
*HN6*⚖️For purposes of a **retaliation** claim, determining whether an action is materially adverse necessarily requires a case-by-case inquiry.  More Like This Headnote

Labor & Employment Law > Discrimination > Retaliation > General Overview 🖼️
*HN7*⚖️In the context of **retaliation,** to support a **jury's** finding that an action was an adverse action, there must be some evidence that it resulted in a meaningful consequence to the plaintiff.  More Like This Headnote

Labor & Employment Law > Discrimination > Harassment > Racial Harassment > Burdens of Proof > Objective & Subjective Standards 🖼️
Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Burdens of Proof > Objective & Subjective Standards 🖼️
Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview 🖼️
*HN8*⚖️Regardless of whether any of the conduct that the plaintiff lists in her Equal Employment Opportunity complaint was prohibited under Title VII of the Civil Rights Act of 1964, an employee's reasonable belief that it crosses the line suffices as long as the complainant communicates that belief to the **employer** in good faith.  More Like This Headnote

Civil Procedure > Trials > Jury Trials > Province of Court & Jury 🖼️
*HN9*⚖️It is not for the court to second guess the **jury's** credibility assessment, but only to determine if there was sufficient evidence for a reasonable **jury** to come to a conclusion.  More Like This Headnote

Labor & Employment Law > Collective Bargaining & Labor Relations > Unfair Labor Practices > Interference With Protected Activities 🖼️
Labor & Employment Law > Discrimination > Retaliation > General Overview 🖼️
*HN10*⚖️In the context of a **retaliation** claim, one way of showing causation is by establishing that the **employer's** knowledge of the protected activity was close in time to the **employer's** adverse action. So, temporal proximity alone can be enough evidence of causation to establish a prima facie case of **retaliation.** It is sufficient in circumstances where the action is taken very close in time to the protected activity. Of course, the closer the adverse action is to the protected activity, the stronger the inference of causation.  More Like This Headnote

Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burden Shifting 🖼️
*HN11*⚖️It is permissible for the trier of fact to infer the ultimate fact of discrimination from

the falsity of an **employers** explanation.   More Like This Headnote

Civil Procedure > Judgments > Relief From Judgment > Motions for New Trials
Civil Procedure > Judgments > Relief From Judgment > Motions to Alter & Amend
*HN12* See Fed. R. Civ. P. 59(a)(1).

Civil Procedure > Judgments > Relief From Judgment > Motions for New Trials
*HN13* It is firmly within the trial court's discretion to grant a motion for a new trial. A new trial may be granted if the clear weight of the evidence does not support the verdict. Moreover, a judge may order a new trial if the verdict will result in a clear miscarriage of justice. An excessive award of damages is also grounds for a new trial. However, deference must be accorded to a **jury's** verdict; it should not be overturned except under most compelling of circumstances where it is seriously erroneous.   More Like This Headnote

Civil Procedure > Judgments > Relief From Judgment > Motions for New Trials
Civil Procedure > Judgments > Relief From Judgment > Motions to Alter & Amend
*HN14* A Fed. R. Civ. P. 59 motion can only be granted if the evidence, viewed from the perspective most favorable to the plaintiff, is so one-sided that the defendant is plainly entitled to judgment, for reasonable minds could not differ as to the outcome.   More Like This Headnote

**COUNSEL:** For CANDY M. BELL, Plaintiff: Matthew Cobb, Law Firm of Matthew Cobb, Boston, MA.

For JOHN E. POTTER, Defendant: Barbara Healy Smith, U.S. Attorney's Office, Boston, MA.

For JOHN E. POTTER, Defendant: Gina Y. Walcott-Torres, U.S. Attorney's Office, Boston, MA.

**JUDGES:** ROBERT B. COLLINGS, United States Magistrate Judge.

**OPINION BY:** ROBERT B. COLLINGS

**OPINION:** [*93]

**MEMORANDUM AND ORDER ON DEFENDANTS' (SIC) MOTION FOR JUDGMENT AS A MATTER OF LAW OR IN THE ALTERNATIVE FOR A NEW TRIAL ( # 84)**

COLLINGS, U.S.M.J.

## I. **INTRODUCTION**

On June 4, 2002, following a six-day trial the **jury** returned a verdict in favor of the plaintiff Candy Bell ("Bell" or "plaintiff") on her Title VII **retaliation** claim as against the defendant John E. Potter, in his official capacity as Postmaster General of the United States Postal Service ("Potter" or "defendant"). Ten days later on June 14, 2002, the defendant filed his renewed motion for judgment as a matter of law pursuant to Rule 50(b), Fed. R. Civ. P., or in the alternative, that a new trial be granted pursuant to Rule 59, Fed. R. Civ. P. ( # 84) [**2] [*94] After the trial transcripts were filed, Potter submitted his memorandum in support of his Rule 50(b)/Rule 59 motion on August 23, 2002. ( # 101) Bell filed her opposition to the defendant's motion ( # 108) on September 6, 2002 and, with leave of Court, Potter filed a reply brief on September 26, 2002. ( # 109) With the record now complete, the defendant's post-trial motion stands ready for decision.

## II. THE LAW - RULE 50(b), FED. R. CIV. P.

Prior to reaching the defendant's numerous arguments, it is perhaps best to set the contextual stage. In a nutshell, Bell claimed that the Postal Service subjected her to **retaliation** for having filed an EEO complaint. [HN1]Such a claim, of course, is analyzed according to the familiar three-stage "burden-shifting" paradigm set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973), and Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981).

[HN2]In accordance with this analytical framework, it was incumbent upon the plaintiff first to make out a prima facie case of **retaliation** under Title VII. Courts have routinely noted that "the prima **[\*\*3]** facie burden is quite easy to meet." Hodgens v. General Dynamics Corp., 144 F.3d 151, 165 (1 Cir., 1998)(internal quotation marks and citations omitted). "All that is needed is the production of admissible evidence which, if uncontradicted, would justify a legal conclusion of discrimination." Brennan v. GTE Gov't Sys. Corp., 150 F.3d 21, 26 (1 Cir., 1998)(citation omitted). To establish a prima facie case, Bell simply had to show that: 1) her **employer** was aware that she engaged in activity protected under Title VII (such as filing an EEO complaint); 2) some adverse employment action followed; and 3) there was a causal connection between the protected activity and the adverse action, motivated in part by **retaliation.** See, e.g., Hernandez-Torres v. Intercontinental Trading, Inc., 158 F.3d 43, 47 (1 Cir., 1998); Petitti v. New England Tel. & Tel. Co., 909 F.2d 28, 33 (1 Cir., 1990).

[HN3]Proof of the Title VII prima facie case gives rise to a legally mandatory rebuttable presumption of, in this instance, **retaliation.** Burdine, 450 U.S. at 254. Once a prima facie case, and, hence, a presumption of discriminatory **retaliation** was **[\*\*4]** established, then the burden shifted to the **employer,** Potter, to articulate a legitimate reason for the adverse employment action. McDonnell Douglas Corp., 411 U.S. at 802. n2 If the **employer** produces evidence of a non-retaliatory reason for its actions and the fact finder believes it, then the presumption of **retaliation** disappears. At that point, the plaintiff must prove by a preponderance of the evidence that the **employer's** stated reason for the adverse action was mere **pretext** and that, in fact, it was actually taken in **retaliation.** McDonnell Douglas Corp., 411 U.S. at 804; St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507-508, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993); Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 19 (1 Cir., 1999). However, after the **employer** has interposed a non-retaliatory reason for its actions, the fact finder may still rely on evidence that was offered during the plaintiff's case-in-chief:

> A satisfactory explanation by the defendant destroys the legally mandatory inference of discrimination arising from **[\*95]** the plaintiff's initial evidence. Nonetheless, this evidence and inferences properly **[\*\*5]** drawn therefrom may be considered by the trier of fact on the **issue** of whether the defendant's explanation is pretextual. Indeed, there may be some cases where the plaintiff's initial evidence, combined with effective cross-examination of the defendant, will suffice to discredit the defendant's explanation.

Burdine, 450 U.S. at 255 n. 10.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n2 To be clear, the defendant's burden is one of production; the plaintiff always carries the ultimate burden of persuasion in a <u>Title VII claim. Burdine, 450 U.S. at 253.</u>

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Turning now to the motion at hand, it is important at the outset to detail the applicable standard. In this regard the Supreme Court has provided clear guidance:

> *HN4*☞Under Rule 50, a court should render judgment as a matter of law when "a party has been fully heard on an **issue** and there is no legally sufficient evidentiary basis for a reasonable **jury** to find for that party on that **issue**."

> \* \* \* \*

> *HN5*☞In the analogous context of **summary judgment** under Rule 56, we have stated **[\*\*6]** that the court must review the record "taken as a whole." And the standard for granting **summary judgment** "mirrors" the standard for judgment as a matter of law, such that "the inquiry under each is the same." It therefore follows that, in entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record.

> In doing so, however, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are **jury** functions, not those of a judge." Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party [] that the **jury** is not required to believe. That is, the court should give credence to the evidence favoring the nonmovant as well as that "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses."

<u>Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S. Ct. 2097, 2109-2110, 147 L. Ed. 2d 105 (2000)</u> **[\*\*7]** (internal citations omitted).

However, it is important to note that the defendants Rule 50(b) motion in the instant case is made after the **jury** has returned its verdict for the plaintiff. That is not the time to be challenging the adequacy of Bell's prima facie case. As the First Circuit has written:

> When, as now, an employment discrimination action has been submitted to a **jury,** the burden-shifting framework has fulfilled its function, and backtracking serves no useful purpose. To focus on the existence of a prima facie case after a discrimination case has been fully tried on the merits is to "unnecessarily evade[] the ultimate question of discrimination vel non." <u>United States Postal Serv. Bd. of Govs. v. Aikens, 460 U.S. 711, 713-14, 103 S. Ct. 1478, 1481, 75 L. Ed. 2d 403 (1983);</u> see also <u>Mesnick, 950 F.2d 816, 824-25.</u> By like token, our evaluation of post-trial motions seeking relief from a **jury's** verdict in such a case is similarly

confined to the ultimate question of discrimination. Consequently, to wander afield in pursuit of appellant's phantom "prima facie case" argument is a bit like undertaking early morning calisthenics: it might be good **[\*\*8]** exercise, but it certainly is not essential to the business of the day.

Sanchez v. Puerto Rico Oil Co., 37 F.3d 712, 720 (1 Cir., 1994); see also Alvarez-Fonseca v. Pepsi Cola of Puerto Rico Bottling Company, 152 F.3d 17, 26 (1 Cir., **[\*96]** 1998), cert. denied, 526 U.S. 1123, 143 L. Ed. 2d 806, 119 S. Ct. 1778 (1999)("Moreover, at this stage of the McDonnell Douglas analysis it is irrelevant whether or not the facts in question sufficed to establish a prima facie case or not. Instead, the question is whether the whole of the evidence mustered by the plaintiff, regardless of whether it was initially presented to establish the prima facie case or to show **pretext,** suffices to allow a finding that the defendant intentionally discriminated against him.")

## III. DISCUSSION - RULE 50(b) MOTION

Potter argues that Bell's evidence was insufficient on many grounds such that the verdict cannot stand. Specifically, it is asserted that the plaintiff failed to produce evidence upon which a reasonable **jury** could have concluded that: (1) the Fitness-for-Duty Examination ("FFD") was an "adverse action," (2) she filed her EEO complaint in good faith, (3) **[\*\*9]** there was a causal connection between filing the complaint and the subsequent actions taken by the Postal Service, or (4) the reasons stated by the Postal Service for taking the adverse personnel actions were pretextual. (Memorandum in Support # 101 at 1) These contentions shall be examined seriatim in order to determine whether, taking all the evidence in the light most favorable to the plaintiff, there was any legally sufficient basis for a reasonable **jury** to find in her favor.

1. Is there sufficient evidence for a reasonable **jury** to conclude that scheduling an FFD constituted an adverse personnel action?

While Potter concedes that the 14-day suspension and notice of removal were adverse personnel actions, he takes **issue** with the FFD being so characterized. It is argued that "the burden to articulate a nondiscriminatory reason for the FFD never shifted to the defendant" because the plaintiff failed to show that the FFD was an adverse employment action. n3 ( # 101 at 16) The defendant points out that his evidence was to the effect that the FFD was ordered for the plaintiff's benefit and perhaps even might have prevented her suspension and removal. ( # 101 at 5, 7) The problem with **[\*\*10]** defendant's analysis is that it ignores the fact that the **jury** plainly believed Bell and disbelieved the witnesses called by the defendant on the **issue.**

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n3 As stated, supra, it is not material at this point whether the plaintiff made out a prima facie case. Alvarez-Fonseca, 152 F.3d at 26; Sanchez, 37 F.3d at 720. What is pertinent is whether, on the basis of all the evidence and taking that evidence in the light most favorable to the plaintiff, the **jury** could have found that the order sending her to an FFD was in **retaliation** for her having filed an EEO complaint.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

*HN6*⛧"Determining whether an action is materially adverse necessarily requires a case-by-case inquiry." Blackie v. State of Maine, 75 F.3d 716, 725 (1 Cir., 1996). The **jury** was properly instructed to apply an objective test to make that determination. ( # 101 at 6 citing **Jury** Instructions V:103) Ultimately, it was for the **jury** to decide whether the FFD was an adverse employment action taken in **retaliation** for Bell's [**11] filing of the EEO complaint.

*HN7*⛧To support the **jury's** finding that the FFD was an adverse action, there must be some evidence that it resulted in a meaningful consequence to the plaintiff. Bishop v. Bell Atlantic Corp., 299 F.3d 53, 59 (1 Cir., 2002). While the defendant maintains that scheduling an FFD was either of no consequence or was actually a benefit to the plaintiff, ordering a psychological examination to determine if an employee is fit to continue working could be an adverse action. [*97]

Bell testified that when the FFD was ordered she felt "punished for complaining[,] like it was an attack on [her] again. You go to FFD. They are doing something...just another superficial investigation." (Plaintiff's Joint Opposition # 108 at 24, quoting II: 86) Basically, the plaintiff argues that the FFD was ordered because of the Postal Service's desire to make Bell look like a problem and that it was reasonable for her to perceive this as a form of punishment. ( # 108 at 21) She observes that the FFD was a psychological exam designed to determine if she is "mentally unfit" to work. Bell claims that the FFD was essentially a preemptive strike undertaken to discredit her. ( # [**12] 108 at 5-6)

None of the cases upon which the defendant relies stand for the proposition that, as a general matter, sending an employee for an FFD cannot serve as the basis for a **retaliation** claim. In Frankel v. United States Postal Service, **summary judgment** was denied as to the FMLA and Title VII **retaliation** claims which challenged the order to submit to an FFD. Even in the context of the discrimination claim on which **summary judgment** was granted, it was not determined that the FFD was not an adverse action. Rather, the Court found that the plaintiff failed to show a causal connection between the protected activity and the challenged actions (including an FFD). Frankel, 96 F. Supp.2d 19, 27-28 (D. Mass., 2000).

The defendant's reliance on other cases is similarly misplaced. See Schoffstall v. Henderson, 223 F.3d 818, 825 (8 Cir., 2000)(did not hold that ordering an FFD could not be the basis for a **retaliation** claim, but only that the specific facts of the case did not support that finding); Vislisel v. Turnage, 930 F.2d 9, 10 (8 Cir., 1991)(**summary judgment** upheld because of failure to show a causal connection between the FFD and the plaintiff's [**13] discrimination complaint); Campbell v. Prince George's County Maryland, 2001 U.S. Dist. LEXIS 7961, 2001 WL 706039 at *6 (D. Md., 2001)(found that the plaintiff had established her prima facie case of **retaliation** and that it is a question for the trier of fact to decide whether an FFD was an adverse employment action considering, inter alia, the emotional distress it may cause); Jones v. Billington, 12 F. Supp. 2d 1, 9, 14-15 (D.D.C., 1997)(it was "assumed that a request for a fitness for duty examination is an employment action covered by Title VII." As to the FFD, **summary judgment on the retaliation** claim was granted because plaintiff failed to connect the FFD causally to his protected activity or show that defendant's reason for requesting it was **pretext**). In sum, an FFD can constitute an adverse personnel action and the **jury** had a sufficient evidentiary basis upon which to conclude that it was in this case.

2. Was it reasonable for the **jury** to conclude that the plaintiff filed her EEO complaint in good faith?

The defendant claims to be entitled to judgment as a matter of law because the plaintiff failed to establish by a preponderance of the evidence that her EEO complaint [**14] was based on a reasonable belief that she had been the victim of racial and/or sexual

harassment. ( # 101 at 11) [HN8]Regardless of whether any of the conduct that the plaintiff listed in her EEO complaint was prohibited under Title VII, "an employee's reasonable belief that it crosses the line suffices, as long as the complainant communicates that belief to the **employer** in good faith." Higgins v. New Balance, 194 F.3d 252, 262 (1 Cir., 1999) (citations omitted). So, the **issue** is to be decided on the basis of a subjective inquiry into whether the plaintiff believed she was the victim of discrimination, not whether **[*98]** the defendant's conduct about which the plaintiff complained was in fact illegal.

The defendant contends that Bell's complaint regarding the March 15th incident did not describe "race or sex-based discrimination" and that she failed to offer corroborating evidence of her sexual and racial harassment claims or that such harassment was the cause of her absences from work. ( # 101 at 8) In her brief, Bell proffers several examples of conduct about which she complained that could have led the **jury** to conclude that she believed she was the victim of race and gender discrimination. **[**15]** ( # 108 at 13-15) Bell asserts that when she went to EEO she told them about "everything," including allegations that she had continually been the victim of "fat black woman type jokes" and comments such as "nigger" and "F  ing Whore" in the workplace. ( # 108 at 15, 17-19) She claims that she complained about the abuse to her supervisor several times and he just told her to ignore the comments. ( # 108 at 11 citing II: 39) Indeed the plaintiff alleges that she was wearing headphones on the day she missed the call concerning her son's accident in order to tune out this pervasive verbal harassment in the workplace. ( # 108 at 15 citing II: 54)

Again, [HN9]it is not for the Court to second guess the **jury's** credibility assessment, but only to determine if there was sufficient evidence for a reasonable **jury** to come to that conclusion. See generally Anderson v. Liberty Lobby, 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). The plaintiff presented evidence that her EEO complaint was ultimately triggered by the events of March 15, but that it was also a response to what she reasonably believed was a long history of racial and sexual harassment at the Post Office. **[**16]** Based on Bell's testimony as to what she had endured in the nature of racial and sexual harassment over the years and the inadequate response of management, the **jury** could have reasonably concluded that Bell believed in good faith that the March 15th incident was more of the same.

3. Is there sufficient evidence to satisfy the plaintiff's initial burden of showing a causal connection between the EEO complaint and the three adverse personnel actions that followed? n4

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n4 Again, the case having been fully tried and a **jury** verdict rendered, this is not the juncture at which to examine the sufficiency of the plaintiff's prima facie case. Alvarez-Fonseca, 152 F.3d at 26; Sanchez, 37 F.3d at 720.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The **issue is whether the jury,** on the evidence taken in the light most favorable to Bell, could find that the adverse personnel actions were taken in **retaliation** for her having filed her EEO complaint. As a practical matter, **employers** typically do not explicitly declare their intentions to discriminate **[**17]** or retaliate against an employee for engaging in Title VII protected activity. "Therefore, generally the plaintiff-employee must make do with circumstantial evidence, leaving it to the **jury** whether to infer from the nature of the materially adverse employment conditions that the defendant-**employer** harbored a

retaliatory animus." Simas v. First Citizens' Federal Credit Union, 170 F.3d 37, 48 (1 Cir., 1999). Keeping in mind that the **jury** believed Bell's testimony, the evidence, viewed through the Rule 50(b) lens, is sufficient to support the verdict.

For example, Bell contends that even with her notable record for absenteeism, never before had she been sent for an FFD. Within days of going to the EEO, she was being ordered to submit to a psychological exam. Causation can generally be established by making an inference based on the timing of events. [HN10] "'One way **[*99]** of showing causation is by establishing that the **employer's** knowledge of the protected activity was close in time to the **employer's** adverse action.'" Frankel, 96 F. Supp.2d at 24 (quoting Wyatt v. City of Boston, 35 F.3d 13, 16 (1 Cir., 1994)). So, temporal proximity alone could be enough evidence **[**18]** of causation to establish a prima facie case of **retaliation.** It is sufficient in circumstances, such as this, where the action is taken "very close" in time to the protected activity. Clark County School District v. Breeden, 532 U.S. 268, 273-274, 149 L. Ed. 2d 509, 121 S. Ct. 1508 (2001)(temporal proximity alone was insufficient to prove causation because the adverse action occurred twenty months later). Of course, the closer the adverse action is to the protected activity, the stronger the inference of causation. Here, where the adverse action occurred only days after the **employer** learned of the protected activity it appears that a causal connection could reasonably be inferred.

Although only the FFD has been specifically discussed, these three actions cannot be considered in isolation. They were ordered by the same supervisor (Mr. Breen) and were a series of actions, beginning with an FFD, ordered just days after the plaintiff filed with EEO.

4. Did the plaintiff satisfy her burden of proof when the burden shifted back to her to show that the reasons offered by the Postal Service for the three personnel actions were pretextual?

Again, the defendant argues the **[**19]** prima facie case **issue** which is not germane at this stage of the proceedings. The defendant claims that the plaintiff did not offer sufficient evidence upon which a reasonable **jury** could have found that the reason stated by the Postal Service for ordering an FFD was pretextual. This argument completely ignores the plain fact that the **jury** believed Bell's testimony and disbelieved that of the Postal Service officials who posited the non-discriminatory reason for the personnel actions. If a plaintiff offers evidence from which the **jury** could disbelieve that the asserted non-discriminatory reason was the true reason for the actions taken, there is no necessity that the plaintiff produce anything more. As the Supreme Court has written, [HN11] "...it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the **employers** explanation." Reeves, 530 U.S. at 147.

The defendant takes the position that the evidence he offered established that the FFD was scheduled in response to the plaintiffs complaints of disabling work-related stress. The **jury** need not have credited this evidence, however; indeed, it is clear from the verdict that they did **[**20]** not.

For example, it was shown that Bell had a long history of work-related stress and absenteeism during her nine years of Postal Service employment that proceeded her EEO complaint. The plaintiff argues that retaliatory animus is evidenced by that fact that it was not until Bell engaged in the protected activity that the Postal Service decided to take action and initiate a series of adverse actions. Although Potter maintained that the 14-day suspension and Notice of Removal were consequences of Bell alleged unexplained absences from work, the plaintiff notes that she had bad been in a state of "equilibrium" with her **employer** with regard to absenteeism until she filed a complaint with EEO in March of 1997. ( # 108 at 29) The determination as to whether the defendant motive and intent were really **retaliation** is left to the **jury** in cases such as these because "proof is generally based on

inferences that must be drawn, rather than on the proverbial "smoking gun.'" Rossy v. Roche Products Inc., 880 F.2d 621, 624 (1 Cir., 1989). If, **[*100]** on the evidence they viewed as credible, the jurors could disbelieve the testimony by defendant's witnesses as to why the Postal Service took **[**21]** the actions it did, then the verdict must stand.

In sum, from the totality of the evidence, both direct and circumstantial, taken in the light most favorable to the plaintiff, the **jury** could have found the following:

a. Bell's testimony was credible and the testimony of Mr. Breen and the other Postal Service officials who testified as to the reasons personnel actions were taken against Bell were not credible. n5

b. Bell had been subject to a long history of racial and sexual harassment at her employment.

c. Bell's supervisors, most especially Mr. Breen, neglected or refused to deal with the long-standing problem of the sexual and racial harassment of Bell in any effective way.

d. Bell, based on (a) and (b), believed, in good faith, that what happened on March 15th were further acts which were motivated by her race and sex.

e. Bell told Mr. Breen that she had filed the EEO complaint.

f. Immediately thereafter Mr. Breen commenced the first adverse personnel action, followed in succession by the second and third.

g. Mr. Breen took these actions in **retaliation** for Bell having filed the EEO complaint.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n5 Even though the Court "...should review the record as a whole, it must disregard all evidence favorable to the moving party that the **jury** is not required to believe." Reeves, 530 U.S. at 151 (citation omitted). The **jury** was clearly not "required" to believe the testimony of Mr. Breen.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[**22]**

It follows that Potter's motion for judgment as a matter of law must be denied. Any other result would require the Court to overturn the **jury's** credibility determinations, which, as the Supreme Court has stated, is improper when ruling on a Rule 50 motion. Reeves, 530 U.S. at 150-1 citing Anderson v. Liberty Lobby, 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).

## IV. THE LAW - RULE 59 MOTION

Rule 59(a), Fed. R. Civ. P., provides that _HN12_ "[a] new trial may be granted...on all or part of the **issues** (1) in an action in which there has been a trial by **jury,** for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." _HN13_ It is firmly within the trial court's discretion to grant a motion for a new trial. Allied Chemical Corp. v. Daiflon, Inc., 449 U.S. 33, 36, 66 L. Ed. 2d 193, 101 S. Ct. 188 (1980). A new trial may be granted if the clear weight of the evidence does not support the verdict. Shiels Title Co., Inc. v. Commonwealth Land Title Ins. Co., 184 F.3d 10, 19 (1 Cir., 1999); Kearns v. Keystone Shipping Co., 863 F.2d 177, 181 (1 Cir., **[**23]** 1988).

Moreover, a judge may order a new trial if the verdict "'will result in a clear miscarriage of justice.'" Puerto Rico Aqueduct & Sewer Auth. v. Constructora Lluch, Inc., 169 F.3d 68, 77 (1 Cir., 1999) quoting Phav v. Trueblood, Inc., 915 F.2d 764, 766 (1 Cir., 1990). An excessive award of damages is also grounds for a new trial. Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 433, 135 L. Ed. 2d 659, 116 S. Ct. 2211 (1996). However, deference must be accorded to a **jury's** verdict; it should not be overturned except "under most compelling of circumstances" where it is seriously erroneous. Flores-Suarez v. Turabo Medical Center, 165 F. Supp.2d 79, 85 (D.P.R., 2001)(citing Velazquez **[*101]** v. Figueroa-Gomez, 996 F.2d 425, 427 (1 Cir., 1993)).

## V. DISCUSSION - RULE 59 MOTION

Defendant argues that no reasonable **jury** could have found that the adverse personnel actions taken by the Postal Service were motivated by a desire to retaliate against the plaintiff for filing an EEO complaint. Therefore Potter requests that judgment as a matter of law or a new trial be granted in order to avoid a miscarriage of justice. **[**24]** Again, the defendant must meet a high standard to persuade the Court that judgment should be granted as a matter of law. [HN14] This motion can only be granted "if the evidence, viewed from the perspective most favorable to the [plaintiff], is so one-sided that the [defendant] is plainly entitled to judgment, for reasonable minds could not differ as to the outcome." FHS Props. Ltd. Pshp. v. BC Associates, 175 F.3d 81, 85 (1 Cir., 1999)(quoting Gibson v. City of Cranston, 37 F.3d 731, 735 (1 Cir., 1994)).

As the discussion regarding the Rule 50(b) motion indicates, this is not such a case. The **jury** believed Bell's testimony; it was within their province to do so. In deciding a Rule 59 motion, the Court cannot make its own credibility judgments and substitute those for the judgments of the **jury.** Yet this is precisely what the defendant asks the Court to do. The Rule 59 motion, at least as to liability, is without merit.

## VI. CONCLUSION AND ORDER

For the reasons stated it is ORDERED that Defendants' (sic) Motion For Judgment As A Matter Of Law Or In The Alternative For A New Trial ( # 84) be, and the same hereby is, DENIED.

ROBERT B. COLLINGS **[**25]**

United States Magistrate Judge

December 12, 2002.

Source: My Sources > Massachusetts > Find Cases > MA Federal & State Cases, Combined ⓘ
Terms: in an action by plaintiff , a whistle-blower, alleging retaliation by his employer, summary judgment not appropriate since issue is for a jury to dete... (Edit Search | Suggest Terms for My Search | Feedback on Your Search)
View: Full
Date/Time: Sunday, August 26, 2007 - 2:51 PM EDT

* Signal Legend:
● - Warning: Negative treatment is indicated
Ⓠ - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
Ⓐ - Citing Refs. With Analysis Available
ⓘ - Citation information available

\* Click on any *Shepard's* signal to *Shepardize*® that case.

 **LexisNexis**®

About LexisNexis  |  Terms & Conditions
Copyright ©  2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# CASE # 2

**LexisNexis®** *Total Research System*

Switch Client ┊ Preferences ┊ Sign Off ┊ ? Help

*My Lexis*™ ▼ Search ▼ Research Tasks ▼ Get a Document ▼ *Shepard's*® ▼ Alerts ▼ Total Litigator ▼    Dossier ┊ History ┊ ▣

Service: **Get by LEXSEE®**
Citation: **426 U.S. 88**

*426 U.S. 88, *; 96 S. Ct. 1895, **;*
*48 L. Ed. 2d 495, ***; 1976 U.S. LEXIS 153*

HAMPTON, CHAIRMAN, U.S. CIVIL SERVICE COMMISSION, ET AL. *v.* MOW SUN WONG ET AL.

No. 73-1596

SUPREME COURT OF THE UNITED STATES

426 U.S. 88; 96 S. Ct. 1895; 48 L. Ed. 2d 495; 1976 U.S. LEXIS 153; 12 Fair Empl. Prac. Cas. (BNA) 1377; 11 Empl. Prac. Dec. (CCH) P10,955

Argued January 13, 1975; Reargued January 12, 1976
June 1, 1976

**PRIOR HISTORY:** CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

## CASE SUMMARY

**PROCEDURAL POSTURE:** Certiorari was granted to the United States Court of Appeals for the Ninth Circuit, to determine whether 5 C.F.R. § 338.101(a) (1976) of the U.S. Civil Service Commission Regulations, barring respondent resident aliens from employment in the federal competitive civil service, was constitutional. Petitioner U.S. Civil Service Commission adopted and enforced the regulations.

**OVERVIEW:** Respondent resident aliens challenged the validity of 5 C.F.R. § 338.101(a) (1976), adopted and enforced by petitioner U.S. Civil Service Commission, which excluded all persons except American citizens and natives of American Samoa from employment in most civil service positions. Respondents were all lawfully admitted resident aliens, and alleged that the advantage given to citizens seeking federal civil service positions was arbitrary and violated the Due Process Clause of U.S. Const. amend. V. The district court held that petitioner commission's discrimination against aliens was constitutional. The district court noted that the federal power over aliens was quite broad, almost plenary, and, therefore, the classification needed only a rational basis. The court of appeals reversed, holding the regulation violative of the Due Process Clause of U.S. Const. amend. V. The Court affirmed the judgment of the court of appeals, and concluded that 5 C.F.R. § 338.101(a) of the Civil Service Commission Regulations deprived respondents of liberty without due process of law. Accordingly, the Court invalidated the regulation.

**OUTCOME:** The Court affirmed the judgment of the court of appeals, concluding that, by broadly denying resident aliens civil service employment, petitioner Civil Service Commission deprived respondents of an aspect of liberty. The Court held that the regulation at issue deprived respondents of liberty without due process of law, and the Court invalidated the regulation.

**CORE TERMS:** civil service, alien, citizenship, postal, noncitizen, appointment, national interests, competitive, allegiance, eligible, Appropriation Acts, owe, employment opportunities,

deprivation, classification, overriding, delegation, prescribe, resident, resident aliens, classes of persons, equal protection, civil service, immigration, personnel, immigration and naturalization, naturalization, promulgated, deprive, treaty

## LEXISNEXIS® HEADNOTES                                                                                      ⊟ **Hide**

Administrative Law > Agency Rulemaking > Formal Rulemaking
**HN1** ⬦ See 5 C.F.R. § 338.101 (1976). *Shepardize:* Restrict By Headnote

Governments > Legislation > Interpretation
**HN2** ⬦ The only persons other than citizens who owe permanent allegiance to the United States are noncitizen nationals. 8 U.S.C.S. §§ 1101 (a)(21), (22), 1408. More Like This Headnote | *Shepardize:* Restrict By Headnote

Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > Scope of Protection
**HN3** ⬦ See U.S. Const. amend. V.

Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > Scope of Protection
Constitutional Law > Substantive Due Process > Citizenship
**HN4** ⬦ See U.S. Const. amend. XIV, § 1. *Shepardize:* Restrict By Headnote

Immigration Law > Naturalization > Administrative Proceedings > General Overview
**HN5** ⬦ See U.S. Const. art. I, § 8, cl. 4. *Shepardize:* Restrict By Headnote

Governments > Federal Government > Employees & Officials
**HN6** ⬦ Overriding national interests may provide a justification for a citizenship requirement in the federal service even though an identical requirement may not be enforced by a State. More Like This Headnote | *Shepardize:* Restrict By Headnote

Immigration Law > Judicial Review > Scope of Review
**HN7** ⬦ The authority to control immigration is not only vested solely in the federal government, rather than the states; also the power over aliens is of a political character and therefore subject only to narrow judicial review. More Like This Headnote | *Shepardize:* Restrict By Headnote

Immigration Law > Duties & Rights of Aliens > Taxes
Labor & Employment Law > Discrimination > Federal Employees
Tax Law > International Taxes > Foreign Persons' Activities in the United States > Nonresident & Resident Aliens (IRC secs. 864, 871-880) > Resident Aliens
**HN8** ⬦ Resident aliens, like citizens, pay taxes, support the economy, serve in the Armed Forces, and contribute in myriad other ways to our society. It is appropriate that a State bear a heavy burden when it deprives them of employment opportunities. More Like This Headnote | *Shepardize:* Restrict By Headnote

Constitutional Law > The Presidency > Appointment of Officials
Governments > Federal Government > Executive Offices
Labor & Employment Law > Discrimination > Federal Employees
**HN9** ⬦ See 5 U.S.C.S. § 3301(1). *Shepardize:* Restrict By Headnote

Administrative Law > Agency Rulemaking > Formal Rulemaking
Labor & Employment Law > Discrimination > Federal Employees

*HN10* See 5 U.S.C.S. § 1302(a).

**LAWYERS' EDITION DISPLAY**                                         — Hide

**SUMMARY:**

Certain lawfully admitted resident aliens, who had been denied or discharged from employment with certain federal agencies because of their alienage, instituted a class action in the United States District Court for the Northern District of California against officials of the Civil Service Commission and the other government agencies involved, challenging the constitutionality of the Commission's regulation ( 5 CFR 338.101) generally barring resident aliens from employment in the federal competitive civil service. The District Court entered judgment for the defendants (333 F Supp 527), but the United States Court of Appeals for the Ninth Circuit reversed, holding that the Commission's regulation violated the due process clause of the Fifth Amendment (500 F2d 1031).

On certiorari, the United States Supreme Court affirmed. In an opinion by Stevens, J., expressing the view of five members of the court, it was held that the Commission's regulation was unconstitutional as depriving lawfully admitted resident aliens of liberty without due process of law under the Fifth Amendment, since (1) even assuming that if Congress or the President had expressly imposed the citizenship requirement, it would have been justified by the national interest in providing an incentive for naturalization or as providing the President with an expendable token for treaty negotiation purposes, nevertheless such matters were not properly the Commission's business and could not provide an acceptable rationalization for the Commission's regulation, (2) neither Congress nor any President had ever required the Commission to adopt the citizenship requirement, or had either approved or disapproved of the regulation, even though both the Legislative and the Executive had been aware of the Commission's policy since it was established in 1883, and (3) administrative convenience in having one simple rule excluding all noncitizens when it was manifest that citizenship was an appropriate requirement for some important and sensitive positions did not provide a rational basis for the Commission's regulation, there being no indication that the Commission actually had made any considered evaluation of the relative desirability of a simple exclusionary rule on the one hand, or the value to the service of enlarging the pool of eligible employees on the other, and rejection of the administrative convenience argument being required by a fair balancing of the public interest in avoiding the wholesale deprivation of employment opportunities caused by the Commission's policy, as opposed to what might be nothing more than a hypothetical justification.

Brennan, J., joined by Marshall, J., concurring, joined the court's opinion with the understanding that questions which would be raised by congressional or Presidential enactment of a bar on employment of aliens by the federal government were reserved.

Rehnquist, J., joined by Burger, Ch. J., White, J., and Blackmun, J., dissented, expressing the view that (1) aliens had no general "liberty" interest in acquiring federal employment, (2) the manner in which policies concerning aliens were made within the political branches of the government was not subject to judicial scrutiny, (3) under the traditional standards governing delegation of authority, the Commission was fully empowered to act in the manner in which it did, the court having no responsibility to interfere with the organization of the Executive Branch, and (4) the Commission's regulation did not infringe upon any constitutional right of the plaintiffs.

**LAWYERS' EDITION HEADNOTES:**

**[***LEdHN1]**

ERROR §852

certiorari -- necessary parties --

Headnote: LEdHN[1]⭐[1]

On certiorari to review a Federal Court of Appeals' judgment holding that a Civil Service Commission regulation barring resident aliens from employment in the federal competitive civil service was unconstitutional--the action having been instituted by certain resident aliens, who had been denied or discharged from federal employment because of their alienage, against officials of the Civil Service Commission and the agencies which had denied employment to the plaintiffs--participation in the proceedings by those agency officials who have no responsibility for the establishment of standards which applicable for federal employment must meet is not necessary; nor is the former Postmaster General, as head of one of the agencies that had denied employment, a necessary party, since (1) after the litigation was begun, a new Postal Service was established and its employees were removed from the Civil Service Commission's jurisdiction, and (2) the present Postal Service regulation made all noncitizens who had permanent resident alien status eligible for general employment, the case not being technically moot as regards the Postal Service, but the Service not having any interest in defending the challenged Civil Service regulation.

**[***LEdHN2]**

LAW §365

due process -- federal employees -- citizenship requirement --

Headnote: LEdHN[2A]⭐[2A] LEdHN[2B]⭐[2B] LEdHN[2C]⭐[2C] LEdHN[2D]⭐[2D]

The United States Civil Service Commission's regulation ( 5 CFR 338.101) generally barring resident aliens from employment in the federal competitive civil service is unconstitutional as depriving lawfully admitted resident aliens of liberty without due process of law under the Fifth Amendment, since (1) even assuming that if Congress or the President had expressly imposed the citizenship requirement, it would be justified by the national interest in providing an incentive for naturalization or as providing the President with an expendable token for treaty negotiating purposes, nevertheless such matters are not properly the Commission's business and cannot provide an acceptable rationalization for the Commission's regulation; (2) the question was one of personnel administration determined by the Commission, not a policy decision made by Congress or the President, neither the Congress nor any President having ever required the Commission to adopt the citizenship requirement, and neither the Legislative, through various appropriations acts, nor the Executive, through Executive Orders, having evidenced approval or disapproval of the Commission's regulation, even though both the Legislative and the Executive had been aware of, and had acquiesced in, the Commission's policy which had been established in 1883; and (3) the administrative convenience in having one single rule excluding all noncitizens when it is manifest that citizenship is an appropriate and legitimate requirement for some important and sensitive positions does not provide a rational basis for the Commission's regulation, because (a) there was no indication that the Commission actually made any considered evaluation of the relative desirability of a simple exclusionary rule on the one hand, or the value to the service of enlarging the pool of eligible employees on the other, (b) it cannot be reasonably inferred that the administrative burden of establishing the job classifications for which citizenship is an appropriate requirement would be

hypothetical justification, requires rejection of the argument of administrative convenience. Commission's indiscriminate policy, as opposed to what may be nothing more than a public interest in avoiding the wholesale deprivation of employment opportunities caused by the a particularly onerous task for an expert in personnel matters, and (c) any fair balancing of the

## [***LEdHN3]

**LAW §313**

-- due process -- equal protection --

**Headnote:** LEdHN[3]⚹[3]

The federal sovereign, like the states, must govern impartially, the concept of equal justice under law being served by the Fifth Amendment's guarantee of due process, as well as by the equal protection clause of the Fourteenth Amendment; although both amendments require the same type of analysis, the two protections are not always coextensive, since not only does the language of the two Amendments differ, but more importantly, there may be overriding national interests which justify selective federal legislation that would be unacceptable for an individual state.

## [***LEdHN4]

**LAW §314**

-- due process -- equal protection --

**Headnote:** LEdHN[4A]⚹[4A]LEdHN[4B]⚹[4B]

Since the due process clause appears in both the Fifth and the Fourteenth Amendments, whereas the equal protection clause does not, the primary office of the latter differs from, and is additive to, the protection guaranteed by the former.

## [***LEdHN5]

**LAW §365**

-- equal protection -- public employment -- citizenship requirement --

**Headnote:** LEdHN[5]⚹[5]

Overriding national interests may provide a justification for a citizenship requirement in the federal service even though, under equal protection principles, an identical requirement may not be enforced by a state.

## [***LEdHN6]

**ALIENS §1**

-- regulation -- power of federal government --

**Headnote:** LEdHN[6]⚹[6]

The federal government's power over aliens is not so plenary that any agent of the national government may arbitrarily subject all resident aliens to different substantive rules than those

http://www.lexis.com/research/retrieve?_m=da74d1cd5a1298bec52d4f2cdda82718&csvc=le&c...   10/10/2007

http://www.lexis.com/research/retrieve?_m=da74d1cd5a1298bec52d4f2cdda8271&csvc=le&c...   10/10/2007

applied to citizens.

[***LEdHN7]

ALIENS §24

COURTS §62

control of immigration -- federal and state authority -- judicial review --

Headnote:LEdHN[7A]⬧[7A]LEdHN[7B]⬧[7B]
The authority to control immigration is vested solely in the federal government, rather than the states; the power over aliens is of a political character and therefore is subject only to narrow judicial review.

[***LEdHN8]

ELECTIONS §4

right to vote -- aliens --

Headnote:LEdHN[8]⬧[8]
Aliens are not entitled to vote.

[***LEdHN9]

LAW §528.5

due process -- federal employees -- citizenship requirement --

Headnote:LEdHN[9]⬧[9]
The disadvantage to aliens resulting from enforcement of the Civil Service Commission's regulation ( 5 CFR 338.101) barring resident aliens from employment in the federal competitive civil service is of sufficient significance to be characterized as a deprivation of an interest in liberty, and by reason of the Fifth Amendment, such a deprivation must be accompanied by due process.

[***LEdHN10]

LAW §313

Fifth Amendment -- due process -- equal protection --

Headnote:LEdHN[10]⬧[10]
The due process clause of the Fifth Amendment authorizes traditional equal protection analysis of federal rules, and therefore the clause has a substantive as well as a procedural aspect.

[***LEdHN11]

LAW §313

due process -- equal protection -- federal regulations --

Headnote:*LEdHN[11]*[11]

When the federal government asserts an overriding national interest as justification for a discriminatory rule which would violate the equal protection clause of the Fourteenth Amendment if adopted by a state, Fifth Amendment due process requires that there be a legitimate basis for presuming that the rule was actually intended to serve that interest, and if the agency which promulgates that rule has direct responsibility for fostering or protecting such interest, it may reasonably be presumed that the asserted interest was the actual predicate for the rule; such presumption is fortified by an appropriate statement of reasons identifying the relevant interest, and alternatively, if the rule were expressly mandated by the Congress or the President, the United States Supreme Court might presume that any interest which might rationally be served by that rule did in fact give rise to its adoption.

## [***LEdHN12]

SERVICE §1

citizenship requirement --

Headnote:*LEdHN[12]*[12]

The need for undivided loyalty in certain sensitive positions justifies a citizenship requirement in at least some parts of the federal civil service.

## [***LEdHN13]

ALIENS §3

oath --

Headnote:*LEdHN[13A]*[13A]*LEdHN[13B]*[13B]

One need not be a citizen in order to take in good conscience an oath to support the Constitution.

## [***LEdHN14]

SERVICE §4

functions of Civil Service Commission --

Headnote:*LEdHN[14]*[14]

The Civil Service Commission performs a limited and specific function, its only concern being the promotion of an efficient federal service; the Commission's business is to adopt and enforce regulations which will best promote the efficiency of the federal civil service, and it has no responsibility for foreign affairs, treaty negotiations, immigration quotas or conditions of entry, or naturalization policies; it is not within the Commission's responsibility to be concerned with the economic consequences of permitting or prohibiting the participation by aliens in employment opportunities in different parts of the national market, and in general, it is fair to assume that the Commission's goal would be best served by removing unnecessary restrictions on the eligibility of qualified applicants for employment.

**[\*\*\*LEdHN15]**

LAW §56

SERVICE §4

duty of Civil Service Commission --

Headnote:<sup>LEdHN[15]</sup>±[15]

Like other administrative agencies, the Civil Service Commission has an obligation to perform its responsibilities with some degree of expertise, and to make known the reasons for its important decisions.

**[\*\*\*LEdHN16]**

LAW §365

Fifth Amendment -- federal employees -- citizenship requirement --

Headnote:<sup>LEdHN[16A]</sup>±[16A]<sup>LEdHN[16B]</sup>±[16B]

For purposes of the Fifth Amendment, a rather broad classification by the Civil Service Commission of positions in the federal competitive civil service for which citizenship is a requirement, reflecting the considered judgment of an agency expert in personnel matters, would be adequately supported on the basis of administrative convenience in having such a classification when it is manifest that citizenship is an appropriate and legitimate requirement for some important and sensitive positions.

**[\*\*\*LEdHN17]**

LAW §365

due process -- federal employees -- citizenship requirement --

Headnote:<sup>LEdHN[17]</sup>±[17]

Since alien residents are admitted as a result of decisions made by Congress and the President, implemented by the Immigration and Naturalization Service acting under the Attorney General of the United States, due process requires that a decision barring such aliens from employment in the competitive federal civil service must be made either at a comparable level of government or, if it is to be made by the Civil Service Commission, that it be justified by reasons which are properly the concern of that agency.

**SYLLABUS**

The Civil Service Commission (CSC) regulation barring noncitizens, including lawfully admitted resident aliens, from employment in the federal competitive civil service *held* unconstitutional as depriving such resident aliens of liberty without due process of law in violation of the Fifth Amendment. Pp. 99-117.

(a) While overriding national interests may justify a citizenship requirement in the federal service

even though an identical requirement may not be enforced by a State, the federal power over aliens is not so plenary that any agent of the Federal Government may arbitrarily subject all resident aliens to different substantive rules from those applied to citizens. When the Federal Government asserts an overriding national interest to justify a discriminatory rule that would violate the Equal Protection Clause of the Fourteenth Amendment if adopted by a State, due process requires that there be a legitimate basis for presuming that the rule was actually intended to serve that interest. Pp. 99-105.

(b) While the CSC's policy of conditioning eligibility for employment in the federal civil service on citizenship has been considered by Congress in certain Appropriation Acts imposing various limitations on the classes of employees who may receive compensation from the Federal Government and by various Presidents in Executive Orders relating to the CSC's authority to establish standards for federal employment, those Appropriation Acts and Executive Orders cannot fairly be construed to evidence either approval or disapproval of the CSC regulation in question. Pp. 105-114.

(c) Assuming without deciding that an explicit determination by Congress or the President to exclude all noncitizens from the federal service would be adequately supported by the national interests of (1) providing the President with an expendable token for treaty negotiation purposes, (2) offering aliens an incentive to become naturalized, and (3) having, for the sake of administrative convenience, one simple rule excluding all noncitizens from employment when citizenship is clearly an appropriate and legitimate requirement for some important and sensitive positions, such interests cannot provide an acceptable rationalization for such a determination by the CSC. The first two are not matters that properly concern the CSC. The third interest is likewise unacceptable, where it does not appear that the CSC fully evaluated the relative desirability of a simple exclusionary rule on the one hand or the value to the service of enlarging the pool of eligible employees on the other, and where it cannot be reasonably inferred that the administrative burden of establishing the job classifications for which citizenship is an appropriate requirement would be particularly onerous. More significantly, in view of the quality of the interest at stake, any fair balancing of the public interest in avoiding the wholesale deprivation of employment opportunities caused by the CSC's indiscriminate policy, as opposed to what may be nothing more than a hypothetical justification, requires rejection of administrative convenience as justification for the regulation. Pp. 114-116.

(d) Since alien residents are admitted as a result of decisions made by Congress and the President, implemented by the Immigration and Naturalization Service acting under the Attorney General, due process requires that the decision to deprive such residents of an important liberty be made either at a comparable level of government or, if it is to be permitted to be made by the CSC, that it be justified by reasons that are the proper concern of that agency. P. 116.

500 F. 2d 1031, affirmed.

STEVENS, J., delivered the opinion of the Court, in which BRENNAN, STEWART, MARSHALL, and POWELL, JJ., joined. BRENNAN, J., filed a concurring statement, in which MARSHALL, J., joined, *post,* p. 117. REHNQUIST, J., filed a dissenting opinion, in which BURGER, C.J., and WHITE and BLACKMUN, JJ., joined, *post,* p. 117.

**COUNSEL:** *Solicitor General Bork* reargued the cause for petitioners. With him on the briefs were *Assistant Attorney General Hills, Louis F. Claiborne, Gerald P. Norton,* and *Bruno A. Ristau.*

*Edward H. Steinman,* by appointment of the Court, 423 U.S. 921, reargued the cause for respondents. With him on the brief were *David C. Moon* and *Kenneth Hecht.* *

* Briefs of *amici curiae* urging affirmance were filed by *Robert Allen Sedler* and *Melvin L. Wulf* for the American Civil Liberties Union; by *Vilma S. Martinez* and *Sanford Jay Rosen* for the Mexican-

American Legal Defense and Educational Fund et al.; and by Sandigan et al.

**JUDGES:** Burger, Brennan, Stewart, White, Marshall, Blackmun, Powell, Rehnquist, Stevens

**OPINION BY:** STEVENS

**OPINION**

[*90] [***501] [**1899] MR. JUSTICE STEVENS delivered the opinion of the Court.

Five aliens, lawfully and permanently residing in the United States, brought this litigation to challenge the validity of a policy, adopted and enforced by the Civil Service Commission and certain other federal agencies, which excludes all persons except American citizens and natives of American Samoa from employment in most positions subject to their respective jurisdictions. [1] Because the policy, the law, and the identity of the parties have changed somewhat since the litigation commenced, [*91] we state the facts in detail before addressing the important question which we granted certiorari to resolve. 417 U.S. 944.

**FOOTNOTES**

[1] The Civil Service Commission's regulations, 5 CFR § 338.101 (1976), provide in pertinent part:

*HN1* "(a) A person may be admitted to competitive examination only if he is a citizen of or owes permanent allegiance to the United States.

"(b) A person may be given appointment only if he is a citizen of or owes permanent allegiance to the United States. However, a noncitizen may be given (1) a limited executive assignment under section 305.509 of this chapter in the absence of qualified citizens or (2) an appointment in rare cases under section 316.601 of this chapter, unless the appointment is prohibited by statute."

Apparently *HN2* the only persons other than citizens who owe *permanent* allegiance to the United States are noncitizen "nationals." See 8 U.S.C. §§ 1101 (a)(21), (22), 1408. The Solicitor General has advised us that the Commission construes the phrase as covering only natives of American Samoa. Brief for Petitioners 81 n. 67.

I

[***502] Each of the five plaintiffs was denied federal employment solely because of his or her alienage. They were all Chinese residents of San Francisco and each was qualified for an available job.

After performing satisfactory work for the Post Office Department for 10 days, respondent Kae Cheong Lui was terminated because his personnel record disclosed that he was not a citizen. [2] Respondents Mow Sun Wong and Siu Hung Mok also demonstrated their ability to perform on the job; they both participated in the California Supplemental Training and Education Program (STEP) and were assigned to federal agencies until the STEP program ended. [**1900] As a noncitizen, Mow Sun Wong, who had been an electrical engineer in China, was ineligible for employment as a janitor for the General Services Administration. Siu Hung Mok, who had 18 years' experience as a

# CASE # 2 CONTINUED

businessman in China, could not retain his job as a file clerk with the Federal Records Center of GSA.

## FOOTNOTES

2 The termination letter, dated October 19, 1970, read:

"Your personnel records indicate that you are not a citizen of the United States. Therefore, it is necessary to terminate your services effective close of business October 20/1970 in accordance with the Postal Manual Regulations 711.531."

Respondent Francene Lum was not permitted to take an examination for a position as evaluator of educational programs in the Department of Health, Education, and Welfare. Her background included 15 years of teaching experience, a master's degree in education, and periods of graduate study at four universities. Anna Yu, the fifth plaintiff, who is not a respondent because she did not join in the appeal from the adverse decision of the District **[*92]** Court, sought a position as a clerk-typist, but could not take the typing test because she was not a citizen.

Two of the plaintiffs, Mow Sun Wong and Siu Hung Mok, had filed declarations of intent to become citizens; the other three had not. They were all lawfully admitted, Francene Lum in 1946, Anna Yu in 1965, Siu Hung Mok and Kae Cheong Lui in 1968, and Mow Sun Wong in 1969.

On December 22, 1970, they commenced this class action in the Northern District of California. As defendants they named the Chairman and the Commissioners of the Civil Service Commission and the heads of the three agencies which had denied them employment. 3

The complaint alleged that there are about four million aliens living in the United States; they face special problems in seeking employment because our culture, language, and system of government are foreign to them; about 300,000 federal jobs become available each year, but noncitizens are not permitted to **[***503]** compete for those jobs except in rare situations when citizens are not available or when a few positions exempted from the competitive civil service are being filled. Plaintiffs further alleged that the advantage given to citizens seeking federal civil service positions is arbitrary and violates the **[*93]** Due Process Clause of the Fifth Amendment to the United States Constitution 4 and Executive Order No. 11,478, 3 CFR 803 (1966-1970 Comp.), which forbids discrimination in federal employment on the basis of "national origin." The complaint sought declaratory and injunctive relief.

## FOOTNOTES

3 The defendants named in the original complaint were Robert E. Hampton, Chairman, James E. Johnson, and L. J. Andolsek, Commissioners, Nicholas J. Oganovic, Executive Director, and Asa T. Briley, Regional Director, of the United States Civil Service Commission; Robert L. Kunzing, then Administrator, and Thomas Hannon, Regional Administrator, of the General Services Administration; Elliot Richardson, then Secretary, and Robert Coop, Regional Director, of the Department of Health, Education, and Welfare; and Winton Blount, then Postmaster General of the United States; Lim Poon Lee, Postmaster of the city and county of San Francisco; and Russel E. James, Regional Director of the United States Post Office Department.

4 The Fifth Amendment to the Constitution of the United States provides:

HN3 "No person shall be... deprived of life, liberty, or property, without due process of law...."

Defendants moved to dismiss the complaint and plaintiffs filed motions for summary judgment supported by affidavits setting forth the facts stated above. The District Court rejected a challenge to its jurisdiction, **5** but ruled in favor of defendants on the merits. 333 F. Supp. 527. The District Court held that the reference to "national origin" in the Executive Order prohibited discrimination among citizens rather than discrimination between citizens and noncitizens. The court also rejected an argument that the Civil Service Commission regulation was inconsistent **[\*\*1901]** with § 502 of the Public Works for Water, Pollution Control, and Power Development and Atomic Energy Commission Appropriation Act, 1970, which permitted payment to classes of persons who are made ineligible by the Civil Service regulation. **6** On that point the court said: S

"The Commission has acted permissibly in relation **[\*94]** to the Appropriations Act in not opening up the civil service to all those whom Congress has indicated it would be willing to pay for their work." 333 F. Supp., at 531.I

## FOOTNOTES

**5** Judge Peckham held that jurisdiction was conferred by 28 U.S.C.§ 1331. He found no merit in the argument that there had been no waiver of sovereign immunity; he was also satisfied that the action is one which "arises under" the Constitution and laws of the United States and that each plaintiff's claim satisfied the jurisdictional amount.

**6** Section 502 of the Act provides in pertinent part as follows:

"[N]o part of any appropriation contained in this or any other Act shall be used to pay the compensation of any officer or employee of the Government of the United States (including any agency the majority of the stock of which is owned by the Government of the United States) whose post of duty is in continental United States unless such person (1) is a citizen of the United States, (2) is a person in the service of the United States on the date of enactment of this Act, who, being eligible for citizenship, had filed a declaration of intention to become a citizen of the United States prior to such date, (3) is a person who owes allegiance to the United States...." 83 Stat. 336.

Finally, the District Court held that the Commission's discrimination against aliens was constitutional. The court noted that the federal power over aliens is "quite broad, almost plenary," and therefore the classification needed only a rational basis. *Ibid.* It identified two grounds upon which the President **7** **[\*\*\*504]** could properly rely: First, that the formation of policy and its execution, at whatever level, should only be entrusted to United States citizens, or, alternatively, that "the Executive may intend that the economic security of its citizens be served by the reservation of competitive civil service positions to them, rather than to aliens." *Id.,* at 532.

## FOOTNOTES

**7** In using the term "Executive," it is clear that Judge Peckham intended to identify the President, rather than any of the defendant agency heads:

"It is quite rational and reasonable for the Executive, via a grant of power from the Legislature, to determine that the formation of policy and its execution, at whatever level, should be entrusted only to United States citizens. Moreover, as an alternative rational basis for the regulation herein, the Executive may intend that the economic security of its citizens be served by the reservation of competitive civil service positions to them, rather than to aliens." 333 F. Supp. at 532.

Four of the plaintiffs appealed. During the period of **[\*95]** over two years that the appeal was pending in the Ninth Circuit, we decided two cases that recognize the importance of protecting the employment opportunities of aliens. [8] In *Sugarman* v. *Dougall,* 413 U.S. 634, we held that a section of the New York Civil Service Law which provided that only United States citizens could hold permanent positions in the competitive class of the State's civil service violated the Equal Protection Clause of the Fourteenth Amendment; that Clause also provided the basis for our holding in *In re Griffiths,* 413 U.S. 717, decided on the same day, that Connecticut's exclusion of aliens from the practice of law was unconstitutional.

**FOOTNOTES**

[8] *Sugarman* v. *Dougall,* 413 U.S. 634, and d">*In re Griffiths,* 413 U.S. 717, were both decided on June 25, 1973. *Graham* v. *Richardson,* 403 U.S. 365, was decided on June 14, 1971, only a few weeks before the District Court decision.

In this case, the Court of Appeals recognized that neither *Sugarman* nor *Griffiths* was controlling because the Fourteenth Amendment's restrictions on state power are not directly applicable to the Federal Government [9] and because Congress and the President have broad power over immigration and naturalization which the States do not possess. [10] Nevertheless, those decisions **[\*\*1902]** provided the Court of Appeals with persuasive reasons for rejecting the bases asserted by the defendants in the District Court as justifications for the Civil Service Commission's policy of discriminating against noncitizens. For we specifically held that the State's legitimate interest **[\*96]** in the undivided loyalty of the civil servant who participates directly in the formulation and execution of government policy, was inadequate to support a state restriction indiscriminately disqualifying the "sanitation man, class B," the typist, and the office worker, 413 U.S., at 641-643; moreover, we expressly considered, and rejected, New York's contention that its special interest in the advancement and profit of its own citizens could justify confinement of the State's civil service to citizens of the United States, *id.,* at 643-645.

**FOOTNOTES**

[9] The Fourteenth Amendment § 1, provides:

*HN4* "[N]or shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

[10] Article I, § 8, cl. 4, of the Constitution of the United States provides:

*HN5* "The Congress shall have Power... [t]o establish an uniform Rule of Naturalization...."

The Court of Appeals reversed; it agreed with the District Court's analysis of the nonconstitutional issues, but held the regulation violative of the Due Process Clause of the Fifth Amendment. Although refusing to accept respondents' contention that the protection against federal **[\*\*\*505]** discrimination provided by the Fifth Amendment is coextensive with that applicable to the States under the Equal Protection Clause of the Fourteenth Amendment, the court concluded that the Commission regulation which "sweeps indiscriminately excluding *all* aliens from *all* positions requiring the competitive Civil Service examination" could not be supported by justifications which related to only a small fraction of the positions covered by the rule. 500 F. 2d 1031, 1037. Thus, the court accepted the argument that citizenship might properly be required in positions involving policymaking decisions, or in positions involving national security interests, but the court was unwilling to support an extraordinarily broad exclusion on such narrow shoulders.

**[\*\*\*LEdHR1]** *LEdHN[1]* [1]Only the Chairman and the Commissioners of the Civil Service Commission petitioned for certiorari. Several of the nonpetitioning defendants have no responsibility for the establishment of standards which applicants for federal employment must meet; accordingly, their participation is not necessary. The former Postmaster **[\*97]** General is not now a necessary party for a different reason.

In 1971, after the litigation was commenced, Congress established a new Postal Service and removed its officers and employees from the jurisdiction of the Civil Service Commission. [11] For the first three years of its existence the new Postal Service retained substantially the same citizenship requirement for employees as did the Civil Service Commission. [12] However, in 1974, without any additional statutory authority or direction, the Postal Service amended its regulation to make all noncitizens who have been accorded permanent resident alien status in the United States eligible for all positions except those at a high executive level or those expressly designated **[\*\*1903]** as **[\*98]** "sensitive." [13] Thus, although the **[\*\*\*506]** case is not technically moot as regards the Postal Service, [14] that Service does not now have any interest in defending the challenged Civil Service regulation.

## FOOTNOTES

[11] Pub. L. 91-375, 84 Stat. 719. The technical amendment to Title 5 removed the officers and employees of the Postal Service and Postal Rate Commission from the definitions of officers and employees who are subject to civil service.

[12] During this period the Postal Service Personnel Handbook provided:

"317.3 Citizenship Requirements

".31 Applicability

".311 Except as provided in 317.312 below, only persons who are citizens of, or owe allegiance to the United States shall be given appointments in the Postal Service. Natives of American Samoa are the only noncitizens who, as a group, owe permanent allegiance to the United States.

".312 Regional Postmasters General may approve individual appointments of noncitizen nationals under unusual circumstances such as when qualified citizens are not available. These appointments will be subject to the individual prior approval of the Regional Postmaster General.

".32 Responsibility for Determining Citizenship

"The appointing officer is responsible for determining that all persons selected for appointment meet the citizenship requirement." Transmittal Letter 2, 8-18-72.

[13] The Postal Bulletin issued on May 2, 1974 substituted the following "citizenship requirements" for those quoted in n. 12, *supra:* "317.3 Citizenship Requirements

".31 Noncitizens of the United States who have been accorded permanent resident alien status in the United States are eligible for appointment to all Postal Service positions other than positions in levels PES-20 and above, and positions designated by the Postal Service as sensitive. Natives of American Samoa are eligible for appointment to all Postal Service positions. Appointments of noncitizens to positions in levels PES-20 and above or to positions designated as sensitive can only be made with the prior approval of the appropriate Regional Postmaster General or an Assistant Postmaster General, in headquarters.

".32 The appointing officer may make his determination as to whether the appointee is a citizen of the United States on the basis of the eligible's sworn or affirmed statement, on Form 61, *Appointment Affidavit,* at the time of appointment. A noncitizen's permanent resident alien status shall be determined by reference to the appointee's Alien Registration Receipt Card (Form I-151), which the permanent resident alien is furnished by the Immigration and Naturalization Service.

".33 The appointing officer is responsible for determining that all persons selected for appointment meet the requirements of sections 317.31 and 317.32.

"Regional and local postal officials should take appropriate measures to insure that announcements and forms conform to the new policy, and that prospective applicants for postal employment are given correct information concerning the policy."

14 Cf. *United States* v. *W. T. Grant Co.,* 345 U.S. 629. The Postal Service, in modifying its citizenship regulations (n. 13, *supra*), specifically indicated that it was doing so "[a]s a result of recent Federal litigation." Postal Bull., May 2, 1974, p. 2.

**[\*\*\*LEdHR2A]** LEdHN[2A]✦[2A]We granted certiorari to decide the following question presented by the petition: S

"Whether a regulation of the United States Civil **[\*99]** Service Commission that bars resident aliens from employment in the federal competitive civil service is constitutional."I

We now address that question.

II

Petitioners have chosen to argue on the merits a somewhat different question. In their brief, the petitioners rephrased the question presented as "[w]hether the Civil Service Commission's regulation... is within the constitutional powers of Congress and the President and hence not a constitutionally forbidden discrimination against aliens." 15

**FOOTNOTES**

15 Brief for Petitioners 2.

This phrasing of the question assumes that the Commission regulation is one that was mandated by the Congress, the President, or both. On this assumption, the petitioners advance alternative arguments to justify the discrimination as an exercise of the plenary federal power over immigration and naturalization. First, the petitioners argue that the equal protection aspect of the Due Process Clause of the Fifth Amendment is wholly inapplicable to the exercise of federal power over aliens, and therefore no justification for the rule is necessary. 16 Alternatively, the petitioners argue that the Fifth Amendment imposes only a slight burden of justification on the Federal Government, and that such a burden is easily met by several factors not considered by the District Court or the Court of Appeals. Before addressing these arguments, we first discuss certain limitations **[\*100]** which the Due Process Clause places on the power of the Federal Government to classify persons subject to its jurisdiction.

**FOOTNOTES**

16 The petitioners state:

"Our primary submission is that the decision to limit employment of noncitizens in the federal competitive civil service is likewise a matter beyond the reach of the equal protection principle." *Id.,* at 24-25.

**[\*\*\*LEdHR3]** *LEdHN[3]*⚓[3] **[\*\*\*LEdHR4A]** *LEdHN[4A]*⚓[4A]The federal sovereign, like the States, must govern impartially. The concept of equal justice under law is served by the Fifth Amendment's guarantee of due process, and **[\*\*\*507]** well as by the Equal Protection **[\*\*1904]** Clause of the Fourteenth Amendment. Although both Amendments require the same type of analysis, see *Buckley* v. *Valeo,* 424 U.S. 1, 93, the Court of Appeals correctly stated that the two protections are not always coextensive. Not only does the language of the two Amendments differ, [17] but more importantly, there may be overriding national interests which justify selective federal legislation that would be unacceptable for an individual State. On the other hand, when a federal rule is applicable to only a limited territory, such as the District of Columbia, or an insular possession, and when there is no special national interest involved, the Due Process Clause has been construed as having the same significance as the Equal Protection Clause. [18]

**[\*\*\*LEdHR4B]** *LEdHN[4B]*⚓[4B]

**FOOTNOTES**

[17] Since the Due Process Clause appears in both the Fifth and Fourteenth Amendments, whereas the Equal Protection Clause does not, it is quite clear that the primary office of the latter differs from, and is additive to, the protection guaranteed by the former.

[18] *Bolling* v. *Sharpe,* 347 U.S. 497; *Yu Cong Eng* v. *Trinidad,* 271 U.S. 500.

**[\*\*\*LEdHR5]** *LEdHN[5]*⚓[5]In this case we deal with a federal rule having nationwide impact. The petitioners correctly point out that the paramount federal power over immigration and naturalization forecloses a simple extension of the holding in *Sugarman* as decisive of this case. [19] We agree **[\*101]** with the petitioners' position that *HN6*⚓overriding national interests may provide a justification for a citizenship requirement in the federal service even though an identical requirement may not be enforced by a State. [20]

**FOOTNOTES**

[19] In that case we did not reach the question whether New York's citizenship restriction was in conflict with Congress' comprehensive regulation of immigration and naturalization, see 413 U.S., at 646, where we cited *Graham* v. *Richardson,* 403 U.S., at 376-380, and we were careful to avoid intimating any view on the question raised in the case now before us. We stated:

"We are aware that citizenship requirements are imposed in certain aspects of the federal service. See 5 U.S.C. § 3301; Exec. Order No. 10577, 19 Fed. Reg. 7521, § 2.1 (1954); 5 CFR §§ 338.101, 302.203 (g) (1973); and, for example, Treasury, Postal Service, and General Government Appropriation Act, 1972, § 602, Pub. L. 92-49, 85 Stat. 122, and Public Works Appropriations Act, 1971, § 502, Pub. L. 91-439, 84 Stat. 902. In deciding the present case, we intimate no view as to whether these federal citizenship requirements are or are not susceptible of constitutional challenge. See *Jalil* v. *Hampton,* 148 U.S. App. D.C. 415, 460 F. 2d 923, cert.

denied, 409 U.S. 887 (1972); Comment, Aliens and the Civil Service: A Closed Door?, 61 Geo. L.J. 207 (1972)." 413 U.S., at 646 n. 12.

20 It should, of course, be noted that in *Sugarman* we merely held that the flat ban on the employment of aliens in positions that had little if any relation to a State's legitimate interests could not withstand scrutiny under the Equal Protection Clause, and we were careful to point out that the holding did not preclude individualized determinations that particular persons could be refused employment on the basis of noncitizenship, or that citizenship could be required as a qualification for appropriately defined classes of positions. See *id.,* at 646-647.

**[\*\*\*LEdHR6]** *LEdHN[6]*[6] **[\*\*\*LEdHR7A]** *LEdHN[7A]*[7A]We do not agree, however, with the petitioners' primary submission that the federal power over aliens is so plenary that any agent of the National Government may arbitrarily subject all resident aliens to different substantive rules from those applied to citizens. We recognize **[\*\*\*508]** that the petitioners' argument draws support from both the federal and the political character of the power over immigration and naturalization. 21 **[\*102]** Nevertheless, countervailing considerations **[\*\*1905]** require rejection of the extreme position advanced by the petitioners.

**[\*\*\*LEdHR7B]** *LEdHN[7B]*[7B]

**FOOTNOTES**

21 It is important to note that *HN7*the authority to control immigration is not only vested solely in the Federal Government, rather than the States, see *Truax* v. *Raich,* 239 U.S. 33, 42, but also that the power over aliens is of a political character and therefore subject only to narrow judicial review. See *Fong Yue Ting* v. *United States,* 149 U.S. 698, 713, where Mr. Justice Gray, writing for the Court, stated:

"The power to exclude or to expel aliens, being a power affecting international relations, is vested in the political departments of the government, and is to be regulated by treaty or by act of Congress, and to be executed by the executive authority according to the regulations so established, except so far as the judicial department has been authorized by treaty or by statute, or is required by the paramount law of the Constitution, to intervene."

**[\*\*\*LEdHR8]** *LEdHN[8]*[8] **[\*\*\*LEdHR9]** *LEdHN[9]*[9]The rule enforced by the Commission has its impact on an identifiable class of persons who, entirely apart from the rule itself, are already subject to disadvantages not shared by the remainder of the community. 22 Aliens are not entitled to vote and, as alleged in the complaint, are often handicapped by a lack of familiarity with our language and customs. The added disadvantage resulting from the enforcement of the rule - ineligibility for employment in a major sector of the economy - is of sufficient significance to be characterized as a deprivation of an interest in liberty. 23 Indeed, we deal with a **[\*103]** rule which deprives a discrete class of persons of an interest in liberty on a wholesale basis. By reason of the Fifth Amendment, such a deprivation must be accompanied by due process. It follows that some judicial scrutiny of the deprivation is mandated by the Constitution.

**FOOTNOTES**

22 Some of these disadvantages stem directly from the Constitution itself, see *Sugarman* v. *Dougall,* 413 U.S., at 651-653 (REHNQUIST, J., dissenting). The legitimacy of the delineation of the affected class buttresses the conclusion that it is "a 'discrete and insular' minority," see *In*

*re Griffiths,* 413 U.S., at 721 and, of course, is consistent with the premise that the class is one whose members suffer special disabilities.

23 See *Board of Regents* v. *Roth,* 408 U.S. 564, 573-574, and cases cited. See also the statement for the Court by Mr. Justice Hughes in *Truax* v. *Raich, supra,* a case dealing with the employment opportunities of aliens:

"It requires no argument to show that the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the Amendment to secure.... If this could be refused solely upon the ground of race or nationality, the prohibition of the denial to any person of the equal protection of the laws would be a barren form of words." 239 U.S., at 41.

**[\*\*\*LEdHR10]** *LEdHN[10]* [10]Respondents argue that this scrutiny requires invalidation of the Commission rule under traditional equal protection analysis. It is true that our cases establish that the Due Process Clause of the Fifth Amendment authorizes that type of analysis of federal rules and therefore that the Clause has a substantive as well as a procedural aspect. However, it is not necessary to resolve respondents' substantive claim, if a narrower inquiry discloses that essential procedures have not been followed.

**[\*\*\*LEdHR11]** *LEdHN[11]* [11]When the Federal Government asserts an overriding national **[\*\*\*509]** interest as justification for a discriminatory rule which would violate the Equal Protection Clause if adopted by a State, due process requires that there be a legitimate basis for presuming that the rule was actually intended to serve that interest. If the agency which promulgates the rule has direct responsibility for fostering or protecting that interest, it may reasonably be presumed that the asserted interest was the actual predicate for the rule. That presumption would, of course, be fortified by an appropriate statement of reasons identifying the relevant interest. Alternatively, if the rule were expressly mandated by the Congress or the President, we might presume that any interest which might rationally be served by the rule did in fact give rise to its adoption.

**[\*\*\*LEdHR12]** *LEdHN[12]* [12]In this case the petitioners have identified several **[\*104]** interests which the Congress or the President might deem sufficient to justify the exclusion of noncitizens from the federal service. They argue, for example, that the broad exclusion may facilitate the President's negotiation of treaties with foreign powers by enabling him to offer employment opportunities to citizens of a given foreign country in exchange for reciprocal concessions - an offer he could not make if those aliens were already eligible for federal jobs. Alternatively, the petitioners argue that reserving the federal service for citizens provides an appropriate incentive to aliens to qualify for naturalization **[\*\*1906]** and thereby to participate more effectively in our society. They also point out that the citizenship requirement has been imposed in the United States with substantial consistency for over 100 years and accords with international law and the practice of most foreign countries. Finally, they correctly state that the need for undivided loyalty in certain sensitive positions clearly justifies a citizenship requirement in at least some parts of the federal service, and that the broad exclusion serves the valid administrative purpose of avoiding the trouble and expense of classifying those positions which properly belong in executive or sensitive categories. 24

**FOOTNOTES**

24 We note, however, that the petitioners do not rely on the District Court's reasoning that the regulation might be justified as serving the economic security of United States citizens. Our discussion of the "special public interest" doctrine in *Sugarman* v. *Dougall, supra.,* at 643-645, no doubt explains the petitioners' failure to press this argument in this case. We have no

occasion, therefore, to decide when, if ever, that doctrine might justify federal legislation.

**[\*\*\*LEdHR2B]** *LEdHN[2B]*➧[2B]The difficulty with all of these arguments except the last is that they do not identify any interest which can reasonably be assumed to have influenced the Civil Service Commission, the Postal Service, the General Services Administration, or the Department of Health, **[\*105]** Education, and Welfare in the administration of their respective responsibilities or, specifically, in the decision to deny employment to the respondents in this litigation. We may assume with the petitioners that if the Congress or the President had expressly imposed the citizenship requirement, it would be justified by the national interest in providing an incentive for aliens to become naturalized, or possibly even as providing the President with an expendable token for treaty negotiating purposes; but we are not willing to presume that the Chairman of the Civil Service Commission, **[\*\*\*510]** or any of the other original defendants, was deliberately fostering an interest so far removed from his normal responsibilities. Consequently, before evaluating the sufficiency of the asserted justification for the rule, it is important to know whether we are reviewing a policy decision made by Congress and the President or a question of personnel administration determined by the Civil Service Commission.

III

It is perfectly clear that neither the Congress nor the President has ever *required* the Civil Service Commission to adopt the citizenship requirement as a condition of eligibility for employment in the federal civil service. On the other hand, in view of the fact that the policy has been in effect since the Commission was created in 1883, it is fair to infer that both the Legislature and the Executive have been aware of the policy and have acquiesced in it. In order to decide whether such acquiescence should give the Commission rule the same support as an express statutory or Presidential command, it is appropriate to review the extent to which the policy has been given consideration by Congress or the President, and the nature of the authority specifically delegated to the Commission.

**[\*106]** The Commission was originally established pursuant to the Pendleton Civil Service Act of 1883. [25] That Act was a major piece of reform legislation designed to eliminate the abuses associated with the patronage system from much of the federal service. [26] Before that legislation was passed, the Senate considered and rejected a bill that would have expressly limited civil service appointment to citizens. [27] It is fair to **[\*\*1907]** summarize the relevant references to the citizenship requirement, however, as indicating that several Senators assumed that such a requirement would be imposed by the Commission, [28] and that the matter was in an area better handled by regulation than by statute. [29]

**FOOTNOTES**

[25] 22 Stat. 403.

[26] See *Arnett* v. *Kennedy, 416 U.S. 134*, 149; H. Kaplan, The Law of Civil Service 1-11 (1958).

[27] A companion bill introduced by Senator Dawes (S. 939) would have expressly provided that "appointments are open to competition to any citizen of the United States, male or female.... [V]acancies shall be filled by competitive examination open to all citizens, in conformity with the provisions of this act...." Appendix to S. Rep. No. 576, 47th Cong., 1st Sess., 4 (1882). The Senate Committee also eliminated, apparently as unnecessary, a preamble that referred to the desirability of allowing "so far as practicable all citizens" equal employment opportunities. See S. Rep. No. 576, *supra*, at XII; see also 14 Cong. Rec. 661 (1882).

[28] See, *e.g.,* the remarks of Senator Hawley:

"Of course it will not do to admit to examination everybody that applies for it. There will be requirements - anybody can think of a few in a moment - the applicant must be a citizen of the United States, he must be in fair physical health, he must be within reasonable limits as to age, he certainly must be able to read and write." *Id.,* at 243.

29 It is noteworthy, however, that other grounds for exclusion from the federal service that would normally be governed by regulation were expressly identified in the statute itself. See § 8 prohibiting the employment of persons habitually using intoxicating beverages to excess, and § 9 prohibiting the employment of members of a family already adequately represented in public service. 22 Stat. 406.

**[*107]** In its historical context, the assumption that only citizens would be employed in the federal service is **[***511]** easily understood. The new system of merit appointment, based on competitive examination, was replacing a patronage system in which appointment had often been treated as a method of rewarding support at the polls; since such rewards were presumably reserved for voters (or members of their families) who would necessarily be citizens, citizenship must have characterized most, if not all, federal employees at that time. The assumption that such a requirement would survive the enactment of the new statute is by no means equivalent to a considered judgment that it should do so.

Moreover, it must be acknowledged that in 1883 there was no doubt a greater inclination than we can now accept to regard "foreigners" as a somewhat less desirable class of persons than American citizens. A provincial attitude toward aliens may partially explain the assumption that they would not be employed in the federal service by the new Civil Service Commission. But since that attitude has been implicitly repudiated by our cases requiring that aliens be treated with the dignity and respect accorded to other persons, 30 and since that attitude did not affect the form of the legislation itself, we disregard it in our evaluation of Congress' participation in the decision to impose the citizenship requirement.

## FOOTNOTES

30 Our recent opinion in *In re Griffiths* noted that from "its inception, our Nation welcomed and drew strength from the immigration of aliens." 413 U.S., at 719. After referring to their self-evident contributions to the social and economic life of the country, and after reviewing the objectionable character of any classification based on alienage, we stated: *HN8* "Resident aliens, like citizens, pay taxes, support the economy, serve in the Armed Forces, and contribute in myriad other ways to our society. It is appropriate that a State bear a heavy burden when it deprives them of employment opportunities." *Id.,* at 722.

When the Commission was created, it immediately **[*108]** adopted the citizenship requirement, and that fact was duly reported to Congress. 31 Congress has not thereafter repudiated, or even considered the desirability of repudiating, the Commission's policy. It has, however, in a number of its Appropriation Acts imposed various limitations on the classes of employees who may receive compensation from the Federal Government. These limitations give rise to conflicting inferences which may be illustrated by reference to five such Acts.

## FOOTNOTES

31 See the Instructions to Applicants Who Wish to Enter the United States Civil Service as reprinted on p. 83 of the Second Report of the U.S. Civil Service Commission (1885).

In 1938 Congressman Starnes offered an amendment to the pending appropriation bill [32] to provide that none of the authorized [**1908] funds could be used to pay the compensation of any federal employee not a citizen of the United States. [33] The stated purpose of the amendment was to give preference to American citizens during a period of widespread unemployment. The amendment was accepted by the House without opposition. In the Senate, however, the restriction was modified to allow employment of any person owing allegiance to the United States, or who was then employed in the service of the United States, or who was needed because citizens with requisite experience and qualifications [***512] were not available. [34] In 1939 a similar provision was broadened further to allow compensation for aliens eligible for citizenship who had filed a declaration of intention to become citizens and also for certain Coast Guard veterans who were ineligible for United States citizenship. [35] In 1942 aliens who were [*109] citizens of the Commonwealth of the Philippines were exempted from the prohibition, [36] in 1943 the exemption was extended to "nationals of those countries allied with the United States in the prosecution of the war," [37] and then in 1953 the exemption was also made applicable to permanently admitted aliens from the Baltic countries. [38]

## FOOTNOTES

[32] Independent Offices Appropriation Bill (H.R. 8837, 75th Cong., 3d Sess.).

[33] 83 Cong. Rec. 357.

[34] *Id.,* at 2424.

[35] See House Manager's Report on the Conference on Amendment of the Senate to H.R. 8947, H.R. Conf. Rep. No. 1981, 75th Cong., 3d Sess. (1938). The provision appeared in several Appropriations Acts. See 52 Stat. 148, 289, 435, 1162.

[36] 56 Stat. 422.

[37] 57 Stat. 196.

[38] 67 Stat. 435.

In the District Court respondents argued that the exemptions from the limitations included in the Appropriations Acts had become so broad by 1969 as to constitute a congressional determination of policy repudiating the narrow citizenship requirement in the Commission rule. Though not controlling, there is force to this argument. On the other hand, the fact that Congress repeatedly identified citizenship as one appropriate classification of persons eligible for compensation for federal service implies a continuing interest in giving preference, for reasons unrelated to the efficiency of the federal service, to citizens over aliens. In our judgment, however, that fact is less significant than the fact that Congress has consistently authorized payment to a much broader class of potential employees than the narrow category of citizens and natives of American Samoa eligible under the Commission rule. Congress has regularly provided for compensation of any federal employee owing allegiance to the United States. Since it is settled that aliens may take an appropriate oath of allegiance, [39] the statutory category, though not precisely defined, is plainly more flexible and expansive than the Commission rule. Nevertheless, for present purposes we need merely conclude [*110] that the Appropriations Acts cannot fairly be construed to evidence either congressional approval or disapproval of the specific Commission rule challenged in this case.

## FOOTNOTES

39 See In re Griffiths, 413 U.S., at 726 n. 18.

Our review of the relevant Executive Orders leads us to a similar conclusion with respect to the President's responsibility for the rule. The first Civil Service rules promulgated by President Arthur required every applicant for an examination to disclose his citizenship, as well as other information such as his name and address. 40 These rules did not expressly prescribe United States citizenship as a condition for eligibility. It may well be true, however, that the President, like the members of the Senate referred to above, assumed that the Commission would impose such a requirement. Moreover, we must assume that he also became aware of the requirement after the Commission adopted it. [***513] Nevertheless, there [**1909] is a marked difference between acceptance by the President of a Commission rule to which no objection has been made and a decision made by the President himself.

### FOOTNOTES

40 Rule XI, Civil Service Rules, promulgated Nov. 7, 1883. First Report of the U.S. Civil Service Commission 47 (1884).

[***LEdHR13A] LEdHN[13A] [13A]Over the years the Commission revised its rules a number of times. Although it was Commission practice to require citizenship between 1883 and 1895, apparently the first time the requirement was expressly stated in a rule was in 1896. 41 In 1903 President Theodore Roosevelt amended the rule to permit persons who "owe allegiance to the United States" to qualify. 42 The amendment did not define that class of persons. The Commission [*111] has explained that it was intended to apply to persons in Puerto Rico and the Philippines who then had the status of noncitizen nationals. The language of the amendment, however, would seem broad enough to cover any person willing to take an appropriate oath of allegiance. 43

[***LEdHR13B] LEdHN[13B] [13B]

### FOOTNOTES

41 Rule V of the Civil Service Rules of May 6, 1896, expressly provided: "Every applicant for examination must be a citizen of the United States…." See Thirteenth Report of the U.S. Civil Service Commission 57 (1897).

42 See Twentieth Report of the U.S. Civil Service Commission 48 (1904).

43 It is, of course, clear that one need not be a citizen in order to take in good conscience an oath to support the Constitution. See In re Griffiths, supra., at 726 n. 18.

In 1906 President Roosevelt again amended the rule by adding an authorization to the Commission, in its discretion, to permit noncitizens to take examinations when "there is a lack of eligibles who are American citizens." 44 The amendment, however, provided that noncitizens should not be certified if eligible citizens were available. Although this amendment had the effect of increasing the employment opportunities of aliens, it unquestionably indicates that President Roosevelt then approved of a policy of giving preference to citizens.

### FOOTNOTES

44 Exec. Order No. 458 (June 13, 1906). Prior to that amendment, Executive Orders had been

# CASE # 2 CONTINUED

issued waiving the citizenship requirement in specific cases because of a lack of qualified citizens. See, *e.g.,* Exec. Order No. 434 (Mar. 28, 1906).

The Executive Order which authorized the promulgation of the specific rule involved in this case was issued by President Eisenhower in 1954. In relevant part it provides: S

"The [Civil Service] Commission is authorized to establish standards with respect to citizenship, age, education, training and experience, suitability, and physical and mental fitness, and for residence or other requirements which applicants must meet to be admitted to or rated in examinations." Exec. Order No. 10,577, § 2.1 (a), 3 CFR 218, 219 (1954-1958 Comp.).I

[*112] This direction "to establish standards with respect to citizenship" is not necessarily a command to require citizenship as a general condition of eligibility for federal employment. Rather it is equally, if not more reasonably, susceptible of interpretation as a command to classify positions for which citizenship should be required. Even though such an interpretation might permit the Commission to decide that citizenship should be required for all federal positions, it would remain true that the decision to impose the requirement was made by the Commission [***514] rather than the President. That this is in fact the case is demonstrated by the elimination of the citizenship requirement for employment in the Postal Service which took place after this litigation commenced. Pursuant to a broad grant of authority comparable, in its generality and in its absence of any reference to a citizenship requirement, to that applicable to the Civil Service Commission, 45 the Postal [**1910] Service originally [*113] imposed such a requirement and then withdrew it. Neither the establishment nor the withdrawal of the requirement was either mandated or questioned by Congress or the President.

**FOOTNOTES**

45 The relevant portions of 39 U.S.C. § 1001 read as follows:

" § 1001. Appointment and status.

"(a) Except as otherwise provided in this title, the Postal Service shall appoint all officers and employees of the Postal Service.

"(b) Officers and employees of the Postal Service (other than those individuals appointed under sections 202, 204, and 1001 (c) of this title) shall be in the postal career service, which shall be a part of the civil service. Such appointments and promotions shall be in accordance with the procedures established by the Postal Service. The Postal Service shall establish procedures, in accordance with this title, to assure its officers and employees meaningful opportunities for promotion and career development and to assure its officers and employees full protection of their employment rights by guaranteeing them an opportunity for a fair hearing on adverse actions, with representatives of their own choosing.

. . . . .

"(e) The Postal Service shall have the right, consistent with section 1003 and chapter 12 of this title and applicable laws, regulations, and collective-bargaining agreements -

"(1) to direct officers and employees of the Postal Service in the performance of official duties;

"(2) to hire, promote, transfer, assign, and retain officers and employees in positions within the Postal Service, and to suspend, demote, discharge, or take other disciplinary action against such officers and employees;

"(3) to relieve officers and employees from duties because of lack of work or for other legitimate reasons;

"(4) to maintain the efficiency of the operations entrusted to it;

"(5) to determine the methods, means, and personnel by which such operations are to be conducted;

"(6) to prescribe a uniform dress to be worn by letter carriers and other designated employees; and

"(7) to take whatever actions may be necessary to carry out its mission in emergency situations."

We have no doubt that the statutory directive which merely requires such regulations "as will best promote the efficiency of [the] Service," 5 U.S.C. § 3301 (1), as well as the pertinent Executive Order, gives the Civil Service Commission the same discretion that the Postal Service has actually exercised; the Commission may either retain or modify the citizenship requirement without further authorization from Congress or the President. [46] We are therefore persuaded that our inquiry is whether the national interests which the Government identifies as justifications for the Commission rule are **[*114]** interests on which that agency may properly rely in making a decision implicating the constitutional and social values at stake in this litigation.

**FOOTNOTES**

[46] Even if this conclusion were doubtful, in view of the consequences of the rule it would be appropriate to require a much more explicit directive from either Congress or the President before accepting the conclusion that the political branches of Government would consciously adopt a policy raising the constitutional questions presented by this rule. Cf. *Peters* v. *Hobby*, 349 U.S. 331, 345; *Ex parte Endo*, 323 U.S. 283, 299-300.

**[***LEdHR2C]** *LEdHN[2C]*[2C]We think the petitioners accurately stated the question presented in their certiorari petition. The question is whether the regulation of the United States Civil Service Commission **[***515]** is valid. We proceed to a consideration of that question, assuming, without deciding, that the Congress and the President have the constitutional power to impose the requirement that the Commission has adopted.

IV

**[***LEdHR14]** *LEdHN[14]*[14]It is the business of the Civil Service Commission to adopt and enforce regulations which will best promote the efficiency of the federal civil service. That agency has no responsibility for foreign affairs, for treaty negotiations, for establishing immigration quotas or conditions of entry, or for naturalization policies. Indeed, it is not even within the responsibility of the Commission to be concerned with the economic consequences of permitting or prohibiting the participation by aliens in employment opportunities in different parts of the national market. On the contrary, the Commission performs a limited and specific function.

The only concern of the Civil Service Commission is the promotion of an efficient federal service. [47] In general **[*115]** it is fair to **[**1911]** assume that its goal would be best served by removing unnecessary restrictions on the eligibility of qualified applicants for employment. With only one exception, the interests which the petitioners have put forth as supporting the Commission regulation at issue in this case are not matters which are properly the business of the Commission.

That one exception is the administrative desirability of having one simple rule excluding all noncitizens when it is manifest that citizenship is an appropriate and legitimate requirement for some important and sensitive positions. Arguably, therefore, administrative convenience may provide a rational basis for the general rule.

**FOOTNOTES**

47 The Commission, of course, acts under the direction of the President.

Title 5 U.S.C. § 3301(1) provides:

*HN9*⚓"The President may -

"(1) prescribe such regulations for the admission of individuals into the civil service in the executive branch as will best promote the efficiency of that service;

Title 5 U.S.C. § 1302(a) provides:

*HN10*⚓"(a) The Civil Service Commission, subject to the rules prescribed by the President under this title for the administration of the competitive service, shall prescribe regulations for, control, supervise, and preserve the records of, examinations for the competitive service."

**[***LEdHR2D]** *LEdHN[2D]*⚓[2D] **[***LEdHR15]** *LEdHN[15]*⚓[15] **[***LEdHR16A]** *LEdHN[16A]*⚓[16A]For several reasons that justification is unacceptable in this case. The Civil Service Commission, like other administrative agencies, has an obligation to perform its responsibilities with some degree of expertise, and to make known the reasons for its important decisions. There is nothing in the record before us, or in matter of which we may properly take judicial notice, to indicate that the Commission actually made any considered evaluation of the relative desirability of a simple exclusionary rule on the one hand, or the value to the service of enlarging the pool of eligible employees on the other. Nor can we reasonably infer that the administrative burden of establishing the job classifications for which citizenship is an appropriate requirement would be a particularly onerous task for an expert in personnel matters; indeed, the Postal Service apparently encountered no particular difficulty in making **[***516]** such a classification. Of greater significance, however, is the quality of the interest at stake. Any fair balancing of the public interest in avoiding the wholesale deprivation of employment opportunities caused by the Commission's indiscriminate **[*116]** policy, as opposed to what may be nothing more than a hypothetical justification, requires rejection of the argument of administrative convenience in this case. 48

**[***LEdHR16B]** *LEdHN[16B]*⚓[16B]

**FOOTNOTES**

48 We find no merit in the petitioners' argument that a more discriminating rule would inevitably breed litigation which in turn would enhance the administrative burden. For even though the argument of administrative convenience may not support a total exclusion, it would adequately support a rather broad classification of positions reflecting the considered judgment of an agency expert in personnel matters. For the classification itself would demonstrate that the Commission had at least considered the extent to which the imposition of the rule is consistent with its assigned mission.

**[***LEdHR17]** *LEdHN[17]*⚓[17]In sum, assuming without deciding that the national interests

identified by the petitioners would adequately support an explicit determination by Congress or the President to exclude all noncitizens from the federal service, we conclude that those interests cannot provide an acceptable rationalization for such a determination by the Civil Service Commission. The impact of the rule on the millions of lawfully admitted resident aliens is precisely the same as the aggregate impact of comparable state rules which were invalidated by our decision in *Sugarman.* By broadly denying this class substantial opportunities for employment, the Civil Service Commission rule deprives its members of an aspect of liberty. Since these residents were admitted as a result of decisions made by the Congress and the President, implemented by the Immigration and Naturalization Service acting under the Attorney General of the United States, [49] due process requires that the decision to impose that deprivation of an important liberty be made either at a comparable level of government or, if it is to be permitted to be made by the Civil Service Commission, that it be justified by reasons which are properly the concern of that agency. We hold that § 338.101(a) of the **[\*\*1912]** Civil Service Commission Regulations has deprived these respondents **[\*117]** of liberty without due process of law and is therefore invalid.

## FOOTNOTES

[49] See 8 U.S.C. § 1103.

The judgment of the Court of Appeals is

*Affirmed.*

## CONCUR BY: BRENNAN

### CONCUR

MR. JUSTICE BRENNAN, with whom MR. JUSTICE MARSHALL joins, concurring.

I join the Court's opinion with the understanding that there are reserved the equal protection questions that would be raised by congressional or Presidential enactment of a bar on employment of aliens by the Federal Government.

## DISSENT BY: REHNQUIST

### DISSENT

MR. JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE, MR. JUSTICE WHITE, and MR. JUSTICE BLACKMUN join, dissenting.

The Court's opinion enunciates a novel conception of the procedural due process guaranteed by the Fifth Amendment, and from this concept proceeds to evolve a doctrine of delegation of legislative authority which **[\*\*\*517]** seems to me to be quite contrary to the doctrine established by a long and not hitherto questioned line of our decisions. Neither of the Court's innovations is completely without appeal in this particular case, but even if we were to treat the matter as an original question I think such appeal is outweighed by the potential mischief which the doctrine bids fair to make in other areas of the law.

I

At the outset it is important to recognize that the power of the federal courts is severely limited in

the areas of immigration and regulation of aliens. As we reiterated recently in _Kleindienst_ v. _Mandel,_ 408 U.S. 753, 766 (1972): S

"'The power of Congress to exclude aliens **[\*118]** altogether from the United States, or to prescribe the terms and conditions upon which they may come to this country, and to have its declared policy in that regard enforced exclusively through executive officers, without judicial intervention, is settled by our previous adjudications.'" Quoting from _Lem Moon Sing_ v. _United States,_ 158 U.S. 538, 547 (1895).I

It is also clear that the exclusive power of Congress to prescribe the terms and conditions of entry includes the power to regulate aliens in various ways once they are here. E.g., _Hines_ v. _Davidowitz,_ 312 U.S. 52, 69-70 (1941). Indeed the Court, by holding that the regulation in question would presumptively have been valid if "expressly mandated by the Congress," _ante,_ at 103, concedes the congressional power to exclude aliens from employment in the civil service altogether if it so desires or to limit their participation.

This broad congressional power is in some respects subject to procedural limitations imposed by the Due Process Clause of the Fifth Amendment. If an alien subject to deportation proceedings claims to be a citizen, he is entitled to a judicial determination of that claim. _Ng Fung Ho_ v. _White,_ 259 U.S. 276 (1922). If he lawfully obtains tenured Government employment, and is thereby protected against discharge except for cause, he is entitled to a hearing before being discharged. _Arnett_ v. _Kennedy,_ 416 U.S. 134 (1974); _Perry_ v. _Sindermann,_ 408 U.S. 593 (1972)."/> But neither an alien nor a citizen has any protected liberty interests in obtaining federal employment. _Cafeteria Workers_ v. _McElroy,_ 367 U.S. 886, 896-899 (1961). Nor in the absence of some form of statutory tenure is a Government employee entitled to a hearing prior to discharge, for "government employment, in the absence of legislation, can be revoked at the will of the appointing officer." **[\*119]** _Id., at_ 896. See also d">_Vitarelli_ v. _Seaton,_ 359 U.S. 535 (1959).

**[\*\*1913]** The Court, however, seems to overlook this limitation on judicial power in justifying judicial intervention by holding:"The rule enforced by the Commission has its impact on an identifiable class of persons who, entirely apart from the rule itself, are already subject to disadvantages not shared by the remainder **[\*\*\*518]** of the community." _Ante,_ at 102.I

This is a classic equal protection analysis such as formed the basis of the Court's holding in _Sugarman_ v. _Dougall,_ 413 U.S. 634, 641 (1973), that States could not bar aliens from the _state_ civil service. _Sugarman_ specifically did not decide whether similar restrictions by the Federal Government would violate equal protection principles (as applied to the Federal Government by the Due Process Clause of the Fifth Amendment, _Bolling_ v. _Sharpe,_ 347 U.S. 497 (1954)).

However, while positing an equal protection problem, the Court does not rely on an equal protection analysis, conceding that "overriding national interests may provide a justification for a citizenship requirement in the _federal_ service even though an identical requirement may not be enforced by a State." _Ante,_ at 101. Thus the Court seems to agree that the Equal Protection Clause does not provide a basis for invalidating this denial of federal civil service employment. The Court instead inexplicably melds together the concepts of equal protection and procedural and substantive due process to produce the following holding: S

"The added disadvantage resulting from the enforcement of the rule - ineligibility for employment in a major sector of the economy - is of sufficient significance to be characterized as a deprivation of **[\*120]** an interest in liberty. Indeed, we deal with a rule which deprives a discrete class of persons of an interest in liberty on a wholesale basis. By reason of the Fifth Amendment, such a deprivation must be accompanied by due process." _Ante,_ at 102-103 (footnote omitted).I

The meaning of this statement in the Court's opinion is not immediately apparent. As already noted, there is no general "liberty" interest in either acquiring federal employment or, in the absence of a statutory tenure, in retaining it, so that the person who is denied employment or who

is discharged may insist upon a due process hearing. *Truax* v. *Raich,* 239 U.S. 33, 41 (1915), is cited by the Court to support the proposition that there is a "liberty" interest at stake here. But to the extent the holding of that case remains unmodified by *Cafeteria Workers, supra,* it deals with a *substantive* liberty interest which may not be arbitrarily denied by legislative enactment; that interest is closely akin to the interest of the aliens asserted in *Sugarman, supra,* and In re *Griffiths,* 413 U.S. 717 (1973). Since the Court declines to pass upon the claim asserted by respondents based upon those cases, it is difficult to see how *Truax* is relevant to its analysis.

There is a liberty interest in obtaining public employment which is protected against procedural deprivation in certain circumstances, as the Court's citation to *Board of Regents* v. *Roth,* 408 U.S. 564, 573-574 (1972), *ante,* at 102 n. 23, indicates. But the cases cited in that passage from *Roth,* cases such as *Schware* v. *Board of Bar Examiners,* 353 U.S. 232 (1957), and *Willner* v. *Committee on Character,* **[\*\*\*519]** 373 U.S. 96 (1963), are distinguishable from the present case in at least two respects. In the first place they were both efforts by States, not to deny *public* employment, but to go further **[\*121]** and proscribe the right to practice one's chosen profession in the *private* sector of the economy. Even more importantly, the vice found in each of those cases was the failure of the State to grant a "full prior hearing," 408 U.S., at 574.

**[\*\*1914]** But in the case presently before the Court, there is simply no issue which would require a hearing in order to establish any matter of disputed fact. All of the respondents freely concede that they are aliens. Their claim is not that they were entitled to a hearing in order to establish the fact that they were citizens, or to establish some other relevant fact; indeed they request no hearing for any purpose. Petitioners assert that due to respondents' alienage they are barred from federal employment, and respondents simply contend that they may not be.

Yet the Court does not decide this issue, but proceeds instead to hold that procedural due process includes not only a shield against arbitrary action but a scalpel with which one may dissect the administrative organization of the Federal Government."When the Federal Government asserts an overriding national interest as justification for a discriminatory rule which would violate the Equal Protection Clause if adopted by a State, due process requires that there be a legitimate basis for presuming that the rule was actually intended to serve that interest." *Ante,* at 103.I

But the "overriding national interest" asserted by the petitioners is not a specific interest in excluding these particular aliens from the civil service, but a general interest in formulating policies toward aliens. See *Harisiades* v. *Shaughnessy,* 342 U.S. 580 (1952). As such it is not necessary for the petitioners to demonstrate why they chose to exclude aliens from the civil service. **[\*122]** To require them to do so is to subject the Government to the same type of equal protection analysis to which the States are subject under *Sugarman* v. *Dougall, supra,* a result which the Court specifically abjures. *Ante,* at 100-101. What the Court seems to do is to engraft notions of due process onto the case law from this Court dealing with the delegation by Congress of its legislative authority to administrative agencies.

In two cases decided in the October Term 1934 the Court held that Congress "is not permitted to abdicate or to transfer to others the essential legislative functions with which it is ... vested" by Art. I, § 1, of the Constitution. *Schechter Corp.* v. *United States,* 295 U.S. 495, 529 (1935). *Panama Rfg. Co.* v. *Ryan,* 293 U.S. 388 (1935). Nothing in either of those opinions, the only cases in which delegations to administrative agencies have been struck down, suggested any reliance upon the Due Process Clause of the Fifth Amendment, and it seems a fair statement to say that the Court has not seen fit during the 40 years following these decisions to enlarge **[\*\*\*520]** in the slightest their relatively narrow holdings.

Not only is such reliance unjustified by prior decisions of this Court as to the scope of the due process guarantee, but it flies in the face of those cases which hold that the manner in which policies concerning aliens are made within the political branches of the government is not subject to judicial scrutiny. *Kleindienst* v. *Mandel,* 408 U.S. 753 (1972); *Galvan* v. *Press,* 347 U.S. 522, 531 (1954). [1]

## FOOTNOTES

1 In *Galvan* the Court held that congressional policies "pertaining to the entry of aliens and their right to remain here are peculiarly concerned with the political conduct of government." 347 U.S., at 531. As such, the only judicial review of those policies is to insure that the Government has respected the demands of procedural due process not whether the policies themselves are constitutionally valid.

### [*123] II

The sole ground by which such procedures may properly be challenged is to argue that there was an improper delegation of authority, which has not previously been thought to depend upon the procedural requirements of the Due Process Clause.

The Court, while not shaping its argument in these terms seems to hold that the **[**1915]** delegation here was faulty. Yet, it seems to me too clear to admit of argument that under the traditional standards governing the delegation of authority the Civil Service Commission was fully empowered to act in the manner in which it did in this case.

Congress, in the Civil Service Act, 5 U.S.C. § 3301, delegated to the President the power to S

"(1) prescribe such regulations for the admission of individuals into the civil service in the executive branch as will best promote the efficiency of that service; [and]

"(2) ascertain the fitness of applicants as to age, health, character, knowledge, and ability for the employment sought...." 2I

## FOOTNOTES

2 Also, 5 U.S.C. § 1302 directly authorized the Civil Service Commission, subject to rules prescribed by the President, to "prescribe regulations for... examinations for the competitive service."

The President, acting under this grant of authority as well as the "authority vested in [him] by the Constitution," promulgated Executive Order No. 10,577, 3 CFR 218 (1954-1958 Comp.), in which he authorized the Civil Service Commission S

"to establish standards with respect to citizenship, age, education... and for residence or other requirements which applicants must meet to be admitted to or rated in examinations." *Id.,* § 2.1 (a), p. 219.I

**[*124]** Acting pursuant to this authority the Civil Service Commission then promulgated the regulations in question which exclude aliens from examination for or appointment to (except under certain special circumstances) the civil service.

Both Congress and the President thus took a power which they possessed and, instead of exercising it directly, chose to delegate it. This is the process by which all federal regulations are promulgated and to forbid it would be to necessarily dismantle the entire structure of the Executive Branch. But the majority does not challenge the procedure as **[***521]** to all cases. Rather, the challenge seems to be leveled only at policies which "rais[e]... constitutional questions." *Ante,* at 113 n. 46. In those cases it becomes necessary for the agency, which was concededly acting

within the scope of its delegated power, to provide reasons which will justify its actions in the eyes of the courts.

But, as previously discussed, such a holding overlooks the basic principle that a decision to exclude aliens from the civil service is a political decision reserved to Congress, the wisdom of which may not be challenged in the courts. Once it is determined that the agency in question was properly delegated the power by Congress to make decisions regarding citizenship of prospective civil servants, then the reasons for which that power was exercised are as foreclosed from judicial scrutiny as if Congress had made the decision itself. The fact that Congress has delegated a power does not provide a back door through which to attack a policy which would otherwise have been immune from attack. [3]

**FOOTNOTES**

[3] In *Ludecke* v. *Watkins,* 335 U.S. 160 (1948), the Court approved a delegation of authority from Congress through the President to the Attorney General to deport any "alien enemies" whom the Attorney General deemed to be "dangerous to the public peace and safety of the United States." Presidential Proclamation No. 2655, 59 Stat. 870 (1945). The Court held that the "Attorney General was the President's voice and conscience. A war power of the President not subject to judicial review is not transmuted into a judicially reviewable action because the President chooses to have that power exercised within narrower limits than Congress authorized." 335 U.S., at 165-166.

[*125] For this Court to hold, *ante,* at 114, that the agency chosen by Congress, through the President, to effectuate its policies, has "no responsibility" in that area is to interfere in an area in which the Court itself clearly has "no responsibility": the organization of the Executive Branch. Congress, through the President, obviously *gave* responsibility in this area to the Civil Service Commission. [**1916] The wisdom of that delegation is not for us to evaluate. Finally I note that, though there is no requirement that it do so, it would appear that, contrary to the Court's assertion, Congress has in fact spoken directly to this issue. In § 502 of the Public Works for Water, Pollution Control, and Power Development and Atomic Energy Commission Appropriation Act, 1970, 83 Stat. 336 (discussed by the Court, *ante,* at 93-94), Congress provided that no compensation will be paid to any employee of the Government who is not (1) a citizen, (2) "a person in the service of the United States on the date of enactment of this Act, who, being eligible for citizenship, had filed a declaration of intention to become a citizen" or (3) a person who "owes allegiance to the United States."

Since respondents are not citizens the question arises as to which of the other categories they fit into. The effective date of the Act was December 11, 1969. Yet according to the record, none of the respondents was employed until August 1970 and one, Lum, was never employed by the Government.

[*126] At the time of their discharge none of the respondents had declared their loyalty to the United States. While it is not clear what it means to "owe allegiance," it must mean something, and there has been no assertion by respondents that they qualified. Indeed, in June [***522] 1971, after the litigation was begun, Mow Sun Wong and Sin Hung Mok filed affidavits with the District Court asserting: "I owe allegiance to the United States." This would seem to imply that, at the time of their discharge, they did not qualify under the statute.

III

Since I do not believe that the Court is correct in concluding that the regulation promulgated by the Civil Service Commission is invalid because of any lack of authority in the Commission to promulgate the rule, I must address the question of whether "the national interests" identified by

the petitioners would adequately support a "determination... to exclude all noncitizens from the federal service." *Ante,* at 116. This question was saved in both *Sugarman* v. *Dougall,* 413 U.S. 634 (1973), and in *In re Griffiths,* 413 U.S. 717 (1973), and I agree with the Court that "the paramount federal power over immigration and naturalization forecloses a simple extension of the holding in Sugarman as decisive of this case." *Ante,* at 100. S

"For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government." *Mathews* v. *Diaz, ante,* at 81.

"[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. **[\*127]** Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Harisiades* v. *Shaughnessy,* 342 U.S., at 588-589, quoted in *Mathews* v. *Diaz, ante,* at 81 n. 17.I

See also *Kleindienst* v. *Mandel,* 408 U.S., at 765-767; *Fong Yue Ting* v. *United States,* 149 U.S. 698, 711-713 (1893).

I conclude therefore that Congress, in the exercise of its political judgment, could have excluded aliens from the civil service. The fact that it chose, in a separate political decision, to allow the Civil Service Commission to make this determination does not render the governmental policy any less "political" and, consequently, does not render it any more subject to judicial scrutiny under the reasoning of *Diaz, ante,* p. 67. The **[\*\*1917]** regulations here, enforced without question for nearly a century, do not infringe upon any constitutional right of these respondents. I would therefore reverse the judgment of the Court of Appeals.

## REFERENCES

3 Am Jur 2d, Aliens and Citizens 6- 10, 38; 15 Am Jur 2d, Civil Service 20, 21

11 Am Jur Pl & Pr Forms (Rev ed), Federal Practice and Procedure, Forms 1881 et seq.

21 Am Jur Trials 625, Preparation and Trial of Federal Class Actions

5 Fed Proc Forms, Class Actions 11.1 et seq.

USCS, Constitution, 5th Amendment

US L Ed Digest, Constitutional Law 365, 524

ALR Digests, Constitutional Law 307, 441.5

L Ed Index to Annos, Aliens; Civil Service; Due Process of Law; Equal Protection of the Laws

ALR Quick Index, Aliens; Civil Service; Due Process of Law; Equal Protection of Law

Federal Quick Index, Aliens; Civil Service; Equal Protection of the Laws

Annotation References:

Constitutionality of enactment or regulation forbidding or restricting employment of aliens in public employment or on public works. 38 ALR3d 1213.

Service: **Get by LEXSEE®**

Citation: **426 U.S. 88**
View: Full
Date/Time: Wednesday, October 10, 2007 - 1:54 PM EDT

* Signal Legend:

- Warning: Negative treatment is indicated

[Q] - Questioned: Validity questioned by citing refs

- Caution: Possible negative treatment

◆ - Positive treatment is indicated

Ⓐ - Citing Refs. With Analysis Available

ⓘ - Citation information available

* Click on any *Shepard's* signal to *Shepardize®* that case.

*My Lexis*™ | Search | Research Tasks | Get a Document | *Shepard's®* | Alerts | Total Litigator
History | Delivery Manager | Dossier | Switch Client | Preferences | Sign Off | Help

 LexisNexis®

About LexisNexis | Terms & Conditions | Contact Us
Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All rights
reserved.

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

DIANNE DULONG                                    )
     Plaintiff,                    )
              )
vs.                                              ) C.A. No. 1:04-cv-12552-   NG
              )
JOHN E. POTTER, POSTMASTER GENERAL  )
       Defendant.                   )

## AFFIDAVIT OF JOSEPH R. GALLITANO

I, Joseph R. Gallitano, hereby depose and state that the following is true and accurate to the best of my belief as follows:

1.  I am an Attorney in good standing and represent the Plaintiff in the above-captioned matter.

2.  Exhibit A attached hereto is a true and accurate copy of the Amended Verified Complaint dated July 15, 2005.

3.  Exhibit B attached hereto is a true and accurate copy of page excerpts from the Deposition of Lorraine Sawyer, in this action.

4.  Exhibit C attached hereto is a true and accurate copy of the Affidavit of Lorraine Sawyer.

5.  Exhibit D attached hereto is a true and accurate copy of page excerpts from the Deposition of Joseph Ferreira, in this action.

6.  Exhibit E attached hereto is a true and accurate copy of page excerpts from the Deposition of Dianne DuLong, the Plaintiff in this action.

7.    Exhibit F attached hereto is a true and accurate copy of the Affidavit of James H. Chapman, Jr.

8.    Exhibit G attached hereto is a true and accurate copy of page excerpts from the Deposition of James H. Chapman, Jr., in this action.

9.    Exhibit H attached hereto is a true and accurate copy of Exhibit 3 from the Deposition of James H. Chapman, Jr.

10.    Exhibit I attached hereto is a true and accurate copy of Exhibit 6 from the Deposition of James H. Chapman, Jr.

11.    Exhibit J attached hereto is a true and accurate copy of Exhibit 4 from the Deposition of James H. Chapman, Jr.

12.    Exhibit K attached hereto is a true and accurate copy of the Affidavit of Richard Pine.

13.    Exhibit L attached hereto is a true and accurate copy of page excerpts from the Deposition of Aaron Tobey, Jr.

14.    Exhibit M attached hereto is a true and accurate copy of the Affidavit of Dianne DuLong.

15.    Case # 1 – <u>Candy Bell v. John E. Potter</u>, 234 F. Supp. 2d 91; 2002 U.S. Dist. LEXIS 24161.

16.    Case # 2 – <u>Hampton, Chairman, U.S. Civil Service Commission, et al v. Mow Sun Wong, et al</u>, 426 U.S. 8; 96 S.Ct. 1895; 48 L.Ed.2d 495; 1976 U.S. LEXIS 153.

Signed and sworn to under the pains and penalties of perjury this 11th day of October, 2007.

Joseph R. Gallitano